

COPY

Brian J. Recor (California Bar No. 229091)
Andrea N. Winternitz (California Bar No. 275221)
**BRYAN CAVE LLP**
120 Broadway, Suite 300
Santa Monica, CA 90401
Telephone: (310) 576-2100
Facsimile: (310) 576-2200
Email: brian.recor@bryancave.com
      andrea.winternitz@bryancave.com

Attorneys for Defendants
OneWest Bank, FSB (erroneously named as "OneWest Bank"
and "IndyMac Mortgage Services"); OneWest Bank Group LLC;
and IMB HoldCo LLC (erroneously named as "IMB HoldCo")

FILED
CLERK, U.S. DISTRICT COURT

**FEB 2 1 2014**

CENTRAL DISTRICT OF CALIFORNIA
BY_____ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA



LILIAN YESENIA PADRON, an individual; RICHARD WEST, an individual; NANCY ARMSTRONG-WEST, an individual; LADISLAO KALMAR, an individual; IZASKUN GALARRAGA, an individual; JORGE ESPINOZA, an individual; ALBINA ESPINOZA, an individual; ; LUIS PEREZ, an individual; ROGELIO HERNANDEZ, an individual; TERESA HERNANDEZ, an individual; AUDREY VINITSKY, an individual; EDWARD VINITSKY, an individual; ; LONNIE WALL, an individual; ; MARGARET LANAM, an individual; STEVEN ANDERSON, an individual; LORRIE ANDERSON, an individual; JILL RIDGWAY-BALL, an individual; ROBERT WHITMORE, an individual; FIONA WHITMORE, an individual; JOHN HICKS, an individual; KATHERINE WARD, an individual; DWAYNE BREWER, an individual; CLEADITH BREWER, an individual; DAVID CERDA PAZ, an individual; ROSA CERDA, an individual; DANIEL RUSSELL, an individual, MASATOSHI TAUCHI, an individual;,, MANUEL MARTINEZ, an individual; LILIA MARTINEZ, an individual, DANIEL GAMBLER, an individual; ALICE GAMBLER, an individual; JENNIFER CAROLAN, an individual; JOSE VELASCO, an individual; BEATRICE VELASCO, an individual; MELBA

Case No. **CV14-01340-ODW(Ex)**

[Los Angeles County Superior Court Case No. BC527752]

**NOTICE OF REMOVAL OF ACTION TO FEDERAL COURT PURSUANT TO 28 U.S.C. SECTIONS 1331, 1332(d), 1441(a), 1446, and 1453 (FEDERAL QUESTION AND CAFA DIVERSITY JURISDICTION)**

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

SM01DOCS\1017669.1

NOTICE OF REMOVAL

SAUNDERS, an individual; PAUL SAUNDERS, an individual; MARIA ALCANTAR, an individual; MIGUEL VEGA, an individual; CYNTHIA VEGA, an individual; RAGHDA ZAYER, an individual; MIKE MANOUGIAN, an individual; SIDNEY P. JACOBS, an individual; LYNN B. JACOBS, an individual; DONNA CASTY, an individual; WILLIAM BARTEL, an individual; WINIFRED BARTEL, an individual; GARY MILLEMAN, an individual; ROSALINDA MILLEMAN, an individual; ELGITHA BALDONADO, an individual; ZABI SUBAT, an individual; ROSENDA CHAPMAN, an individual; GENARO LARIOS, an individual; SILVIA MEDINA RIVERA, an individual; ALEJANDRO MANZO, an individual; MARIA MANZO, an individual; WILLIAM LOWE, an individual; ANGEL ANDRADE, an individual; FELIPA ANDRADE, an individual; LEONIDA PAPA, an individual; VINCENT ADAMO, an individual; NAZARIO MADRIGAL, an individual; MILLICENT DICKINSON, an individual; TERRY SANNITA, an individual; RAYE SANNITA, an individual; TARYN COSS, an individual; SCOTT SEELIG, an individual; ROCIO SEELIG, an individual; SCOTT JAKOVICH, an individual; VICTORIA JAKOVICH, an individual; EUNICE AKPAN, an individual; JOHN V1GLIOTTI, an individual; DEANNA VIGLIOTTI, an individual; HAYDEE LOPEZ, an individual; JESUS LOPEZ, an individual; ROLANDA WHITE, an individual; LUIS LOPEZ, an individual; OSCAR SANDOVAL, an individual; SONIA SANDOVAL, an individual; HUGO CARCAMO, an individual; CLAUDIA CARCAMO, an individual; ELVIRA BALUYOT, an individual; NOEL BALUOT, an individual; EDWARD VARENAS, an individual; NELINIA VARENAS, an individual; GLORIA CHARLES, an individual; FRANCISCO ROMO, an individual; FELIPE MURO, an individual; PAOLA MURO, an individual; DENNIS MICHAEL CHILCOAT, an individual; CAROL ANN CHILCOAT, an individual; PEARL BOWEN, an individual; MANUEL CALVILLO, an individual;

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

SM01DOCS\1017669.1

HERACLIO GONZALEZ, an individual; MARICELA GONZALEZ, an individual; CARLETTA MCCRAY, an individual; TOMMIE MCCRAY, an individual; ALAN BERGUM, an individual; ROCIO BERGUM, an individual; IVORY RODRIGUEZ, an individual; FRANCISCA RODRIGUEZ, an individual; DIANA THAN, an individual; ENRIQUETA POLANCO, an individual; MARTIN LOZANO, an individual; CHARLES NAVARRO, an individual; DEBRA NAVARRO, an individual; NHU THUAN THI NGUYEN, an individual; JOSEFINA MARTINEZ, an individual; GILBERTO MURILLO, an individual; JANNET TORRES, an individual; IVAN SALAZAR, an individual; PORFIRIO CAMACHO, an individual; DONIDA GARZARO, an individual; NELSON MIGUEL, an individual; MALIETA MIGUEL, an individual; TEODORO ABUYO, an individual; NATIVIDAD ABUYO, an individual; JUANA TLATENCHI, an individual; FELIPE TLATENCHI, an individual; Q.C KELKER, an individual; FACUNDO ROSAS, an individual; CHRISTINA RESINA, an individual.

Plaintiffs,

vs.

ONEWEST BANK, a Delaware corporation; ONEWEST BANK GROUP LLC, a Delaware Limited Liability Company; INDYMAC BANK, a Delaware corporation; INDYMAC MORTGAGE SERVICES, a Delaware corporation; INDYMAC BANCORP, INC., a Delaware corporation; IMB HOLDCO, a Delaware Limited Liability Company; NDEX WEST, LLC a Delaware corporation; MERIDIAN FORECLOSURE SERVICE f/k/a MTDS, INC., a California corporation DBA MERIDIAN TRUST DEED SERVICE; FEDERAL DEPOSIT INSURANCE CORPORATION, a Delaware corporation; LANDAMERICA,INC., a Delaware corporation; and Does I through 1000 , inclusive,

Defendants.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

SM01DOCS\1017669.1

NOTICE OF REMOVAL

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

TO THE CLERK OF THE ABOVE-ENTITLED COURT AND TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that Defendants OneWest Bank, FSB (erroneously named as "OneWest Bank" and "IndyMac Mortgage Services"); OneWest Bank Group LLC; and IMB HoldCo LLC (erroneously named as "IMB HoldCo") (collectively, "Defendants") remove the mass action styled *Padron, et al. v. OneWest Bank, et al.* (Los Angeles Co. Super. Ct. Case No. BC527752) (the "*Padron* Action") from the Superior Court of the State of California for the County of Los Angeles to the United States District Court for the Central District of California on the basis of Federal Question Jurisdiction, 28 U.S.C. § 1331, and alternatively pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA"), and pursuant to 28 U.S.C. §§ 1441, 1446 and 1453.

The state court docket indicates that other defendants were served, and Defendants have attempted to contact them regarding removal. Defendants NDEX West, LLC ("NDEX") and Meridian Foreclosure Service ("Meridian") have consented to removal. However, consent of other defendants is not required for removal under CAFA. *See* 28 U.S.C. § 1453(b).

## I.   BACKGROUND OF THE STATE COURT MASS ACTION

1. On November 18, 2013, 121 separately named Plaintiffs filed the Complaint in the *Padron* Action in the Superior Court of California for the County of Los Angeles.

2. On January 23, 2014, Defendants were personally served with the Summons and Complaint.

3. The Complaint attempts to state 24 claims against Defendants based on alleged fraudulent concealment; intentional misrepresentation; negligent misrepresentation; negligence; violations of California Business & Professions Code § 17200 (the "UCL"); violations of 15 U.S.C. § 1639e; violations of 12 CFR § 323.5; violations of 15 U.S.C. § 1; violations of California Code of Civil Procedure

§§ 580B and 726; rescission of contract; breach of contract; violations of California Civil Code §§ 1788 and 2994G; and wrongful foreclosure.

4. All 121 Plaintiffs in the *Padron* Action allege that they "demand a jury trial" (Compl. 1:1) and seek compensatory damages for, *inter alia*, "loss of equity in their houses" (Compl. ¶¶ 125, 132, 145, 185; Prayer ¶ 1).

5. For the Plaintiffs that specifically allege the amount of damages they suffered as a result of lost equity in their homes, the alleged damages total at least $13,409,752 (*see* Appendix A ("App. A") ¶¶ 1-4, 8, 10-13, 15-16, 18-21, 23-30, 32-34, 38, 40, 41, 44, 46-53, 55-60, 62-63, 65-67, 70-71, 76, 78).

## II. FEDERAL QUESTION JURISDICTION PROVIDES A BASIS FOR REMOVAL

6. This Court has original jurisdiction over the *Padron* Action pursuant to 28 U.S.C. § 1331, and the action may be removed to this Court by Defendants pursuant to 28 U.S.C. § 1441, subsections (a) and (c) because Plaintiffs allege violations of the following federal statutes: violations of 15 U.S.C. § 1639e ("Appraisal Independence"); violations of 12 CFR § 323.5 ("Appraiser Independence"); and violations of 15 U.S.C. § 1 ("The Sherman Antitrust Act") (*see* Compl. ¶¶ 210-211, 266-274).

7. Section 1331 of Title 28 to the United States Code provides that District Courts shall have original jurisdiction of all civil actions arising under the laws of the United States. Section 1441(a) provides for removal of any action in which the United States District Courts have original jurisdiction, and subdivision (c) allows for removal of the entire action, including claims arising under state laws. As the *Padron* Action is a civil action founded on claims arising under federal laws, removal on the basis of federal question jurisdiction is proper pursuant to 28 U.S.C. §§ 1331, and 1441(a) and (c).

8. This Court also has supplemental jurisdiction over Plaintiffs' remaining state law claims pursuant to 28 U.S.C. § 1367(a). Plaintiffs' state law claims are

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

premised on allegations that Defendants violated California and federal law by concealing and misrepresenting information regarding their loans during origination and by inflating their property appraisals. Plaintiffs' state law claims arise under the same operative facts as their federal claims. Plaintiffs' state and federal law claims are thus so related that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).

## III. CAFA PROVIDES AN ADDITIONAL BASIS FOR REMOVAL

9. CAFA grants federal courts original jurisdiction over certain class actions and "mass actions." *See* 28 U.S.C. § 1332(d)(2) & (11); *United Steel v. Shell Oil Co.*, 602 F.3d 1087, 1091 (9th Cir. 2010).

10. A civil action may be removed under CAFA as a "mass action" if: (1) it meets CAFA's statutory definition of "mass action"; (2) any plaintiff is a citizen of a state different from any defendant (*i.e.*, minimal diversity exists); and (3) the amount in controversy exceeds CAFA's jurisdictional threshold of $5 million exclusive of interest and costs. *See* 28 U.S.C. § 1332(d)(2).

### A. The *Padron* Action Is a "Mass Action" under CAFA

11. CAFA defines a "mass action" as "any civil action . . . in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact . . . ."[1] 28 U.S.C. § 1332(d)(11)(B).

12. In the *Padron* Action, all 121 individually-named Plaintiffs propose to try their monetary relief claims jointly on the ground that their claims purportedly involve common questions of law and fact relating to Defendants' alleged: fraudulent concealment, intentional and negligent misrepresentations, negligence, and violations of the UCL in connection with the origination of Plaintiffs'

---

[1] A civil action falling within this definition may not qualify as a "mass action" if it falls within certain exceptions defined by CAFA. *See* 28 U.S.C. § 1332(d)(11)(B)(ii)(I)-(IV). The *Padron* Action does not fall within these exceptions.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

mortgages, appraisals of Plaintiffs' properties, and manipulation of the real estate market (Compl. ¶¶ 59, 120-157, 162, 181-224, 251-281).

13. Accordingly, the *Padron* Action is a "mass action" within the meaning of CAFA.

**B.** **The *Padron* Action Meets CAFA's "Minimal Diversity" Requirement**

14. CAFA's minimal diversity requirement is satisfied when "any member of the class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A).

15. An unincorporated association is a citizen of the state where it has its principal place of business and under which state's laws it is organized. *See* 28 U.S.C. § 1332(d)(1).

16. As Plaintiffs correctly allege in the Complaint, NDEX is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Texas (Compl. ¶ 38). Therefore, NDEX is a citizen of both Delaware and Texas.

17. All of the 121 individual Plaintiffs allege that they are residents of California (App. A ¶¶ 1-82).

18. As none of the Plaintiffs are alleged to be citizens of Delaware or Texas, the *Padron* Action meets CAFA's minimal diversity requirement.

**C.** **The *Padron* Action Meets CAFA's Amount in Controversy Requirement**

19. To remove an action to federal court under CAFA, the amount in controversy must exceed "the sum or value of $5,000,000, exclusive of interest and costs." 28 U.S.C. § 1332(d)(2).

20. It is facially evident from the Complaint that CAFA's amount in controversy threshold is satisfied. Each of the 121 Plaintiffs expressly seeks

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

compensatory damages for, *inter alia*, "loss of equity in their houses" (Compl. ¶¶ 125, 132, 145, 185; Prayer ¶ 1).

21.    Based on the allegations in the Complaint, the aggregate of the amount of damages suffered as a result of lost equity in Plaintiffs' property totals at least $13,409,752—well in excess of CAFA's $5 million threshold.

22.    In an effort to defeat federal jurisdiction, Plaintiffs claim that "fewer than 100 plaintiffs are alleging claims in amounts that would, as to them, equal or exceed the jurisdictional amount for federal jurisdiction under 28 U.S.C. § 1332(a)" (Compl. ¶ 23).  This effort to defeat federal jurisdiction fails for several reasons. First, there are 121 named Plaintiffs in this action, not "fewer than 100 plaintiffs." Second, Plaintiffs' specific allegations regarding the amount in controversy in the lawsuit—*i.e.*, the purported minimum of $13 million of damages as a result of lost equity in their homes—trump Plaintiffs' general jurisdictional allegation attempting to defeat federal jurisdiction. *See Smith v. Gross*, 604 F.2d 639, 641 n.2 (9th Cir. 1979).  Third, at least one named plaintiff demands more than $75,000 (*see* App. A ¶¶ 1, 4—Lilian Padron seeks $132,500; Jorge and Albina Espinoza seek $237,750). *See Bullard v. Burlington N. Santa Fe Ry. Co.*, 535 F.3d 759, 761 (7th Cir. 2007).

23.    If any individual plaintiff does not have an amount in controversy of $75,000, that plaintiff's claims may be remanded to state court. *See* 28 U.S.C. § 1332(d)(2); *Anwar v. Fairfield Greenwich Ltd.*, 676 F. Supp. 2d 285, 292-93 (S.D.N.Y. 2009).  The federal court is not divested of jurisdiction over the "mass action," even if the remanded claims brings the total number of federal plaintiffs below 100. *Lowery v. Alabama Power Co.*, 483 F.3d 1184, 1206 (11th Cir. 2007); S. Rep. No. 109-14, at 47 (Feb. 28, 2005), as reprinted in 2005 U.S.C.C.A.N. 3, 44.

24.    Based on Plaintiffs' allegations and requested relief in the Complaint, the *Padron* Action exceeds CAFA's amount in controversy requirement.

//

//

## IV.   OTHER REMOVAL REQUIREMENTS ARE SATISFIED

25.   A notice of removal must be "filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of a pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." 28 U.S.C. § 1446(b); *see also* 28 U.S.C. §§ 1332(d)(11) & 1453(b).

26.   Because Defendants were served with the Summons and Complaint on January 23, 2014, this Notice of Removal—which is filed within 30 days of service—is timely.

27.   The proper venue for removal is "to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a).  As this District Court embraces the County of Los Angeles, removal to this Court is proper.  28 U.S.C. § 84(c).

28.   In compliance with 28 U.S.C. §1446(a), "all process, pleadings, and orders served upon" Defendants are attached hereto as **Exhibit A**.  28 U.S.C. §1446(a).

29.   In compliance with 28 U.S.C. §1446(d), a copy of this Notice of Removal is being served on all parties of record, including all adverse parties, and will be filed with the Clerk of the Superior Court of California for the County of Los Angeles promptly after the filing of this Notice of Removal.

//
//
//
//
//
//
//
//

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

## V. CONCLUSION

30. For the foregoing reasons, Defendants have removed the *Padron* Action to this Court and request that this Court issue all necessary orders and process and grant such other and further relief as in law and justice that Defendants may be entitled to receive.

Dated: February 21, 2014

Respectfully submitted,

**BRYAN CAVE LLP**

By: _____
    Brian J. Recor
Attorneys for Defendants
OneWest Bank, FSB (erroneously named as "OneWest Bank" and "IndyMac Mortgage Services"); OneWest Bank Group LLC; and IMB HoldCo LLC (erroneously named as "IMB HoldCo")

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

SM01DOCS\1017669.1

7

NOTICE OF REMOVAL

# EXHIBIT A

RECEIVED
Y:   11:32am
JAN 2 2 2014
personal
LEGAL DEPT

*(LIST OF BORROWERS ON A SEPARATE SHEET)*

SUM-100

## SUMMONS
### (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

ONEWEST BANK, a Delaware corporation;
(Please see attachment)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

LILIAN YESENIA PADRON, an individual;
(Please see attachment)

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

NOV 1 8 2013

Sherri R. Carter, Executive Officer/Clerk
By Cristina Grijalva, Deputy

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: *(El nombre y dirección de la corte es):* LOS ANGELES SUPERIOR COURT | CASE NUMBER: *(Número del Caso):* BC 527752 |
|---|---|

111 North Hill St.
Los Angeles, CA 90012, STANLEY MOSK COURTHOUSE

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Brookstone Law, PC, 18831 Von Karman Ave., Suite 400, Irvine, CA 92612

SHERRI R. CARTER

| DATE: *(Fecha)* | Clerk, by *(Secretario)* CRISTINA GRIJALVA | , Deputy *(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

NOV 1 8 2013

**NOTICE TO THE PERSON SERVED:** You are served
1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*
3. [X] on behalf of *(specify):* OneWest Bank, a Delaware corporation

under: [X] CCP 416.10 (corporation)  [ ] CCP 416.60 (minor)
[ ] CCP 416.20 (defunct corporation)  [ ] CCP 416.70 (conservatee)
[ ] CCP 416.40 (association or partnership)  [ ] CCP 416.90 (authorized person)
[ ] other *(specify):*
4. [X] by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use Judicial Council of California SUM-100 [Rev. July 1, 2009] | SUMMONS | Code of Civil Procedure §§ 412.20, 465 www.courtinfo.ca.gov |
|---|---|---|

EXHIBIT A - PAGE 8

SUM-200(A)

| SHORT TITLE:<br>Padron v. OneWest Bank | CASE NUMBER: |
|---|---|

## INSTRUCTIONS FOR USE

➜ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

➜ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff    ☑ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

ONEWEST BANK GROUP LLC, a Delaware Limited Liability Company; INDYMAC BANK, a Delaware corporation; INDYMAC MORTGAGE SERVICES, a Delaware corporation; INDYMAC BANCORP, INC., a Delaware corporation; IMB HOLDCO, a Delaware Limited Liability Company; NDEX WEST, LLC a Delaware corporation; MERIDIAN FORECLOSURE SERVICE f/k/a MTDS, INC., a California corporation DBA MERIDIAN TRUST DEED SERVICE; FEDERAL DEPOSIT INSURANCE CORPORATION, a Delaware corporation; LANDAMERICA,INC., a Delaware corporation; and Does I through 1000 ,inclusive,

Page __3__ of __3__

Page 1 of 1

Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

EXHIBIT A - PAGE 9

**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Padron v. OneWest Bank | |

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.)*:

☑ Plaintiff    ☐ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

NELINIA VARENAS, an individual; GLORIA CHARLES, an individual; FRANCISCO ROMO, an individual; FELIPE MURO, an individual; PAOLA MURO, an individual; DENNIS MICHAEL CHILCOAT, an individual; CAROL ANN CHILCOAT, an individual; PEARL BOWEN, an individual; MANUEL CALVILLO, an individual; HERACLIO GONZALEZ, an individual; MARICELA GONZALEZ, an individual; CARLETTA MCCRAY, an individual; TOMMIE MCCRAY, an individual; ALAN BERGUM, an individual; ROCIO BERGUM, an individual; IVORY RODRIGUEZ, an individual; FRANCISCA RODRIGUEZ, an individual; DIANA THAN, an individual; ENRIQUETA POLANCO, an individual; MARTIN LOZANO, an individual; CHARLES NAVARRO, an individual; DEBRA NAVARRO, an individual; NHU THUAN THI NGUYEN, an individual; JOSEFINA MARTINEZ, an individual; GILBERTO MURILLO, an individual; JANNET TORRES, an individual; IVAN SALAZAR, an individual; PORFIRIO CAMACHO, an individual; DONIDA GARZARO, an individual; NELSON MIGUEL, an individual; MALIETA MIGUEL, an individual; TEODORO ABUYO, an individual; NATIVIDAD ABUYO, an individual; JUANA TLATENCHI, an individual; FELIPE TLATENCHI, an individual; Q.C KELKER an individual; FACUNDO ROSAS, an individual; CHRISTINA RESINA, an individual.

Page   2   of   3

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

EXHIBIT A - PAGE 10

**SUM-200(A)**

| SHORT TITLE:<br>Padron v. OneWest Bank | CASE NUMBER: |
|---|---|

### INSTRUCTIONS FOR USE

→ This form may be used as en attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use e separate page for each type of party.):*

[✓] Plaintiff     [ ] Defendant     [ ] Cross-Complainant     [ ] Cross-Defendant

RICHARD WEST, an individual; NANCY ARMSTRONG-WEST, an individual; LADISLAO KALMAR, an individual; IZASKUN GALARRAGA, an individual; JORGE ESPINOZA, an individual; ALBINA ESPINOZA, an individual; LUIS PEREZ, an individual; ROGELIO HERNANDEZ, an individual; TERESA HERNANDEZ, an individual; AUDREY VINITSKY, an individual; EDWARD VINITSKY, an individual; LONNIE WALL, an individual; MARGARET LANAM, an individual; STEVEN ANDERSON, an individual; LORRIE ANDERSON, an individual; JILL RIDGWAY-BALL, an individual; ROBERT WHITMORE, an individual; FIONA WHITMORE, an individual; JOHN HICKS, an individual; KATHERINE WARD, an individual; DWAYNE BREWER, an individual; CLEADITH BREWER, an individual; DAVID CERDA PAZ, an individual; ROSA CERDA, an individual; DANIEL RUSSELL, an individual; MASATOSHI TAUCHI, an individual; MANUEL MARTINEZ, an individual; LILIA MARTINEZ, an individual; DANIEL GAMBLER, an individual; ALICE GAMBLER, an individual; JENNIFER CAROLAN, an individual; JOSE VELASCO, an individual; BEATRICE VELASCO, an individual; MELBA SAUNDERS, an individual; PAUL SAUNDERS, an individual; MARIA ALCANTAR, an individual; MIGUEL VEGA, an individual; CYNTHIA VEGA, an individual; RAGHDA ZAYER, an individual; MIKE MANOUGIAN, an individual; SIDNEY P. JACOBS, an individual; LYNN B. JACOBS, an individual; DONNA CASTY, an individual; WILLIAM BARTEL, an individual; WINIFRED BARTEL, an individual; GARY MILLEMAN, an individual; ROSALINDA MILLEMAN, an individual; ELGITHA BALDONADO, an individual; ZABI SUBAT, an individual; ROSENDA CHAPMAN, an individual; GENARO LARIOS, an individual; SILVIA MEDINA RIVERA, an individual; ALEIANDRO MANZO, an individual; MARIA MANZO, an individual; WILLIAM LOWE, an individual; ANGEL ANDRADE, an individual; FELIPA ANDRADE, an individual; LEONIDA PAPA, an individual; VINCENT ADAMO, an individual; MILLICENT DICKINSON, an individual; TERRY SANNITA, an individual; RAYE SANNITA, an individual; TARYN COSS, an individual; SCOTT SEELIG, an individual; ROCIO SEELIG, an individual; SCOTT JAKOVICH, an individual; VICTORIA JAKOVICH, an individual; EUNICE AKPAN, an individual; IOHN VIGLIOTTI, an individual; DEANNA VIGLIOTTI, an individual; HAYDEE LOPEZ, an individual; JESUS LOPEZ, an individual; ROLANDA WHITE, an individual; LUIS LOPEZ, an individual; OSCAR SANDOVAL, an individual; SONIA SANDOVAL, an individual; HUGO CARCAMO, an individual; CLAUDIA CARCAMO, an individual; ELVIRA BALUYOT, an individual; NOEL BALUOT, an individual; EDWARD VARENAS, an individual;

Page __1__ of __3__

Page 1 of 1

Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

EXHIBIT A - PAGE 11

Vito Torchia, Jr. (SBN244687)
vjt@brookstonelaw.com
BROOKSTONE LAW, PC
18831 Von Karman Ave., Suite 400
Irvine, CA 92612
Telephone: (800) 946-8655
Facsimile: (866) 257-6172
E-mail: PadronvOneWest@BrookstoneLaw.com

Attorneys for Plaintiffs



CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

NOV 18 2013

Sherri R. Carter, Executive Officer/Clerk
By Cristina Grijalva, Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### COUNTY OF LOS ANGELES

**BC527752**

LILIAN YESENIA PADRON, an individual; RICHARD WEST, an individual; NANCY ARMSTRONG-WEST, an individual; LADISLAO KALMAR, an individual; IZASKUN GALARRAGA, an individual; JORGE ESPINOZA, an individual; ALBINA ESPINOZA, an individual; ; LUIS PEREZ, an individual; ROGELIO HERNANDEZ, an individual; TERESA HERNANDEZ, an individual; AUDREY VINITSKY, an individual; EDWARD VINITSKY, an individual; ; LONNIE WALL, an individual; ; MARGARET LANAM, an individual; STEVEN ANDERSON, an individual; LORRIE ANDERSON, an individual; JILL RIDGWAY-BALL, an individual; ROBERT WHITMORE, an individual; FIONA WHITMORE, an individual; JOHN HICKS, an individual; KATHERINE WARD, an individual; DWAYNE BREWER, an individual; CLEADITH BREWER, an individual; DAVID CERDA PAZ, an individual; ROSA CERDA, an individual; DANIEL RUSSELL, an individual, MASATOSHI TAUCHI, an individual;, , MANUEL MARTINEZ, an individual; LILIA MARTINEZ, an individual, DANIEL GAMBLER, an individual; ALICE GAMBLER, an individual; JENNIFER

Case No.:

**BY FAX**

COMPLAINT FOR:

1. INTENTIONAL PLACEMENT OF BORROWERS INTO DANGEROUS LOANS THEY COULD NOT AFFORD THROUGH COORDINATED DECEPTION, IN THE NAME OF MAXIMIZING LOAN VOLUME AND THUS PROFIT

   COUNT 1- FRAUDULENT CONCEALMENT

   COUNT 2- INTENTIONAL MISREPRESENTATION

   COUNT 3- NEGLIGENT MISREPRESENTATION

   COUNT 4- NEGLIGENCE

   COUNT 5- UNFAIR, UNLAWFUL, AND FRAUDULENT BUSINESS PRACTICES (VIOLATION OF CAL. BUS. & PROF. CODE §17200)

2. INDIVIDUAL APPRAISAL INFLATION

   COUNT 6- INTENTIONAL MISREPRESENTATION

   COUNT 7- NEGLIGENT MISREPRESENTATION

   COUNT 8- NEGLIGENCE

   COUNT 9- UNFAIR, UNLAWFUL, AND FRAUDULENT BUSINESS PRACTICES (VIOLATION OF CAL. BUS. & PROF. CODE

i

COMPLAINT

EXHIBIT A - PAGE 12

CAROLAN, an individual; JOSE VELASCO, an individual; BEATRICE VELASCO, an individual; MELBA SAUNDERS, an individual; PAUL SAUNDERS, an individual; MARIA ALCANTAR, an individual; MIGUEL VEGA, an individual; CYNTHIA VEGA, an individual; RAGHDA ZAYER, an individual; MIKE MANOUGIAN, an individual; SIDNEY P. JACOBS, an individual; LYNN B. JACOBS, an individual; DONNA CASTY, an individual; WILLIAM BARTEL, an individual; WINIFRED BARTEL, an individual; GARY MILLEMAN, an individual; ROSALINDA MILLEMAN, an individual; ELGITHA BALDONADO, an individual; ZABI SUBAT, an individual; ROSENDA CHAPMAN, an individual; GENARO LARIOS, an individual; SILVIA MEDINA RIVERA, an individual; ALEJANDRO MANZO, an individual; MARIA MANZO, an individual; WILLIAM LOWE, an individual; ANGEL ANDRADE, an individual; FELIPA ANDRADE, an individual; LEONIDA PAPA, an individual; VINCENT ADAMO, an individual; NAZARIO MADRIGAL, an individual; MILLICENT DICKINSON, an individual; TERRY SANNITA, an individual; RAYE SANNITA, an individual; TARYN COSS, an individual; SCOTT SEELIG, an individual; ROCIO SEELIG, an individual; SCOTT JAKOVICH, an individual; VICTORIA JAKOVICH, an individual; EUNICE AKPAN, an individual; JOHN VIGLIOTTI, an individual; DEANNA VIGLIOTTI, an individual; HAYDEE LOPEZ, an individual; JESUS LOPEZ, an individual; ROLANDA WHITE, an individual; LUIS LOPEZ, an individual; OSCAR SANDOVAL, an individual; SONIA SANDOVAL, an individual; HUGO CARCAMO, an individual; CLAUDIA CARCAMO, an individual; ELVIRA BALUYOT, an individual; NOEL BALUOT, an individual; EDWARD VARENAS, an individual;

§17200)

3. **MARKET FIXING**

**COUNT 10** – FRAUDULENT CONCEALMENT

**COUNT 11** – NEGLIGENCE

**COUNT 12**- PRICE FIXING - VIOLATION OF SHERMAN ACT 15 USC §1 ET SEQ.

**COUNT 13**- UNFAIR, UNLAWFUL, AND FRAUDLENT BUSINESS PRACTICES (VIOLATION OF CAL. BUS. & PROF. CODE §17200)

4. **DECEPTION IN LOAN MODIFICATIONS**

**COUNT 14**- COUNT 14 : VIOLATION OF CAL. CODE CIV. PROC. § 580B AND §726 PROHIBITING COLLECTION OF DEBT AFTER ELECTING TO FORECLOSE

**COUNT 15** – FRAUDULENT CONCEALMENT

**COUNT 16** – INTENTIONAL MISREPRESENTATION

**COUNT 17** – NEGLIGENT MISREPRESENTATION

**COUNT 18**- RESCISSION OF CONTRACT AND/OR RESTITUTION ON THE GROUNDS OF FRAUD, AND/OR UNCONSCIONABILITY

**COUNT 19** – BREACH OF CONTRACT

**COUNT 20**- VIOLATION OF THE CRIER RULE (CAL. CIV. CODE §2994G)

**COUNT 21**- UNFAIR DEBT COLLECTION PRACTICES (VIOLATION OF CAL. CIV. CODE §1788 ET SEQ)

**COUNT 22**- UNLAWFUL, UNFAIR & FRAUDULENT BUSINESS PRACTICES (VIOLATION OF CAL. BUS. & PROF. CODE §17200)

5. **INTENTIONAL UNAUTHORIZED FORECLOSURES PURSUED IN THE NAME OF PROFIT**

**COUNT 23**- WRONGFUL FORECLOSURE

**COUNT 24**- UNFAIR, UNLAWFUL, AND FRAUDULENT BUSINESS PRACTICES (VIOLATION OF CAL. BUS. & PROF. CODE §17200)

ii

COMPLAINT

NELINIA VARENAS, an individual; GLORIA CHARLES, an individual; FRANCISCO ROMO, an individual; FELIPE MURO, an individual; PAOLA MURO, an individual; DENNIS MICHAEL CHILCOAT, an individual; CAROL ANN CHILCOAT, an individual; PEARL BOWEN, an individual; MANUEL CALVILLO, an individual; HERACLIO GONZALEZ, an individual; MARICELA GONZALEZ, an individual; CARLETTA MCCRAY, an individual; TOMMIE MCCRAY, an individual; ALAN BERGUM, an individual; ROCIO BERGUM, an individual; IVORY RODRIGUEZ, an individual; FRANCISCA RODRIGUEZ, an individual; DIANA THAN, an individual; ENRIQUETA POLANCO, an individual; MARTIN LOZANO, an individual; CHARLES NAVARRO, an individual; DEBRA NAVARRO, an individual; NHU THUAN THI NGUYEN, an individual; JOSEFINA MARTINEZ, an individual; GILBERTO MURILLO, an individual; JANNET TORRES, an individual; IVAN SALAZAR, an individual; PORFIRIO CAMACHO, an individual; DONIDA GARZARO, an individual; NELSON MIGUEL, an individual; MALIETA MIGUEL, an individual; TEODORO ABUYO, an individual; NATIVIDAD ABUYO, an individual; JUANA TLATENCHI, an individual; FELIPE TLATENCHI, an individual; Q.C KELKER, an individual; FACUNDO ROSAS, an individual; CHRISTINA RESINA, an individual.

Plaintiffs,

ONEWEST BANK, a Delaware corporation; ONEWEST BANK GROUP LLC, a Delaware Limited Liability Company; INDYMAC BANK, a Delaware corporation; INDYMAC MORTGAGE SERVICES, a Delaware corporation; INDYMAC BANCORP, INC., a Delaware corporation; IMB HOLDCO, a

**[JURY TRIAL DEMANDED]**

iii

COMPLAINT

Delaware Limited Liability Company; NDEX WEST, LLC a Delaware corporation; MERIDIAN FORECLOSURE SERVICE f/k/a MTDS, INC., a California corporation DBA MERIDIAN TRUST DEED SERVICE; FEDERAL DEPOSIT INSURANCE CORPORATION, a Delaware corporation; LANDAMERICA,INC., a Delaware corporation; and Does 1 through 1000 , inclusive,

Defendants.

## TABLE OF CONTENTS

**NATURE OF ACTION** ........................................................................................- 1 -

**PARTIES** ..........................................................................................................- 7 -

    Plaintiffs.........................................................................................................- 7 -

    Defendants ....................................................................................................- 7 -

    Relationship of Defendants.........................................................................- 12 -

**FIRST CAUSE OF ACTION:_INTENTIONAL PLACEMENT OF BORROWERS INTO DANGEROUS LOANS THEY COULD NOT AFFORD THROUGH COORDINATED DECEPTION, IN THE NAME OF MAXIMIZING LOAN VOLUME AND THUS PROFIT ..- 14 -**

    Defendants Systematically Abused and Abandoned Industry Standard Underwriting Guidelines to Intentionally Place Unqualified Borrowers into Loans Which Defendants Knew They Could Never Afford ....................................................- 17 -

    Defendants Turned Substantial Profits Through Their Borrowers' Default Furthering Their Incentive to Intentionally Place Plaintiffs Into Impossible and Unaffordable Loans.......................................................................................- 20 -

    Defendants Intentionally Misrepresented, Partially Misrepresented, & Concealed Highly Material Information In Order To Induce Plaintiffs to Unknowingly Take Dangerous Loans So that Defendants Could Profit .........................................- 21 -

        Authority to Bind .................................................................................- 29 -

iv

COMPLAINT

Plaintiffs Reasonably Relied on Defendants' Numerous Deceptions in Deciding to Enter into Contracts With Them ........................................- 30 -

Bank Defendants Owed Plaintiffs a Duty .........................................- 33 -

COUNT 1: FRAUDULENT CONCEALMENT ............................................- 37 -

COUNT 2: INTENTIONAL MISREPRESENTATION ................................- 38 -

COUNT 3: NEGLIGENT MISREPRESENTATION ..................................- 39 -

COUNT 4: NEGLIGENCE ..............................................................- 39 -

COUNT 5 : UNFAIR, UNLAWFUL, AND FRAUDULENT BUSINESS PRACTICES (VIOLATION OF CAL. BUS. & PROF. CODE §17200) .............................- 40 -

SECOND CAUSE OF ACTION: INDIVIDUAL APPRAISAL INFLATION ...............- 43 -

COUNT 6: INTENTIONAL MISREPRESENTATION ...............................- 49 -

COUNT 7: NEGLIGENT MISREPRESENTATION ..................................- 49 -

COUNT 8: NEGLIGENCE ..............................................................- 50 -

COUNT 9: UNFAIR, UNLAWFUL, AND FRAUDULENT BUSINESS PRACTICES (VIOLATION OF CAL. BUS. & PROF. CODE §17200) .............................- 51 -

THIRD CAUSE OF ACTION: MARKET FIXING ....................................- 56 -

COUNT 10: FRAUDULENT CONCEALMENT .......................................- 67 -

COUNT 11: NEGLIGENCE .............................................................- 68 -

COUNT 12: PRICE FIXING - VIOLATION OF SHERMAN ACT 15 USC §1 ET SEQ .......- 68 -

COUNT 13: UNFAIR, UNLAWFUL, AND FRAUDLENT BUSINESS PRACTICES (VIOLATION OF CAL. BUS. & PROF. CODE §17200) .............................- 70 -

FOURTH CAUSE OF ACTION: DECEPTION IN LOAN MODIFICATIONS ............- 71 -

Defendants' Scheme To To Extract Workout Payments From Borrowers In Distress And Then Foreclosing, As Opposed To Genuinely Offering Loan Modifications ....- 71 -

Bank Defendants' Adhesive Workout Agreements Are Unconscionable ...................- 76 -

v

COMPLAINT

EXHIBIT A - PAGE 16

Bank Defendants Fail To Withdraw Foreclosure Proceedings Even When Borrowers Have Made All Plan Payments Under The Workout Agreement ................................- 77 -

Defendants Used The Promise Of Loan Modifications As Bait To Damage Plaintiffs' Credit, Preventing Plaintiffs From Obtaining Financing Anywhere Else ................................- 80 -

Defendants Used The Promise Of Loan Modifications As Bait For An Outright Cash-Grab With No Intent To Ever Modify Plaintiffs ...............................................- 80 -

COUNT 14 : VIOLATION OF CAL. CODE CIV. PROC. § 580B AND §726 PROHIBITING COLLECTION OF DEBT AFTER ELECTING TO FORECLOSE..............- 82 -

COUNT 15 : FRAUDULENT CONCEALMENT...............................................- 82 -

COUNT 16 : INTENTIONAL MISREPRESENTATION.................................- 84 -

COUNT 17: NEGLIGENT MISREPRESENTATION .......................................- 85 -

COUNT 18: RESCISSION OF CONTRACT AND/OR RESTITUTION ON THE GROUNDS OF FRAUD, AND/OR UNCONSCIONABILITY .............................................- 86 -

COUNT 19: BREACH OF CONTRACT.......................................................- 86 -

COUNT 20: VIOLATION OF THE CRIER RULE (CAL. CIV. CODE §2994G) .................- 87 -

COUNT 21: UNFAIR DEBT COLLECTION PRACTICES (VIOLATION OF CAL. CIV. CODE §1788 ET SEQ).........................................................- 88 -

COUNT 22: UNLAWFUL, UNFAIR & FRAUDULENT BUSINESS PRACTICES ...........- 88 -

FIFTH CAUSE OF ACTION : INTENTIONAL UNAUTHORIZED FORECLOSURES PURSUED IN THE NAME OF PROFIT...................................................................- 90 -

COUNT 23: WRONGFUL FORECLOSURE................................................- 92 -

COUNT 24: UNFAIR, UNLAWFUL, AND FRAUDULENT BUSINESS PRACTICES (VIOLATION OF CAL. BUS. & PROF. CODE §17200)..........................................- 96 -

PRAYER FOR RELIEF ......................................................................- 98 -

vi

COMPLAINT

Plaintiffs, and each of them, hereby demand a jury trial and allege as follows:

### NATURE OF ACTION

1.   Glossary. As used herein:

   a.   "DEFENDANTS" shall collectively refer to each and every Defendant named in this action; such Defendants are all alleged to have acted in coordinated conspiracy with one another.

   b.   "BANK DEFENDANTS" shall refer, collectively, to all Defendants acting to originate or service loans including: ONEWEST BANK, ONEWEST BANK GROUP LLC, INDYMAC BANK, INDYMAC MORTGAGE SERVICES, INDYMAC BANCORP, INC., and IMB HOLDCO.

   c.   "TRUSTEE DEFENDANTS" shall refer, collectively, to Defendants NDEX WEST, LLC ("NDEX") and MERIDIAN FORECLOSURE SERVICE f/k/a MTDS, INC. dba MERIDIAN TRUST DEED SERVICE ("Meridian").

   d.   "DOT" shall act as an abbreviation for the term: Deed of Trust.

2.   This lawsuit arises from Defendants' wrongs and deception in inducing Plaintiffs to enter into mortgages from 2003 through 2008 with the Bank Defendants, as well as deception in loan modifications and wrongful foreclosure activities through current day.

3.   The gravamen of Plaintiffs' Complaint is that Defendants had ceased acting as conventional money lenders and instead morphed into an enterprise engaged in systematic fraud upon its borrowers. With profit as their motive, the conspiracy of Defendants set out upon a massive and centrally-directed fraud by which Defendants (1) placed the Plaintiff-homeowners into loans which Defendants *knew* Plaintiffs could not afford and would default upon to a mathematical certainty, (2) abandoned industry-standard underwriting guidelines, (3) concealed/misrepresented the terms of their loans to borrowers to induce their unwitting consent, and (4) intentionally inflated the appraisal values of homes throughout California in a market-fixing scheme – all for the sole purpose of herding as many borrowers as they could into the largest loans possible which Defendants would then sell on the secondary market at inflated values for unimaginable profit (wildly surpassing the profit they would

- 1 -

COMPLAINT

make by holding the loans), *knowing that their scheme would cause the precipitous decline in values of all homes throughout California*, including those of Plaintiffs herein.

4.    Because Bank Defendants stood to reap so much more profit by securitizing and selling these loans on the secondary market, than they would by holding their loans under the conventional "originate to hold model" of traditional banking, Defendants ceased acting as conventional money lenders and instead adopted the "originate to sell" model - originating loans with an eye towards (1) *immediately* selling the loans on the secondary market, while (2) simultaneously becoming a servicer of the loan – both immensely profitable. The result was simple. Because Defendants knew the purchasers of these loans (secondary market investors) would bear all the risk in the event of default, Bank Defendants no longer had any incentive to verify a borrower's creditworthiness, or ensure that the borrower qualified for (or could afford) the loans they were being given. Indeed they had an incentive to do the opposite: the sheer profit made by selling high volumes of these loans.

5.    To feed their investors and continue to make such never-before-seen profits, all of which inured to the benefit of the conspiracy of Defendants, Bank Defendants needed more borrowers. In turn, Bank Defendants began (1) disregarding their own as well as industry-standard underwriting standards, (2) intentionally approving borrowers who they knew were grossly under-qualified, who they knew could not afford their loans and who they knew would default to a mathematical certainty, (3) falsifying the income and asset documentation of Plaintiff-borrowers without their consent, and (4) concealing the material terms of their loans to induce a borrower's unwitting consent – all in the name of getting as many loans out the door, and sold to investors for profit, as possible. (Cause of Action for **"Intentional Placement of Borrowers into Dangerous Loans Which They Could Not Afford"** )

6.    Bank Defendants also ceased acting as a conventional money lender by originating loans with an eye towards immediately becoming the servicer on the loan. Servicers earn more money from initiating foreclosures and collecting various fees and thus have significantly different incentives and motivations than do lenders. Knowing that they would soon become servicers, Bank Defendants had an (additional) incentive to place borrowers into loans they knew their borrowers could not afford and to conceal highly material information regarding the loans, because as servicers they would make more money by collecting fees from borrowers who couldn't afford their loans such as late fees, default

- 2 -

**COMPLAINT**

EXHIBIT A - PAGE 19

fees, and foreclosure fees. In other words, because Bank Defendants made more money collecting fees from borrowers who couldn't afford their loans, Bank Defendants had an incentive to place their borrowers into loans they couldn't afford. In doing so, Bank Defendants became anything but a conventional money lender – their interests were aligned solely with those of a servicer.

7.    Part and parcel with this scheme, the conspiracy of Defendants undertook a scheme to artificially manipulate and inflate California's real estate market through their appraisal subsidiary, Defendant LANDAMERICA, INC. ("LandAmerica") over whom Bank Defendants exercised complete dominion. As is common knowledge in the real estate industry, appraisers are required to calculate the value of a home based almost entirely on the value of other nearby homes (called comparables aka "comps"). Defendants, including Bank Defendants seized on this vulnerability in the system. Exercising dominion over their LandAmerica, Defendants directed LandAmerica to begin systematically inflating the valuations they rendered upon the subject properties of each of their loans (including loans of Plaintiffs herein), *knowing that by doing so* their falsely inflated valuations would act as comps upon which numerous *other* appraisers based their valuations of *other* homes. These inflated appraisals caused other homes to be valued for more than they were worth, which in turn acted as the predicate for even higher appraisals on other homes. The result was a vicious self-feeding exponential cycle, both expected and intended by Defendants - the intentional, systematic, artificial inflation of home values throughout California. Because Bank Defendants had such massive market share, they had the means and the ability to fully manipulate the market on a scale that few others could, and indeed they did. **(The "Market Fixing Scheme Cause of Action" and separately the "Individual Appraisal Fraud Cause of Action")**

8.    Bank Defendants' reasons for artificially inflating the prices of real estate were simple. First, **by doing so Defendants created the illusion of a naturally-appreciating real economy, which resulted in a purchase *and* refinance boom** – which meant more loans for Defendants, and thus more profit. Second, by doing so, Bank Defendants induced Plaintiffs to enter into contract with them by convincing Plaintiffs that the value of their home was sufficient to justify taking out a loan of that size – or in other words, to assure Plaintiffs that their collateral was sound. Third, by doing so, Bank Defendants intended to induce Plaintiffs to consummate their purchase transactions by falsely reassuring

- 3 -
**COMPLAINT**

them that they were paying what the home was worth, and not more – the result of which was, once again, more loans generated by Defendants and thus more profit. Fourth, by driving the prices of real estate up, borrowers were forced to take out larger loans to afford the same property, once again resulting in more profit to Bank Defendants. Fifth, then, based on these fraudulently inflated loan amounts, Bank Defendants deceptively extracted excessive and unearned payments, points, fees, and interest from Plaintiffs. All of these profits were shared among the conspiracy of Defendants, and inured to the benefit of the Conspiracy.

9.    The inevitable and intended result of Defendants' conspiracy was the creation of a super-heated pricing bubble in the real estate economy, created by and at the direction of the conspiracy of Defendants, designed to manipulate and inflate property values, and effectuated for the sole purpose of lining the conspiracy of Defendant's pockets with money.

10.    Bank Defendants and their co-conspirators conducted their scheme *knowing it would cause the wide-spread crash of property values throughout California* and the substantial loss of equity to Plaintiffs, and indeed it did. As a result of Defendants' market fixing scheme, Plaintiffs were forced to pay much more for their homes, then their true uninflated worth. Even for those Plaintiffs who did not purchase their property, but rather refinanced it, the demise of Defendants' scheme drove the value of their property far below its original purchase price, once again resulting in the loss of substantial equity.

11.    From 2008 to the present, Californians' home values decreased by considerably more than most other areas in the United States as a direct and proximate result of the Defendants' scheme set forth herein.

12.    As a result, Plaintiffs have lost their equity in their homes, if not their homes themselves, their credit ratings and histories were damaged or destroyed, among a host of other damages and harms which will be laid out in detail throughout this Complaint.

13.    The profit-driven scheme/conspiracy did not end there. To further their profit, the conspiracy of Defendants then intentionally steamrolled wrongful and unauthorized foreclosures upon those borrowers whose very peril was caused by Defendants' fraud in the first place. They intentionally initiated these wrongful foreclosures without regard to whether they had authority to foreclose, or had complied with the requirements under California Law, because foreclosure is a profitable business,

- 4 -

COMPLAINT

creating profit not only for the foreclosing trustee, but also the servicing bank, as well as the owner of the Deed of Trust. By initiating such unauthorized/wrongful foreclosures Bank Defendants and Trustee Defendants were able to charging a host of profitable "foreclosure fees' including trustee fees, attorney fees, late fees, default fees, inspection fees, among many others. (**"Intentional Wrongful Foreclosure Cause of Action"**)

14. Further, in the face of the escalating foreclosure crisis in the United States and especially in California, the Bank Defendants have further victimized and preyed on those struggling to keep by offering and inducing customers into illusory "Loan Modification" or "Workout Agreements," which purport to offer hope of an opportunity to cure loan default, but in truth and fact are merely a ruse through which the Bank Defendants dupe homeowners into paying them thousands of dollars immediately before they foreclose. On information and belief, the Bank Defendants have reaped illicit profits from these actions exceeding $100 million. (**the "Deception in Loan Modification Cause of Action"**)

15. These activities have been the subject of intense scrutiny, enforcement actions and litigation. As recently as April 13, 2011, multiple Federal regulators entered into stipulated consent orders with other similarly situated banks and related entities such as MERS (described below) describing massive failures and taking the first steps toward requiring Defendants and other banks to refund sums to homeowners improperly foreclosed upon by Defendants and other banks.

16. These illusory work-out agreements were nothing more than a cash-grab designed to circumvent California's prohibition against deficiency judgments. Plaintiffs are entitled to rescind and obtain back from the Bank Defendants their promised (and delivered) consideration, namely the payments that were made to the Bank Defendants under the Workout Agreements and Extended Workout Agreements. Because California law prohibits deficiency judgments, the Bank Defendants were not entitled to require post-election-to-sell payments and foreclose on the loans. In addition, such payments included attorney and other fees which Plaintiffs had no obligation to pay under their mortgages absent Bank Defendants' Work out Agreement Scheme

17. Plaintiffs are entitled to rescind and obtain back from the Bank Defendants their promised (and delivered) consideration, namely the payments that were made to the Bank Defendants

- 5 -

**COMPLAINT**

under the illusory Workout Agreements and Extended Workout Agreements. Because California law prohibits deficiency judgments, Bank Defendants were not entitled to require post-election-to-sell payments and foreclose on the loans. In addition, such payments included legal and other fees which Plaintiffs had no obligation to pay under their mortgages absent the Bank Defendants' Work out Agreement Scheme.

18.    Through this Action, Plaintiffs seek to stop Bank Defendants from preying on their customers through its Workout Agreement Scheme. Where Bank Defendants have exercised their election to sell under non-judicial foreclosure, they must not be permitted to extract thousands of dollars in additional payments with illusory promises and false statements of opportunities to cure defaulted loans. Bank Defendants herein have sold or initiated foreclosures on many of the Plaintiffs in this action. At the very least, Plaintiffs are entitled to a return of the payments they made under the false promise from Bank Defendants, that Plaintiffs would at least have an opportunity to avoid foreclosure.

19.    This Complaint alleges in no uncertain terms that had Plaintiff known the truth of any of these material facts, they would never have entered into any loans and/or modifications with Defendants. If the Plaintiffs had later learned the truth, each Plaintiff would have either (1) rescinded the loan transaction under applicable law and/or (2) refinanced the loan transaction with a reputable institution prior to the decline in mortgage values in late 2008.  Instead, each Plaintiff reasonably relied on the deceptions of the Defendants in entering their loans, "trial" modification agreements (aka Workout Plans), and forbearing from exercising their rights to rescind or refinance their loans.

20.    It bears emphasizing – that this action is not about the harm and frauds that Defendants have perpetrated on third-party investors, but rather the harms and frauds perpetrated upon Plaintiffs herein – the borrowers. The frauds described in the Complaint upon the investor, were merely the *incentive* for Defendants' fraud on Plaintiff-borrowers.  The Complaint brings no action for Defendants' fraud upon the investors. It only brings an action for fraud upon the borrower-Plaintiffs herein.

21.    No business, particularly one as centrally-important to the American economy as banking, should be allowed to so egregiously deceive its consumers.  If Banks are to conduct business, their business *must not be* that of fraud and deception.

- 6 -

**COMPLAINT**

EXHIBIT A - PAGE 23

## PARTIES

### *Plaintiffs*

22. All Plaintiffs listed in the above caption are competent adults and individuals residing in the State of California, who borrowed money from one or more of the Defendants or its subsidiaries or affiliates or successors and assigns between January 1, 2003, and December 31, 2008, secured by a deed of trust on his or her California real estate(s). At all material times hereto, one or more of the Defendants have acted as Servicer or some other control or capacity over processing the loan.

23. Based on information now available to them, fewer than 100 plaintiffs are alleging claims in amounts that would, as to them, equal or exceed the jurisdictional amount for federal jurisdiction under 28 U.S.C. § 1332(a).

24. **IN ADDITION TO THE ALLEGATIONS MADE THROUGHOUT THIS COMPLAINT, WHICH APPLY TO ALL PLAINTIFFS (EXCEPT WHERE OTHERWISE NOTED), APPENDIX "A" ("INDIVIDUALIZED PLAINTIFF ALLEGATIONS") PROVIDES INDIVIDUALIZED ALLEGATIONS AS TO EACH AND EVERY PLAINTIFF IN THIS ACTION AND THE SPECIFIC WRONGS DONE BY EACH DEFENDANT.** By this reference, Plaintiffs hereby incorporate Appendix "A" to this Complaint.

25. **Statute of Limitations & Equitable Tolling** - All of the concealments, partial misrepresentations and affirmative misrepresentations were unknown to all Plaintiffs referenced herein at the time of loan origination. Defendants' scheme was built on deception and keeping borrowers in the dark. All Plaintiffs herein discovered these frauds and concealments beginning no more than 3 years prior to the date of filing this action. A reasonable person would have been unable to reasonably discover said frauds any earlier. The circumstances and date of discovery of these wrongs are alleged with specificity as to each and every Plaintiff in Appendix A.

### *Defendants*

26. IndyMac Bank was founded as a Countrywide Mortgage Investment in 1985 by David S. Loeb and Angelo Mozilo as a means of collateralizing Countrywide Financial loans too big to be sold to Freddie Mac and Fannie Mae. In 1997, Countrywide spun off IndyMac as an independent company run

- 7 -

## COMPLAINT

by Mike Perry, who remained its CEO until the downfall of the bank in July of 2008. "Mac" is an established contraction for "Mortgage Corporation", usually associated with Government sponsored entities such as "Freddie Mac" (Federal Home Loan Mortgage Corporation) and "Farmer Mac" (Federal Agricultural Mortgage Corporation). IndyMac, however, had always been a private corporation with no relationship to the government.

27.    In July 2000, IndyMac Mortgage Holdings, Inc. acquired SGV Bancorp, the parent of First Federal Savings and Loan Association of San Gabriel Valley. IndyMac changed its name to IndyMac Bank and became the ninth largest bank headquartered in California. IndyMac Bank, operating as a combined thrift and mortgage bank, provided lending for the purchase, development, and improvement of single-family housing. IndyMac Bank also issued secondary mortgages secured by such housing, and other forms of consumer credit.

28.    IndyMac Bancorp, a holding company headquartered in Pasadena, California, eventually acquired:

    a.    Financial Freedom, an originator and servicer of reverse mortgage loans, on July 16, 2004;

    b.    New York Mortgage Company, an East Coast mortgage bank, on April 2, 2007;

    c.    Barrington Capital Corporation, a West Coast mortgage bank, in September 2007.

29.    "IndyMac" was a generally accepted contraction of the formal name Independent National Mortgage Corporation. Before its failure, IndyMac Bank was the largest savings and loan association in the Los Angeles area and the seventh largest mortgage originator in the United States. The failure of IndyMac Bank on July 11, 2008, was the fourth largest bank failure in United States history, and the second largest failure of a regulated thrift. IndyMac Bank's parent corporation was IndyMac Bancorp (OTC Markets Group: IDMCQ) until the FDIC seized IndyMac Bank. IndyMac Bancorp has filed for Chapter 7 bankruptcy.

30.    In March 2009, the Federal Deposit Insurance Corporation (FDIC) held an auction for IndyMac Bank, which it had seized in 2008, and sold it to IMB HoldCo LLC. The FDIC said at the time that IMB Management Holdings LP, a limited partnership composed primarily of hedge funds, controlled IMB Holdco LLC. The FDIC also said that IMB HoldCo was the only bidder for all of the

- 8 -

COMPLAINT

EXHIBIT A - PAGE 25

IndyMac Bank assets. IMB HoldCo did not bid on the uninsured deposits at IndyMac Bank. There were a number of conditions of the FDIC sale to IMB HoldCo LLC, including that IMB HoldCo would capitalize OneWest with approximately $1.3 billion in cash.

31. As another condition of the sale IMB HoldCo also agreed to continue the FDIC's existing loan modification program. The FDIC also agreed to share losses on a portfolio of qualifying loans, with IMB HoldCo assuming the first 20% of losses, with the FDIC sharing losses 80/20 for the next 10% of losses and 95/5 thereafter. Finally under a participation structure on an approximately $2 billion portfolio of construction and other loans, the FDIC will receive a majority of all cash flows generated.

32. OneWest Bank began operations as a newly formed Pasadena, California-based federal savings bank on March 19, 2009 with its acquisition of certain assets and certain limited liabilities of IndyMac Federal Bank, FSB from the FDIC. The newly-formed bank opened its doors with 33 branches and approximately $16 billion of assets.

33. Since its formation, OneWest Bank has grown through acquisitions from the FDIC of certain assets, loans, and deposits of other California-based financial institutions. On December 18, 2009, OneWest completed the acquisition of the banking operations of First Federal Bank of California, including $6 billion in assets and $5 billion in deposits. On February 19, 2010, OneWest acquired all of the deposits and certain assets of La Jolla Bank, FSB, including $4 billion in assets and $3 billion in deposits.

34. In February 2010, OneWest Bank entered into a purchase and assumption agreement with the FDIC for acquisition of the deposits and certain assets of La Jolla Bank, FSB. Under the terms of the transaction, OneWest acquired $3.6 billion in assets. The FDIC and OneWest agreed to a loss-sharing agreement covering a majority of the acquired loans from La Jolla Bank.

35. On October 4, 2010 OneWest Bank, announced that it has implemented the Principal Reduction Alternative (PRA) loan modification program as outlined under the Home Affordable Modification Program (HAMP). With this announcement, OneWest becomes one of the first servicers to launch the program. In November 2010, OneWest Bank, purchased of a $1.4 billion multifamily and commercial real estate loan portfolio from Citibank, N.A. The portfolio, which includes approximately 600 loans, is a strategic addition to OneWest Bank's growing Commercial Real Estate lending business.

- 9 -

COMPLAINT

36.    OneWest Bank is a federal savings bank with 82 retail branches in Southern California and approximately $14 billion in deposits as of February 2010.

37.    As of November 2010, OneWest Bank has been recognized as the 40th largest among US banks and thrifts by SNL Financial.

38.    Defendant NDEX West, LLC ("NDEX") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Addison, Texas, and doing business in the State of California and the County of Los Angeles, and has intentionally and maliciously concealed the true names of entities to which Plaintiffs' home loans were transferred by other Defendants. NDEX is one of the Defendants' agents which acts as trustee under the deeds of trust securing real estate loans so as to foreclose on property securing the real estate loans held or serviced by the Defendants. The foregoing is part of a scheme by which the Defendants concealed the transferees of loans and deeds of trust, inter alia in violation of California Civil Code § 2923.5, §2934(a) and 15 U.S.C. § 1641, as more fully described herein.

39.    Defendant Meridian Foreclosure Service ("Meridian") is a corporation organized and existing under the laws of the State of California, with its principal place of business in Newport Beach, California, and doing business in the entire State of California and the County of Los Angeles, and has intentionally and maliciously concealed the true names of entities to which Plaintiffs' home loans were transferred by other Defendants. Meridian is one of the Defendants' agents which acts as trustee under the deeds of trust securing real estate loans so as to foreclose on property securing the real estate loans held or serviced by the Defendants. The foregoing is part of a scheme by which the Defendants concealed the transferees of loans and deeds of trust, inter alia in violation of California Civil Code § 2923.5, §2934(a) and 15 U.S.C. § 1641, as more fully described herein.

40.    The Federal Deposit Insurance Corporation ("FDIC") is a corporation organized and existing under the laws of the State of Delaware, and doing business in the State of California, with a branch office in the City of Irvine, California. The FDIC does business in all 50 States and in the County of Los Angeles, and has intentionally incentivized the Defendants to foreclose on Plaintiffs' homes.

41.    The Trustee Defendants were the vital foreclosing arm of the fraudulent conspiracy of Bank Defendants, intentionally and maliciously foreclosing on Plaintiffs herein knowing they had no

- 10 -

**COMPLAINT**

authority to do so, at the direction of the conspiracy, in the name of profit. Further Trustee Defendants intentionally and maliciously concealed the true names of entities to which Plaintiffs' home loans were transferred by other Defendants. The foregoing is part of a scheme by which the Defendants concealed the transferees of loans and deeds of trust, inter alia in violation of California Civil Code § 2923.5 and 15 U.S.C. § 1641, as more fully described herein. Trustee Defendants are also independently liable as co-conspirators in the broad fraudulent conspiracy among all Defendants.

    a. Upon information and belief, Trustee Defendants are acting under the direct control of Bank Defendants. Trustee Defendants are personally responsible for robo-signing affidavits, executing assignments, and recording of Notice of Defaults and Trustee Sale Notices which are defective and not in accordance to California Law.

    b. This Complaint seeks significant relief, including monetary relief, from Trustee Defendants given the key role that they played caused many of the Plaintiffs herein to lose their homes. Through a number of wrongful foreclosure actions they conspired with the other Defendants to commit assorted violations of California Law. All of the violations done by this specific defendant were made in the State of California against California citizens.

    c. Furthermore it is alleged that Trustee Defendants' action in moving forward with the foreclosure, and their actions as co-conspirators in the fraud and other harms complained of herein, are done with actual malice and in bad faith – eviscerating any defense of qualified trustee immunity. See *Kachlon v. Markowitz* (2008) 168 Cal.App.4th 316, 341; *Latino v. Wells Fargo Bank, N.A.* (E.D. Cal, Oct. 27 2011) 2011 WL 4928880 at \*5

42. The true names and capacities of the Defendants listed herein as DOES 1 through 1,000 are unknown to Plaintiffs who therefore sue these Defendants by such fictitious names. Each of the DOE Defendants was the agent of each of the other Defendants herein, named or unnamed, and thereby participated in all of the wrongdoing set forth herein. On information and belief, each such Defendant is responsible for the acts, events and concealment set forth herein and is sued for that reason. Upon learning the true names and capacities of the DOE Defendants, Plaintiffs may amend this Complaint accordingly.

- 11 -

**COMPLAINT**

### *Relationship of Defendants*

43. Defendants herein acted pursuant to a coordinated conspiracy.

a. At all times material hereto, the business of Defendants was operated through a common plan and scheme designed to effectuate the wrongs complained of herein, misrepresent and/or conceal material facts set forth herein from Plaintiffs, from the California public, and from regulators, either directly or as successors-in-interest to other Defendants.

b. These wrongful acts including (but not limited to) misrepresentation and concealment were completed, ratified and/or confirmed by each Defendant herein directly or as a successor-in-interest for another Defendant, and each Defendant performed the tortious acts set forth herein for its own monetary gain and as a part of a common plan developed and carried out with the other Defendants, or as a successor-in-interest to a Defendant that did the foregoing.

c. Each Defendant herein agreed to participate in the Conspiracy, shared in the profit of the conspiracy, and took tortious action in furtherance of the conspiracy.

d. Each of the conspirators reached a unity of purpose, common design, and meeting of the minds in the unlawful arrangement and acts alleged throughout this Complaint.

e. "Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although **not actually committing a tort themselves**, share with the immediate tortfeasors a common plan or design in its perpetration." *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.,* 7 Cal.4th 503, 510-11 (1994). "By participation in a civil conspiracy, a coconspirator **effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy.**" *Id.* at 511 (citing *Wyatt v. Union Mortgage Co.,* 24 Cal.3d 773, 784 (1979). "In this way, a coconspirator **incurs tort liability co-equal with the immediate tortfeasors.**" *Id.* See also *Vieux v. East Bay Regional Park District,* 906 F.3d 1330, 1343 (9th Cir. 1990)

f. As to each and every Cause of Action and Count herein, Plaintiffs allege that such actions were taken at the direction, behest, knowledge, and in furtherance of the conspiracy, with all acts an proceeds inuring to the benefit of the members of the Conspiracy. Defendants knowingly agreed to participate in the conspiracy with one another, and all acted in

-12-

**COMPLAINT**

furtherance of the conspiracy. Defendants have adopted as their own, the torts of their co-conspirators all of which fell within the ambit of the conspiracy alleged throughout this Complaint. All Defendants knowingly and intentionally conspired with one another. Accordingly all Defendants are liable for each Count and Cause of action under a theory of Conspiracy..

44.    Plaintiffs believe and thereon allege that the agents and co-conspirators through which the named Defendants operated included, without limitation, financial institutions and other firms that originated loans on behalf of the Defendants. These institutions acted at the behest and direction of the Defendants, or agreed to participate – knowingly or unknowingly - in the fraudulent scheme described herein.

45.    Those companies originating loans that knowingly participated in the scheme are jointly and severally liable with the Defendants for their acts in devising, directing, knowingly benefitting from and ratifying the wrongful acts of the knowing participants. Upon learning the true name of such knowing participants, Plaintiffs may seek leave to amend this Complaint to identify such knowing participants as Doe Defendants.

46.    For avoidance of doubt, such knowing participants include, without limitation, legal and natural persons owned in whole or in part by the Defendants or affiliates thereof; legal and natural persons owning directly or through affiliates financial interests in Defendants; legal and natural persons directly or through affiliates acting pursuant to agreements, understandings and arrangements to share in the benefits of the wrongdoing alleged in this Complaint and knowingly, to at least some degree, committing acts and omissions in support thereof; and legal and natural persons knowingly, to at least some degree, acting in concert with the Defendants.

47.    As to those legal and natural persons acting in concert without an express legal relationship with Defendants or their affiliates, on information and belief, Defendants knowingly induced and encouraged the parallel acts and omissions, created circumstances permitting and authorizing the parallel acts and omissions, benefited therefrom and ratified the improper behavior, becoming jointly and severally liable therefore.

48.    As to those legal and natural persons whose acts and omissions in support of the Defendants scheme were unwitting, on information and belief, Defendants knowingly induced and

- 13 -

**COMPLAINT**

encouraged the acts and omissions, created circumstances permitting and authorizing the parallel acts and omissions, benefited therefrom and ratified the improper behavior, becoming liable therefore.

49.    To the extent that certain Plaintiffs herein become aware of information that provides a basis for asserting the Defendants herein are liable for the origination of their loans, those Plaintiffs reserve the right to seek leave of this Court to re-assert the appropriate claims herein. Plaintiffs are informed and believe, and thereon allege, that: (1) the Defendants are liable for all wrongful acts of the companies which Defendants acquired prior to the date thereof as the successor-in-interest to those companies; (2) Bank Defendants directly and through their subsidiaries and other agents sued herein as Does have continued the unlawful practices of the acquired companies since the dates of their acquisition, including, without limitation thereof, writing fraudulent mortgages as set forth above and concealing wrongful acts that occurred in whole or in part prior thereto, and (3) Bank Defendants and their subsidiaries are jointly and severally liable as alter egos and as a single, greater unified whole.

50.    Bank Defendants' public disclosures, as reflected in its filings with the SEC, make clear that Bank Defendants considers themselves both a common enterprise operating as a greater whole and without meaningful distinctions as to its operating units.

51.    The other Defendants followed IndyMac and OneWest's directions because they are or were either subsidiaries of IndyMac and OneWest, directly or indirectly owned, controlled and dominated by IndyMac and OneWest, or because they are in an unequal economic and/or legal relationship with IndyMac and OneWest by which they are beholden to IndyMac and OneWest and are thereby controlled and dominated by IndyMac and OneWest.

## FIRST CAUSE OF ACTION:
## INTENTIONAL PLACEMENT OF BORROWERS INTO DANGEROUS LOANS THEY COULD NOT AFFORD THROUGH COORDINATED DECEPTION, IN THE NAME OF MAXIMIZING LOAN VOLUME AND THUS PROFIT
*(By All Plaintiffs against Bank Defendants and all other Defendants as Co-Conspirators)*

52.    During the 1980s and 1990s, the mortgage securitization business grew rapidly, making it

- 14 -

COMPLAINT

possible for mortgage originators to make more loans than would have been possible using only the traditional primary source of funds from deposits. During that period, Bank Defendants made loans in accordance with its stated underwriting and appraisal standards.

53.     Under the traditional mortgage model, which Bank Defendants originally subscribed to, a mortgage originator originated loans to borrowers, *held* the loans to maturity, and therefore retained the credit default risk. As such, under the traditional model, the mortgage originator had a financial incentive to ensure that (i) the borrowers had the financial ability to repay the loans, and (ii) the underlying properties had sufficient value to enable the mortgage originator to recover its principal and interest if the borrowers defaulted on the loans.

54.     Traditionally, mortgage lenders financed their mortgage business primarily using funds from depositors, retained ownership of the mortgage loans they originated, and received a direct benefit from the income flowing from the mortgages. When a lender held a mortgage through the term of the loan, it received revenue from the borrower's payments of interest and fees, and also bore the risk of loss if the borrower defaulted and the value of collateral was not sufficient to repay the loan. As a result of this "**originate to hold**" model, the lender had an economic incentive to verify the borrower's creditworthiness through prudent underwriting and to obtain an accurate appraisal of the value of the underlying property before issuing the mortgage loan.

55.     With the advent of securitization, the traditional "originate to hold" model gave way to the "originate to sell" model, in which mortgage originators sold the mortgages and transferred credit risk to their investors through the issuance and sale of Mortgage Backed Securities. Securitization concurrently provided lenders like Bank Defendants with an incentive to increase the number of mortgages they issued and reduced their incentive to ensure the mortgages' credit quality.

56.     With the aforementioned mandate for growth as the backdrop and incentive for their fraud, Bank Defendants abandoned the traditional model of "**originate to hold**" and instead adopted the much more lucrative "**originate to sell**" model, and in the early 2000's Bank Defendants began to systematically disregard its stated underwriting guidelines in an effort to originate an unprecedented number of loans for securitization.

57.     But to feed its investors and continue to make such never-before-seen profits, Defendants

- 15 -

**COMPLAINT**

needed more borrowers. In turn, Bank Defendants began disregarding their own underwriting standards, and approving borrowers who were grossly under-qualified, in the name of getting as many loans out the door, and sold to investors for a profit, as possible.

58. In fact they *preferred* under qualified borrowers. Because Bank Defendants had taken out insurance policies against the possibility of default, Bank Defendants and its co-conspirators (Defendants herein) would get paid in the event of a borrower's default. In fact, in many cases, Defendants had taken out numerous redundant insurance policies on the same property, so that when default occurred, Defendants were getting paid out multiple times – they weren't just breaking even, they were *actually turning a profit* when borrowers defaulted. In other words, Bank Defendants had an *incentive* to place borrowers into impossible loans, because by doing so they made profit.

59. With profit as their motive, Bank Defendants, in conspiracy with the other Defendants herein, set out upon a massive and centrally directed fraud by which Bank Defendants placed homeowners into loans which Defendants *knew* Plaintiffs could not afford, abandoned industry standard underwriting guidelines, and intentionally inflated the appraisal values of homes throughout California for the sole purpose of herding as many borrowers as they could into the largest loans possible which Bank Defendants would then sell on the secondary market at inflated values for unimaginable, ill-gotten profit (wildly surpassing the profit they would make by holding the loans), *knowing that their scheme would cause the precipitous decline in values of all homes throughout California*, including those of Plaintiffs herein.

60. To be clear, it is alleged that Bank Defendants' actions in intentionally placing borrowers into impossible loans in the pursuit of profit , were a substantial factor in if not *the* cause of the generalized market crash which caused the prices of real estate values throughout California to plummet, damaging Plaintiffs herein.

61. Like cattle, Plaintiff-borrowers were led to slaughter by Defendants and their greed. Borrowers were intentionally placed in loans which Defendants knew Plaintiffs could not afford, and whose default they knew was a mathematical certainty.

62. To achieve this loan volume, Bank Defendants (acting in furtherance of the conspiracy of Defendants), intentionally concealed and misrepresented numerous material terms of their loans, to induce Plaintiffs' unwitting, uninformed consent to those loans– for instance going to extraordinary

- 16 -

**COMPLAINT**

lengths to conceal the true negatively amortizing nature of the loan, or in other instances affirmatively misrepresenting that the true payment of a loan, among numerous other deceptions described below.

63.    To further increase their loan volume and maximize their profit, Defendants intentionally abandoned industry standard-underwriting guidelines (as well as their own underwriting guidelines) in order to approve borrowers for loans which Bank Defendants knew were dangerous for them.

### *Defendants Systematically Abused and Abandoned Industry Standard Underwriting Guidelines to Intentionally Place Unqualified Borrowers into Loans Which Defendants Knew They Could Never Afford*

64.    As mentioned above, however, Defendants' fraud was multipronged. To feed their investors and continue to make such never-before-seen profits, Bank Defendants needed more borrowers. In turn, Bank Defendants systematically and intentionally began disregarding their own underwriting standards, and approving borrowers who were grossly under-qualified, in the name of getting as many loans out the door, and sold to investors for a profit, as possible.

65.    In other words, not only did Bank Defendants inflate appraisal values, hand-in-hand with LandAmerica, in the name of making the loans appear safer to investors, and thus more profitable to the banks (discussed below in the causes of action for "Individual Appraisal Inflation" and "Market Fixing"), but Bank Defendants also abandoned their own underwriting guidelines to approve more and more borrowers for loans. In doing so, Defendants intentionally placed borrowers into dangerous loans which would imperil their entire livelihoods, and often cases into loans whose default was an absolute mathematical certainty. The result was, once again, more profit obtained through deception.

66.    To achieve their fraud, Bank Defendants intentionally and grossly falsified Plaintiffs' salary, income, bank accounts, liquid assets, non-liquid assets, employment, real estate owned values, rental income ad infinitum, and by doing so simultaneously achieved two goals. First, they were able to approve borrowers who could never have been approved under their own published conventional underwriting guidelines (as well as industry standard underwriting guidelines used throughout the United States.) Second, they were able to conceal from the investor the highly risk nature of the loan, which resulted in more profit to the Bank. Investors were willing to pay more money for less risky loans.

- 17 -

**COMPLAINT**

EXHIBIT A - PAGE 34

The translation is that Defendants had every incentive to deceive borrowers into entering loans which they realistically could never afford. The result was that Defendants turned profit, *at the sole expense of their borrowers*. When the music stopped, only the borrowers were left without a chair.

67.     Bank Defendants' long-term campaign of misrepresentations, concealments and abandonment of industry standard underwriting guidelines – all of which were designed to maximize loan volume by placing as many borrowers into loans as possible, whether qualified or unqualified – was implemented by the Board, Management and Ownership of the Bank Defendants pursuant to a **top-down policy**. Bank Defendants intentionally put mechanisms and programs in place to allow their own employee's/Loan Consultants/Loan Representatives to **falsify** borrower income, asset and other material information of their borrowers, without a borrower ever knowing that their income or assets had been inflated. One such program was called the **"Stated Income"** program. Under this program, Defendant would take as true any income stated on the application, without requesting any documentation in support. Seizing this unbridled free-for-all, Defendants' **own** employees who were paid commission based on the number and size of loans they got approved, rampantly falsified material income and asset information of their borrowers. By doing so they were paid more commission. But more importantly, Bank Defendant themselves created more products to be sold on the secondary market for even more profit. In other words, Bank Defendants intentionally put policies and programs into motion which would allow it to place unqualified borrowers into dangerous loans – all while maintaining the semblance of propriety, and all without ever having to disclose to their investors that the incomes listed on their loan applications were false.

68.     Numerous others similar programs were also adopted such as **"stated assets"**, and **"low documentation loans"**. Both of which allowed Bank Defendants to falsify information, and get loans approved which would  never been approved under traditional documentation

69.     Even in the absence of these programs Bank Defendants and their employees nevertheless had the ability to and did, falsify their borrower's income and assets through numerous other means. For example, Defendants would inflate a borrower's income by making it appear as though the borrower was earning rental income on of their other properties when in fact they were earning none. To legitimatize this false income, Defendants would add insult to injury by manufacturing an entirely

- 18 -

COMPLAINT

false rental agreement, showing the false monthly rental income, complete with the forged signature of a non-existent renter.

70. Bank Defendants *regularly* inflated borrowers' incomes by over 50% and on many occasions by as much as a mind-numbing 500%.

71. Bank Defendants were intentionally turning a blind-eye to the rampant and egregious manipulations of incomes by their own employees, through policies and programs intentionally set forth by Defendants' very own top executives to achieve *just such a result*. The result was that Bank Defendants were able to originate loans which they knew were false, and they intended to be false, but without ever having to *admit* to their secondary market investors that the loans were, in fact, false.

72. Bank Defendants knew and intended that their employees would falsify this information, for the very reasons set forth above, and in fact incentivized them through their commission and reward structure to do so. In other words Bank Defendants intended that this program would be abused. And by doing so, allowed and intended for their borrowers to be placed into loans which the borrowers had no chance of being able to afford had their true income/asset information been used .

73. Bank Defendants then told their borrowers, and Plaintiffs herein, that a determination by the Bank that they were "*qualified*" for a loan meant that the borrowers would be able to "*afford*" their loan.

74. Industry Standard and Conventional Underwriting guidelines, including those used by Bank Defendants herein, required that loans with a "front end" debt to income ratio higher than **35%** be rejected. They also required that loans with a "back end" debt to income ratio of higher than **45%** be rejected – and that 45% figure was on the on the *very* high end. For a loan with a 45% "back end" debt to income ratio to be approved, a borrower had to have excellent credentials in all other areas such as 720+ median credit score and high liquid asset reserves totaling more than 12 months of their mortgage payment.

75. However, Bank Defendants in this action regularly approved loans with front end ratios wildly exceeding 35% (and back end ratios wildly exceeding 45%) on a regular basis, and as a matter of course, in violation of their own published underwriting guidelines as well industry standard underwriting guidelines used throughout the banking industry.  Bank Defendants intentionally placed

- 19 -

COMPLAINT

borrowers into these dangerous loans, which fall wildly outside of their own underwriting guidelines – and intentionally did so in the name of profit without any regard for a borrower's safety. Then, to ensure that these wrongs and deceptions went unnoticed Defendants embarked on a campaign of concealments and misrepresentations all of which were designed to conceal the true nature and payments of the loan and designed induce the borrower's belief that they could "afford" the loan.

## *Defendants Turned Substantial Profits Through Their Borrowers' Default Furthering Their Incentive to Intentionally Place Plaintiffs Into Impossible and Unaffordable Loans*

76.   Not only did Bank Defendants approve under qualified borrowers – they preferred them. That's because a defaulting borrower meant profit for the conspiracy of Defendants.

77.   All of the Bank Defendants managed risk through leverage and derivatives trading. With the advent of "Credit Default Swaps" ("CDS"), an insurance policy of sorts, they had the protection they needed to push these loans out the door to grossly under qualified borrowers, without any fear of loss whatsoever. The CDS gave defendants *another* incentive to give grossly under qualified borrowers – whose default was virtually certain. Not only (1) were Defendants incentivized to give loans to unqualified borrowers because they were turning other-worldly profit by selling as many loans on the secondary market as possible, *but also* ... (see next paragraph).

78.   (2) Because Defendants had taken out these insurance policies – aka Credit Default Swaps - against the possibility of default, IndyMac and its co-conspirators (Defendants herein) would get paid in the event of a borrower's default. In fact, in many cases, Defendants had taken out numerous redundant Credit Default Swaps and insurance policies out on the same property, so that when default occurred, Defendants were getting paid out multiple times – they weren't just breaking even, they were *actually turning a profit* when borrowers defaulted. In other words, Bank Defendants had an *incentive* to place borrowers into impossible loans, because by doing so they were making money.

79.   This technique gave these Defendants the insurance they needed to pass the risk along to third party without taking the risk themselves. Since they planned on securitizing all of their loans and not keeping any of them, Bank Defendants could not care less about quality or who they hurt. They would push insurance on the investors and actually over insure the loan pools, at times betting that the

- 20 -

**COMPLAINT**

EXHIBIT A - PAGE 37

Plaintiffs and other borrowers would default.

80.    Since the Defendants created these pools to begin with, they were fully aware of the lack of quality and lack of due diligence that went into setting up these pools. These "swaps" are life insurance policies that are placed on Plaintiffs' loans. If the loan dies, the Defendants get paid.

81.    But insurance against default wasn't the only way Defendants made money from the losses of their imperiled borrowers. Bank Defendants and Trustee Defendants also made money by charging a litany of unearned and egregiously marked up fees associated with the initiation of and conducting (their own wrongful) foreclosures including: inspection fees, default fees, late fees, advance fees, attorney's fees, and trustee fees. In short Bank Defendants had an incentive *to place Plaintiff borrowers into loans they knew their borrowers could not afford* because by doing so, Bank Defendants and Trustee Defendants would turn a profit. Not only that, but Defendants had an incentive *to wrongfully initiate foreclosures* because they made money by doing so through the assessment of excessive, disproportionate and unearned fees. This topic is further developed in the Cause of Action for Wrongful Foreclosure (discussed below).

### *Defendants Intentionally Misrepresented, Partially Misrepresented, & Concealed Highly Material Information In Order To Induce Plaintiffs to Unknowingly Take Dangerous Loans So that Defendants Could Profit*

82.    To maximize their profit, Defendants needed loan volume. In turn, Bank Defendants (acting in furtherance of the conspiracy of Defendants), intentionally concealed and misrepresented numerous material terms of their loans, to induce Plaintiffs' unwitting, uninformed consent to those loans , in order to get as many borrowers into loans as possible – for instance going to extraordinary lengths to conceal the true negatively amortizing nature of the loan, or in other instances affirmatively misrepresenting the true payment and terms of a loan, among numerous other deceptions described below.

83.    To further their fraud, Bank Defendants, acting at the behest of the Conspiracy of Defendants, operated with the primary imperative of keeping Plaintiffs in the dark about the truth of their scheme and the terms of the loans because Defendants knew that if Plaintiffs knew the truth,

-21-

**COMPLAINT**

EXHIBIT A - PAGE 38

Plaintiffs would never have entered into the loans with Bank Defendants.

84.     To that end, Bank Defendants embarked on a long term campaign of misinformation, including intentional misrepresentations, partial misrepresentations & half-truths calculated to deceive, as well as active suppression of material facts, all in aims of inducing Plaintiffs to enter into a loan contract with Defendant which they would not have otherwise.

85.     Defendants, hand-in-hand with one another, **actively concealed** the following highly material items of information:

a.  The fact that Bank Defendants had intentionally abandoned their own as well as industry standard underwriting guidelines *for the purpose of* placing borrowers into loans which they knew borrowers could not afford and upon which they knew borrowers would default to a mathematical certainty;

b.  That Bank Defendants had abandoned the "originate to hold" business model of conventional money lenders, and instead became **a loan packaging and re-selling facility in which Bank Defendants originated loans for the sole purpose of reselling them on the secondary market for vast profit** –creating an incentive to place borrowers into loans which bank defendants knew they could not afford and simultaneously passing along all risk of default to the purchasers of the loan.

c.  That Bank Defendants had falsified Plaintiffs' income and asset documentation to intentionally place them into loans they could not otherwise afford;

d.  That Bank Defendants internally knew the products they were selling were dangerous and referred to them, among other things as "sacks of shit" as established by numerous internal emails;

e.  That Bank Defendants possessed internal reports concluding that if a Plaintiff took a loan from Defendants, that Plaintiff would suffer material losses, including but not limited to the loss of substantial equity;

f.  That Bank Defendants knew their scheme would cause a liquidity crisis that would devastate home prices;

g.  That Bank Defendants were no longer making loans based on a borrower's qualifications

- 22 -

**COMPLAINT**

or their ability to afford such a loan and that those ideas were now unimportant to them, but were instead making loans without regard for a borrowers qualifications or ability to afford simply to create sufficient product to sell to investors on the secondary market for profit;

h. That Bank Defendants *knew* Plaintiff-borrowers could not afford the loans they were being placed into and which they knew Plaintiffs would default upon to a mathematical *certainty*, but intentionally placed them into these impossible loans nonetheless in the name of making profit;

i. That Bank Defendants actively concealed the material terms of their loans from their borrowers, including but not limited to the fact a borrower was *certain* to defer interest under an Option ARM loan by making the minimum payment

j. That Defendants were no longer making loans based upon the profitability of their mortgage lending business (but rather instead upon the profitability of sales of these loans to investors and secondary markets);

k. That Because of this profitable scheme and because their loans were insured, Defendants stood to profit regardless of whether their loans performed and as such had no incentive to insure that the loans they were placing their borrowers into were safe, or that their borrowers were actually qualified for (or could make payments on) the loans into which they were being placed – in fact they had a disincentive to do so;

l. That Bank Defendants were in fact dependent on selling loans it originated into the secondary mortgage market, to sustain its business;

m. That Bank Defendants were making loans simply to create sufficient product to sell to investors for profit;

n. That Bank Defendants had ceased acting as conventional money lenders and had, instead, morphed into an enterprise engaged in systematic fraud on all of its material constituencies, including Plaintiffs;

o. That Bank Defendants had ceased acting as conventional money lenders who carried their own risk and turned profit through the production of low-risk loans, and instead morphed

- 23 -

**COMPLAINT**

EXHIBIT A - PAGE 40

into a loan conveyor belt, packaging loans with little if any regard for their underwriting standards, and selling those loans at substantial profit to investors on the secondary market to whom the risk would be passed on, through fraud and misrepresentation – a business enterprise vastly more profitable than the business model of being a conventional money lender;

p. That in furtherance of this scheme, Bank Defendants had in fact abandoned their conventional lending business and prudent lending standards, consistently lending to those who were grossly under-qualified and who they knew could not afford their loans and would default upon to a mathematical certainty;

q. Bank Defendants knew these loans were unsustainable for themselves and the borrowers and to a certainty would result in a crash that would destroy the equity invested by Plaintiffs and other of Defendants' borrowers;

r. Bank Defendants, their officers and employees internally referred to these loans as "Sacks of Shit" and "Garbage Loans";

s. Bank Defendants knew the sheer scope of their loan portfolio and fraudulent packaging of the portfolio would cause a liquidity crisis that would devastate home prices and gravely damage Plaintiffs;

t. Bank Defendants knew Plaintiffs would be materially and substantially harmed by contracting with Defendants;

u. Bank Defendants pursuit of a matching strategy in which it matched the terms of any loan being offered in the market, even loans offered by primarily subprime originators dangerously placed borrowers into loans regardless of whether or not they were actually qualified for the loan or could actually afford the loan, instead ceding their underwriting guidelines to whoever was the most lax lender at the time, regardless of whether or not *that* lenders guidelines were proper, safe, negligent or even dangerous or guided by reason;

v. The high percentage of loans it originated that were outside its own already widened underwriting guidelines due to loans made as exceptions to guidelines;

- 24 -

**COMPLAINT**

w. Bank Defendants definition of "prime" loans included loans made to borrowers with FICO scores well below any industry standard definition of prime credit quality;

x. The high percentage of Bank Defendants subprime originations that had a loan to value ratio of 100%; and

y. Bank Defendants subprime loans had significant additional risk factors, beyond the subprime credit history of the borrower, associated with increased default rates, including reduced documentation, stated income, piggyback second liens, and LTVs in excess of 95%.

86. The Plaintiffs did not know any of the concealed facts. Defendants had exclusive knowledge of these facts.

87. Bank Defendants, at the benefit of the Conspiracy of Defendants, further stated numerous half-truths and made partial representations calculated to deceive Plaintiffs and to create a substantially false impression. (*Boschma v. Home Loan Center, Inc. (2011) 198 Cal.App.4th 230, 250,* ["Defendant [bank] had a common law duty to avoid making partial, misleading representations that effectively concealed material facts"]; ((*Vega v. Jones, Day, Reavis & Pogue* (2004) 121 Cal.App.4th 282, 292 ["**Even where no duty to disclose would otherwise exist**, where one <u>does</u> speak he must speak the whole truth to the end that he does not conceal any facts which materially qualify those stated." ]). By making such partial misrepresentations, Defendants incurred a duty to speak the whole truth such that Defendants do not conceal any facts which materially qualify those stated. Such **partial misrepresentations** include:

a. Representations calculated to make a borrower believe that his or her payment would only be X dollars, when in reality such payment was only available for a limited undisclosed period of time and would then drastically increase;

b. Representations that a borrower could afford payments under their loan, calculated to make a borrower believe that the loan payment would always be constant, but made knowing that the such payments would later drastically increase and knowing that the borrower would be *unable* to afford such increased payments;

c. Representations that a borrower qualified for a loan, when in reality the borrowers'

- 25 -

**COMPLAINT**

qualification was only obtained through Defendants falsification of the borrowers' income, asset and other documentation, done without the borrower's knowledge;

d. Defendants' intentional publication and dissemination of their underwriting guidelines intended to create the perception that Bank Defendants lent in conformity with those guidelines and that their lending standards were safe, when in reality Defendants had abandoned their underwriting guidelines and were issuing loans which they knew were in unsafe;

e. Representations made that a borrower *qualified* for a loan (oftentimes based on documents falsified by Defendants) calculated to induce the borrower's belief they could *afford* their loan, when in reality Defendants knew borrowers would be unable to afford their loan as a matter of fact (oftentimes because Defendants had falsified their income and asset documentation as well as abandoned their own underwriting guidelines);

f. Representations to a borrower that his payment would cover both principal and interest, and calculated to induce the borrower to believe that his or her payment would always cover principal and interest, when in reality that same payment would no longer cover any principal after a very short period of time, and indeed would not even cover the minimum interest on the loan resulting in deferred interest;

g. Representations made in the Loan Documents that by making the minimum payment of an Option ARM loan, a party *may* defer interest (aka "negatively amortize"), when in *reality* by making the minimum payment a party was *certain* to defer interest. **The California Court of Appeals in *Boschma* has held that these identical allegations give rise to an actionable claim for fraudulent concealment.**; The *Boschma* court held that where, as here, the disclosures in Defendants' Option ARM loans discussing negative amortization, only frame negative amortization as a mere **possibility**, rather than the reality which is that when making a minimum payment negative amortization is a **certainty**, the disclosure is insufficient under law, giving rise to a valid cause of action not only for UCL but also for fraudulent concealment . (*Boschma v. Home Loan Center*, Inc. (2011) 198 Cal.App.4th 230.) In so holding the court in *Boschma* explicitly held that Banks have a duty to disclose such material

- 26 -

**COMPLAINT**

information. Plaintiffs allege that Bank Defendants, identically, failed to disclose the certainty of negative amortization in the Option ARM loans. Plaintiffs have attached supporting documentation. (See Appendix A).

h. The provision of an intentionally ambiguous Truth in Lending Disclosure ("TILDS") Payment Schedule which did not make it clear that borrowers could have avoided negative amortization (under an Option ARM loan) by making payments larger than those that were mandated by the payment schedule, in fact the payment schedule created the materially false impression that by following the payment schedule, Plaintiff borrowers would not negatively amortize their loan;

i. Other partial misrepresentations and half-truths calculated to induce the borrower to fundamentally misunderstand the nature of their loan, such that Plaintiff-borrowers would agree to a loan they would not have otherwise agreed to, such as the meaning of a pre-payment penalty, or whether they had a pre-payment penalty.

88. Bank Defendants, hand in hand with one another, **intentionally and affirmatively misrepresented**:

a. That Plaintiffs would be able to *afford* the loans they were being given;

b. That Defendants' calculations confirmed that Plaintiffs will be able to afford the loans they were being given;

c. That Defendants calculations confirmed that Plaintiffs would be able to shoulder the additional debt resulting from Defendant's loans, even in light of Plaintiffs' other debts and expenses;

d. That the term "qualify" was synonymous with being able to "afford" a loan.

e. That by paying the minimum payment on the Option ARM loan they would not be deferring interest (aka "negatively amortizing"), when in reality, they would be deferring interest;

f. That by paying the minimum payment on the Option ARM loan, Plaintiffs would be paying principal and interest, when in reality the minimum payment did not pay down any principal, and actually resulted in deferred interest (aka negative amortization);

- 27 -

COMPLAINT

g. That the value arrived at by Defendants' and LandAmerica's appraisals of Plaintiffs' property was indeed the true value of Plaintiffs' property (when in reality Defendants appraisals' were intentionally and artificially inflated, and moreover when Defendants had engaged in a systematic price fixing scheme which had already falsely inflated the value of Plaintiffs' property);

h. The true terms of the their loans, including their interest rate, the terms of their loans, whether the loan was variable or fixed, the duration of any fixed period, and the inclusion of a prepayment penalty;

i. That Defendants only entered into mortgages with qualified borrowers (when in reality Defendants were recklessly and intentionally ignoring their own underwriting standards, and offering mortgages to substantially under-qualified borrowers, including Plaintiffs herein who they knew could not afford their loans);

j. That Defendants were financially sound (when in reality Defendants were dependent on selling their fraudulently-pooled loans to investors and the secondary market to sustain their business);

k. That Defendants held their loans in their own portfolio and did not sell them on the secondary market (when in reality Defendants sold the overwhelming majority of their loans on the secondary market);

l. That Defendants were engaged in lending of the highest caliber (when in reality Defendants (1) were disregarding industry standard quality assurance and underwriting guidelines as well as their own underwriting guidelines, (2) had ceded their underwriting guidelines to the bottom of the market by virtue policy to match loans of any other lender no matter how unsafe, and (3) were lending to under qualified borrowers upon properties which were intentionally overvalued – all in the name of making as much money on the secondary/investor market as quickly as possible);

m. That the loans they offered were safe and secure (when internally Defendants and their officers were referring to their loans as "SACKS OF SHIT" and "GARBAGE LOANS");

n. That Plaintiffs and other borrowers were qualified for the loans Defendants were placing

- 28 -

**COMPLAINT**

EXHIBIT A - PAGE 45

them into and that Plaintiffs were capable of affording the fully amortized payments on those loans (when internally Defendants knew that Plaintiffs were not qualified, that Plaintiffs could not afford the loan, and that, in many instances, it was a mathematical inevitability that the Plaintiffs would default);

o. That Plaintiffs would be able to refinance their loans at a later date (when internally Defendants knew that Plaintiffs would not be able to refinance Plaintiffs as a result of the depressed real estate market created by Defendants, the overvaluation of Plaintiffs' property, the damage to Plaintiffs' credit score which defendants knew would ensue, and for the many reasons already set forth above);

p. That Defendants would modify Plaintiffs' loans (when in fact Defendants did not modify Plaintiffs' loans, had no intentions to do so, and it was more profitable for Defendants to leave the loans unmodified).

### *Authority to Bind*

89.    These representations were not made as statements of opinion, but as statements of fact, made by the employees and agents of the Bank Defendants charged with the duty of originating loans ("**Loan Representatives**") and who were specifically employed by Bank Defendants to walk Plaintiff borrowers through the loan process, and vested with the authority, both apparent and actual, to bind Defendants.

90.    Each and every one of these Loan Representatives was vested by the respective bank they work for – the bank/lending institution from which a Plaintiff got his/her loan – with both actual and apparent authority to bind that bank/lending institution. These Loan Representatives were the *primary*, if not sole, interface between the bank/lending institution and the customer/borrower/plaintiff. Defendant banks very much intended to create the distinct perception that the representations made by these Loan Representatives, were factual representations coming directly from the bank, and representations upon which the borrower Plaintiffs could reasonably rely, well above-and-beyond that of mere opinion.

91.    Specifically, with regard to the representation made by Bank Defendants to Plaintiff

- 29 -

**COMPLAINT**

borrowers, that they could "afford" the loans they were being given were statements delivered as statements of fact upon which Plaintiffs could reasonably rely, particularly in light of the specialized expertise of the Defendant employees who made the statements. These employees spend months and years, undergoing specialized education, to learn the highly complicated mathematics of lending such as loan amortization, loan re-casting, front end debt to income ratios, back end debt to income ratios, and loan to value ratios – mathematics which borrowers simply don't understand, nor could they be expected to. Because of their vastly superior knowledge, and because of the actual and apparent authority vested in these employees by the Defendant Banks, as described above, Plaintiffs herein reasonably relied on these statements. By making these false and misleading statements, they incurred a duty to be truthful.

***Plaintiffs Reasonably Relied on Defendants' Numerous Deceptions in Deciding to Enter into Contracts With Them***

92.    Defendants intended to deceive Plaintiffs and induce their reliance, by intentionally misrepresenting and failing to disclose the material facts.

93.    Plaintiffs did in fact rely on each of the aforementioned misrepresentations, partial representations and concealments in deciding to contract with Defendants

94.    Plaintiffs reasonably and foreseeably relied upon the deception of Defendants in deciding to enter into a Loan contract with Bank Defendants - Defendants were among the nation's leading providers of Loan. It was highly regarded and by dint of its campaign of deception through securities filings, press releases, public utterances, web sites, advertisements, brokers, loan consultants and branch offices, Bank Defendants had acquired a reputation for performance and quality underwriting.

95.    Moreover, as consumers unfamiliar with the myriad intricacies, terms and mathematics of mortgages, it was both reasonable and foreseeable (if not entirely intended) that Plaintiffs would rely on the advice of loan professionals and bank representatives (many of whom held the title "Loan CONSULTANT") trained to understand the highly-complicated terms and mathematics of financing, amortization, indices, margins, and collateralization in the mortgage world, in deciding to contract with Bank Defendants. Their knowledge of this process, its details, as well as their loan products was vastly superior to those of Plaintiff borrowers. Indeed, Bank Defendants had exclusive knowledge of these

- 30 -

**COMPLAINT**

material facts which were not known to Plaintiff.

96.    The reality is that borrowers simply don't understand the highly complicated mathematics of lending such as amortization, loan re-casting, loan to value ratios, or debt to income ratios, etc. Nor could they be expected to – those mathematics require specialized training and education. The borrower's knowledge is inferior. Because of the vast imbalance of knowledge, when a loan consultant tells a borrower that they can afford their loan, borrowers are put in a position where they must repose their trust on their lender's knowledge.

97.    Indeed, Bank Defendants induce their borrowers (Plaintiffs) to repose trust in them by holding themselves out as (1) experienced professionals with (2) superior knowledge, education and expertise,  and **by offering them financial guidance on how to structure their assets, equity position, and debt – all of which was held out as being for the borrower's (Plaintiffs') benefit.** In many instances Bank Defendants called Borrowers to **solicit loans under the guise of offering them "financial advice" and "investment strategies."** In so acting, Defendants acted as fiduciaries or quasi-fiduciaries.

98.    Based upon the Defendants' (1)long term media campaign holding themselves out as a trustworthy and reputable lending institution, (2) position as leading financial institutions,(3)Defendants' expertise, highly specialized training, unique understanding of the highly complicated terms and mathematics of financing  as well as Defendant Banks' capacity as an advisor, in addition to their (4) intentionally misleading and/or partially true statements found in omissions, including in their securities filings, numerous documents, advertisements and other media, statements made by their employees and agents with apparent and/or actual authority and their publicly available underwriting guidelines the Plaintiffs reasonably relied upon the statements and omissions made by Defendants and reasonably relied that no material information necessary to their decisions would be withheld or incompletely, inaccurately or otherwise improperly disclosed. In so relying, the Plaintiffs were gravely damaged as described herein.  The Defendants acted willfully with the intention to conceal and deceive in order to benefit therefrom at the expense of the Plaintiffs.

99.    Further, Plaintiffs had no way of knowing, among other things, that Defendants (1) were secretly departing from their own stated underwriting guidelines to intentionally approve borrowers for

- 31 -
**COMPLAINT**

loans they couldn't afford in aims of selling as many loans as possible on the secondary market for profit, or (2) had surreptitiously manipulated the appraised values of their borrower's properties and had otherwise artificially pumped up values of real estate through California (aka "market fixing"). Defendants' knowledge of these items was exclusive. Their scheme was built on keeping borrowers in the dark

100.    Furthermore, because of a lender's (2) vastly superior knowledge compared to that of their borrowers, and because of (3) the highly-advisory role a lender takes in the lending process (advising borrowers how much they can afford, what type of loan and term they should take, what size loan to take, how to structure their loan, and what their payments will be), Bank Defendants intentionally placed their borrowers in a position where they *must* repose trust in their lender.

101.    In reliance on the above concealments and/or material misrepresentations, Plaintiffs entered into mortgage contracts with Defendants they otherwise would not have entered into and as a result thereof were damaged. This damage was not only foreseeable by Defendants, but actually foreseen (and then concealed) by them.

102.    The unraveling of Defendants' scheme has caused the material depression of real estate values throughout California, including the real estate of Plaintiffs herein.

103.    Defendants knew that within a foreseeable period, its investors would discover that Defendants' borrowers could not afford their loans and the result would be foreclosures and economic devastation.

104.    Despite their awareness of and concerns about the increasing risk the Defendants were undertaking, they hid these risks from the Plaintiffs, borrowers, potential borrowers, and investors.

105.    These frauds and concealments, partial misrepresentations and affirmative misrepresentations were unknown to all Plaintiffs referenced herein at the time of loan origination. All Plaintiffs herein discovered these frauds and concealments beginning no more than 3 years prior to the date of filing this action. A reasonable person would have been unable to reasonably discover said frauds any earlier.

- 32 -

**COMPLAINT**

EXHIBIT A - PAGE 49

### *Bank Defendants Owed Plaintiffs a Duty*

106.    For seven separate and independent reasons, Bank Defendants owed Plaintiffs a duty.

107.    **First** under California Civil Code §1572, parties to a contract have an unequivocal duty to disclose material facts to one another. (*Walker v. KFC Corp.* (S.D.Cal. 1981) 515 F.Supp. 612, 622 ["[section] 1572 affirmatively imposes the duty not to suppress facts on persons who are parties to a contract or who are inducing others to enter into a contract."]) Here Plaintiffs are engaged in contracts with respective loan contracts with each of the Bank Defendants, and plaintiffs have alleged numerous failures to disclose such material facts. (See paragraph 333, and Appendix A).

108.    **Second**, California Civil Code §§1709 and 1710 establish a separate independent duty of disclosure, even in the absence of a contractual relationship, where, as here, Bank Defendants and LandAmerica have made partial inaccurate disclosures which are likely to mislead for want of the missing fact, codifying the long-standing rule that the "telling of a half-truth calculated to deceive, is fraud." Plaintiffs have alleged numerous such partially misleading disclosures at paragraph 336, of this Complaint, and in Appendix A. The Supreme Court of California has held the same. (Warner Constr. Corp., supra, 2 Cal.3d at 294 [A defendant has a duty of disclosure "when the defendant makes partial representations but also suppresses some material facts."]).

109.    **Third**, Bank Defendants and LandAmerica had exclusive knowledge of numerous items of highly material information which they did not disclose. Numerous cases including those from the Supreme Court of California hold that a defendant has a duty of disclosure "when the defendant had exclusive knowledge of material facts not known to plaintiff." *Warner Constr. Corp.*, supra, 2 Cal.3d at 294.

110.    **Fourth**, a Defendant has a duty to disclose "when it actively conceals a material fact from the plaintiff." Warner Constr. Corp., supra, 2 Cal.3d at 294. This Complaint alleges throughout that Bank Defendants and LandAmerica embarked on a campaign of active suppression and concealment of numerous material facts.

111.    **Fifth**, Numerous court, including the California Court of Appeal have held that where, as here, the disclosures in Plaintiffs' Option ARM loans discussing negative amortization, only frame negative amortization as a mere possibility, rather than the reality which is that when making a

- 33 -

**COMPLAINT**

minimum payment negative amortization is a certainty, the disclosure is insufficient under law, giving rise to a valid cause of action not only for UCL but also for fraud/misrepresentation. (Boschma v. Home Loan Center, Inc. (2011) 198 Cal.App.4th 230.) The court in Boschma explicitly held that Banks have a duty to disclose such material information. Plaintiffs allege that Bank Defendants, identically, failed to disclose the certainty of negative amortization in the Option ARM loans. Plaintiffs have attached supporting documentation. (See Appendix A).

112. Sixth, Defendants have **ceased acting as conventional money lenders**. In conducting the wrongs described above and throughout this Complaint, the Bank Defendants stepped vastly outside of their role as conventional money lenders, and instead morphed into an enterprise engaged in intentional fraud upon their borrowers. Among their numerous departures from the actions of a conventional money lender, Defendants:

a. **Intentionally falsified the values and appraisals of each of the Plaintiffs' subject properties** – numerous courts have held that such falsification of appraisals "do not fall within a bank's role as a traditional money lender." (*Sullivan v. JP Morgan Chase Bank, N.A.* (E.D.Cal. 2010) 725 F.Supp.2d 1087, 1094; *Watkinson v. MortgageIT* (2010) 2010 WL 2196083 at *9.)

b. Artificially and fraudulently inflated the value of all of the California real estate market, (as opposed to just those of Plaintiffs herein) in **a Price Fixing scheme achieved through pervasive and coordinated falsification of appraisals**, knowing that by doing so their fraudulent appraisals would act as comparables which would artificially inflate the rest of the market (as detailed in the Causes of Action for "Individual Appraisal Inflation" and "Market Fixing" below)

c. **Coerced their appraisers to falsify their appraisals through bribery, undue influence, instruction, appraiser selection manipulation, financial pressure, as well as threats – both explicit and implicit –** that if their appraisals didn't return a valuation above that demanded by Bank Defendants (1) future business with the appraiser would either diminish or discontinue altogether or (2) that the individual appraiser would be fired/blacklisted.

- 34 -

COMPLAINT

d. Intentionally and knowingly subjected their appraisers to known conflicts of interest.

e. **Intentionally falsifying the income and asset documentation** of their borrowers to place them into loans which Defendants knew Plaintiffs could not afford, and would default upon to a mathematical certainty. Numerous courts have held banks liable for fraud for such identical acts because such acts "do not fall within a bank's traditional role as money lender." (*Sullivan v. JP Morgan Chase Bank, N.A.* (E.D.Cal. 2010) 725 F.Supp.2d 1087, 1094; *Watkinson v. MortgageIT* (2010) 2010 WL 2196083 at \*9.)

f. Abandoned the "originate to hold" business model of conventional money lenders, and instead became **a loan packaging and re-selling facility in which bank defendants originated loans for the sole purpose of reselling them on the secondary market for vast profit** –creating an incentive to place borrowers into loans which bank defendants knew they could not afford and simultaneously passing along all risk of default to the purchasers of the loan.

g. Intentionally abandoned industry-standard underwriting guidelines – the hallmark of conventional money lending - in order to place borrowers into loans they knew they could not afford solely in the name of profit;

h. **Originated loans with an eye towards immediately securitizing and re-selling them on the secondary market and becoming the servicer on the loan,** thus creating an incentive to place borrowers into loans they knew their borrowers could not afford because by doing so Defendants-now-turned-servicers would be in a position to collect highly-lucrative fees from their imperiled borrowers, such as late fees, default fees, and indeed foreclosure fees. In doing so, Defendants became anything but conventional money lenders – **their interests were directly aligned with those of a servicer.** Numerous courts have held that where, as here, a bank acts as servicer they have exceed their role as a conventional money lender. (*Johnson v. HSBC Bank USA, Nat. Ass'n* (S.D.Cal. 2012) 2012 WL 928433 \*4.)

i. **Entered into loan modifications with Plaintiffs.** A lender goes beyond its "role as a silent lender and loan servicer [when it] offer[s] an opportunity to plaintiffs for loan

- 35 -
COMPLAINT

EXHIBIT A - PAGE 52

modification and to engage with them concerning the trial period plan. ... [T]his is precisely beyond the domain of a usual money lender ... [and] constitutes sufficient active participation to create a duty of care", as held by numerous courts. (*Garcia v. Ocwen Loan Serv.*, LLC (N.D. Cal.) 2010 WL 1881098 at *3; *Ansanelli v. JPMorgan Chase Bank, N.A.*, No. C 10-03892 WHA, 2011 U.S. Dist. LEXIS 32350, at *21-22 (N.D.Cal. Mar. 28, 2011; *Johnson v. HSBC Bank USA*, (S.D. Cal. 2012) 2012 WL 928433 at *3.)

j. **Engaged in massive intentional fraud upon its borrowers.** While a bank may in the course of conventional lending act negligently from time to time, intentional committed torts cannot be said to be conventional practice for lenders. If Bank Defendants wish to assert that massive intentional fraud on their borrowers is conventional practice for lenders, they should do so at trial. Numerous courts, including the Supreme Court of the United States have recognized that a duty properly attaches to a bank when it acts intentionally, rather than negligently. (*Connor v. Great Western Sav. & Loan Ass'n* (1968) 69 Cal.2d 850, 865; *Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089; *Becker v. Wells Fargo Bank, N.A.* (E.D.Cal. 2011) 2011 WL 3319577; *Dumas, supra,* 2011 WL 4906412; *Champlaie, supra,* 706 F.Supp.2d at 1060; *Watkinson v. MortgageIT, Inc.* (S.D. Cal. 2010) 2010 WL 2196083.)

k. **Seventh, and finally,** even when acting as a conventional money lender, Banks nevertheless owe a duty to their borrowers, when they meet the following test:

> In California, the test for determining whether a financial institution owes a duty of care to a borrower-client " 'involves the balancing of various factors, among which are [1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm.

(*Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089, 1098). Each of the 6 elements is amply alleged throughout this Complaint.

113.  Defendants' profit-driven scheme to herd as many borrowers into loans at any cost through coordinate deception was implemented pursuant to a top down policy ratified at the highest

- 36 -

**COMPLAINT**

EXHIBIT A - PAGE 53

levels of each of Bank Defendants, and done at the behest of the Conspiracy.

114. Defendants' actions in intentionally placing borrowers into impossible loans in the pursuit of profit , were a substantial factor in if not *the* cause of the generalized market crash which caused the prices of Real Estate values throughout California to plummet, damaging Plaintiffs herein.

115. The unraveling of the Defendants' scheme has materially depressed the price of real estate throughout California, including the real estate owned by the Plaintiffs, resulting in losses to the Plaintiffs.

116. As a result of the foregoing, Plaintiffs' damages herein are exacerbated by a continuing decline in residential property values and further erosion of their credit records.

117. Defendants' concealments and misrepresentations, both as to the their scheme to profiteer from the mortgage melt-down and as to their purported efforts to resolve loan modifications with Plaintiffs, are substantial factors in causing the harm to Plaintiffs described in this Complaint.

118. Without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages arising from this Cause of Action also include loss of equity in their houses, costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

119. Counts 1 – 5 arise under this Cause of Action, and are brought by all Plaintiffs named in this Cause of Action, against all Defendants named in this Cause of Action.

## COUNT 1: FRAUDULENT CONCEALMENT

120. The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein

121. Bank Defendants, at the direction, behest, and on behalf of the Conspiracy of Defendants intentionally concealed the material facts alleged above at Paragraph 76 and 78, in order to induce Plaintiffs reliance into entering into Loan Contracts with Bank Defendants

122. Plaintiffs did in fact rely on the non-existence of the concealed facts in deciding to enter into Loan Contracts with Bank Defendants. Had Plaintiffs known the truth, they would not have entered

- 37 -

COMPLAINT

into the Loan Contracts.

123.   Defendants had exclusive knowledge of the truth. Their scheme was built on keeping their borrowers (Plaintiffs herein) in the dark.

124.   Defendants had a duty to disclose such material information but intentionally failed to do so.

125.   As a result of such concealments Plaintiffs were damaged as described in this Cause of Action. Without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages arising from this Cause of Action also include loss of equity in their houses, growth in their loan balances resulting from concealed negative amortization, costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

126.   Defendants' actions in intentionally placing borrowers into impossible loans in the pursuit of profit , were a substantial factor in if not *the* cause of the generalized market crash which caused the prices of Real Estate values throughout California to plummet, damaging Plaintiffs herein.

127.   Defendants' intentional, wide-scale, fraudulent conduct also merits the imposition of punitive damages. Plaintiffs respectfully request the award of such punitive damages and any other relief this court shall deem just and proper.

## COUNT 2: INTENTIONAL MISREPRESENTATION

128.   The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein

129.   Bank Defendants, at the direction, behest, and on behalf of the Conspiracy of Defendants intentionally misrepresented the material facts alleged above at Paragraphs 77 and 78, in order to induce Plaintiffs reliance into entering into Loan Contracts with Bank Defendants

130.   Plaintiffs did in fact rely on the truth of the misrepresented facts in deciding to enter into Loan Contracts with Bank Defendants. Had Plaintiffs known the truth, they would not have entered into the Loan Contracts.

131.   Defendants had exclusive knowledge of the truth. Their scheme was built on keeping

- 38 -

**COMPLAINT**

EXHIBIT A - PAGE 55

their borrowers (Plaintiffs herein) in the dark.

132.    As a result of such intentional misrepresentations Plaintiffs were damaged as described in this Cause of Action. Without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages arising from this Cause of Action also include loss of equity in their houses, loan payments falsely represented to be much lower than what they truly were, growth in their loan balances resulting from negative amortization which Defendants represented would not occur, costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

133.    Defendants' actions in intentionally placing borrowers into impossible loans in the pursuit of profit , were a substantial factor in if not *the* cause of the generalized market crash which caused the prices of Real Estate values throughout California to plummet, damaging Plaintiffs herein.

134.    Defendants' intentional, wide-scale, fraudulent conduct also merits the imposition of punitive damages. Plaintiffs respectfully request the award of such punitive damages and any other relief this court shall deem just and proper.

## COUNT 3: NEGLIGENT MISREPRESENTATION

135.    The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

136.    The allegations of this Count are identical to those above in the previous Count except that the degree of intent herein is that of negligence. Put another way, at the time Bank Defendants made the misrepresentations described in this Cause of Action, they did not have reasonable grounds to believe them to be true.

## COUNT 4: NEGLIGENCE

137.    The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein

138.    Bank Defendants had a duty to act reasonably, and further had duties of care imposed

- 39 -
## COMPLAINT

upon them by law and statute as alleged above at paragraphs 96-102

139. In undertaking to place as many borrowers into loans as possible in the pursuit of profit without regard for their ability to afford them, their creditworthiness, or the distinct risk of default (either a known likelihood of default or reckless disregard thereof) and the commensurate effects such wide scale defaults would have on property values and the economic system, Bank Defendants breached that duty.

140. Bank Defendants further breached their duty by abandoning industry standard underwriting guidelines.

141. Bank Defendants breached their duty in numerous other fashions as described throughout this Complaint, whose allegations in their entirety are incorporated by reference as to all Causes of Action and all Counts.

142. In breaching their duty, Bank Defendants, acting in conspiracy with the other Defendants herein, caused grave damage to Plaintiffs herein and numerous others.

143. These harms were foreseeable if not actually foreseen by Defendants.

144. Further, Defendants' actions in intentionally placing borrowers into impossible loans in the pursuit of profit , were a substantial factor in if not *the* cause of the generalized market crash which caused the prices of Real Estate values throughout California to plummet, damaging Plaintiffs herein

145. Without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages arising from this Cause of Action also include loss of equity in their houses, costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

## COUNT 5: UNFAIR, UNLAWFUL, AND FRAUDULENT BUSINESS PRACTICES
### (VIOLATION OF CAL. BUS. & PROF. CODE §17200)

146. The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

147. Bank Defendants' acts, hand-in-hand with the conspiracy of Defendants, as described in

- 40 -

COMPLAINT

this Cause of Action are Fraudulent as set forth above

148.    In addition to being fraudulent, Bank Defendants' actions are also unlawful. Defendants' actions in implementing and perpetrating their fraudulent scheme of inducing Plaintiffs to accept mortgages for which they were not qualified based on inflated property valuations and undisclosed disregard of their own underwriting standards and the sale of overpriced collateralized mortgage pools, all the while knowing that the plan would crash and burn, taking the Plaintiffs down and costing them the equity in their homes and other damages, violates numerous federal and state statutes and common law protections enacted for consumer protection, privacy, trade disclosure, and fair trade and commerce. In addition to being fraudulent and violates numerous federal and state statutes and common law protections enacted for consumer protection, privacy, trade disclosure, and fair trade and commerce.

   a.  Bank Defendants violated the Truth in Lending Act ("TILA") by failing to make the necessary disclosures under Law, including the failure to sufficiently disclose the certainty of negative amortization in their Loan Documents as well as the accompanying Truth In Lending Disclosure Statement. These identical allegations have been recognized by the California Court of Appeal in *Boschma*, to give rise to an actionable claim for Fraudulent Concealment, Violation of TILA & Violation of the UCL.

   b.  Defendants further violated TILA by failing to properly disclose or fraudulently hiding prepayment penalties, points, origination discounts, kickbacks, commissions, etc. to Plaintiffs oftentimes resulting in Plaintiff being forced to incur or pay unnecessary or unfair charges which they were never aware of, and which they never had an opportunity to contest.

149.    The acts of the Conspiracy of Defendants are also patently unfair as more fully set forth above. Without limiting the allegations above which are fully incorporated herein, Defendants acts are unfair insofar as they intentionally place unsuspecting borrowers into loans which jeopardize their financial livelihoods and risk potential homelessness. Simply put, Defendants' scheme is to use borrowers as pawns to increase their profit. It speaks for itself that such acts are patently unfair.

150.    Such acts and practices violate established public policy and the harm they cause to consumers in California greatly outweighs any benefits associated with those practices.

- 41 -

**COMPLAINT**

151. These actions were immoral, unethical, oppressive, unscrupulous and substantially injurious to similarly situated borrowers, and Plaintiffs herein. Defendants' conduct had no utility other than for their own ill-gotten gain, and the harm was great not only to Plaintiffs herein, but also to residents of California, broadly, who have seen a decrease in their home and property values as a result of the bursting of the super-heated pricing bubble created by Defendants' fraudulently inflated appraisal; at the time of their fraud, Defendants *knew* that their conduct would cause the precipitous decline in property values throughout the State of California. Defendant's acts caused substantial consumer injury with no benefits to consumer competition. Plaintiffs could not have reasonably avoided these injuries occasioned by Defendants' intentional deceit, misrepresentation, and omission. Further, Defendants acts significantly threatened harm to competition.

152. The unfair, unlawful and fraudulent acts and practices of Defendants named herein present a continuing threat to Plaintiff and to members of the public in that these acts and practices are ongoing and are harmful and disruptive to business and financial markets.

153. Defendant's acts caused substantial consumer injury with no benefits to consumer competition. Plaintiffs could not have reasonably avoided these injuries occasioned by Defendants' intentional deceit, misrepresentation, and omission. Further, Defendants acts significantly threatened harm to competition.

154. Plaintiffs are entitled to restitution of the loan payments obtained by Defendants pursuant to their unlawful, unfair, and fraudulent business practices.

155. Further, as a result of the foregoing conduct, Plaintiffs suffered injury in fact including diminished credit scores with a concomitant increase in borrowing costs and diminished access to credit, fees and costs, including, without limitation, attorneys' fees and costs.

156. As a result of Defendants' unfair competition, Plaintiffs are entitled to restitution for all sums received by Defendants with respect to Defendants' unlawful and/or unfair and/or fraudulent conduct, including, without limitation, interest payments made by Plaintiffs, fees paid to Defendants, including, without limitation, the excessive fees paid at Defendants' direction, and premiums received upon selling the mortgages at an inflated value.

157. Finally, as a result of Plaintiffs were placed into larger loans than they could afford or

- 42 -
**COMPLAINT**

should have been placed into. The additional fees, points and interests paid as a result of the higher/inflated loan amounts constitute damages, and legally cognizable sources of restitution.

158.    Plaintiffs hereby also request injunctive relief against future violation of the same.

## SECOND CAUSE OF ACTION: INDIVIDUAL APPRAISAL INFLATION

### *(By All Plaintiffs against Bank Defendants and LandAmerica and all other Defendants as Co-Conspirators)*

159.    An accurate appraisal performed pursuant to a legitimate appraisal process is critical to calculating the loan-to-value ("LTV") ratio, a financial metric commonly used to evaluate the risk associated with a mortgage, and which would also be used as part of the valuation of a Mortgage Backed Security (which were sold on the secondary market for profit). The LTV ratio expresses the amount of the mortgage or loan as a percentage of the appraised value of the collateral property. For example, if a borrower seeks to borrow $90,000 to purchase a home appraised for $100,000, the LTV ratio would be $90,000 divided by $100,000, or 90% - which was viewed in the industry as a risky loan. Typically any loan over 80% LTV was considered risky, and would require the purchase of "Mortgage Insurance" to insure against the additional risk associated with such high LTV loans. The idea being that a high LTV means that a borrower has invested little of his own money in the property, and is thus more likely to walk away from the property when things get tough. Now imagine the above scenario with a slight modification - instead of the above property being appraised at $100,000 dollars, the appraisal was manipulated to reflect that the home was instead $112,500, now the Loan-to-Value ratio would appear as a much safer, and less risky 80% LTV ($90,000 Loan divided by $112,500 property value = 80%).

160.    From an **investor's perspective**, a high LTV ratio represents a greater risk of default on the loan, which means they are unwilling to pay as much for that loan as they would one which was less risky. This is true for a number of reasons. First borrowers with a small equity position in the underlying property have "less to lose" in the event of default. Second, even a slight drop in housing prices might cause a loan with a high LTV ratio to exceed the value of the underlying collateral, which might cause the borrower to default and would prevent the issuing trust recouping its expected return in the case of foreclosure and subsequent sale of the property.

- 43 -

**COMPLAINT**

161.    From the **Defendants' perspective**, Because of their shift from the "originate to hold" model to the "originate to sell" model, Bank Defendants (and the conspiracy of Defendants) were incentivized to enter into as many loans as possible to sell on to the secondary market for profit. Because Bank Defendants weren't holding these loans anymore, they held no risk – they had no reason to ensure that the borrower was adequately qualified, or more importantly, in the context of *this* discussion, that the property had sufficient value, because Bank Defendants immediately turned around and sold that loan. Because investors were willing to pay more for less risky loans (lower LTV loans), Defendants were given an incentive to fraudulently inflate the appraisal values of their property, thus making the collateral (the subject property) of the loan seem safer to the investor, and thus more valuable to them. More value to the investors means more profit to Defendants. And so it began, Bank Defendants acting to the benefit of the conspiracy quickly embarked on a scheme to inflate their appraisals, and more broadly, property values throughout the State of California (discussed below in the Market Fixing Cause of Action), because, in short, they made a *lot more money by doing so*.

162.    To maximize their loan volume and accordingly profit, Bank Defendants began falsely inflating and intentionally misrepresenting the appraised values of the Plaintiff's subject properties. Their purpose was three-fold :

    a.  **First,** by doing so, Bank Defendants induced Plaintiffs to consummate their purchase transactions by falsely and intentionally reassuring them that they were paying what the home was worth, and not more – the result of which was, once again, more loans generated by Defendants and thus more profit. Put another way, Defendants falsely inflated the appraisals of Plaintiffs' properties in order to assure them that the property was indeed worth what they were paying for it, such that Plaintiff would move forward with the purchase and loan, and not back out. For those who were refinancing, the fraudulent appraisal inflation acted to falsely assure them that sufficient equity existed in their home, to merit incurring additional debt.

    b.  **Second,** by doing so, Bank Defendants induced Plaintiffs to consummate their transactions by falsely and intentionally reassuring them that their collateral was sound.

    c.  Third, **because investors were willing to pay more for less risky loans (lower LTV**

- 44 -

**COMPLAINT**

loans), **Defendants were given an incentive to fraudulently inflate the appraisal values of their property**, thus making the collateral (the subject property) of the loan seem safer to the investor, and thus more valuable to them. This in turn led to more sales and even more profits on the secondary market.

163.    To achieve this, Bank Defendants exercised dominion over IndyMac's appraisal company LandAmerica, directing them to provide the results requested, or engaged in a practice of pressuring and intimidating LandAmerica into using appraisal techniques that met Bank Defendants' business objectives even if the use of such appraisal technique was improper and in violation of industry standards. Bank Defendant black-listed appraisers who did not provide appraisal reports with their expectations.

164.    In a scathing complaint filed by the Federal Housing Finance Agency on September 2, 2011 they outlined how this brazen planned worked. IndyMac would use their in-house or contract appraisers at LandAmerica to artificially inflate Plaintiff's home values in order for their loans to be used in Securitization transactions.

165.    According to the Financial Crisis Inquiry Commission (FCIC), they identified "inflated appraisals" as a pervasive problem at IndyMac during the period of the Securitizations in the time span mentioned in this complaint, and determined through its investigation that appraisers were often pressured by mortgage originators, among others, to "produce inflated results."

166.    This coercion by Defendants to fraudulently inflate appraisal values was particularly rampant in the context of refinance transactions. When a property didn't appraise for a high enough value, a deal wouldn't "go through" this meant that (1) the loan consultant on the transaction wouldn't get a commission, (2) the Area Divisions (sometimes referred to as "Home Loan Centers" – often comprised of hundreds of loan consultants over several cities, and managed by a single manager) which were paid handsomely for each funded loan wouldn't get paid, and (3) Bank Defendants wouldn't be able to sell the loan on the secondary market for profit. Nobody made money. However, the system was set up to allow coercion, bribery, and undue influence over the appraisers. Loan consultants would contact appraiser and direct them specifically as to what value was "needed" to make the deal go through, some even going so far as to give gifts to the appraisers, and many were given outright bribes. Area Division managers who also had a financial incentive as mentioned earlier, would exercise undue

- 45 -

**COMPLAINT**

influence and contact appraisers and demand certain values from them, abolishing the exercise of independent thought necessary to render an accurate/good faith appraisals. The same Area Division Managers, because of their power and influence within the company, would even go so far as to call the appraisal group's *managers* and request (read "demand") an appraisal to come in at a certain value, or if that appraisal had already been rendered and it was too low, would request the appraisal value to be "bumped" or increased. The Area Division Managers who often had personal or friendly relationships with LandAmerica's Appraisal *managers* would coerce, bribe or influence, give gifts to or "call in favors" from the Appraisal managers to ensure that the appraised value of the subject property was high enough to make the deal "go through," so that all parties could make their money. The Appraisal managers obliged.

167. On other occasions Bank Defendants, hand-in-hand with LandAmerica, would use overvalued, inflated or out-of-area comps from non-comparable *superior* properties in valuating the subject property for the wrongful purpose of arriving at a higher value than would be supported by nearby or appropriate comps. Bank Defendants intended this to artificially inflate the appraised value of the subject property.

168. On the rare occasion when a loan consultant's or Area Division Manager's influence didn't get the appraiser to inflate the value of the appraisal by a sufficient amount, Defendants' policies gave them another, more effective way to fraudulently inflate the amount – they were allowed to hire an *outside appraiser*. It was well known in the industry that outside appraisers would deliver an appraisal in the amount they were told to deliver. Why? Because they were being paid directly by the loan consultant, or the Area Division Manager. In other words, loan consultants and Area Division Manager's had outside appraisers "in their pockets." Outside appraisers would deliver the results (meaning inflated values) they were expected to deliver for two reasons: (1) In the interest of keeping the client happy and hopefully earning future business and (2) for fear of not getting paid on their individual deal if they didn't deliver the results they were expected to deliver. This procedure (allowing the hiring of easily-influenced outside appraises) was explicitly made part of Defendants' own policies, and its use was encouraged by Defendants, as well as their mid-level and upper management.

169. This coercion and influence even existed from the top down – Regional Managers (in

- 46 -

COMPLAINT

EXHIBIT A - PAGE 63

charge of entire portions of the country, several states large) would also call in favors and demand appraised values to be inflated or changed to make deals happen in the interest of making money. This pattern was not only tolerated by Defendants, but ratified and encouraged by them, because more funded loans meant more money for Defendants (who as described above, held none of the risk). In fact, Defendants had intentionally set up the appraisal system in such a way as to allow for the exercise of influence over appraisals and the appraisal departments. This influence was intended and foreseen.

170.   In short, Bank Defendants intentionally designed an appraisal system which they could manipulate through influence and coercion to further their own ends – namely, profit. By its very design, the independence of thought necessary for a professional appraiser to render a good faith opinion was decimated. (1) Defendants held dominion over the very appraisal company which was supposed to render independent appraisals, LandAmerica. Then, (2) Bank Defendants through its explicit (as well as unwritten) policies and procedures, intentionally allowed their own employees who made commission/money as a function of every funded loan (managers, loan consultants, etc.), to contact individual appraisers and bribe, exercise influence, call in favors, harass, and coerce appraisers into rendering the exact value they needed. And finally, when all else failed (3) Defendants set up a fail-safe; they created an internal policy which allowed for the hiring of "outside" appraisers who were particularly well known within the industry for being willing to "fudge" the numbers.

171.   Alan Hummel, Chair of the Appraisal Institute, testified before the Senate Committee on banking that the dynamic between mortgage originators and appraisers created a "terrible conflict of interest" where appraiser "experience[d] systemic problems of coercion" and were "ordered to doctor their reports" or they might be "placed on exclusionary or 'do-not-use' lists." Too often, this pressure succeeded in generating artificially high appraisals and appraisals being doing on a "drive-by" basis which appraisers issued their appraisal without reasonable bases for doing so.

172.   A 2007 survey of 1,200 appraisers conducted by October Research Corp., which publishes *Valuation Review*, found that 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to enable deals to go through. This figure was nearly double the findings of a similar study conducted just three years earlier. The 2007 study also "found that 75% of appraisers reported 'negative ramifications' if they did not cooperate, alter their appraisal, and provide a

- 47 -
**COMPLAINT**

EXHIBIT A - PAGE 64

higher valuation.

173. Through their intentional misrepresentations and fraudulent appraisal inflation Bank Defendants, and LandAmerica intended to induce Plaintiffs' reliance on the truth of their valuations and representations, and to induce them to move forward with their loan transactions, which were profitable to Bank Defendants and the conspiracy of Defendants – and did indeed induce such reliance.

174. A professional appraiser's (such as those used by Defendants) knowledge of property valuation is vastly superior to that of the lay borrower. The complicated mathematics and calculations of appraisals require highly specialized education. Their training and knowledge is so specialized, in fact, that one cannot act as an appraiser without being properly trained and licensed. It is reasonable and foreseeable that a consumer would rely upon an appraisal arrived at by a professional appraiser – particularly in light of their complicated nature. Plaintiffs did in fact rely on the representations and concealments of these parties.

175. Bank Defendants and LandAmerica knew that it was foreseeable that Plaintiffs would rely on their appraisals and/or (mis)representations of values.

176. These misrepresentations were material to Plaintiffs decision to enter into the Loans

177. Plaintiffs did rely on the truth of such (mis)representations and, in doing so, entered into Loan Contracts with Defendants. Had Plaintiffs known the truth they would not have moved forward with the purchase transactions, or loan transactions.

178. Bank Defendants, together with LandAmerica, perpetrated this systematic appraisal fraud at the direction of and for the benefit of the conspiracy, and with the knowledge, ratification, and acquiescence of their executives and board members.

179. As a result of such Appraisal Inflation, Plaintiffs were induced to pay more for their homes than their true value, induced to take larger loans than would have been necessary, pay larger down payments, pay additional interest, fees, and pay additional property taxes.

180. Counts 6 through 9 arise under this (Second) Cause of Action for Individual Appraisal Inflation, and are brought by all Plaintiffs named in this Cause of Action, against all Defendants named in this Cause of Action.

- 48 -

**COMPLAINT**

## COUNT 6: INTENTIONAL MISREPRESENTATION

181. The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

182. Bank Defendants and LandAmerica, at the direction, behest, and on behalf of the Conspiracy of Defendants intentionally inflated and misrepresented the true values of Plaintiffs' homes, in order to induce Plaintiffs reliance into entering into Loan Contracts with Bank Defendants, as described at length throughout this Cause of Action.

183. Plaintiffs did in fact rely on the truth of the misrepresented facts in deciding to enter into Loan Contracts with Bank Defendants. Had Plaintiffs known the truth, they would not have entered into the Loan Contracts.

184. Defendants had exclusive knowledge of the truth. Their scheme was built on keeping their borrowers (Plaintiffs herein) in the dark.

185. As a result of such Appraisal Inflation, Plaintiffs were induced to pay more for their homes than their true value, induced to take larger loans than would have been necessary, pay larger down payments, pay additional interest, fees, and pay additional property taxes. Without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages arising from this Cause of Action also include loss of equity in their houses, costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

186. Defendants' intentional, wide-scale, fraudulent conduct also merits the imposition of punitive damages. Plaintiffs respectfully request the award of such punitive damages and any other relief this court shall deem just and proper.

## COUNT 7: NEGLIGENT MISREPRESENTATION

187. The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

188. The allegations of this Count are identical to those above in the previous Count except

- 49 -
## COMPLAINT

that the degree of intent herein is that of negligence. Put another way, at the time of the misrepresentations described in this Cause of Action (and listed in part above), Bank Defendants and LandAmerica did not have reasonable grounds to believe them to be true.

## COUNT 8: NEGLIGENCE

189.    The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein

190.    Bank Defendants and LandAmerica had a duty to act reasonably, and further had duties of care imposed upon them by law and statute as alleged above at paragraphs 97-103 to provide accurate appraisals. Such duties are also established by the applicable standards of care within the profession.

191.    In falsely inflating and causing to be inflated the appraisals of Plaintiffs herein LandAmerica and Bank Defendants breached that duty.

192.    In (recklessly, knowingly, or intentionally) placing borrowers into loans upon which they would be instantly upside down and be instantly upside down by virtue of inflated valuations – all so that the Conspiracy of Defendants could profit - Bank Defendants further breached their duty.

193.    In (recklessly, knowingly, or intentionally) furnishing false and inflated appraisals – all so that the Conspiracy of Defendants could profit –Bank Defendants, and LandAmerica further breached their duty.

194.    In (recklessly, knowingly, or intentionally) failing to observe the standards of care in the appraisal profession, LandAmerica breached its duty.

195.    In undertaking to place as many borrowers into loans as possible in the pursuit of profit without regard for their ability to afford them, their creditworthiness, or the distinct risk of default (either a known likelihood of default or reckless disregard thereof) and the commensurate effects such wide scale defaults would have on property values and the economic system, Bank Defendants breached that duty.

196.    Bank Defendant additionally breached their duty by coercing and bribing their appraisers, as well as subjecting their appraisers to conflicts of interest, as more fully set forth in this Cause of Action.

- 50 -

**COMPLAINT**

197.    LandAmerica additionally breached their duty by accepting such bribes, and/or acting under known conflicts of interest, as more fully set forth in this Cause of Action.

198.    Bank Defendants and LandAmerica breached their duty in numerous other fashions as described throughout this Complaint, whose allegations in their entirety are incorporated by reference as to all Causes of Action and all Counts.

199.    In breaching that duty Bank Defendants, and LandAmerica acting in conspiracy with the other Defendants herein, caused grave damage to Plaintiffs herein and numerous others.

200.    These harms were foreseeable if not actually foreseen by Defendants.

201.    Defendants' actions in intentionally manipulating and inflating appraised property values, were a substantial factor in if not *the* cause of the generalized market crash which caused the prices of Real Estate values throughout California to plummet, damaging Plaintiffs herein.

202.    Further, Defendants' actions in intentionally placing borrowers into impossible loans in the pursuit of profit , were a substantial factor in if not *the* cause of the generalized market crash which caused the prices of Real Estate values throughout California to plummet, damaging Plaintiffs herein

203.    Without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages arising from this Cause of Action also include loss of equity in their houses, costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

## COUNT 9: UNFAIR, UNLAWFUL, AND FRAUDULENT BUSINESS PRACTICES
### (VIOLATION OF CAL. BUS. & PROF. CODE §17200)

204.    The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

205.    Bank Defendants' acts in intentionally causing falsely inflated appraisals in order to induce their borrowers to move forward with Loans were unlawful, unfair, **and** fraudulent – all in the disjunctive.

206.    Such acts are **fraudulent** for all of the reasons described above, whose allegations are

- 51 -
**COMPLAINT**

EXHIBIT A - PAGE 68

hereby incorporated by reference.

207. These acts are also **unlawful.**

208. California Civil Code §1090.5 "Valuation of real estate; improper influence; violation" forbids the exercise of influence over the valuation of property by any person with an interest in that real estate transaction. Defendants have violated this law.

a. Bank Defendants and their Co-conspirators herein had a direct interest in the valuation of real estate transactions at issue, as they were the institution that was lending on the property, and moreover because they stood to profit from the consummation of the real estate transaction – which depended in large part on a sufficient valuation being returned by the appraiser. Their wrongful influence occurred in connection with the "development, reporting, result, or review of that valuation" in accord with the language of the statute.

b. Defendants herein both in their individual capacity, and in their capacity as co-conspirators with one another and with LandAmerica (IndyMac's appraisal management company) have violated California Civil Code §1090.5 by violating appraiser independence through, among other things, compensation, coercion, extortion, bribery, intimidation of their appraisers, as well as the appraisal management company itself, and its management and executives, as well as other independent, outside, or "fee appraisers" not employed by LandAmerica.

c. As described throughout this Complaint at length, Bank Defendants herein as well as their employees, officers, and agents intentionally:

d. Caused the appraisers to base the value of their appraisals on a factor other than the independent judgment of the appraiser;

e. Mischaracterized and/or suborned the mischaracterization of the appraised value of the property securing the extension of credit;

f. Sought to influence the appraiser to facilitating the making of and pricing of their transactions;

g. Sought to influence the appraiser to achieve a targeted value;

h. Withheld or threatened to withhold payment for the appraisal services rendered in

- 52 -

**COMPLAINT**

conformity with the contract between the parties;

i. Implied, directly or indirectly or threatened that the future retention of the appraiser was contingent upon their return of a satisfactory valuation; and

j. Excluded other appraisers from rendering future valuations based on the return of valuations which did not meet a certain target in the past.

k. Defendants acted with malice and with the intent of artificially inflating California Real estate properties generally, as well as the values of Plaintiffs' individual properties and homes.

209.    As alleged at length above, Bank Defendants violated California Civil Code §1090.4 by subjecting, both, their appraisers as well as their appraisal management company, to coercion, undue influence, bribery, instruction, appraiser selection manipulation, financial pressure, as well as threats – both explicit and implicit – that if their appraisals didn't come back in at value (1) future business with the appraisers would either diminish or discontinue altogether or (2) that the individual appraiser would be blacklisted.

210.    Bank Defendants also violated 15 U.S.C. §1639e (entitled "Violation of Appraiser Independence") by violating appraiser independence through, among other things, compensation, coercion, extortion, bribery, intimidation of their appraisers, as well as the appraisal management company itself, and its management and executives, as well as other independent, outside, or "fee appraisers" not employed by their Appraisal management company.

a. Bank Defendants herein were in the business of extending credit and providing services related to the extension of credit in the consumer credit transactions secured by the principal dwelling of the customer – Plaintiffs herein.

b. As described throughout this Complaint at length, Bank Defendants herein as well as their employees, officers, and agents, while acting for the benefit of the Conspiracy of Defendants intentionally:

i. Caused the appraisers to base the value of their appraisals on a factor other than the independent judgment of the appraiser;

ii. Mischaracterized and/or suborned the mischaracterization of the appraised value

- 53 -
**COMPLAINT**

EXHIBIT A - PAGE 70

of the property securing the extension of credit

iii. Sought to influence the appraiser to facilitating the making of and pricing of their transactions;

iv. Sought to influence the appraiser to achieve a targeted value; and

v. Withheld or threatened to withhold payment for the appraisal services rendered in conformity with the contract between the parties.

211. Bank Defendants and LandAmerica, acting on behalf of the Conspiracy also violated 12 C.F.R §323.5 by allowing their staff appraisers to have an direct or indirect financial or other interest in the property, namely Bank Defendants and LandAmerica often bribed, or incentivized their staff appraisers for who appraised homes whose loans ended up funding, and further by penalizing and denying the appraiser pay for not valuing a property at a high enough value.

a. As to fee appraisers, outside appraisers and independent appraisers, Bank Defendants and LandAmerica also violated 12 C.F.R. §323.5 in knowingly allowing their loan consultants, brokers, and other such loan origination employees to engage the appraisers themselves directly, knowing that such employees would exercise influence over the appraisers. Further, these fee/outside/independent appraisers were given a direct interest in the transaction – their pay and the possibility of future business would often be contingent on the results they provided, namely high values.

b. Additionally, Bank Defendants and LandAmerica violated this section as to both Staff and "fee"/outside/independent appraisers by "blacklisting" any appraiser who consistently brought back lower values than expected. In other words, Defendants conditioned the appraiser's very job on their willingness to "play ball" – a strong financial interest in the value of the property if ever there were any. Appraisers who would bring back conservative or low values were let go and never re-hired. This was a well-known reality within the appraisal and banking industry and influenced the independence of thought of any appraiser working with a big bank such as bank Defendant Banks herein. Defendants intended the threat of being blacklisted to deter appraisers from rendering uninhibited good faith appraisals and instead to influence

- 54 -

**COMPLAINT**

appraisers to exaggerate their values. When taken in the aggregate, Defendants' policies, coercion and acts resulted in the systematic and artificial inflation of California real estate values (as discussed below in the "**Market Fixing**" Cause of Action).

    c.  The loan transactions alleged in this cause of action qualify as "federally regulated transactions" under the statute because such transactions are defined in the definition section of the statute as "any real-estate-related financial transaction entered into on or after August 9, 1990 that... requires the services of an appraiser."

212. Further, Defendants acts in tricking borrowers to enter into Loans with them by intentionally misleading them about the value of their homes, are fundamentally **unfair** and deceptive. Defendants knowingly placed Plaintiffs borrowers in a position of peril, for their own personal gain.

213. No business, particularly one as centrally-important to the American economy as banking, should be allowed to so egregiously deceive its consumers. If Banks are to conduct business, their business *must not be* that of fraud and deception.

214. Without limiting the allegations above which are fully incorporated herein, Bank Defendants' acts are **unfair** insofar as they intentionally place unsuspecting borrowers into loans which jeopardize their financial livelihoods and risk potential homelessness. Simply put, Defendants' scheme is to use borrowers as pawns to increase their profit. It speaks for itself that such acts are patently unfair.

215. Such acts and practices violate established public policy and the harm they cause to consumers in California greatly outweighs any benefits associated with those practices.

216. These actions were immoral, unethical, oppressive, unscrupulous and substantially injurious to similarly situated borrowers, and Plaintiffs herein. Bank Defendants' and LandAmerica's conduct had no utility other than for their own personal gain, and the harm was great not only to Plaintiffs herein, but also to residents of California, broadly, who have seen a decrease in their home and property values as a result of the bursting of the super-heated pricing bubble created by Defendants' fraudulently inflated appraisal; at the time of their fraud, Defendants *knew* that their conduct would cause the precipitous decline in property values throughout the State of California. Defendant's acts caused substantial consumer injury with no benefits to consumer competition. Plaintiffs could not have reasonably avoided these injuries occasioned by Defendants' intentional deceit, misrepresentation, and

- 55 -

**COMPLAINT**

EXHIBIT A - PAGE 72

omission. Further, Defendants acts significantly threatened harm to competition.

217.   Defendant's acts caused substantial consumer injury with no benefits to consumer competition. Plaintiffs could not have reasonably avoided these injuries occasioned by Defendants' intentional deceit, misrepresentation, and omission. Further, Defendants acts significantly threatened harm to competition.

218.   Defendants acted with malice and with the intent of artificially inflating California Real estate properties generally, as well as the values of Plaintiffs' individual properties and homes.

219.   As a result of Defendants' unfair competition, Plaintiffs are entitled to restitution for all sums received by Defendants with respect to Defendants' unlawful and/or unfair and/or fraudulent conduct, including, without limitation, interest payments made by Plaintiffs, fees paid to Defendants, including, without limitation, the excessive fees paid at Defendants' direction, and premiums received upon selling the mortgages at an inflated value.

220.   Plaintiffs are entitled to restitution of the loan payments obtained by Defendants pursuant to their unlawful, unfair, and fraudulent business practices.

221.   Further, as a result of the foregoing conduct, Plaintiffs suffered injury in fact including diminished credit scores with a concomitant increase in borrowing costs and diminished access to credit, fees and costs, including, without limitation, attorneys' fees and costs.

222.   Finally, as a result of these acts, Plaintiffs were placed into larger loans than they could afford or should have been placed into. The additional fees, points and interests paid as a result of the higher/inflated loan amounts constitute damages, and legally cognizable sources of restitution.

223.   The unfair, unlawful and fraudulent acts and practices of Defendants named herein present a continuing threat to Plaintiff and to members of the public in that these acts and practices are ongoing and are harmful and disruptive to business and financial markets and merit the award of injunctive relief.

## THIRD CAUSE OF ACTION:  MARKET FIXING

*(By All Plaintiffs against Bank Defendants, and* LandAmerica, *and all other Defendants as Co-Conspirators)*

224.   To further the wrongs alleged throughout this Complaint (and its profit), Bank

- 56 -

**COMPLAINT**

Defendants, using its size and prominent market share, began **systematically** creating false and inflated property appraisals **throughout California**, hand-in-hand with their appraisal company LandAmerica, in a Market Fixing Scheme designed to inflate the property values of homes throughout California. (The "Market Fixing Scheme").

225.    Though conceptually related to the Cause of Action for Individual Appraisal Inflation, the harms, actions, and reasons behind the Market Fixing Scheme were unique.

226.    The cause of action for the broad *market fixing scheme* alleges that Defendants in conspiracy with their appraisal company, LandAmerica , manipulated/inflated the prices of *all* California real estate prices as compared to their true value. **Everybody**, even people who didn't originate their loans through or get an appraisal from Defendants, were forced to purchase their homes for a higher price than they should have as a result of Defendants' Market Fixing activities – the additional amounts they were forced to pay constitute damage to Plaintiffs. Indeed, these damages accrued to people who didn't even have their properties appraised by Defendants.

227.    Plaintiffs reasonably relied on the fact that the market was operating normally and thus the prices people were paying for their homes were uninflated. Defendants however failed to disclose that the market was not operating normally – that they had manipulated it

228.    From **Bank Defendants' perspective**, their reasons (in other words, their intent) for fraudulently inflating Plaintiff's appraisals and engaging in the Market Fixing Scheme was three-fold:

    a.  **First, by doing so Bank Defendants created the illusion of a naturally appreciating real economy, which resulted in a purchase *and*** refinance boom – which meant more loans for Bank Defendants, and thus more profit for the conspiracy of Defendants. And so it began, Defendants together with LandAmerica quickly embarked on a scheme to inflate their appraisals, and more broadly, property values throughout the State of California, because, in short, they made a *lot more money by doing so*.

    b.  **Second,** by systematically driving the prices of real estate up, borrowers were required to take out larger loans to afford the same property, once again resulting in more profit to Defendants. The damages to Plaintiffs resulting from these larger loans are discussed below.

- 57 -

**COMPLAINT**

c. **Third**, Defendants falsely inflated the appraised values, because by doing so Defendants were able to turn more profit on the sale of these loans to investors. Because investors were willing to pay more for less risky loans (lower Loan-to-Value loans), Bank Defendants and LandAmerica were given an incentive to fraudulently inflate the appraisal values of their property, thus making the collateral (the subject property) of the loan seem safer to the investor, resulting in more profit to Defendants.

229. To carry out this fraud, Bank Defendants used its size and market share as one of the largest lenders in California to systematically create false and inflated property appraisals throughout California, hand-in-hand with their appraisal company, LandAmerica.

230. At Bank Defendants' direction, LandAmerica began systematically and wrongfully inflating the valuations of properties throughout California – not just on the properties of Plaintiffs herein, but on all properties throughout California. As is common knowledge in the real estate industry, appraisers take the value of other nearby homes (called comparables aka "comps") into account in determining the value of the homes they appraise. **These inflated appraisals and home valuation conducted by Bank Defendants and their subsidiaries** *then* **acted as comps upon which numerous** *other* **appraisers based their valuations of** *other* **homes. The results were a vicious self-feeding exponential cycle, both expected and intended by Defendants. These inflated appraisals caused other homes to be valued for more than they were worth, which in turn acted as the predicate for even higher appraisals and which caused even more homes to be valued for more than they were worth.** The inevitable and intended result of Defendants' conspiracy was the creation of a super-heated pricing bubble in the real estate economy, created by and at the direction of Defendants, designed to manipulate and inflate property values, and effectuated for the sole purpose of lining Defendants' pockets with money. The harm it inflicted to Plaintiffs herein, California's real estate economy, and more broadly, the American economy mattered little. Defendants were making money and plenty of it.

231. Moreover, as IndyMac's appraisal company, LandAmerica was specifically directed by Defendants to systematically "bump" or inflate appraisal values of homes throughout California, with the intent of creating housing appreciation, leading to a real estate boom, which Defendants could then capitalize on by selling not only more loans, but more loans at even higher loan amounts. From the very

- 58 -

**COMPLAINT**

top to the very bottom, Defendants created a system intended to render consistently inflated appraisals. But they knew the 'boom' they were creating, was one stilted up and fueled by their fraud – and that when the music stopped playing the house of cards they'd built would come crumbling down destroying any and all equity Plaintiff borrowers had in their home.

232.    Rapidly, these two intertwined schemes (the Market Fixing Scheme [Third Cause of Action], and the Scheme to place borrowers into loans they could not afford [First Cause of Action]) grew into a brazen plan to disregard underwriting standards and fraudulently inflate property values – county-by-county, city-by-city, person-by-person – in order to take business from legitimate mortgage-providers, and moved on to massive securities fraud hand-in-hand with concealment from, and deception of, Plaintiffs and other mortgagees on an unprecedented scale.

233.    According to the April 7, 2010 FCIC testimony of Richard Bitner, a former executive of a subprime mortgage originator for 15 years and the author of the book *Confessions of a Subprime Lender*, "the appraisal process [was] highly susceptible to manipulation, lenders had to conduct business as though the broker and appraiser couldn't be trusted, [and] either the majority of appraisers were incompetent or they were influenced by brokers to increase the value." He continued:

> To put things in perspective, during my company's history, half of all the loans we underwrote were overvalued by as much as 10%. This means one out of two appraisals was still within an acceptable tolerance for our end investors. Our experiences showed that 10% was the most an appraisal could be overvalued and still be purchased by investors. Another quarter that we reviewed was overvalued by 11-20%. These loans were either declined or we reduced the property to an acceptable tolerance level. The remaining 25% of appraisals that we initially underwrote were so overvalued they defied all logic. *Throwing a dart at a board while blindfolded would've produced more accurate results*

234.    Mr. Bitner testified about the implications of inflated appraisals:

> **If multiple properties in an area are overvalued by 10%, they become comparable sales for future appraisals. The process then repeats itself.** We saw it on several occasions. We'd close a loan in January, and see the subject property show up as a comparable sale in the same neighborhood six months later. Except this time, the new subject property, which was nearly identical in size and style to the home we financed in January, was being appraised for 10% more. Of course, demand is a key component to driving value, but the defective nature of the appraisal process served as an accelerant.

235.    Mr. Bitner testified that the engine behind the increased malfeasance was the Wall Street Banks: "[T]he demand from Wall Street investment banks to feed the securitization machines coupled

- 59 -

**COMPLAINT**

with an erosion in credit standards led the industry to drive itself off the proverbial cliff."

236. In a scathing complaint filed by the Federal Housing Finance Agency on September 2, 2011 they outlined how this brazen planned worked. Bank Defendants would use their in-house or contract appraisers to artificially inflate Plaintiff's home values in order for their loans to be used in Securitization transactions. According to that complaint, "an inflated appraisal will understate, sometimes greatly, the credit risk associated with a given loan", mainly our Plaintiffs' homes.

237. According to the Financial Crisis Inquiry Commission (FCIC), they identified "inflated appraisals" as a pervasive problem at IndyMac during the period of the Securitizations in the time span mentioned in this complaint, and determined through its investigation that appraisers were often pressured by mortgage originators, among others, to "produce inflated results".

238. Since California homes (including those of Plaintiffs herein) were Bank Defendants' main target, this scheme led directly to a mortgage meltdown for Plaintiffs in this complaint that was substantially worse than any economic problems facing Defendants' borrowers in the rest of the United States.

239. At the time of their respective Purchase and/or Loan Transactions Plaintiffs relied on the fact that the real estate market was operating normally, and thus the prices Plaintiffs were paying were naturally occurring, uninflated prices – a reasonable reliance.

240. Bank Defendants and LandAmerica however intentionally failed to disclose the material fact that the market was not operating normally – but rather that they had systematically and intentionally manipulated the market hand-in-hand with their co-conspirators, to inflate real estate prices for their own profit.

241. Specifically, Bank Defendants and LandAmerica intentionally **concealed** the material facts that they:

    a. had intentionally and falsely inflated the appraisals on Plaintiffs properties throughout California;

    b. had subjected their appraisers over whom they exercised complete dominion to a massive conflict of interest precluding them from being able to render good-faith, accurate, technically proper appraisals in conformity with the standards required in the profession;

- 60 -

**COMPLAINT**

c. had systematically, intentionally, and artificially inflated the prices of real estate throughout California (otherwise known as "market fixing"), resulting in:

d. had fixed the real-estate market and systematically driven the prices of property well above what they were worth, with the intent of creating the illusion of a naturally-appreciating real estate economy to spur a purchase and refinance boom resulting in more business and thus more profits for the bank;

e. knew that the true uninflated value of Plaintiffs' homes were insufficient to justify the size of the loans Plaintiffs were being given;

f. falsely inflated the appraisals of Plaintiffs' properties in order to place Plaintiffs into loans that they would not otherwise be able to obtain or afford, all so Defendants and their employee-Loan Consultants could turn profit;

g. falsely inflated the appraisals of Plaintiffs' properties in order to assure them that the property was indeed worth what they were paying for it, such that Plaintiff would move forward with the purchase;

h. falsely inflated the appraisals of Plaintiffs' properties to induce plaintiffs to enter into loan and assure them that their collateral was sound;

i. knew that the values being used did not justify the size of the loans being placed on the property, and moreover that Defendants knew such valuations would inevitably result in the home going "upside" down followed by inevitable default;

j. knew their scheme would cause a liquidity crisis that would devastate home prices.

242. As a result everybody, even people who didn't originate their loans through or get an appraisal from Defendants, were forced to purchase their homes for a higher price than they should absent Defendants' Market Fixing activities – the additional amounts they were forced to pay constitute substantial damage to Plaintiffs.

243. This underscores the difference between the Broad Market Fixing Scheme and the Cause of Action for Individual Appraisal Inflation. Yes, they are conceptually related in the sense that Defendants' individual appraisal inflations when taken in the aggregate had the intended cumulative effect of further bolstering their market manipulation/inflation. But their conceptual relationship does

- 61 -

**COMPLAINT**

not make them the same fraud. Unlike the Broad Market Fixing fraud which involved the fraudulent **concealment** of the material fact that they had **manipulated the market** for the reasons listed in paragraph 221 of this Complaint , the Individual Appraisal inflation was an **affirmative intentional misrepresentation** of the <u>individual values of Plaintiffs' homes</u> for the reasons listed in paragraph 157 of this Complaint (i.e. "with the intent of inducing Plaintiffs to enter into their loans... and with the intent of assuring them their collateral was sound", *inter alia*).

244.    The following table briefly details some (not all) of the differences between the Market Fixing Cause of Action and the Individual Appraisal Inflation Cause of Action. This table below is not intended to be an exhaustive list of the differences between the two actions. (Table appears on following page).

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

- 62 -
**COMPLAINT**

| | Broad Market Fixing Scheme | Individual Appraisal Inflation |
|---|---|---|
| Act | the fraudulent **concealment** of the material fact that Defendants had manipulated the market, | affirmative intentional **misrepresentation** of the individual values of Plaintiffs' homes |
| Intent | (1)To create the illusion of a naturally appreciating real estate economy to stimulate a purchase and refinance boom,<br><br>(2)By systematically driving the prices of real estate up, borrowers were required to take out larger loans to afford the same property | (1)With the intent of inducing Plaintiffs to enter into their loans…<br>(2)With the intent of assuring them their collateral was sound<br>(3)With the intent of falsely assuring Plaintiffs that the property was indeed worth what they were paying for it such that they would consummate the purchase |
| Plaintiffs' Reliance | Plaintiffs' reliance was on the fact that the market was operating normally and thus the prices people were paying for their homes were uninflated.  Defendants however **failed to disclose** that the market was not operating normally – that they had manipulated it | On the truth of the home value represented by Defendants |
| Damages | Being forced to purchase property at an inflated property value;<br><br>Being forced to take out larger loans, pay more interest points, fees, taxes, etc.<br><br>More damages listed below in ¶245 | Fraudulently induced to enter into loan contract<br><br>Being forced to take out larger loans, pay more interest points, fees, taxes, etc.<br><br>Other Damages as listed in 2nd COA |

- 63 -

**COMPLAINT**

EXHIBIT A - PAGE 80

245.    As a result of Bank Defendants and LandAmerica's Market Fixing Activities, in furtherance of the Conspiracy of Defendants, Plaintiffs were harmed in each of the following manners:

a.    **First,** the hyper-inflated property values resulting from Defendants' inflated appraisals and market-fixing scheme directly caused Plaintiffs to pay a substantially higher price for their home than they would have otherwise, and then their home was truly worth at the time. The additional amounts Plaintiffs were forced to pay above and beyond the true uninflated value of their property at the time of purchase, constitutes damage to Plaintiffs directly caused by Defendant's scheme.

b.    **Second,** the damage didn't end there however - the unraveling of Defendants' scheme caused the market to be sent into a downward spiral, which Defendants knew and foresaw would be the result of their actions, and caused Plaintiffs' home value to plummet *much below the true value* of the property at the time of purchase. **To be clear, it is alleged that Defendants' Appraisal Inflation and Market Fixing Activities, were a substantial factor in if not *the* cause of the generalized market crash which caused the prices of Real Estate values throughout California to plummet.** This is a separate and distinct loss from item number "a" – item "a" deals with false inflation, while item "b" alleges diminution in value/depression. These two losses in sum constitute Plaintiffs' loss of equity, and can be determined by subtracting the current depressed value of Plaintiffs' property from the artificially inflated price they were forced to purchase it for. Even for those Plaintiffs who did not purchase their property, but rather refinanced it, the demise of Defendants' scheme drove the value of their property far below its original purchase price, once again resulting in the loss of substantial equity;

c.    **Third,** another intended effect of Defendants' silent market-fixing/appraisal inflation fraud was that Plaintiffs were forced to take out larger loans to purchase the inflated-value homes. Not only were Plaintiffs forced to pay additional principal on this artificially created-value, but additional interest as well. As an example, let's say that because of Defendants' market inflation, Plaintiffs purchased a home for $600,000 (when in reality its true uninflated value would have been $500,000), and took a loan from

- 64 -
**COMPLAINT**

Defendants at 6% interest. Not only were Plaintiffs forced to pay $100,000 more for this home than they should have had to, but they were also forced to pay interest on that additional $100,000 in false value, in the amount of $500 dollars per month. Had Defendants abstained from conducting their fraud, Plaintiffs would never have needed to pay the interest on this falsely created value. The additional interest Plaintiffs were forced to pay constitutes damage to Plaintiffs;

d.  **Fourth,** for the same reason as directly above (in sub-paragraph "b"), Plaintiffs were also forced to pay additional fees and points (all of which are a function of the inflated loan size). As is common knowledge throughout the industry, lenders, including Defendants herein, often charge what are known as "points" to originate a loan. Charging one "point" is another way of saying that the bank will charge you 1% of your loan amount. Two points would be 2% of the loan amount. Now, using the above example (of a 500k home, artificially inflated to 600k), let's say a borrower was forced to pay 2 points (or in other words 2% of his total loan amount). Because the loan amount was inflated he was forced to pay 2% of 600k ($12,000), when in reality, had Defendants not embarked on their scheme, he would only have had to pay 2% of 500k ($10,000). The additional $2,000 paid ($12,000 - $10,000) constitutes additional damage.

e.  **Fifth,** the falsely-inflated property values also caused Plaintiffs to pay substantially higher property taxes.

f.  **Sixth,** Bank Defendants also used these inflated values, to induce Plaintiffs and other borrowers into entering ever-larger loans on increasingly risky terms. The result was more money for the conspiracy of Defendants.

g.  **Seventh,** The resultant higher payments coupled with the housing crash (both known if not intended by Defendants) resulted in Plaintiffs' inevitable default, wreaking havoc with their credit, and upon which Bank Defendants and Trustee Defendants charged a host of excessive fees (trustee fees, default fees, cleanup fees, inspection fees, late fees, advance fees, and attorney fees) all of which were marked up dramatically. In short, Defendants couldn't lose; they were making money no matter what, and were benefitting

- 65 -

**COMPLAINT**

from Plaintiffs' default. By tossing on so many fees Defendants made it impossible for Plaintiffs to be able to ever pay off their "default" amounts. Why? Because Defendants made money by doing so. Recall, that by this time, Defendant Banks had already sold these loans to their investors, and were only acting as servicers. Servicers have significantly different motivations than do lenders. Servicers earn more from foreclosing even when the noteholder (investors) may benefit financially in the long-term by modifying Plaintiffs' loans. And because they were servicers (rather than note-holders), Bank Defendants' incentives were not to preserve the loans and prevent default, but rather to the contrary, they made money initiating foreclosures and charging fees. In other words Defendant Banks' interests as a servicer were exactly the opposite of those when they originated the loan and were note-holders. Their interests were aligned directly with those of a servicer. They had become anything but a conventional money lender. By making it impossible for Plaintiffs to pay off their unilaterally imposed default amounts, Defendants could come in and scoop up whatever equity Plaintiffs had left in the property. It was a win, win, win scenario.

246. Bank Defendants', and LandAmerica's fraudulent inflation and manipulation of real estate values throughout the State of California, the demise of which sent real estate values spiraling downwards, caused Plaintiffs to be placed in homes that were immediately upside-down, and to instantly lose their equity – if not their homes altogether. And as a result of these two schemes coupled together (the scheme to place borrowers into loans they could not afford, and the Market Fixing Scheme), Plaintiff-borrowers were placed into loans far larger than would be supported by the true value of their property or their income. Then, based on these fraudulently inflated loan amounts, Defendants deceptively extracted excessive and unearned payments, points, fees, and interest from Plaintiffs – all of which comprise damage to Plaintiffs.

247. As a result of the improper scheme undertaken by Bank Defendants and LandAmerica, at the behest and benefit of the Conspiracy, Plaintiffs paid more for their homes then they should have, then adding insult to injury lost their equity in their homes, their credit ratings and histories were damaged or destroyed, and Plaintiffs incurred material other costs and expenses, described herein. At

COMPLAINT

EXHIBIT A - PAGE 83

the same time, Defendants took from Plaintiffs and other borrowers billions of dollars in interest payments and fees and generated billions of dollars in illegal and fraudulently obtained profits by selling their loans at inflated values and using the loans as collateral for fraudulent swaps.

248. Bank Defendants and LandAmerica perpetrated this systematic individual appraisal inflation and market fixing scheme at the direction of and for the benefit of the conspiracy, and with the knowledge and acquiescence of their executives and board members.

249. Defendants had exclusive knowledge of their silent scheme to inflate appraisals and fix the market.

250. Counts 10-13 arise under this (Third) Cause of Action for Market Fixing, and are brought by all Plaintiffs named in this Cause of Action, against all Defendants named in this Cause of Action.

## COUNT 10: FRAUDULENT CONCEALMENT

251. All preceding and following paragraphs of this Complaint are incorporated by reference as though fully set forth herein

252. Bank Defendants, and LandAmerica, at the direction, behest, and on behalf of the Conspiracy of Defendants intentionally concealed the material facts alleged above at Paragraph 234 (a)-(j), (namely their systematic market fixing activities) in order to induce Plaintiffs reliance into entering into Loan Contracts with Bank Defendants

253. Plaintiffs did in fact rely on the non-existence of the concealed facts in deciding to enter into Loan Contracts with Bank Defendants. Had Plaintiffs known the truth, they would not have entered into the Loan Contracts.

254. Defendants had exclusive knowledge of the truth. Their scheme was built on keeping their borrowers (Plaintiffs herein) in the dark.

255. Bank Defendants and LandAmerica had a duty to disclose such material information but intentionally failed to do so.

256. As a result of such concealments Plaintiffs were damaged as described in this Cause of Action as set forth above in Paragraph 237(a)-(g)

257. Further, without limiting the damages as described elsewhere in this Complaint, Plaintiffs

- 67 -

**COMPLAINT**

damages arising from this Cause of Action also include loss of equity in their houses,, costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

258.    Defendants' actions in systematically and falsely pumping up real estate values throughout California, were a substantial factor in if not *the* cause of the generalized market crash which caused the prices of Real Estate values throughout California to plummet, damaging Plaintiffs herein.

259.    These harms were both known and foreseen, if not intended, by the Conspiracy of Defendants.

260.    Defendants' intentional, wide-scale, fraudulent conduct also merits the imposition of punitive damages. Plaintiffs respectfully request the award of such punitive damages and any other relief this court shall deem just and proper.

## COUNT 11: NEGLIGENCE

261.    All preceding paragraphs and following paragraphs are hereby incorporated as though fully set forth herein.

262.    Specifically, each and every allegation of Count 8 (for Negligence) arising under the *previous* Cause of Action for Individual Appraisal Inflation, are set forth identically  herein and realleged here, in the interest of brevity. All of the wrongs and harms alleged in that Count are specifically brought here in this Count as well.

263.    In addition to the allegations of Count 8, Plaintiffs further allege as follows.

264.    Bank Defendants and LandAmerica additionally breached their duty by maliciously (or alternatively, knowingly, or recklessly) inflating values of real estate throughout California in a Market Fixing Scheme, as described throughout this Cause of Action.

## COUNT 12: PRICE FIXING - VIOLATION OF SHERMAN ACT 15 USC §I ET SEQ.

265.    All preceding paragraphs and following paragraphs are hereby incorporated as though fully set forth herein.

- 68 -

COMPLAINT

266. The Market Fixing Scheme alleged throughout this Cause of Action falls within the definition of a price fixing conspiracy under 15 USC §1 et seq.

267. Plaintiffs herein bring this count for injuries occurring as a direct result of Bank Defendants' and LandAmerica's (and their Co-Conspirator's) Price Fixing conspiracy, as described throughout this Cause of Action ("Market Fixing").

268. Bank Defendants herein were among the leading lenders at all times alleged herein and had sizeable market share, individually and collectively.

269. The purpose and effect of this anti-competitive conspiracy was to fix, raise, and stabilize the prices of homes throughout California, in order to bolster and increase Defendants' profits at the expense and injury of their borrowers, as well as other fairly competing lending institutions. These actions led to commensurate inflation of real estate values in states contiguous to California.

270. Bank Defendants and LandAmerica collusively and affirmatively conspired with one another to artificially raise the values of real estate throughout California, with effects spreading throughout contiguous states, because in doing so, all parties would see significantly more profit. The Bank Defendants were able to charge higher loan amounts, higher interest, and higher fees and points, while simultaneously able to increase their sales on the secondary market by creating the substantially false impression that the loans being sold were less risky than they were. Because of the intentionally increased danger of their loans, and increased likelihood of default the Servicing Defendants were able to collect highly lucrative late fees, default fees, and other such fees. Both Lending and Servicing Defendants turned additional profit when their borrowers, through their coordinated acts of deception and Market Fixing inevitably defaulted and were foreclosed upon, because Lending and Servicing Defendants were profitably insured against loss. Finally the Trustee Defendants also profited through this price fixing scheme in that more foreclosures allowed them to collect lucrative foreclose fees, trustee fees, inspection fees, and numerous other such fees.

271. Bank Defendants and LandAmerica acted intentionally and with the specific intent of fixing the market, and inhibiting fair competition.

272. Bank Defendants and LandAmerica succeeded in inflating, fixing, and raising real estate prices throughout the areas described, to the grave detriment of their consumers all of whom were

- 69 -
COMPLAINT

unknowingly forced to pay substantially more for their homes than they would have absent such price/market fixing. Defendants' acts were the direct and proximate causes of Plaintiffs' harms.

273.    As a result of such acts Plaintiffs have been damaged as set forth in Paragraph 237 (a)-(g)

274.    Further, without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages arising from this Cause of Action also include loss of equity in their houses, costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

## COUNT 13: UNFAIR, UNLAWFUL, AND FRAUDLENT BUSINESS PRACTICES
### (VIOLATION OF CAL. BUS. & PROF. CODE §17200)

275.    All preceding paragraphs and following paragraphs are hereby incorporated as though fully set forth herein.

276.    Specifically, each and every allegation of Count 9 (for violation of the UCL) arising under the *previous* Cause of Action for Individual Appraisal Inflation, are set forth identically herein and realleged here, in the interest of brevity. All of the wrongs and harms alleged in that Count are specifically brought here in this Count as well.

277.    In addition to the allegations of Count 9, Plaintiffs further allege as follows.

278.    Bank Defendants and LandAmerica acts are additionally **fraudulent** as set forth throughout this Third Cause of Action and the preceding Counts, all of which are hereby incorporated by reference.

279.    Bank Defendants and LandAmerica's acts are additionally **unfair** in that the intentional systematic manipulation and inflation of real estate values throughout California, causing Plaintiffs (and numerous others) to have to pay substantially more for their homes, loans, taxes, and numerous other fees – all so that the Conspiracy of Defendants could profit is patently unfair.

280.    Bank Defendants and LandAmerica acts are additionally **unlawful** in that

   a. their market and price fixing activities constitute violation of Anti-Trust law under the Sherman Act.

- 70 -
COMPLAINT

EXHIBIT A - PAGE 87

281.    Further as a result of Defendant's (1) artificial and fraudulent inflation of Plaintiffs' property values, and property values throughout the State of California, as well as (2) Defendants' abandonment of their own as well as industry standard underwriting guidelines, coupled with (3) Defendants incentive to package and sell as many dollars' worth of loans as they could to the secondary market, Defendants placed Plaintiff-borrowers into loans which were considerably larger than were justified by (a) the *true* uninflated valued of their properties, (b) Plaintiffs true uninflated incomes and (c)by Defendants own underwriting guidelines. As a result of Plaintiffs were placed into larger loans than they could afford or should have been placed into. The additional fees, points and interests paid as a result of the higher/inflated loan amounts constitute damages, and legally cognizable sources of restitution.

## FOURTH CAUSE OF ACTION: DECEPTION IN LOAN MODIFICATIONS

*(By Plaintiffsa Oscar Sandoval, Sonia Sandoval, Miguel Vega, Cynthia Vega, Ladislao Kalmar, Izaskun Galarraga, Lilian Padron, Raghda Zayer, Mike Manougia – Against Bank Defendants and all other Defendants as Co-Conspirators)*

*Defendants' Scheme To Extract Workout Payments From Borrowers In Distress And Then Foreclosing, As Opposed To Genuinely Offering Loan Modifications– Violating California's Prohibition Against Collecting Deficiency Judgments After Electing to Non-Judicially Foreclose*

282.    In the face of the escalating foreclosure crisis in the United States and especially in California, Bank Defendants have further victimized and preyed on those struggling to keep by offering and inducing customers into illusory "Workout Agreements," (also known as "Trial Payment Plans") or "TPP"s) which purport to offer hope of (1) a permanent loan modification and/or (2) an opportunity to cure loan default, but in truth and fact are merely a ruse through which Bank Defendants dupes homeowners into paying them thousands of dollars immediately before they foreclose. On information and belief, Bank Defendants have reaped illicit profits from these actions exceeding $100 million.

283.    Under these Workout Agreements, Bank Defendants promise to (1) permanently modify the borrower's loan, (2)refrain from foreclosing during the pendency of the Workout Agreement, and (3) an opportunity to otherwise cure loan default,  if a borrower pays three (sometimes more) "trial

- 71 -
COMPLAINT

EXHIBIT A - PAGE 88

payments" to the lender.  Despite their promises to the contrary, Bank Defendants have not fulfilled their promises under the Agreement (breach of contract), and indeed never intend to (fraud).  Instead, as alleged below, these Workout agreements are a sham designed to extract payments from borrowers immediately before Bank Defendants foreclose (violation of California's prohibition against collecting deficiency judgments after electing to non-judicially foreclose; *See* Cal. Code Civ. Proc. § 580b and Cal. Code Civ. Proc. § 726).

284.   In their capacity as loan servicers, Bank Defendants are paid by and beholden to the investors that hold the principal and interest rights to the loan being serviced.  The larger the face value of the pools of loan Bank Defendants service, the more it makes.  Quality of servicing and responsiveness to borrowers are irrelevant to the bottom line.  In fact, for loans in default, past due, and/ or on the brink of foreclosure, Bank Defendants makes *more money* in fees.  As such, it is in Bank Defendants interest to have loans in default and arrears for as long as possible prior to foreclosure, then foreclosing. Bank Defendants stand only to lose revenue by giving loan modifications to borrowers instead of foreclosing.

285.   Bank Defendants' servicing agreements with investors provide that the Bank Defendants gets a set percentage of every dollar it collects from borrowers. If a borrower is in default and not making any payments, Bank Defendants then receive no compensation for servicing the loan.  In addition, most of Bank Defendants' loan servicing agreements requires them to advance to investors the monthly payments that defaulted borrowers do not make.  This requires Bank Defendants to borrow money from its parent bank to cover such advances.  It is thus disastrous to Bank Defendants' profitability to have defaulted loan where no payments are being made.

286.   As a result, Bank Defendants designed the "Workout Agreements" at issue here to convert non-performing loans that only cost it money into "cash-flowing" loans that made it money. Its policies from the outset of its use of the Workout Agreements require any borrower asking for a modification to first sign-up for a Workout Agreement, and it financially incentivized its call center employees to push the Workout Agreements on all defaulted borrowers.  It is in Bank Defendants' interest to delay – but not prevent- foreclosure when by doing so it can avoid making the payment advances to its investors and collect additional sums from distressed borrowers prior to foreclosure.

- 72 -

**COMPLAINT**

287. Under California's non-judicial foreclosure rules, by electing to foreclose, a party loses the right to collect any amount owed on the loan that exceeds the amount recovered through the foreclosure process. Thus, when a home is worth less than the amount owed, after an election is made to non-judicially foreclose on the borrower, that borrower does not have to repay any deficiency, and Bank Defendants has no legal authority to collect, any arrearage or missed payments on the loan(s). Importantly, once a foreclosure has been initiated, a borrower has no legal obligation to make payments on the loan and the lender has no legal ability to collect any such payments.

288. These activities have been the subject of intense scrutiny, enforcement actions and litigation. As recently as April 13, 2011, multiple Federal regulators entered into stipulated consent orders with certain Defendants herein and related entities such as MERS (described below) describing massive failures and taking the first steps toward requiring Defendants and other banks to refund sums to homeowners improperly foreclosed upon by Defendants and other banks.

289. Some Plaintiffs entered into "Workout Agreements" with Bank Defendants in which Plaintiffs promised to pay and paid thousands of dollars- including legal and other fees which were not owed under their mortgages- on the seeming return promise of a review for a loan modification and an opportunity to cure their default at the end of a review period. But Bank Defendants' promises in return were empty: At the end of the Workout Agreements it told borrowers to continue to make monthly payments as it "considered" modification. Then it foreclosed on Plaintiffs' homes *without allowing borrowers access to any "cure method" despite its promises in the Workout Agreements to do so.*

290. In fact, Bank Defendants' internal policies and procedures were *not* to render a modification decision during the term of the Workout Agreements and its policy was *not* to provide cure information to the borrower at the end of the Workout Agreement absent a specific request from the borrower. As a result, Bank Defendants fraudulently induced their customers to enter the Workout Agreements and pay them thousands of dollars, while making no legally binding promise in return to Plaintiffs. The Plaintiffs in this action are entitled to rescind. In the alternative, Plaintiffs allege that Bank Defendants breached their duty of good faith and fair dealing when they foreclosed on Plaintiffs' homes without first giving an opportunity to cure the default.

291. In return for Plaintiffs' promises to make monthly payments, under the "workout

- 73 -

**COMPLAINT**

agreements", which included legal and other fees not required to be paid under Plaintiffs' mortgages, Bank Defendants promised: (a)to permanently modify Plaintiff's loans (b) not to foreclose for the duration of the Workout Agreement; and (c) at the end of the Workout Agreements to provide an opportunity for Plaintiffs to "cure: their loan deficiency through: (1)reinstatement (*i.e.,* bring the loan current); (2) payoff( i.e., refinancing with another lender to pay off the serviced loan); (3) modification; or (4) another workout "option" at the discretion of Bank Defendants.

292.    The Workout Agreements signed and offered to Plaintiffs by Bank Defendants were a sham. They were illusory because Bank Defendants made materially false statements in the Workout Agreements and made no legally binding promises in exchange for the borrowers' promises to make payments. The (1) promise of permanent loan modification and (2) "other" workout options were entirely at Bank Defendants' discretion, and thus not a binding promise. Defendants never permanently modified Plaintiffs as promised despite their compliance with every term of the workout offer, including their payment of all trial payments. The options to cure by (3) reinstatement or (4) payoff were also illusory because Bank Defendants' policy was to foreclose on properties *without providing the opportunity to cure* default through another means to avoid foreclosure. Borrowers had no opportunity to cure through reinstatement or pay-off their loan because they were not told at least five days before the Trustee's sale date that a modification other workout plan was denied. As a result, Plaintiffs' consent to the Workout Agreements was fraudulently obtained and Bank Defendants' consideration for the Workout Agreements failed, rendering such agreements *void ab initio* and subject to rescission. In addition, under the black letter California law, Plaintiffs are entitled to punitive damages where, as here, consent to a contract is fraudulently induced *See Mahon v. Berg*, 267 Cal. App. 2d 588, 589 (1968).

293.    Plaintiffs herein have complied with each and every term of the Workout Agreements. Plaintiffs have made all payments required under such agreements. Plaintiff's representations made in connection with such Workout Agreements remain true and correct.  Defendants however have not delivered the promised consideration, and are therefore in breach of contract.  Defendants have not permanently modified Plaintiffs loans as promised. No opportunity to cure default or deficiency as above described was offered. And in many instances Bank Defendants foreclosed on Plaintiffs while Plaintiffs were still making "trial payments" under the Workout Agreements.

- 74 -

**COMPLAINT**

294.   Though the language of the Workout Agreements requires them to do so in order to reject a Plaintiff, Bank Defendants never notified any of the Plaintiffs herein, in writing or otherwise, that they were ineligible for a permanent loan modification after they made all of the trial payments during the "trial period".

295.   California law requires that if a borrower complies with all the terms of the TPP, then the lender *must offer* a permanent loan modification.

296.   Plaintiffs are entitled to rescind and obtain back from Bank Defendants their promised (and delivered) consideration, namely the payments that were made to Bank Defendants under the Workout Agreements and Extended Workout Agreements. Because California law prohibits deficiency judgments, Bank Defendants was not entitled to require, post-election-to-sell payments and foreclose on the loans. Nor were Plaintiffs required to make such payments. These payments were new consideration. Such payments included legal and other fees which Plaintiffs had no obligation to pay under their mortgages absent Bank Defendants' Work out Agreement Scheme.

297.   In the alternative, should the Workout Agreements and/or Extended Workout Agreements be deemed enforceable, Bank Defendants has breached its duty of good faith and fair dealing by foreclosing on Plaintiffs' properties without providing the opportunity to cure the loan default at least five days prior to the Trustee's sale. Plaintiffs complied with all of their obligations under the Workout Agreements and Extended Workout Agreements. At the very least, Bank Defendants were required by good faith and fair dealing to provide notice to Plaintiffs that had been rejected and that Plaintiffs needed to invoke another of the permitted means to cure their defaults.

298.   Irrespective of validity of the Workout Agreements and Extended Workout Agreements, Bank Defendants has violated the Rosenthal Fair Debt Collections Practices Act, Cal. Civ. Code § 1788, *et seq.*, by using false, deceptive and misleading statements in connection with their collection of Plaintiffs' mortgage debt – namely the false promise of modification.

299.   Through this Action, Plaintiffs seek to stop Bank Defendants from preying on their customers through its Workout Agreement Scheme. Where Bank Defendants intend to foreclose on a property, and after it has exercised its election to sell under non-judicial foreclosure, it must not be permitted to extract thousands of dollars in additional payments with illusory promises and false

- 75 -

**COMPLAINT**

statements of opportunities to cure defaulted loans. Bank Defendants have sold or initiated foreclosures on many of the Plaintiffs in this action. At the very least, Plaintiffs are entitled to a return of the payments they made under the false promise from Bank Defendants that Plaintiffs would at least have an opportunity to avoid foreclosure.

300. Once a lender invokes its power to sell the underlying security for a mortgage (through providing its "Notice of Default and Election to Sell"), it cannot also seek to collect on the underlying note any amount owed in excess of the amount it recovers through the trustee's sale.

   a. California law forbids deficiency judgments in non-judicial foreclosure of residential mortgages. *See* Cal. Code Civ. Proc. § 580b. Once a lender invokes its power to sell the underlying security for a mortgage (through providing its "Notice of Default and Election to Sell"), it cannot also seek to collect on the underlying note any amount owed in excess of the amount it recovers through the trustee's sale.

   b. The notion that a mortgage lender must elect his remedy is also codified in the "Security First Rule," Cal. Code Civ. Proc. § 726. It provides that where Cal Code Civ. Proc. § 580b applies; an action in foreclosure is the *only* means by which a mortgagor can forcibly collect on a note secured by a deed of trust.

301. California law provides that a Trustee's sale can be postponed by mutual agreement. *See* Cal. Civ. Code § 2994g. However, the new date and time of the postponed sale must be provided by the trustee (and can be "cried") at the time of the prior scheduled sale. *See* Cal. Civ. Code § 2994g (d). Bank Defendants herein count on the crier rule in the design and implementation of its Workout Agreement Scheme. It knows that borrowers will not be present at the first scheduled Trustee's sale because it tells them that such sale is "suspended" or "on hold." Thus, it knows that Plaintiffs will have no way to know whether a new date and time has been set for the foreclosure and will have to rely on Bank Defendants' assurances that such sales will not occur if Bank Defendants' demands for payment are met.

***Bank Defendants' Adhesive Workout Agreements Are Unconscionable***

- 76 -

**COMPLAINT**

302.    Plaintiffs have entered in Workout Agreements with Bank Defendants. The terms of Bank Defendants' Workout Agreements are contained in a standard form, which is drafted by Bank Defendants.

303.    Moreover, Plaintiffs are not in a bargaining position with respect to the imposition of Bank Defendants' from Workout Agreement. Bank Defendants are large lenders and loan servicers with substantial assets and resources. Plaintiffs are individual homeowners under financial hardship and have substantially less bargaining power.

304.    Bank Defendants prepare the Workout Agreements and presents them to borrowers for their signature.

305.    Bank Defendants thus requires borrowers to agree to the Workout Agreement as presented. It does not provide an opportunity to negotiate or opt-out of the unconscionable terms at issue herein. The inequality of bargaining power this results in no real negotiation and absence of a meaningful choice on the part of Plaintiffs.

306.    Bank Defendants' form Workout Agreements contain multiple provisions that are unfairly one-sided, overly harsh and punitive to borrowers, and thus substantively unconscionable. Under the terms of the form Workout Agreement, Bank Defendants systematically (1) fail to withdraw foreclosure proceedings against borrowers who are in "Workout Agreements" and who make payments under the Workout Agreement; (2) create payment plans whereby the aggregate payments are insufficient to cure the borrower's deficiency; and (3) initiate foreclosures with no notice and opportunity for the borrower to cure any alleged default.

### *Bank Defendants Fail To Withdraw Foreclosure Proceedings Even When Borrowers Have Made All Plan Payments Under The Workout Agreement*

307.    Bank Defendants' Workout Agreements purport to obtain the borrower's agreement that foreclosure proceedings commenced by Bank Defendants will not be withdrawn unless Bank Defendants determines to do so. In this regard, the Workout Agreement provides:

**Section 2.B.** Except as set forth in Section 2.C. below, the Lender will suspend any scheduled foreclosure sale, provided I continue to meet the obligations under this Plan, but any pending foreclosure will not be dismissed and may be immediately resumed from

- 77 -

**COMPLAINT**

the point at which it was suspended if this Plan terminates, and no new notice of default, notice of intent to accelerate, notice of acceleration, or similar notice will be necessary to continue the foreclosure action, all rights to such notices being hereby waived unless prohibited by law;

(See Exhibit "A" to Complaint, p.2)

308.    Relying on the above provision, Bank Defendants fails to withdraw foreclosure proceedings while borrowers are supposedly being considered for a loan modification. Once borrowers begin making payments under the Workout Agreement, Bank Defendants unilaterally postpone any pending foreclosure sales date without obtaining the borrowers mutual consent and without informing borrowers of the reset foreclosure dates. It does so *even if* borrowers make all Plan Payments under the Workout Agreement.

309.    Bank Defendants' policy of failing to withdraw foreclosure proceedings and resetting the foreclosure sale date without the mutual agreement of, or notice to, borrowers in unfair, unlawful, and injurious to such borrowers. This practice is calculated to ultimately allow Bank Defendants to foreclose without notice or an opportunity to cure after obtaining payments under the Workout Agreement.

310.    After inducing Plaintiff Borrowers into entering dangerous loans through outright deception and in the name of greed - loans which would threaten their livelihoods - Defendants refused to modify Plaintiff Borrowers' loans despite laws and court orders which required them to make good faith efforts to do. Why? To protect themselves. Not the borrowers, but themselves. Because Defendants were required to buy back loans from their investors if a material misrepresentation was discovered, Bank Defendants refused to modify loans which qualified in every regard for one, for fear of having their own fraud and falsified information discovered by the investor, and having to buy back their fraudulent loans, and incurring massive loss. In other words, Bank Defendants placed their fiscal interests ahead of borrowers who desperately needed and *qualified* for the modifications, and who would face financial ruin or homelessness without one. Instead, Defendants chose to line their coffers, rather than offer assistance to the very people they imperiled through their greed – assistance they were under a good faith obligation to provide. Simply put, Bank Defendants were looking out for themselves.

311.    Plaintiffs believe and hereby allege that the servicers would want to use MERS to keep the investor information private is to obscure truth from the Plaintiffs and the Certificate Holders of the Trust.

312.    Every Pooling and Servicing Agreement has strict Warranties and Material

- 78 -

**COMPLAINT**

Misrepresentation Provisions that must be honored by the Depositors. In the event that a loan has a material misrepresentation or violates the warranties given to certificate holders and the Trustee of the REMIC, the loan must be purchased from the Certificate Holders and whatever insurance was in place is now void due to fraud being detected on the loan.

313. In the case of loan modifications it benefits the servicer to keep vital information away from the Certificate Holders and the Trustee that oversees the Trust. In the event that fraud is detected on a mortgage loan the "**buy back**" provisions kick in and the servicer or originator, which is sometimes the same company, would be forced to take back the loan. In this case Bank Defendants would be forced to put a dead loan on their balance sheet with no hopes of being able to collect on the insurance policy that is in place due to fraud.

314. When Plaintiffs are desperate for help, Bank Defendants refuses to assist them. In the event that Bank Defendants forwards the true and accurate financial information to the Trustee overseeing the REMIC or to a third party chosen by the Trustee, they can and sometimes do find material misrepresentations that took place at origination. A Plaintiff supplies current financial information up to and including a signed 4506-T and the investor or Bank Defendants through their processing centers find out that the income listed on the initial loan application was not correct.

315. This leads to a chain of events that Plaintiffs and the Courts are unaware of. Based on evidence Plaintiffs will introduce at trial Bank Defendants instructs their employees to decline any application to modify a loan that contains a material misrepresentation for *fear of having to buy back the loan*.

316. This practice has led to numerous lawsuits including Government lawsuits in which Government Sponsored Enterprises have independently sent out modification requests and have verified fraudulent information was used at the origination of the Plaintiffs loans.

317. This practice alone has led to millions of American's losing their homes for fear of reprisal from investors that were lied to, when they purchased these *Toxic* loans. Defendants' wrongful acts continue to this day with hardball tactics and deception that continue to threaten Plaintiffs' rights and financial security, as well as the economic future of the State of California. Since 2010, these tactics and Defendants' other wrongful acts have been revealed as a result of extensive

- 79 -
COMPLAINT

litigation and Government investigations.

*__Defendants Used The Promise Of Loan Modifications As Bait To Damage Plaintiffs' Credit, Preventing Plaintiffs From Obtaining Financing Anywhere Else__*

318.    Bank Defendants had an unfair and fraudulent pattern on inducing and directing borrowers to fall behind on their payments with the promise that by doing so, they would become eligible for a loan modification. Relying on these representations, Plaintiffs fell behind on their loan payments, but were never offered a loan modification.

319.    In doing so, Plaintiffs' credit was substantially damaged, they suffered greatly diminished access to credit and financing, and were penalized with fees, penalties and charges in addition to becoming delinquent on their loan as recommended by the Bank.

320.    By recommending that Plaintiffs fall behind, Bank Defendants effectively trapped Plaintiffs into keeping their loan with Defendants, because no other institution would help Plaintiffs after they became delinquent on their mortgage, or after their credit was destroyed.

321.    At its most fundamental level, these sorts of unscrupulous business tactics, undermine notions of fair play and good faith in business dealings, and jeopardize the consuming public.

*__Defendants Used The Promise Of Loan Modifications As Bait For An Outright Cash-Grab With No Intent To Ever Modify Plaintiffs__*

322.    Bank Defendants also had an unfair and fraudulent pattern of offering borrowers what appeared to be Loan modification offers (called "Trial Payment Plans"), but in reality these offers were nothing more than "cash grabs." Defendants never intended to permanently modify Plaintiffs' loans. Specifically, Bank Defendants would offer Plaintiffs and homeowners who were already on the brink of default/foreclosure a lower payment called a "trial payment" or "Workout Agreement." Bank Defendants promised that if Plaintiffs were able to make the trial payment for 3 (or more) months, Defendants would permanently modify Plaintiffs' payment to be the same amount under the trial payments. But Defendants had a pattern of rejecting these loan modifications despite Plaintiffs' compliance with every term of the loan modification offer. Instead Bank Defendants would use the offer

- 80 -

**COMPLAINT**

as bait to induce Plaintiffs to make payments which would never be applied to the principal and interest of their loan, but instead would be applied to the mountain of unmerited late charges, and fees, taking what little money the financially imperiled plaintiffs had left, and duping them into spending it on unfairly placed fees and late charges. Bank Defendants never had any intent of modifying their loans, despite Plaintiffs' full compliance with the terms of the offer. Such acts are patently unfair and fraudulent, and Plaintiffs are entitled to remuneration of all payments made under such trial payment plans, as well as an injunction prohibiting Defendants from this deceptive business practice. More specifically, Bank Defendants unlawful and unfair practices in this regard include, but are not limited to, the following:

    a.  failing to make good faith efforts to provide them with a loan modification and breaching their contractual obligations, written and implied promises, loan servicing functions owed to Plaintiffs, who fulfilled their obligations by making timely modified payments;

    b.  making false and/or misleading representations that Plaintiffs were eligible and entered into the trial modification period, which would lead to a permanent modification of their mortgage payment;

    c.  failing to disclose to Plaintiffs that their modified payments may be reported to credit bureaus as default or late payments that would destroy their credit scores;

    d.  delaying processing, demanding duplicate documentation, and failing to provide adequate information or communication regarding the loan modification programs to Plaintiffs;

    e.  engaging in conduct that undermines or violates the spirit or intent of the consumer protection laws alleged in this Complaint; and

    f.  omitting to inform Plaintiffs that they could be rejected from the trial modification period at any point, and that this would result in the immediate demand for a balloon payment consisting of purported delinquency payments and substantial late fees, default fees, foreclosure fees, inspection fees, property preservation fees, trustee fees, trustee sale guarantee fees, mail fees, recording fees, and default servicing fees

- 81 -

**COMPLAINT**

323.    Counts 14 through 22 arise under this (Fourth) Cause of Action for Deception in Loan Modifications, and are brought by all Plaintiffs named in this Cause of Action, against all Defendants named in this Cause of Action.

**COUNT 14: VIOLATION OF CAL. CODE CIV. PROC. § 580B AND §726 PROHIBITING COLLECTION OF DEBT AFTER ELECTING TO FORECLOSE**

324.    The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

325.    As described above, California law forbids deficiency judgments in non-judicial foreclosure of residential mortgages. *See* Cal. Code Civ. Proc. § 580b. Once a lender invokes its power to sell the underlying security for a mortgage (through providing its "Notice of Default and Election to Sell"), it cannot also seek to collect on the underlying note any amount owed in excess of the amount it recovers through the trustee's sale.

326.    As alleged throughout this Cause of Action, Bank Defendants have entered into Workout Agreements with Plaintiffs after initiating foreclosures on their properties, under which it has intentionally extracted thousands of dollars of payments from each of the Plaintiffs named herein in explicit and *knowing* violation of Cal. Code Civ. Proc §580(b) and §726 prohibiting the collection of payments on the note after the election to foreclose.

327.    Bank Defendants' acts comprise a scheme to circumvent the statutory bar against seeking a deficiency judgment. These acts were taken in furtherance of the conspiracy among all Defendants alleged throughout this Complaint.

328.    Such unlawfully extracted payments constitute damage to Plaintiffs herein. These payments must be returned to Plaintiffs, plus pre-judgment interest. Further, Bank Defendants should be enjoined from continuing to violate this rule in the future.

**COUNT 15: FRAUDULENT CONCEALMENT**

329.    The preceding paragraphs and the paragraphs following this cause of action are

- 82 -
COMPLAINT

incorporated by reference as though fully set forth herein

330. Plaintiffs and Bank Defendants were parties to the Loan Workout Agreements described above in this Cause of Action

331. By intentionally failing to disclose the material information described above in this Cause of Action, Bank Defendants fraudulently induced Plaintiffs to enter into such Workout Agreements. To reiterate, *in part* here, Bank Defendants intentionally concealed the materials facts:

  a. that the true purpose of such Loan Workout Agreements were to extract additional payments from Plaintiffs;

  b. that Plaintiffs would not be modified despite their exact compliance with the terms of the agreement;

  c. that such payments would not be applied to their loan balance;

  d. that Bank Defendants would report Plaintiffs as delinquent to credit reporting agencies, when making the exact payments required under the Bank Defendants' Trial Payment Plans.

332. Bank Defendants were under a duty to disclose this information to Plaintiffs

333. By intentionally failing to disclose such information Bank Defendants intended to induce Plaintiffs reliance to enter in the illusory Workout Agreements, and to induce their payments made thereunder

334. Plaintiffs under this Cause of Action did rely on Bank Defendants' failure to disclose such information in deciding to enter into the Workout Agreements and Extended Workout Agreements

335. If Plaintiffs had known the truth, they would not have entered into the Workout Agreements and Extended Workout Agreements

336. As a result, Plaintiffs were damaged in amount to be determined at trial. At minimum Plaintiffs must be returned all amounts paid by Plaintiffs under the Workout Agreements, as well as pre-judgment interest. Plaintiffs have also been damaged in the form of reduced credit scores, and the unavailability of financing.

337. Plaintiffs are further entitled to an award of punitive damages for Defendants intentional fraudulent conduct.

- 83 -

COMPLAINT

EXHIBIT A - PAGE 100

## COUNT 16: INTENTIONAL MISREPRESENTATION

338. The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein

339. Plaintiffs and Bank Defendants were parties to the Loan Workout Agreements discussed in this Cause of Action.

340. By intentionally misrepresenting the material information described above in this Cause of Action, Bank Defendants fraudulently induced Plaintiffs to enter into such Workout Agreements. To reiterate, *in part* here, Bank Defendants intentionally misrepresented the materials facts:

a. it wanted to help Plaintiffs maintain ownership of their homes. In particular, Bank Defendants sent the letters and made the statements described herein.

b. that by complying with the Workout Agreements, Plaintiffs loans would be permanently modified

c. that their homes would not be foreclosed as long as Plaintiffs continued to make payments under the Workout Agreements and Extended Workout Agreements. In particular, Plaintiffs were repeatedly told to continue to make payments and that their homes would not be foreclosed, as described herein.

d. whether they were approved for a loan modification and would have a genuine opportunity to cure their loan defaults prior to the execution of a Trustee's sale on their homes. Plaintiffs were never given such an opportunity

e. that upon the expiration of the Work out Agreements, Plaintiffs would have an opportunity to cure their defaults through: (1) reinstatement; (2) payoff; (3) HAMP sponsored Loan Modification; or (4) Investor Sponsored internal modification

f. that plaintiff-borrowers must miss payments (and thus damage their credit) in order to be eligible for modifications

g. that plaintiff-borrowers' homes would not be foreclosed upon while their requests for modifications were pending, but sending foreclosure notices, scheduling auction dates, and even selling consumers' homes while they waited for decisions

- 84 -

## COMPLAINT

h.  that their foreclosures would continue to be on hold after the expiration of the Workout Agreements if Plaintiffs continued to make payments to Bank Defendants.

i.  regarding the eligibility criteria for modifications and providing consumers with inaccurate and deceptive reasons for denying their requests for modifications

341.  At the time Bank Defendants made these representations to the Plaintiffs, Bank Defendants knew they were not true. Bank Defendants intended to and did foreclose during the time period for which the Plaintiffs had already made payments under their Extended Workout Agreements.

342.  Bank Defendants made these representations with the purpose of inducing Plaintiffs reliance to enter into the Workout Agreements, and Extended workout Agreements, and to continue to make payments of thousands of dollars per month.

343.  Plaintiffs relied on these representations in entering the Workout Agreements, and extended Workout agreements, and in continuing to make payments thereunder.

344.  Plaintiffs would not have entered into the Workout Agreements and Extended Workout Agreements had they known that these representations were not true. That is, had they known that they would not have a genuine opportunity to save their homes and to cure, and that Bank Defendants could and would foreclose on their properties without any notice that modifications were denied and after they had paid thousands of dollars to Bank Defendants, Plaintiffs would not have entered into the Workout Agreements to begin with and would not have made the payments during the terms of the Workout Agreements and the Extended Workout Agreements.

345.  As a result, Plaintiffs were damaged in amount to be determined at trial. At minimum Plaintiffs must be returned all amounts paid by Plaintiffs under the Workout Agreements, as well as pre-judgment interest. Plaintiffs have also been damaged in the form of reduced credit scores, and the unavailability of financing.

346.  Plaintiffs are further entitled to an award of punitive damages for Defendants intentional fraudulent conduct.

## COUNT 17: NEGLIGENT MISREPRESENTATION

347.  The preceding paragraphs and the paragraphs following this cause of action are

- 85 -

COMPLAINT

incorporated by reference as though fully set forth herein

348. The allegations of this Count are identical to those above in the previous Count except that the degree of intent herein is that of negligence. Put another way, at the time Bank Defendants made the misrepresentations described in this Cause of Action (and listed in part above), Bank Defendants did not have reasonable grounds to believe them to be true.

**COUNT 18: RESCISSION OF CONTRACT AND/OR RESTITUTION ON THE GROUNDS OF FRAUD, AND/OR UNCONSCIONABILITY**

349. All preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein

350. As described throughout this Cause of Action, consent to the Workout Agreements and Extended Workout Agreements was not real or free in that it was obtained solely through fraud and misrepresentations as herein alleged.

351. As described throughout this Cause of Action, the Workout Agreements were both procedurally and substantively unconscionable. Rescission is appropriate for this separate and independent reason.

352. Plaintiffs thus seek to rescind the agreements under California Civil Code § 1689 (b)(1). Plaintiffs have retained no consideration provided by Bank Defendants that can be tendered back to Bank Defendants prior to rescission.

**COUNT 19: BREACH OF CONTRACT**

353. The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

354. Plaintiffs and Bank Defendants were parties to the Loan Workout Agreements discussed in this Cause of Action.

355. Plaintiffs furnished consideration under the Loan Workout Agreement in the form of thousands of dollars of payments

356. Bank Defendants breached their obligations to Plaintiffs under Contract as set forth above in this Cause of action, including but not limited to:

- 86 -

**COMPLAINT**

a. Breaching its obligations to modify plaintiffs upon their compliance with the terms of the Workout agreement

b. Breaching its obligation to not foreclose while Plaintiffs made payments under the Workout Agreement

c. Breaching its obligation to allow Plaintiffs an opportunity to cure under the Workout Agreement

357.    Separately Bank Defendants has breached the duty of good faith and fair dealing implicit in all contracts, as alleged above.

358.    As a result, Plaintiffs have been damaged in an amount to be proven at trial. At minimum Plaintiffs must be returned all amounts paid by Plaintiffs under the Workout Agreements, as well as pre-judgment interest.

359.    Alternatively Plaintiffs request enforcement of the Workout Agreement. Specifically Plaintiffs request enforcement of the promise of Loan Modification pursuant to the terms and payments made thereunder, and any other legal or equitable remedies which this Court may deem just and proper.

## COUNT 20: VIOLATION OF THE CRIER RULE (CAL. CIV. CODE §2994G)

360.    The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

361.    California law provides that a Trustee's sale can be postponed by mutual agreement. *See* Cal. Civ. Code § 2994g. However, the new date and time of the postponed sale must be provided by the trustee (and can be "cried") at the time of the prior scheduled sale. *See* Cal. Civ. Code § 2994g (d).

362.    Bank Defendants have violated this law by failing to provide the time of the new postponed sale at the time of the prior scheduled sale.

363.    In doing so, Defendants have failed to comply with the fundamental notice requirements of California's non-judicial foreclosure statutes, with which "strict compliance" is required. *Ung v. Koehler* (2005) 37 Cal.App.4[th] 186, 202. Without proper notice, there is no power of sale, and accordingly the foreclosure sales at issue are void.  .

- 87 -

## COMPLAINT

## COUNT 21: UNFAIR DEBT COLLECTION PRACTICES

## (VIOLATION OF CAL. CIV. CODE §1788 ET SEQ)

364.    The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

365.    Bank Defendants, in their capacity as servicers, are "debt collector" engaging in "debt collection" practices under the Rosenthal Fair Debt Collection Practices Act (the "Rosenthal Act"). See Cal. Civ. Code § 1788.2 (c).

366.    Bank Defendants violated the Rosenthal Act by using false, deceptive, and misleading statements and deceptive omissions in connection with its collection of Plaintiffs' mortgage debt, as alleged herein. See Cal. Civ. Code § 1788.17, incorporating 15 U.S.C. § 1692(e). For example(and without limitation), Plaintiffs were consistently led to believe that modification review was pending under the Workout Agreements and that the requests for additional documents and receipt thereof would continue the review process and Workout Agreements. But Bank Defendants unilaterally ceased the review process and foreclosed on dates previously represented as being postponed.

367.    The Rosenthal Act was also violated because the Workout Agreements were themselves deceptive in that they ambiguously appeared to offer an opportunity for borrowers to cure their arrearage and save their homes from foreclosure *and* stated that the arrearage would not be cured at the end of the Workout Agreement. The Rosenthal Act allows for a private right of action to the same extent permitted under the federal Fair Debt Collection Practices Act ("FDCPA"). *See* Cal. Civ. Code § 1788.17; *Gonzales v. Arrow Financial Services, LLC*, 233 F.R.D. 577, 581 (S.D. Cal. 2006).

368.    Plaintiffs have suffered damages and harm as a result of Bank Defendants' unfair debt collection practices, including irreparable harm to their credit and the amounts paid under the Workout Agreements and Extended Workout Agreements.

//

//

//

## COUNT 22: UNLAWFUL, UNFAIR & FRAUDULENT BUSINESS PRACTICES
## (VIOLATION OF CAL. BUS. & PROF. CODE §17200)

- 88 -

COMPLAINT

369.    The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

370.    Bank Defendants' acts described in this action are **Unlawful** in that they violate:

    a.    The prohibition against collection of deficiency judgments after electing to foreclose (Cal. Code Civ. Proc. § 580b)

    b.    The Security First Rule (Cal. Code Civ. Proc. § 726)

    c.    The Crier rule (Cal. Civ. Code §2994(g)

    d.    The Rosenthal Fair Debt Collection Practices Act (Cal. Civ. Code §1788 et seq.)

371.    Separately, Bank Defendants' acts as described in this Cause of Action are **Fraudulent** as set forth above (in Counts 15, 16, and 17 *inter alia*).

372.    Bank Defendants' acts are also patently **Unfair** as more fully set forth above. Without limiting the allegations above which are fully incorporated herein, Defendants acts are unfair insofar as:

    a.    they unfairly bait Plaintiffs to make thousands of dollars of monthly payments under the false promise of having their loan modified, when in reality Defendants have no intent of modifying. These illusory work-out agreements were nothing more than unfair, and fraudulent cash-grabs

    b.    they used the promise of Loan Modification as bait to damage plaintiffs' credit preventing them from obtaining financing anywhere else.

    a.    they are designed a subterfuge to the crier rule, and are designed to allow Defendants to foreclose on Plaintiffs without their knowledge and without giving them notice.

373.    The Bank Defendants' acts and practices violate established public policy and the harm they cause to consumers in California greatly outweighs any benefits associated with those practices.

374.    Bank Defendants' conduct offends public policy and/or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. Bank Defendants' conduct in this regard includes, but is not necessarily limited to, the following:

    a.    Bank Defendants have commonly failed to withdraw foreclosure proceedings against borrowers who made all Plan Payments under Workout Agreement;

    b.    Bank Defendants have initiated foreclosure proceedings without providing borrowers

- 89 -

**COMPLAINT**

notice or opportunity to cure their remaining arrearage or default;

c. Bank Defendants have engaged in conduct that constitutes systematic breach of contract and breach of the implied covenant of good faith and fair dealing.

375. Bank Defendants' conduct as set forth herein resulted in loss of money or property to Plaintiffs, including (1) principal and interest that they were not obligated to pay after Bank Defendants elected to exercise non-judicial foreclosure and to which Bank Defendants had no ability to collect after foreclosure; and (2) legal and other fees that Plaintiffs paid to Bank Defendants under the Workout Agreements and Extended Workout Agreements.

376. Defendant's acts caused substantial consumer injury with no benefits to consumer competition. Plaintiffs could not have reasonably avoided these injuries occasioned by Defendants' intentional deceit, misrepresentation, and omission. Further, Defendants acts significantly threatened harm to competition

377. Plaintiffs' payments made under the Workout Agreements constitute cognizable restitution which must be returned to Plaintiffs as well as pre-judgment interest thereon.

378. The unfair, unlawful and fraudulent acts and practices of Defendants named herein present a continuing threat to Plaintiff and to members of the public in that these acts and practices are ongoing and are harmful and disruptive to business and financial markets. Accordingly, Plaintiffs request injunctive relief to preclude the actions/wrongs described above by Bank Defendants.

## FIFTH CAUSE OF ACTION:

## INTENTIONAL UNAUTHORIZED FORECLOSURES PURSUED IN THE NAME OF PROFIT

(By Plaintiffs Masatoshi Tauchi, Jose Velasco, Beatrice Velasco, Lonnie Wall, Rolanda White, Maria Alcantar, Cleadith Brewer, Dwayne Brewer, Daniel Gambler, Alice Gambler, Alejandro Manzo, Maria Manzo, Felipe Muro, Paola Muro, Daniel Russell, Martin Lozano, Jorge Espinoza, Albina Espinoza—Against All Defendants)

379. Continuing their chronology of profit-driven deception and intentional wrongdoing, Defendants not only (1) intentionally placed Plaintiffs into known dangerous and impossible loans in the name of profit on the secondary market, and, (2) offered Plaintiffs trial loan modifications in an attempt

- 90 -

**COMPLAINT**

to grab as much cash as they could before foreclosing – none of which would be applied to the principal or interest of Plaintiff's loans - with no intent of ever actually modifying Plaintiffs' loans, but in a final coup-de-grace (3) intentionally foreclosed on plaintiffs despite having no ownership interest in the notes or deeds of trust, in the name of collecting preposterous and unmerited "foreclosure fees" including: inspection fees, default fees, late fees, advance fees, attorney fees, and trustee fees – hand in hand with the Trustee Defendants, who while purporting to act merely in their capacity as trustee, act intentionally and maliciously to foreclose knowing they have no authority to do so, and in knowing violation of California foreclosure statutes. As discussed above, Trustee Defendants are the vital foreclosure arm of Defendants' fraudulent scheme alleged throughout this Complaint.

380. Bank Defendants along with Trustee Defendants unilaterally charged these ill-defined and ambiguous fees whose amounts were *never* disclosed, nor consented to Plaintiffs in any writing or contract whatsoever. They decided how much they wanted to charge for whatever reason they wanted to charge it. The amounts they charged were tantamount to price gauging, often charging double, triple or even quadruple the fair market value for these "services." The outrageous price markups all inured to the benefit of the conspiracy of Defendants. As Defendants did not have an ownership interest in the property upon which to foreclose, these charges and fees were entirely unjustified, and constitute numerous cognizable sources of restitution.

381. In short, Bank Defendants together with Trustee Defendants made money by initiating foreclosures, and for this very reason intentionally steamrolled wrongful foreclosures over plaintiffs without having any true possessory or ownership interest in the deed of trust – the document which confers the power of foreclosure - threatening to wrongfully dispossess Plaintiffs of their homes and placing them on the streets.

382. In the greed-driven world of Defendants, neither law nor ethics would be allowed to stand as an obstacle in their insatiable hunt for profit.

383. Counts 23 through 24 arise under this (Fifth) Cause of Action for "Intentional Unauthorized Foreclosure in the Pursuit of Profit" and are brought by all Plaintiffs named in this Cause of Action, against all Defendants named in this Cause of Action.

- 91 -

**COMPLAINT**

## COUNT 23: WRONGFUL FORECLOSURE

384. Bank Defendants' continue to demand payment and to foreclose and threaten to foreclose on Plaintiffs (through co-conspirator Trustee Defendants), despite the facts that:

    a. The Foreclosing Defendants have no proof that they own the notes and deeds of trust they seek to enforce;

    b. The Foreclosing Defendants have never received a proper assignment of the Deed of Trust ("DOT") - the document which confers the power of foreclosure. Accordingly, they have no authority to foreclose.

    c. There is considerable evidence that the Foreclosing Defendants do not own the notes and deeds of trust they enforce and seek to enforce and based thereon, Plaintiffs allege that they do not; and

385. As alleged with further detail in Appendix A, in many instances, the foreclosing Bank Defendants never properly received an assignment of the DOT (and therefore had no authority to foreclose) because the trusts they were being assigned into had been closed long prior, and therefore could not legally accept assignment of the Loans and DOTs.

    a. The reason loans are pooled and placed into these loan trusts named REMIC's is due to income tax purposes. A REMIC is an "SPV" or Special Purpose Vehicle that is treated by the IRS as a "QSPE" or Qualifying Special Purpose Entity. It specifically was designed by Congress to allow the vehicle to not be taxed as the cash flows through the vehicle and distributed to the investor and certificate holders. It is like an S Corp where there is no double taxation.

    b. Pooling and Servicing Agreements only allow loans to be placed into a REMIC for two years after the set-up of the Trust due to tax implications. A loan substituted in or out of such trust after the two year period, results in a massive tax penalty of 100% of the face value of *all the assets in the trust.*

386. The trusts which foreclosed on many of the Plaintiffs never received assignment of the DOT – the document which confers the power of foreclosure. Specifically, Bank Defendants foreclosed on numerous Plaintiffs herein on behalf of trusts which had no ownership interest whatsoever in the

- 92 -

## COMPLAINT

DOT, **because the trusts had been-long closed under the terms of their very own PSA.** In other words Defendants had no authority whatsoever to foreclose on Plaintiffs herein. The foreclosing trust had no ownership interest in the DOT which would give it the power to foreclose.

387. Established authority makes clear that a Plaintiff states a claim for wrongful foreclosure when it is alleged that the assignment to the trust was executed after the closing date of the trust. *Vogan v. Wells Fargo Bank, N.A.* (E.D. Cal., Nov. 17, 2011,) 2011 WL 5826016 at *7; *Johnson v. HSBC Bank USA, Nat. Ass'n* (S.D. Cal., Mar. 19, 2012) 2012 WL 928433at *3.

388. As to other Plaintiffs, Bank Defendants and Trustee Defendants foreclosed on them despite having no ownership interest in the DOT, because the DOT was **never endorsed to them.** In other words, they never had the authority to foreclose. A Plaintiff states a viable claim for wrongful foreclosure when it is alleged that the Defendants are "not the proper parties to foreclose." *Ohlendorf v. Am. Home Mortg.,* (E.D.Cal. 2010) 2010 U.S. Dist. LEXIS 31098, at *21–24; *Tamburri v. Suntrust Mortgage (N.D. Cal, 2011) 2011 WL 6294472 *11'* [same] *Sacchi v. Mortgage Electronic Registration Systems, Inc. (C.D.Cal. June 24, 2011) 2011 WL 253302* at *8; *Castillo v. Skoba* (S.D.Cal. 2010) 2010 WL 3986953, at*2 [same].

389. As to other Plaintiffs herein, Bank Defendants and Trustee Defendants had no authority to foreclose because *at the time* they initiated foreclosure (by filing a Notice of Default), they had not yet received an assignment of the DOT. In other words, at the time they initiated foreclosure, they had no authority to foreclose. ""[S]ince the plaintiffs had alleged facts **suggesting the foreclosing party had no legal interest in the deed <u>at the appropriate time</u>,** there [is] a valid cause of action." *Tamburri v. Suntrust Mortgage (N.D. Cal, 2011) 2011 WL 6294472 *11,* citing *Sacchi v. Mortgage Electronic Registration Systems, Inc. (C.D.Cal. June 24, 2011) 2011 WL 253302* at *8 [[holding plaintiff had stated a valid cause of action for wrongful foreclosure where the foreclosing entity had no authority to foreclose because it had "**no beneficial interest in the Deed of Trust <u>when</u> it acted to foreclose on** Plaintiffs' home."]; *Castillo v. Skoba* (S.D.Cal. 2010) 2010 WL 3986953, at*2 [same]. Foreclosures initiated by or on behalf of a party, who at the time had no authority to foreclose are *void ab initio. Tamburri; Castillo.*

390. As to other Plaintiffs still, Bank Defendants and Trustee Defendants had no authority to

- 93 -

**COMPLAINT**

EXHIBIT A - PAGE 110

foreclose because they had failed to comply with Cal. Civ. Code §2923.5 – a necessary prerequisite to foreclosure – which requires a lender to contact its borrower to disclose alternatives to foreclosure. Foreclosing Bank Defendants have failed to, and continue to fail to comply with this legal requirement.

391.    Still, as to other Plaintiffs, Bank Defendants' and Trustee Defendants' foreclosures were void because the trustee who conducted the foreclosure sale was an unauthorized trustee who had never been properly substituted as trustee.  Under California Law, a foreclosure sale conducted by an unauthorized trustee is void as a matter of law. *Dimock v. Emerald Properties* (2000) 198 Cal.App.4th 868.

392.    Finally, such foreclosures were additionally wrongful insofar as they were intentionally occasioned by the Frauds of Defendants who (1) concealed the true terms, payments, and nature of the loans in order to induce borrowers into entering them, knowing that such loans would be impossible for them to afford, and would result in their default to a *mathematical certainty*, and (2) falsely tampered with the appraised values of their homes – so that Bank Defendants, Trustee Defendants, and their conspirators could collect lucrative fees, including **foreclosure fees**. Causing the foreclosure of their borrowers was an intentional part of their fraudulent scheme. It meant more money.

393.    Whether or not they can demonstrate ownership of the requisite notes and deeds of trust, Defendants lack the legal right to enforce the foregoing because they have not complied with disclosure requirements intended to assure mortgages are funded with monies obtained lawfully.

394.    Plaintiffs allege that Bank Defendants have made demand for payment on the Plaintiffs with respect to Plaintiffs' properties at a time when Defendants are incapable of establishing (and do not have any credible knowledge regarding) who owns the promissory notes Defendants are purportedly servicing.  Plaintiffs believe and thereon allege that because Defendants are not the holders of Plaintiffs' notes and deeds of trust and are not operating under a valid power from the various current holders of the notes and deeds of trust, Defendants may not enforce the notes or deeds of trust.

395.    Bank Defendants have already foreclosed upon the following property owned by the following Plaintiffs – allegations establishing the specific factual basis of the wrongful nature of the foreclosure as against each of the Plaintiffs below are set forth in **APPENDIX A**.

- 94 -
**COMPLAINT**

a. Masatoshi Tauchi (Appendix A, ¶17)
   16639 Alviso Court, Lake Elsinore, CA 92530

b. Jose Velasco and Breatrice Velasco (Appendix A, ¶18)
   11885 Autumn Place, Fontana, CA 92337

c. Lonnie Wall (Appendix A, ¶8)
   1426 East Andrew Street, Ontario, CA 91761

d. Rolanda White (Appendix A, ¶51)
   19856 Santa Clara Court, Riverside, CA 92508

e. Maria Alcantar (Appendix A, ¶23)
   5380 Sebastopol Road, Santa Rosa, CA 95407

f. Cleadith Brewer and Dwayne Brewer (Appendix A, ¶15)
   13503 Reva Place, Cerritos, CA 90703

g. Daniel Gambler and Alice Gambler (Appendix A, ¶20)
   8 South Cambridge Drive, Lodi, CA 95242

h. Alenjandro Manzo and Maria Manzo (Appendix A, ¶35)
   29972 Pechanga Drive, Temecula, CA 92592

i. Felipe Muro and Paola Muro (Appendix A, ¶59)
   515 East 7 Street, Corona, CA 928779

j. Daniel Russell (Appendix A, ¶16)
   2921 C Street Unit 279, San Diego, CA 92102

k. Martin Lozano (Appendix A, ¶69)
   2191 West 29th Place, Los Angeles, CA 90018

l. Jorge Espinoza and Albina Espinoza (Appendix A, ¶4)
   5715 Walnut Avenue, Long Beach, CA 90805

396. Because the foreclosing Bank Defendants are not the holders of the notes and deeds of trust and are not operating under a valid power from the current holders of the notes and deeds of trust, Defendants did not have the right to proceed with the foregoing foreclosures.

397. Bank Defendants, and Trustee Defendants, acted outrageously, persistently, intentionally and with actual malice in performing the acts alleged in this cause of action. Accordingly, Plaintiff is entitled to exemplary and punitive damages in a sum according to proof and to such other relief as is set

- 95 -

**COMPLAINT**

EXHIBIT A - PAGE 112

forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

398.    As a result of the foregoing unlawful acts Plaintiffs have been damaged in being wrongfully deprived of their homes, losing equity, being forced to incur relocation expenses, suffering emotional distress, being forced to pay foreclosure fees, attorney's fees, trustee fees, suffering damage to their credit scores, experiencing reduced availability of financing, among the other damages described throughout this Complaint.

<u>COUNT 24</u>: UNFAIR, UNLAWFUL, AND FRAUDULENT BUSINESS PRACTICES

(VIOLATION OF CAL. BUS. & PROF. CODE §17200)

399.    The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

400.    Bank Defendants' and Trustee Defendants' acts described in this action are **Unlawful** in that they violate:

    a.    The requirement to make contact with a defaulting borrower prior to foreclosure in order to explore alternatives to foreclosure (Cal. Civ. Code §2923.5)

    b.    The requirement that the party on behalf of whom foreclosure is being instituted must first have an ownership interest in the Deed of Trust before acting to foreclose. (Cal. Civ. Code §2924 et seq.)

    c.    The Requirement that a trustee must first be authorized as a trustee before it can conduct a trustee/foreclosure sale (Cal. Civ. Code §2924 et seq.)

    d.    The Requirement that a party must first record an NOD before they have the power to foreclose (Cal. Civ. Code §2924 et seq).

    e.    The Crier Rule (Cal. Civ. Code §2994(g)

    f.    The Rosenthal Fair Debt Collection Practices Act (Cal. Civ. Code §1788 et seq)

401.    Separately, Bank Defendants' acts as described in this Cause of Action are **Fraudulent** as set forth above.

402.    Such foreclosures were additionally wrongful insofar as they were intentionally occasioned by the Frauds of Defendants who concealed the true terms, payments, and nature of the loans in order to induce borrowers into entering them, knowing that such loans would be impossible for them

- 96 -

**COMPLAINT**

to afford, and would result in their default to a *mathematical certainty* – so that Plaintiffs and their conspirators and could collect lucrative fees, including **foreclosure fees**. Causing the foreclosure of their borrowers was an intentional part of their fraudulent scheme. It meant more money.

403. Bank Defendants' and Trustee Defendants' acts in intentionally foreclosing upon their borrowers in the name of profit, and/or without authority, as described above are also unfair.

404. Such acts and practices violate established public policy and the harm they cause to consumers in California greatly outweighs any benefits associated with those practices.

405. These actions were immoral, unethical, oppressive, unscrupulous and substantially injurious to similarly situated borrowers, and Plaintiffs herein. Bank Defendants' and Trustee Defendants' conduct had no utility other than for their own ill-gotten gain, and the harm was great not only to Plaintiffs herein, but also to residents of California, broadly, who have seen a decrease in their home and property values as a result of the bursting of the super-heated pricing bubble created by Defendants' intentional wrongful foreclosure which now devastate real estate values.

406. At the time of their fraud, Defendants *knew* that their conduct would cause the precipitous decline in property values throughout the State of California.

407. Defendant's acts caused substantial consumer injury with no benefits to consumer competition. Plaintiffs could not have reasonably avoided these injuries occasioned by Defendants' intentional deceit, misrepresentation, and omission. Further, Defendants acts significantly threatened harm to competition.

408. Defendant's acts caused substantial consumer injury with no benefits to consumer competition. Plaintiffs could not have reasonably avoided these injuries occasioned by Defendants' intentional deceit, misrepresentation, and omission. Further, Defendants acts significantly threatened harm to competition.

409. Bank Defendants acted with malice and with the intent of artificially inflating California Real estate properties generally, as well as the values of Plaintiffs' individual properties and homes.

410. As a result of Defendants' unfair competition, Plaintiffs are entitled to restitution for all sums received by Defendants with respect to Defendants' unlawful and/or unfair and/or fraudulent conduct, including, without limitation, interest payments made by Plaintiffs, fees paid to Defendants,

- 97 -

**COMPLAINT**

including, without limitation, trustee fees, and the excessive fees paid at Defendants' direction, and premiums received upon selling the mortgages at an inflated value.

411.    As a result of the foregoing unfair, unlawful, and fraudulent acts Plaintiffs have been damaged in being wrongfully deprived of their homes, losing equity, being forced to incur relocation expenses, suffering emotional distress, being forced to pay foreclosure fees, attorney's fees, trustee fees, suffering damage to their credit scores, experiencing reduced availability of financing, among the other damages described throughout this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants and each of them as follows:

1.    General, Actual, Compensatory, Special and Exemplary damages according to proof under the First, Second, Third, Fourth, Sixth, Seventh, Eighth, Tenth, Eleventh, Twelfth, Fourteenth, Fifteenth, Sixteenth, Seventeenth, Eighteenth, Nineteenth, Twenty-First, and Twenty-Third Counts, and any other Counts for which such relief may be available;

2.    Punitive Damages under the First, Second, Sixth, Tenth, Fifteenth, and Sixteenth Counts and any other Counts for which such relief may be available;

3.    Statutory relief according to proof under the Twelfth, Fourteenth, Twentieth, and Twenty-First Counts and any other Counts for which such relief may be available;

4.    Restitution and Injunctive Relief under the Ninth, Thirteenth, Eighteenth, Twenty-Second and Twenty Fourth Counts and any other Counts for which such relief may be available;

5.    Rescission under the Eighteenth Count;

6.    On all Counts, for costs of suit herein;

7.    On all Counts, for pre- and post-judgment interest;

8.    On all Counts for which attorney's fees may be awarded pursuant to the governing contract, by statute or otherwise, reasonable attorneys' fees; and

9.    On all Counts, for such other and further relief as this Court may deem just and proper.

//

//

- 98 -

**COMPLAINT**

Dated: November 15, 2013

Respectfully submitted,
**BROOKSTONE LAW, PC**

By: _____
Vito Torchia, Jr.
Attorneys for Plaintiffs

- 99 -
**COMPLAINT**

EXHIBIT A - PAGE 116

**APPENDIX A TO COMPLAINT**

1.    Plaintiff Lilian Padron ("Padron") discussed obtaining a mortgage to purchase her home located at 541 Houston Drive, Thousand Oaks, CA 91360 and APN: 669-0-241-225 with a Loan Consultant ("Loan Consultant"), a representative and authorized agent of Mortgage Store Financial, Incorporation, a correspondent of OneWest Bank and Defendants herein (the "Defendants") and authorized by Defendants to lend on their behalf in or around November 2006. In the course of their discussions ranging from November 2006 until January 2007, Defendants and Loan Consultant steered her into an adjustable rate mortgage in the amount of $430,000.00 with an interest rate at 1.25% for a term of 30 years. Little did Padron know, however, her loan was a negatively amortized PayOption ARM. Padron was not advised that the interest rate was never "fixed" but applied to only her first monthly payment and could adjust every month thereafter. The amount of Padron's minimum monthly payment was "fixed" for 12 months and could adjust every 12 months thereafter. When the amount of the minimum monthly payment is insufficient to cover the amount of interest due, then the amount of that deficiency is added onto the unpaid principal balance of her loan. The recast point of this loan is 115% of the original loan amount. This loan has a prepayment penalty of 3 years. This loan was originated by OneWest Bank, on the note and deed of trust Mortgage Store Financial, Incorporation is identified as the lender, and OneWest Bank was the servicer of the loan.

Defendants and Loan Consultant represented to Padron that her monthly payment would always be $1,432.98. Although the amount of Padron's minimum monthly payment was $1,432.98, Defendants and Loan Consultant failed to clarify their partially true representations and advise Padron: (1) how the interest rate on her loan was calculated; (2) that the minimum monthly payment of $1,432.98 would not always be available; (3) that the minimum monthly payment would not be the permanent payment under the loan despite Defendants' and Loan Consultant's affirmative representations to the contrary; (4) that by paying the initial minimum monthly payment she would be definitively deferring interest on her loan, increasing the principal balance of her loan every time she made the minimum monthly payment; (5) that by paying the minimum monthly payment the principal balance of her loan was certain to increase; or (6) her loan would be recast within a few years and she would be forced to pay considerably

1

**APPENDIX A TO COMPLAINT**

higher payments.

The disclosures in Padron's loan documents discussing negative amortization, only frame negative amortization as a mere possibility rather than a certainty when making the minimum payment. However the reality was that by making the minimum payment, negative amortization was a certainty. Indeed, the payment schedule set forth in the Truth in Lending Disclosure Statement ("TILDS") which set forth what appeared to be the required payment schedule fails to disclose that making payments pursuant to the TILDS payment schedule will result in negative amortization. Padron was not provided, before entering into the loans, with any other payment schedule or with any informed option to make payments different than those listed in the TILDS payment schedule. Had Defendants disclosed that by making the payment pursuant to the TILDS Padron would be deferring interest, or had they disclosed the payment amounts sufficient to avoid negative amortization from occurring, Padron would not have entered into the loans. Defendants intentionally omitted a clear disclosure of the nature of Padron's loans because giving a clear explanation of how the loan worked would have punctured the illusion of a low-payment, low interest rate loan.

Further, Defendants and Loan Consultant advised her that she was eligible for a Low Doc Loan. Unbeknownst to her at the time, Defendants and Loan Consultant used this low documentation requirement to fraudulently inflate her income; and in doing so, Defendants and Loan Consultant caused her to be placed into a loan whose payments she could not afford given her true, un-inflated monthly income. Defendants and Loan Consultant altered Padron's loan application without her knowing consent or authorization as Loan Consultant completed Padron's application without giving Padron an opportunity to review the loan application.

Defendants and Loan Consultant also explicitly represented to Padron that she could afford her loan and further represented that she could shoulder the additional financial burden of repaying her loan in consideration of her other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $3,304.50. Given Padron's true monthly income of $3,734.40, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 88%- in excess of industry standard

2

EXHIBIT A - PAGE 118

**APPENDIX A TO COMPLAINT**

underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Padron that she could rely on the assessment that she was "qualified" to mean that she could afford the loan. Because of Padron's lack of familiarity with how much debt a person can and should reasonably take on compared to her monthly income, and because Padron reasonably relied on Defendants' and Loan Consultant's expertise that any payment she was "qualified" for would take into account what the maximum debt a person such as Padron should be shouldering was, Padron reasonably believed Defendants' and Loan Consultant's representations that she could afford her loan and its payments.

Although Defendants and the Loan Consultant represented to Padron that she was "qualified" for her loan and could afford her loan and its monthly payments, Defendants and the Loan Consultant misled Padron into believing that her monthly payments would always only be $1,432.98. Furthermore, at no point did Defendants or Loan Consultant clarify Padron's false belief and advise her that $1,432.98 would not be her permanent payment under the loan, or that every time she made a monthly payment in the amount of $1,432.98, which is less than interest only, she would be deferring interest on her loan, increasing the principal balance of her loan.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around January 2, 2007, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Padron's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Padron's home was worth $430,000.00 at the time she entered into her loan, and that such a valuation was a true and correct measure of her home's worth. The current fair market value of Padron's home is approximately $297,500.00. Padron alleges that the appraisal was artificially inflated, and that she has suffered damages in the amount of $132,500.00 ($430,000.00-$132,500.00) due to a substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Loan Consultant also represented to Padron that she would be able to refinance her loan at a later time. Padron relied on this assurance in deciding to enter into the

3

APPENDIX A TO COMPLAINT

mortgage contract. However, Padron has not been able to refinance her loan. Defendants and Loan Consultant also represented that it would modify Padron's loan, and Padron relied on this representation in deciding to enter into the loan. In addition, Padron was advised by a representative and authorized agent of Defendants, to stop making payments in order to be eligible for a modification. Padron relied on Defendants' and Defendants' Representative's advice and stopped making her monthly payments causing her to fall even further behind. However, Defendants refused to permanently modify her loan.

In or around early 2009, Padron was experiencing financial difficulty due to a grave downturn in her hair salon business. With respect to that, Padron contacted Defendants and began the loan modification review process. Padron had applied for a loan modification on 3 separate occasions. During all relevant times, Padron provided all information in a timely fashion and whenever Defendants requested it. However, Defendants never had the intent to modify Padron's loan. Defendants repetitively demanded the same information and ultimately denied Padron's modification because it was alleged that Padron failed to submit the requested information at all or within the time frame set by Defendants.

On March 11, 2009 Padron submitted her updated financial information for consideration of a loan modification, which was denied by Defendants. In or around June 2010, Padron submitted a second application for a loan modification. During both processes, Defendants on multiple occasions requested the same documents which Padron provided to Defendants as instructed. Despite Padron's abiding by the Defendants' terms, Defendants "dual tracked" Padron in that they have initiated foreclosure proceedings against Padron. During the period that Padron was being reviewed for loan modification, Defendants recorded a Notice of Default (July 14, 2010) ("NOD"). On September 21, 2010 Defendants ultimately rejected Padron's loan modification stating that Padron did not provide Defendants with the documents requested.

On November 15, 2010 Padron received an offer to enter into a Special Forbearance Agreement with Defendants. Under the special Forbearance Agreement, Padron was required to make an initial lump sum amount of $14, 875.95 and after such first payment. Padron was required to make $2,697.67 per month from November 2010 until April 2011 (Forbearance

4

## APPENDIX A TO COMPLAINT

Agreement). The Forbearance Agreement provides that Defendants will not foreclose on Padron as long as she made the payments and Defendants cannot unilaterally terminate the Forbearance Agreement until and unless Padron defaulted under the terms of the Agreement. Padron ponied up a lump sum payment of $14,875.95 and made Forbearance payments on time. However, Defendants persistently claimed that Padron did not perform all terms and conditions under the Forbearance Agreement by failing to submit the requested documents and ultimately rejected Padron's loan modification on March 15, 2011. Padron always did everything that required of her during the Forbearance Agreement period.

Defendants cancelled Padron's loan modification prior to the end of the Forbearance Agreement to the detriment of Padron. To make the matter worse, Defendants tacked on late fees, attorney fees, and other unexplainable fees, which exponentially increased Padron's unpaid principal balance. This caused her to seriously fall behind on the loan. Defendants recorded a second Notice of Default against Padron's property on August 19, 2011 (Notice of Default) and a Notice of Trustee's Sale on November 21, 2011 ("NOS"). Padron lost her home to foreclosure on July 2, 2012.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Padron could afford the loan; (4) she was "qualified" for her loan; (5) "qualified" meant that she could afford her loan; (6) Defendants would modify her loan in the future; and (7) she would be able to refinance her loan in the future.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Padron that: (1) Defendants and Loan Consultant knew that she could not and would not be able to afford her loan and that there was a very high probability that she would default and/or be foreclosed upon; (2) Defendants had an incentive to sell her loan, and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not hers; (4) that Defendants' and Loan Consultant's representations that she was "qualified" to pay her loan was not intended

5

APPENDIX A TO COMPLAINT

to communicate that she could actually "afford" the loan which she was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Padron's home to require her to borrow more money with the knowledge that the true value of Padron's home was insufficient to justify the amount of Padron's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Padron would lose substantial equity in her home.

Based on these misrepresentations and omissions, the material facts concerning Padron's loan were concealed from her, and she decided to move forward with her loan. On January 26, 2007, Padron signed the loan and Deed of Trust, before a notary. Had she known the truth however, Padron would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Padron has lost substantial equity in her home, has damaged or destroyed credit, and at the time Padron entered into the loan her home was worth $430,000.00, now her home is worth approximately $297,500.00. Padron did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around March 4, 2011. (True and correct copies of the aforementioned documents are attached here to as *Exhibit 1*).

2.      Plaintiffs Richard West and Nancy Armstrong-West ("West and Armstrong-West") refinanced their existing mortgage on their property located at 10584 Margarita Avenue, Fountain Valley, CA 92708, A.P.N.:108-632-07 with Sierra Pacific Mortgage Company on December 7, 2004. West and Armstrong-West were steered into a fixed rate mortgage in the amount of $525,000.00 with an interest rate at 6% for a term of 30 years. Their payments made during the first 10 years of their loan were Interest-Only. The loan has a prepayment penalty of 3 years. The interest-only payment of this loan is $2,625.00. The fully amortized monthly payment on the loan was $3,147.64. On the note and deed of trust Sierra Pacific Mortgage Company is

6

**APPENDIX A TO COMPLAINT**

identified as the lender and it subsequently assigned its beneficial interest in the Deed of Trust to OneWest Bank and Defendants herein ("Defendants"). OneWest Bank is currently servicing the loan.

At the time West and Armstrong-West entered into the loan, they were represented that they were more than qualified for their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts. Because of West's and Armstrong-West's lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income, West and Armstrong-West reasonably believed that they could afford their loan and its payments.

Soon after they entered into this loan, they could not afford the loan anymore because their income could no longer keep up with the mortgage payment. Although the principle and interest portion of the loan remained the same, their mortgage payments substantially jumped because the escrow of their loan increased a great deal. In addition, Armstrong-West became unemployed for several years after West and Armstrong-West entered into this mortgage contract. Both West and Armstrong-West are federal employees, which subjects them to President Obama's proposal to freeze federal employees' salaries which had caused West and Armstrong-West's salaries to freeze for 3consecutive years.

Due to this, West and Armstrong-West really needed help in repaying their loan. In that regard, West and Armstrong-West contacted Defendants to get assistance in a loan modification. The representative requested West and Armstrong-West to submit a lot of loan documents and financial statements in pressed time. West and Armstrong-West always submitted all documents in a timely manner and whenever Defendants requested. However, upon submitting the requested documents, West and Armstrong-West received a call from the representative that they did not qualify for a loan modification. Defendants' representative advised West and Armstrong-West that since they had not yet defaulted on their loan for at least 90 days, Defendants refused to consider West and Armstrong-West for a loan modification. As of now, West and Armstrong-West have not been able to get their loan modified.

On December 7, 2004, West and Armstrong-West signed the loan and Deed of Trust,

7

EXHIBIT A - PAGE 123

**APPENDIX A TO COMPLAINT**

before a notary. As a result of entering into this loan, West and Armstrong-West have lost substantial equity in their home, have damaged or destroyed credit, and at the time West and Armstrong-West entered into the loan their home was worth $750,000.00, now their home is worth approximately $367,322.00. West and Armstrong-West did not discover any of these misrepresentations or omissions during the period their loan is being serviced until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around May 7, 2011.

3. Plaintiffs Ladislao Kalmar ("Kalmar") and Izaskun Galarraga ("Galarraga") refinanced an existing mortgage on their property located at 42583 Meade Circle, Temecula, CA 92592 and APN 965-160-006 with Mortgageit on January 5, 2006. Kalmar and Galarraga were steered into an adjustable rate mortgage in the amount of $560,000.00 with an interest rate at 1% for a term of 30 years. However, little did Ladislao and Galarrga know at the time they entered into the loan, their loan was a negatively amortized PayOption ARM. Kalmar and Galarrga were not advised that the interest rate was never "fixed" but applied to only their first monthly payment and could adjust every month thereafter. The amount of Kalmar and Galarraga minimum monthly payment was "fixed" for 12 months and could adjust every 12 months thereafter. When the amount of the minimum monthly payment is insufficient to cover the amount of interest due, then the amount of that deficiency is added onto the unpaid principal balance of their loan. The recast point of this loan is 115% of the original loan amount. On the note and deed of trust Mortgageit is identified as the lender and the loan later was assigned to IndyMac Bank and Defendants herein (the "Defendants"). OneWest Bank was the servicer of the loan.

Kalmar and Galarraga were represented that they could afford their minimum monthly payment of $1,801.18 loan in consideration of their other existing debts. However, the fully amortized monthly payment on the loan was $3,980.18. Given Kalmar's and Galarraga's true monthly income of $12,500.00, this represents a "front-end" debt-to-income ratio, meaning a

8

APPENDIX A TO COMPLAINT

debt-to-income ratio, before any other debts are even considered, of over 32%. Because of Kalmar's and Galarraga's lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income, Kalmar and Galarraga  were led to believe that they could afford their loan and its payments.

A few years after Kalmar and Galarraga entered into the loan, their minimum payment option was taken away. Kalmar and Galarraga were shocked to learn that their monthly mortgage payment would jump from $1,801.18 to $4,100.00 per month. Kalmar and Galarrage realized that they would be plunged into dire financial hardship once the amount of the mortgage payments skyrocketed, Kalmar and Galarraga sought to apply for a loan modification in hope to reduce their mortgage payments.

Kalmar lost his job shortly thereafter. Kalmar and Galarraga first applied for modification in November 2009 and were approved in February 2010for a "Home Affordable Modification Trial Period Plan" in which the trial payment was $3,200.00 including taxes and insurance. In the trial modification agreement, Defendants put in writing that Defendants would permanently modify their loan if Kalmar and Galarrga complied with the Defendants' terms that they had made all the trial payments in a timely fashion, and that they had fully submitted all of the documents whenever Defendants requested. Kalmar and Galarraga were required to make the February, March, and April trial payments.

Kalmar and Galarraga completed the trial modification by making all 3 trial payments on time. When the trial payment plan had gone into its 9th month without any correspondences from Defendants regarding the offer for permanent loan modification, Kalmar and Galarraga placed a call to Defendants, who was OneWest Bank at this time. To Kalmar and Galarrga's surprise, the Representative advised them that they were never approved for a modification because Kalmar and Galarraga failed to submit the Loss and Profit statement. Kalmar and Galarrga had TWICE sent in the document to Defendants.

However, Defendants did not reject Kalmar's and Galarraga's file outright but demanded Kalmar and Galarraga to pay a huge lump sum of amount of $60,000.00 including late fees and other unexplained surcharges in order to be eligible for a permanent loan modification. Kalmar

9

APPENDIX A TO COMPLAINT

and Galarraga could not come up with such a large amount of money in pressed time. Defendants subsequently opened up negotiation with Kalmar and Galarraga by dropping it down to $20,000.00, a lump sum amount that Kalmar and Galarraga were still unable to able afford in consideration that they were experiencing serious financial difficulty. Defendants refused to modify Kalmar's and Galarraga's loan.

After another unsuccessful attempt to modify their loan in 2011, Kalmar and Galarrage could no longer hold on to their home and let it go in March 2012.

On January 5, 2006, Kalmar and Galarraga signed the loan and Deed of Trust, before a notary. After Kalmar and Galarraga entered into the loan, they lost substantial equity in their home, have damaged or destroyed credit, and at the time Kalmar and Galarraga entered into the loan their home was worth $700,000.00, now their home is worth approximately $330,000.00. Kalmar and Galarraga were not treated fairly during the loan modification process. Kalmar and Galarraga did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around March 10, 2011. (True and correct copies of the aforementioned documents are attached here to as *Exhibit 2*).

4.      Plaintiffs Jorge Espinoza and Albina Espinoza ("Mr. and Mrs. Espinoza") discussed refinancing an existing mortgage on their property located at 5715 Walnut Avenue, Long Beach, CA 90805, A.P.N.:71128-008-009 with a Loan Consultant ("Loan Consultant"), a representative and authorized agent of IndyMac Bank and Defendants herein (the "Defendants") in or around September 2007. In the course of their discussions ranging from September 2007 until November 2007, Defendants and Loan Consultant steered them into an adjustable rate mortgage in the amount of $315,000.00 with an interest rate at 5.5% for a term of 30 years. Little did Mr. and Mrs. Espinoza know, however, payments made during the first 10 years of their loan were Interest-Only. Mr. and Mrs. Espinoza also were not advised that their interest rate was "fixed" for only 5 years, and could adjust every year thereafter. This loan was originated by

10

**APPENDIX A TO COMPLAINT**

IndyMac Bank, on the note and deed of trust IndyMac Bank is identified as the lender, and OneWest Bank was the servicer of the loan.

Defendants and Loan Consultant represented to Mr. and Mrs. Espinoza that their monthly payment would always be $1,443.75. Although the amount of Mr. and Mrs. Espinoza's monthly payment was $1,443.75, Defendants and Loan Consultant failed to clarify their partially true representations and advise Mr. and Mrs. Espinoza that: (1) their monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) their monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of their monthly payment would not remain "fixed" for the entire term of the loan.

Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Espinoza that they could afford their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $2,201.45. Given Mr. and Mrs. Espinoza's true monthly income of $3,000.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 74%- in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Mr. and Mrs. Espinoza that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Espinoza's lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income, and because Mr. and Mrs. Espinoza reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Espinoza should be shouldering was, Mr. and Mrs. Espinoza reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

Although Defendants and Loan Consultant represented to Mr. and Mrs. Espinoza that they were "qualified" for their loan and could afford their loan and its monthly payments, Defendants and Loan Consultant misled Mr. and Mrs. Espinoza into believing that their monthly

11

EXHIBIT A - PAGE 127

APPENDIX A TO COMPLAINT

payments would always only be $1,443.75. Furthermore, at no point did Defendants or Loan Consultant clarify Mr. and Mrs. Espinoza's false belief and advise them that $1,443.75 would not be their permanent payment under the loan, or that every time they made a monthly payment in the amount of $1,443.75, they were not paying down any of their principal balance.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around October 25, 2007, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Espinoza's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Mr. and Mrs. Espinoza's home was worth $395,000.00 at the time they entered into their loan, and that such a valuation was a true and correct measure of their home's worth. The current fair market value of Mr. and Mrs. Espinoza's home is approximately $157,250.00. Mr. and Mrs. Espinoza allege that the appraisal was artificially inflated, and that they have suffered damages in the amount of $237,750.00 ($395,000.00-$157,250.00) due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Loan Consultant also represented to Mr. and Mrs. Espinoza that they would be able to refinance their loan at a later time. Mr. and Mrs. Espinoza relied on this assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Espinoza have not been able to refinance their loan because there was negative equity in their house. Defendants and Loan Consultant also represented that it would modify Mr. and Mrs. Espinoza's loan, and Mr. and Mrs. Espinoza relied on this representation in deciding to enter into the loan.

Mr. and Mrs. Espinoza suffered from financial difficulty and thus were unable to make their mortgage payments. In that regard, Mr. and Mrs. Espinoza contacted Defendants for assistance in a loan modification. Mr. and Mrs. Espinoza were approved for a trial loan modification. During the entire course of loan modification, no single point of contact was appointed to Mr. and Mrs. Espinoza. Defendants repetitively demanded the same documentation from Mr. and Mrs. Espinoza. But Mr. and Mrs. Espinoza did everything they could to fully comply with Defendants' requests by making the first 2 trial payments in a timely fashion and

12

EXHIBIT A - PAGE 128

APPENDIX A TO COMPLAINT

submitting all of the documents Defendants requested.

Defendants also represented to Mr. and Mrs. Espinoza that that they would qualify for a loan modification if they made their trial payments to the terms of the trial agreement. Despite this representation, Defendants refused to accept Mr. and Mrs. Espinoza's third trial payment and rejected Mr. and Mrs. Espinoza' modification because Mr. and Mrs. Espinoza failed to return the "requested documents" to Defendants. However, Mr. and Mrs. Espinoza were never informed about the specific documents that Defendants requested. Defendants breached the trial loan modification agreement, which caused Mr. and Mrs. Espinoza to be unable to afford their mortgage payments. Defendant finally foreclosed on Mr. and Mrs. Espinoza's home.

The foreclosure against Mr. and Mrs. Espinoza was void because at the time the Notice of Default (NOD) was recorded (on September 22, 2010), the foreclosing beneficiary (OneWest Bank) did not yet have the authority to initiate foreclosure. That is because the foreclosing party had not yet properly received any beneficial interest in the property until the Assignment of Deed of Trust 1 (ADOT1) was executed on September 24, 2011, which was more than 2 months after the NOD was recorded. Accordingly the foreclosure was void.

Even if the assignment deed of trust transferring the Deed of Trust (DOT) from IndyMac Bank to OneWest Bank was valid, the foreclosure was still void. The Trustee's Deed upon Sale (TDUS) shows that Fannie Mae was the foreclosing beneficiary and the property was reverted back to Fannie Mae at the trustee's sale on March 14, 2011. However, at the time of the sale, Fannie Mae did not have yet any recorded interest in the property; OneWest Bank did. Fannie Mae was not assigned the beneficiary interest in the property until after the sale. However, Fannie Mae backdated the Assignment Deed of Trust 2 (ADOT2) to give it the appearance that it was executed before the trustee's sale. Since Fannie Mae did not possess any beneficiary interest in the property when the trustee's sale was conducted, the TDUS was invalid. Without a valid Trustee's deed, the foreclosure was void.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

13

EXHIBIT A - PAGE 129

**APPENDIX A TO COMPLAINT**

made in good faith; (3) Mr. and Mrs. Espinoza could afford the loan; (4) they were "qualified" for their loan; (5) "qualified" meant that they could afford their loan; (6) Defendants would modify their loan in the future; and (7) they would be able to refinance their loan in the future.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Mr. and Mrs. Espinoza that: (1) Defendants and Loan Consultant knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they were being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mr. and Mrs. Espinoza's home to require them to borrow more money with the knowledge that the true value of Mr. and Mrs. Espinoza's home was insufficient to justify the amount of Mr. and Mrs. Espinoza's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Espinoza would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Espinoza's loan were concealed from them, and they decided to move forward with their loan. On November 16, 2007, Mr. and Mrs. Espinoza signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mr. and Mrs. Espinoza would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Espinoza have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Espinoza entered into the loan their home was worth $395,000.00, now their home is worth approximately $157,250.00. Mr. and Mrs. Espinoza did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone

14

**APPENDIX A TO COMPLAINT**

Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around December 29, 2010. (True and correct copies of the aforementioned documents are attached here to as *Exhibit 3*).

5. Plaintiff Luis Perez ("Perez") discussed obtaining a mortgage on his home located at 2304 W Walnut Creek Parkway, West Covina, CA 91790 and A.P.N.:8463-009-044 with a loan consultant (the "Loan Consultant"), and representative and authorized agent of Defendants herein (the "Defendants") in or around May 2006. In the course of their discussions ranging from May 2005 until July 2005, Defendants and Loan Consultant steered him into a loan, of which the Defendants and Loan Consultant concealed and inaccurately, incompletely or otherwise improperly disclosed the material terms and information concerning the loan to him. This loan was originated by IndyMac Bank, on the note and deed of trust IndyMac Bank is identified as the lender, and IndyMac Mortgage Services, a division of OneWest Bank was the servicer of the loan.

Defendants and Loan Consultant explicitly represented to Perez that he could afford his loan; and further represented that he could shoulder the additional financial burden of repaying his loan in consideration of his other existing debts. Loan Consultant and Defendants further represented to Perez that he could rely on the assessment that he was "qualified" to mean that he could afford the loan. Because of Perez's lack of familiarity with how much debt a person can and should reasonably take on compared to his/her monthly income, and because Perez reasonably relied on Defendants' and Loan Consultant's expertise that any payment he was "qualified" for would take into account what the maximum debt a person such as Perez should be shouldering was, Perez reasonably believed Defendants' and Loan Consultant's representations that he could afford his loan and its payments.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. An appraisal company under the direct control and supervision of Defendants conducted an appraisal on Perez's home, which was fraudulently inflated to an intentionally overstated value. Perez alleges that the appraisal was

15

EXHIBIT A - PAGE 131

APPENDIX A TO COMPLAINT

artificially inflated, and that he has suffered damages due to a substantial loss of equity in his home as a result of Defendants' fraudulent inflation and other acts described herein.

Loan Consultant and Defendants also represented to Perez that he would be able to refinance his loan at a later time. Perez relied on this assurance in deciding to enter into the mortgage contract. However, Perez has not been able to refinance his loan. Loan Consultant and Defendants also represented that it would modify Perez's loan, and Perez relied on this representation in deciding to enter into the loan. In addition, Perez was advised by a representative and authorized agent of Defendants to stop making payments in order to be eligible for a modification. Perez relied on Defendants' and the Defendants representative and authorized agent's advice and stopped making his monthly payments causing him to fall even further behind. However, Perez was unable to modify his loan.

Furthermore, Loan Consultant and Defendants represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Perez could afford the loan; (4) He was "qualified" for his loan; (5) "qualified" meant that he could afford his loan; (6) He would be able to modify his loan in the future; and (7) He would be able to refinance his loan in the future.

Moreover, Loan Consultant and Defendants withheld or incompletely, inaccurately or otherwise improperly disclosed to Perez that: (1) Loan Consultant and Defendants knew that he could not and would not be able to afford his loan and that there was a very high probability that he would default and/or be foreclosed upon; (2) Defendants had an incentive to sell his loan, and did sell his loan at fraudulently inflated prices; (3) Loan Consultant's and Defendants' "qualification" process was for Defendants' own protection and not his; (4) That Loan Consultant's and Defendants' representations that he was "qualified" to pay his loan was not intended to communicate that he could actually "afford" the loan which he was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Perez 's home to require him to borrow more money with the knowledge that the true value of

16

**APPENDIX A TO COMPLAINT**

Perez 's home was insufficient to justify the amount of Perez 's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Perez would lose substantial equity in his home.

Based on these misrepresentations and omissions, the material facts concerning Perez's loan were concealed from him, and he decided to move forward with his loan. On July 20, 2005, Perez signed the loan and Deed of Trust, before a notary. Had he known the truth however, Perez would not have accepted the loan. As a result of the Defendants' fraudulent acts described throughout this complaint Perez has lost substantial equity in his home, has damaged or destroyed credit, and at the time Perez entered into the loan his home was worth substantially more than its current fair market value. Perez did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around March 3, 2011.

6.     Plaintiffs Rogelio Hernandez and Teresa Hernandez ("Mr. and Mrs. Hernandez") discussed refinancing an existing mortgage on their home located at 12110 Pennsylvania Avenue, South Gate, CA 90280 and A.P.N.6243-004-003  with a loan consultant (the "Loan Consultant"), and representative and authorized agent of Defendants herein (the "Defendants") in or around . In the course of their discussions ranging from February 2007 until April 2007, Defendants and Loan Consultant steered them into a loan of which the Defendants and Loan Consultant concealed and inaccurately, incompletely or otherwise improperly disclosed the material terms and information concerning the loan. On the note and deed of trust Oak Hills Mortgage is identified as the lender, and IndyMac Mortgage Services is currently servicing the loan.

Defendants and Loan Consultant explicitly represented to Mr. and Mrs. Hernandez that they could afford their loan; and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts.  Loan

17

EXHIBIT A - PAGE 133

**APPENDIX A TO COMPLAINT**

Consultant and Defendants further represented to Mr. and Mrs. Hernandez that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Hernandez's lack of familiarity with how much debt a person can and should reasonably take on compared to his/her monthly income, and because Mr. and Mrs. Hernandez reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Hernandez should be shouldering was, Mr. and Mrs. Hernandez reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. An appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Hernandez's home, which was fraudulently inflated to an intentionally overstated value. Mr. and Mrs. Hernandez allege that the appraisal was artificially inflated, and that they have suffered damages due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

Loan Consultant and Defendants also represented to Mr. and Mrs. Hernandez that they would be able to refinance their loan at a later time. Mr. and Mrs. Hernandez relied on this assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Hernandez have not been able to refinance their loan. Loan Consultant and Defendants also represented that it would modify Mr. and Mrs. Hernandez's loan, and Mr. and Mrs. Hernandez relied on this representation in deciding to enter into the loan. In addition, Mr. and Mrs. Hernandez were advised by a representative and authorized agent of Defendants to stop making payments in order to be eligible for a modification. Mr. and Mrs. Hernandez relied on the Defendants' and the Defendants representative and authorized agents' advice and stopped making their monthly payments causing them to fall even further behind. However, Mr. and Mrs. Hernandez were unable to modify their loan.

Furthermore, Loan Consultant and Defendants represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in

18

APPENDIX A TO COMPLAINT

lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mr. and Mrs. Hernandez could afford the loan; (4) They were "qualified" for their loan; (5) "qualified" meant that they could afford their loan; (6) They would be able to modify their loan in the future; and (7) They would be able to refinance their loan in the future.

Moreover, Loan Consultant and Defendants withheld or incompletely, inaccurately or otherwise improperly disclosed to Mr. and Mrs. Hernandez that: (1) Loan Consultant and Defendants knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Loan Consultant's and Defendants' "qualification" process was for Defendants' own protection and not theirs; (4) That Loan Consultant's and Defendants' representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mr. and Mrs. Hernandez's home to require them to borrow more money with the knowledge that the true value of Mr. and Mrs. Hernandez's home was insufficient to justify the amount of Mr. and Mrs. Hernandez's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Hernandez would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Hernandez's loan were concealed from them, and they decided to move forward with their loan. On April 4, 2007, Mr. and Mrs. Hernandez signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mr. and Mrs. Hernandez would not have accepted the loan. As a result of the Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Hernandez have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Hernandez entered into the loan their home was worth substantially more than its current fair market value. Mr. and Mrs. Hernandez did not discover any of these

19

EXHIBIT A - PAGE 135

**APPENDIX A TO COMPLAINT**

misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around March 1, 2011.

7.      Plaintiffs Edward Vinitsky and Audrey Vinitsky ("Mr. and Mrs. Vinitsky") discussed refinancing an existing mortgage on their home located at 858 Calle Portilla, Camarillo, CA 93010 and A.P.N.: 158-0-222-055 with a loan consultant (the "Loan Consultant"), and representative and authorized agent of Defendants herein (the "Defendants") in or around April 2007. In the course of their discussions ranging from April 2007 until June 2007, Defendants and Loan Consultant steered them into a loan of which the Defendants and Loan Consultant concealed and inaccurately, incompletely or otherwise improperly disclosed the material terms and information concerning the loan. This loan was originated by IndyMac Bank, on the note and deed of trust IndyMac Bank is identified as the lender, and IndyMac Mortgage Services, a division of OneWest Bank is currently servicing the loan.

Defendants and Loan Consultant explicitly represented to Mr. and Mrs. Vinitsky that they could afford their loan; and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts. Loan Consultant and Defendants further represented to Mr. and Mrs. Vinitsky that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Vinitsky's lack of familiarity with how much debt a person can and should reasonably take on compared to his/her monthly income, and because Mr. and Mrs. Vinitsky reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Vinitsky should be shouldering was, Mr. and Mrs. Vinitsky reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. An appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Vinitsky's

20

**APPENDIX A TO COMPLAINT**

home, which was fraudulently inflated to an intentionally overstated value. Mr. and Mrs. Vinitsky allege that the appraisal was artificially inflated, and that they have suffered damages due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

Loan Consultant and Defendants also represented to Mr. and Mrs. Vinitsky that they would be able to refinance their loan at a later time. Mr. and Mrs. Vinitsky relied on this assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Vinitsky have not been able to refinance their loan. Loan Consultant and Defendants also represented that it would modify Mr. and Mrs. Vinitsky's loan, and Mr. and Mrs. Vinitsky relied on this representation in deciding to enter into the loan. In addition, Mr. and Mrs. Vinitsky were advised by a representative and authorized agent of Defendants to stop making payments in order to be eligible for a modification. Mr. and Mrs. Vinitsky relied on the Defendants' and the Defendants representative and authorized agents' advice and stopped making their monthly payments causing them to fall even further behind. However, Mr. and Mrs. Vinitsky were unable to modify their loan.

Furthermore, Loan Consultant and Defendants represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mr. and Mrs. Vinitsky could afford the loan; (4) They were "qualified" for their loan; (5) "qualified" meant that they could afford their loan; (6) They would be able to modify their loan in the future; and (7) They would be able to refinance their loan in the future.

Moreover, Loan Consultant and Defendants withheld or incompletely, inaccurately or otherwise improperly disclosed to Mr. and Mrs. Vinitsky that: (1) Loan Consultant and Defendants knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Loan Consultant's and Defendants' "qualification" process was for Defendants' own protection and not theirs; (4) That Loan Consultant's and Defendants' representations that they were "qualified"

21

APPENDIX A TO COMPLAINT

to pay their loan was not intended to communicate that they could actually "afford" the loan which they was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mr. and Mrs. Vinitsky's home to require them to borrow more money with the knowledge that the true value of Mr. and Mrs. Vinitsky's home was insufficient to justify the amount of Mr. and Mrs. Vinitsky's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Vinitsky would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Vinitsky's loan were concealed from them, and they decided to move forward with their loan. On June 29, 2007, Mr. and Mrs. Vinitsky signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mr. and Mrs. Vinitsky would not have accepted the loan. As a result of the Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Vinitsky have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Vinitsky entered into the loan their home was worth substantially more than its current fair market value. Mr. and Mrs. Vinitsky did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around April 3, 2011.

8. Plaintiff Lonnie Wall ("Wall") refinanced an existing mortgage on his property located at 1426 East Andrew Street, Ontario, CA 91761 and APN 0216-451-05 with Empire Financial on January 30, 2007. Wall was steered into an adjustable rate mortgage in the amount of $440,000.00 with an interest rate at 1.45% for a term of 40 years. Little did Wall know, however, his loan was a negatively amortized PayOption ARM. Wall was not advised that the interest rate was never "fixed" but applied to only his first monthly payment and could adjust every month thereafter. The amount of Wall's minimum monthly payment was "fixed" for 12

22

EXHIBIT A - PAGE 138

APPENDIX A TO COMPLAINT

months and could adjust every 12 months thereafter. When the amount of the minimum monthly payment is insufficient to cover the amount of interest due, then the amount of that deficiency is added onto the unpaid principal balance of his loan. The recast point of this loan is 110% of the original loan amount. This loan has a prepayment penalty of 3 years. Sometimes prior to January 2009 IndyMac Federal Bank and Defendants herein ("Defendants") became the servicer of Wall's loan. OneWest Bank later purchased IndyMac Federal Bank, and in doing so succeeded to all of its right and assumed all of its obligations by function of succession.

Wall was represented that his monthly payment would always be $1,208.59. Although the amount of Wall's minimum monthly payment was $1,208.59, Wall was not fully advised that: (1) how the interest rate on his loan was calculated; (2) that the minimum monthly payment of $1,208.59 would not always be available; (3) that the minimum monthly payment would not be the permanent payment under the loan despite Defendants' and Loan Consultant's affirmative representations to the contrary; (4) that by paying the initial minimum monthly payment he would be definitively deferring interest on his loan, increasing the principal balance of his loan every time he made the minimum monthly payment; (5) that by paying the minimum monthly payment the principal balance of his loan was certain to increase; or (6) his loan would be recast within a few years and he would be forced to pay considerably higher payments.

The disclosures in Wall's loan documents discussing negative amortization, only frame negative amortization as a mere possibility rather than a certainty when making the minimum payment. However the reality was that by making the minimum payment, negative amortization was a certainty. Indeed, the payment schedule set forth in the Truth in Lending Disclosure Statement ("TILDS") which set forth what appeared to be the required payment schedule fails to disclose that making payments pursuant to the TILDS payment schedule will result in negative amortization. Wall was not provided, before entering into the loans, with any other payment schedule or with any informed option to make payments different than those listed in the TILDS payment schedule. Had Defendants disclosed that by making the payment pursuant to the TILDS Wall would be deferring interest, or had they disclosed the payment amounts sufficient to avoid negative amortization from occurring, Wall would not have entered into the loans. A clear

23

### APPENDIX A TO COMPLAINT

disclosure of the nature of Wall's loans was intentionally omitted because giving a clear explanation of how the loan worked would have punctured the illusion of a low-payment, low interest rate loan.

Wall was represented that he could afford his loan and further represented that he could shoulder the additional financial burden of repaying his loan in consideration of his other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $3,377.92. Given Wall's true monthly income of $8,333.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 41%. Defendants and Loan Consultant further represented to Wall that he could rely on the assessment that he was "qualified" to mean that he could afford the loan. Because of Wall's lack of familiarity with how much debt a person can and should reasonably take on compared to his monthly income, and because Wall reasonably relied on Defendants' and Loan Consultant's expertise that any payment he was "qualified" for would take into account what the maximum debt a person such as Wall should be shouldering was, Wall reasonably believed Defendants' and Loan Consultant's representations that he could afford his loan and its payments.

Although Wall was represented to Wall that he was "qualified" for his loan and could afford his loan and its monthly payments, Defendants and the Loan Consultant misled Wall into believing that his monthly payments would always only be $1,208.59. Furthermore, at no point did Defendants or Loan Consultant clarify Wall's false belief and advise him that $1,208.59 would not be his permanent payment under the loan, or that every time he made a monthly payment in the amount of $1,208.59, which is less than interest only, he would be deferring interest on his loan, increasing the principal balance of his loan.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around January 4, 2007, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Wall's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Wall's home was worth $550,000.00 at the time he entered into his loan, and that such a valuation was a true and correct

24

EXHIBIT A - PAGE 140

**APPENDIX A TO COMPLAINT**

measure of his home's worth. The current fair market value of Wall's home is approximately $227,800.00. Wall alleges that the appraisal was artificially inflated, and that he has suffered damages in the amount of $322,200.00 ($550,000.00-$227,800.00) due to a substantial loss of equity in his home as a result of Defendants' fraudulent inflation and other acts described herein.

In or around late 2008 Wall experienced financial difficulty due to a huge drop in his income. In that regard, Wall contacted Defendants to discuss a possible loan modification. Wall was current on his loan at the time. Defendants' Representative advised Wall that his loan type – PayOption ARM which he did not fully understand its terms when he executed the Note – did not qualify for a modification. At the same time, the Representative advised Wall to fall behind on the loan in order to be eligible for a loan modification. Wall followed the Representative's advice and defaulted on his loan. Unbeknown to Wall, unmerited late charges and fees incurred by his reliance on the Defendants' direction to stop making payments. These late charges and fees are tacked on the loan, exponentially increasing the unpaid balance of Wall's loan.

Wall fell behind on his loan upon following Defendants' advice to fall behind on the loan. Wall reached out to Defendants to obtain a loan modification. Despite the fact that Defendants sent a modification package to Wall to fill out, Defendants "dual tracked" Wall in that they initiated and moved forward with foreclosure. Defendants recorded a Notice of Default ("NOD") on January 6, 2009 and a Notice of Trustee's Sale ("NOTS") on April 9, 2009. Wall had to file for bankruptcy in order to stop the trustee's sale.

Dual tracking befell Wall again when he defaulted on the loan in or around May 2012. Defendants recorded NOS against Wall's property on May 8, 2012 with a sale date scheduled for June 29, 2012. To halt the trustee's sale, Wall re-submitted the loan modification application to Defendants on June 26, 2012. In response to the submission, Defendants agreed to postpone the trustee's sale to July 5, 2012. Defendants acknowledged the receipt of the application and requested additional modification paperwork multiple times and in response Wall fully submitted all of requested documents on time. Despite that fact, Defendants had no intent to stop foreclosure on Wall. On July 3, 2012 which was only 2 days before the trustee's sale, Defendants rejected Wall's loan modification and reverted to foreclosure track. Fortunately, Wall has not

25

APPENDIX A TO COMPLAINT

lost his home to foreclosure because he opted to file for bankruptcy again to stay the trustee's sale.

The foreclosure against Wall would be wrongful. The Notice of Default (NOD) was improperly executed on January 6, 2009 because the foreclosing beneficiary (IndyMac Federal Bank) did not yet have the authority to execute the NOD, rendering NOD invalid. The assignment deed of trust (ADOT) transferring the beneficial interest from Empire Financial to IndyMac Federal Bank was made almost 1 month after the NOD was filed. Without a valid NOD, any subsequent foreclosure proceedings based on that NOD is also invalid.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Wall could afford the loan; (4) he was "qualified" for his loan; (5) "qualified" meant that he could afford his loan; and (6) he would be able to refinance his loan in the future.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Wall that: (1) Defendants and Loan Consultant knew that he could not and would not be able to afford his loan and that there was a very high probability that he would default and/or be foreclosed upon; (2) Defendants had an incentive to sell his loan, and did sell his loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not his; (4) that Defendants' and Loan Consultant's representations that he was "qualified" to pay his loan was not intended to communicate that he could actually "afford" the loan which he was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Wall's home to require him to borrow more money with the knowledge that the true value of Wall's home was insufficient to justify the amount of Wall's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Wall would lose substantial equity in his

26

## APPENDIX A TO COMPLAINT

home.

Based on these misrepresentations and omissions, the material facts concerning Wall's loan were concealed from him, and he decided to move forward with his loan. On January 30, 2007, Wall signed the loan and Deed of Trust, before a notary. Had he known the truth however, Wall would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Wall has lost substantial equity in his home, has damaged or destroyed credit, and at the time Wall entered into the loan his home was worth $550,000.00, now his home is worth approximately $227,800.00. Wall did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around March 14, 2011. (True and correct copies of the aforementioned documents are attached here to as *Exhibit 4*).

9. Plaintiff Margaret Lanam ("Lanam") discussed refinancing an existing mortgage on her home located at 1020 Harbor Crossing Lane, Marina Del Rey, CA 90292 and A.P.N.:4224-033-029 with a loan consultant (the "Loan Consultant"), and representative and authorized agent of Defendants herein (the "Defendants") in or around April 2007. In the course of their discussions ranging from April 2007 until June 2007, Defendants and Loan Consultant steered her into a loan, of which the Defendants and Loan Consultant concealed and inaccurately, incompletely or otherwise improperly disclosed the material terms and information concerning the loan to her. This loan was originated by IndyMac Bank, on the note and deed of trust IndyMac Bank is identified as the lender, and IndyMac Mortgage Services, a division of OneWest Bank is currently servicing the loan.

Defendants and Loan Consultant explicitly represented to Lanam that she could afford her loan; and further represented that she could shoulder the additional financial burden of repaying her loan in consideration of her other existing debts. Loan Consultant and Defendants further represented to Lanam that she could rely on the assessment that she was "qualified" to mean that she could afford the loan. Because of Lanam's lack of familiarity with how much debt

27

### APPENDIX A TO COMPLAINT

a person can and should reasonably take on compared to his/her monthly income, and because Lanam reasonably relied on Defendants' and Loan Consultant's expertise that any payment she was "qualified" for would take into account what the maximum debt a person such as Lanam should be shouldering was, Lanam reasonably believed Defendants' and Loan Consultant's representations that she could afford her loan and its payments.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. An appraisal company under the direct control and supervision of Defendants conducted an appraisal on Lanam's home, which was fraudulently inflated to an intentionally overstated value. Lanam alleges that the appraisal was artificially inflated, and that she has suffered damages due to a substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other acts described herein.

Loan Consultant and Defendants also represented to Lanam that she would be able to refinance her loan at a later time. Lanam relied on this assurance in deciding to enter into the mortgage contract. However, Lanam has not been able to refinance her loan. Loan Consultant and Defendants also represented that it would modify Lanam's loan, and Lanam relied on this representation in deciding to enter into the loan. In addition, Lanam was advised by a representative and authorized agent of Defendants to stop making payments in order to be eligible for a modification. Lanam relied on Defendants' and the Defendants representative and authorized agent's advice and stopped making her monthly payments causing her to fall even further behind. However, Lanam was unable to modify her loan.

Furthermore, Loan Consultant and Defendants represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Lanam could afford the loan; (4) She was "qualified" for her loan; (5) "qualified" meant that she could afford her loan; (6) She would be able to modify her loan in the future; and (7) She would be able to refinance her loan in the future.

Moreover, Loan Consultant and Defendants withheld or incompletely, inaccurately or otherwise improperly disclosed to Lanam that: (1) Loan Consultant and Defendants knew that

28

EXHIBIT A - PAGE 144

**APPENDIX A TO COMPLAINT**

she could not and would not be able to afford her loan and that there was a very high probability that she would default and/or be foreclosed upon; (2) Defendants had an incentive to sell her loan, and did sell her loan at fraudulently inflated prices; (3) Loan Consultant's and Defendants' "qualification" process was for Defendants' own protection and not hers; (4) That Loan Consultant's and Defendants' representations that she was "qualified" to pay her loan was not intended to communicate that she could actually "afford" the loan which she was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Lanam's home to require her to borrow more money with the knowledge that the true value of Lanam's home was insufficient to justify the amount of Lanam's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Lanam would lose substantial equity in her home.

Based on these misrepresentations and omissions, the material facts concerning Lanam loan were concealed from her, and she decided to move forward with her loan. On June 21, 2007, Lanam signed the loan and Deed of Trust, before a notary. Had she known the truth however, Lanam would not have accepted the loan. As a result of the Defendants' fraudulent acts described throughout this complaint Lanam has lost substantial equity in her home, has damaged or destroyed credit, and at the time Lanam entered into the loan her home was worth substantially more than its current fair market value. Lanam did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around April 5, 2011.

10. Plaintiffs Steven Anderson and Lorrie Anderson ("Mr. and Mrs. Anderson") refinanced an existing mortgage on their property located at 13507 Smokestone Street, Rancho Cucamonga, CA 91739 and A.P.N.: 0227-741-15 with Paramount Residential Mortgage Corporation on May 31, 2006. In the course of their loan discussions, Mr. and Mrs. Anderson

APPENDIX A TO COMPLAINT

were steered into a subprime fixed rate mortgage in the amount of $410,500.00 with an interest rate at 8.25% for a term of 30 years. On the note and deed of trust Paramount Residential Mortgage Corporation is identified as the lender. The monthly payment is $3,083.95. The loan was assigned to IndyMac Bank and Defendants herein ("Defendants") in June 2008, and Indymac Mortgage Services, a division of OneWest Bank has been servicing the loan since June 2008.

Due to the economic downturn, Mr. Anderson experienced a substantial decrease in his income. Mrs. Anderson's income alone was insufficient to afford the mortgage. A notice of default was recorded against their home in May 2008. In or around April 2009 Mr. and Mrs. Anderson applied for a loan modification. Approximately 3 months later Defendants contacted Mr. and Mrs. Anderson requesting additional documents and demanded that Mr. and Mrs. Anderson re-submit some of their paystubs because Defendants claimed the ink ran that the copies were too grainy to read. Although Mr. and Mrs. Anderson faithfully complied with Defendants' requests, Defendants refused to modify Mr. and Mrs. Anderson's loan.

Mr. and Mrs. Anderson continued and wanted to make their mortgage payments after the modification denial. Defendants refused to accept the checks and returned them to Mr. and Mrs. Anderson, making them fall even further behind on the loan. Unbeknownst to Mr. and Mrs. Anderson, mountain of unmerited late charges and fees incurred by Defendants' unreasonable servicing practices and were added onto the unpaid principle.

By tossing on many late fees, default fees and other excessive associated fees, Defendants made it impossible for Mr. and Mrs. Anderson to ever pay off their "default" amounts. By making it impossible for Mr. and Mrs. Anderson to pay off their default amounts, Defendants scooped up whatever equity Mr. and Mrs. Anderson had left in the property.

In or around July 2011 Mr. and Mrs. Anderson were approved for a Forbearance Plan, in which their monthly payment was $5,163.86. This payment ran almost double the original payment. Mr. and Mrs. Anderson were represented that the forbearance payment accounted for all late fees that had been incurring. Due to the high monthly payment, Mr. and Mrs. Anderson could not afford the Forbearance Plan and opted out of the plan.

30

EXHIBIT A - PAGE 146

APPENDIX A TO COMPLAINT

In or around September 2011 Mr. and Mrs. Anderson re-applied for loan modification and were placed in another Special Forbearance Plan in September 2011. However, Defendants proceeded with foreclosure while Mr. and Mrs. Anderson's Forbearance Plan was pending. A Notice of Sale ("NOS") was recorded October 27, 2011 against Mr. and Mrs. Anderson's property.

There was a grave lack of communication during the loan modification that Mr. and Mrs. Anderson could not understand the status of their application. The loan modification process was frustrating because Mr. and Mrs. Anderson were unable to speak with the right representative who could assist Mr. and Mrs. Anderson with their file. While Mr. and Mrs. Anderson immersed themselves into the Forbearance Plan, they were swept away by the Notice of Sale. Due to this, Defendants rejected Mr. and Mrs. Anderson's loan modification and moved forward with foreclosure.

As the last resort Mr. and Mrs. Anderson filed for bankruptcy to postpone the trustee's sale. Although bankruptcy filing has the power to temporarily prevent the foreclosure, it tremendously destroyed their credit scores, reducing the availability of their financial options in the future and increased cost of goods and services tied to credit ratings.

On May 31, 2006, Mr. and Mrs. Anderson signed the loan and Deed of Trust, before a notary. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Anderson have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Anderson entered into the loan their home was worth $709,000.00, now their home is worth approximately $342,887.00. Mr. and Mrs. Anderson did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around January 16, 2011.

11.    Plaintiff Jill Ridgway-Ball ("Ridgeway-Ball) refinanced an existing mortgage on her property located at 540 South Longderry, Anaheim Hills, CA 92807, A.P.N.:361-671-18 with Community Lending on March 5, 2005. Ridway-Ball was steered into an adjustable rate

31

EXHIBIT A - PAGE 147

**APPENDIX A TO COMPLAINT**

mortgage in the amount of $575,000.00 with an interest rate at 5.5% for a term of 30 years. Little did Ridgway-Ball know, however, payments made during the first 5 years of her loan were Interest-Only. Ridgway-Ball also was not advised that her interest rate was "fixed" for only 5 years, and could adjust every year thereafter. Sometimes prior to April 24, 2009 IndyMac Mortgage Services and Defendants herein ("Defendants") became the servicer of her loan. OneWest Bank later purchased IndyMac Federal Bank, and in doing so succeeded to all of its rights and assumed all of its obligations by function of succession.

Ridway-Ball was not represented that her monthly payment would always be $2,365.42. Although the amount of Ridgway-Ball's monthly payment was $2,635.42, Defendants and Loan Consultant failed to clarify their partially true representations and advise Ridgway-Ball that: (1) her monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) her monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of her monthly payment would not remain "fixed" for the entire term of the loan.

Defendants and Loan Consultant also explicitly represented to Ridgway-Ball that she could afford her loan and further represented that she could shoulder the additional financial burden of repaying her loan in consideration of her other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $3,272.37. Defendants and Loan Consultant further represented to Ridgway-Ball that she could rely on the assessment that she was "qualified" to mean that she could afford the loan. Because of Ridgway-Ball's lack of familiarity with how much debt a person can and should reasonably take on compared to her monthly income, and because Ridgway-Ball reasonably relied on Defendants' and Loan Consultant's expertise that any payment she was "qualified" for would take into account what the maximum debt a person such as Ridgway-Ball should be shouldering was, Ridgway-Ball reasonably believed Defendants' and Loan Consultant's representations that she could afford her loan and its payments.

Although Defendants and Loan Consultant represented to Ridgway-Ball that she was "qualified" for her loan and could afford her loan and its monthly payments, Defendants and

32

APPENDIX A TO COMPLAINT

Loan Consultant misled Ridgway-Ball into believing that her monthly payments would always only be $2,635.42. Furthermore, at no point did Defendants or Loan Consultant clarify Ridgway-Ball's false belief and advise her that $2,635.42 would not be her permanent payment under the loan, or that every time she made a monthly payment in the amount of $2,635.42, she was not paying down any of her principal balance.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around February 15, 2005, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Ridgway-Ball's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Ridgway-Ball's home was worth $825,000.00 at the time she entered into her loan, and that such a valuation was a true and correct measure of her home's worth. The current fair market value of Ridgway-Ball's home is approximately $555,050.00. Ridgway-Ball alleges that the appraisal was artificially inflated, and that she has suffered damages in the amount of $269,950.00 ($825,000.00-$555,050.00) due to a substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Loan Consultant also represented to Ridgway-Ball that she would be able to refinance her loan at a later time. Ridgway-Ball relied on this assurance in deciding to enter into the mortgage contract. However, Ridgway-Ball has not been able to refinance her loan because there was negative equity in the house. Nor has Ridway-Ball been able to modify her loan. A few years after she entered into the loan, Ridgway-Ball was struggling to afford her payments as her income dropped substantially. Ridgway-Ball contacted Defendants for assistance in modifying her loan. Defendants advised her that she did not qualify for loan modification because the trustee of the loan, Deutsche Bank, did not participate in the Making Home Affordable Program (HAMP). As of now Defendants have not yet modified her loan.

Defendants became the servicer of Ridway-Ball's loan prior to April 24, 2009. Defendants erroneously calculated Ridway-Ball's escrow payments by more than $1,000.00 for year 2009 and year 2010. The 2009 Escrow Account Disclosure Statement ("Escrow Statement")

33

EXHIBIT A - PAGE 149

### APPENDIX A TO COMPLAINT

shows that the hazard insurance is $2,158.00 and the 2010 Statement shows $2,254.00 for hazard insurance. Thereafter, the hazard insurance for year 2011, 2012, and 2013 decreased by over $1,000.00. In other words, the Escrow Statement for year 2011, 2012, and 2013 show that the hazard insurance was only $1,297.00, $1,535.00, and $1,584.00 respectively. In short, Defendants gravely miscalculated the escrow account that it shot up her mortgage payments in 2009 and 2010 substantially.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Ridgway-Ball could afford the loan; (4) she was "qualified" for her loan; (5) "qualified" meant that she could afford her loan; and (6) she would be able to refinance her loan in the future.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Ridgway-Ball that: (1) Defendants and Loan Consultant knew that she could not and would not be able to afford her loan and that there was a very high probability that she would default and/or be foreclosed upon; (2) Defendants had an incentive to sell her loan, and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not hers; (4) that Defendants' and Loan Consultant's representations that she was "qualified" to pay her loan was not intended to communicate that she could actually "afford" the loan which she was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Ridgway-Ball's home to require her to borrow more money with the knowledge that the true value of Ridgway-Ball's home was insufficient to justify the amount of Ridgway-Ball's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Ridgway-Ball would lose substantial equity in her home.

Based on these misrepresentations and omissions, the material facts concerning Ridgway-

34

**APPENDIX A TO COMPLAINT**

Ball's loan were concealed from her, and she decided to move forward with her loan. On March 3, 2005, Ridgway-Ball, along with Jay Ball, signed the loan and Deed of Trust, before a notary. Had she known the truth however, Ridgway-Ball would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Ridgway-Ball has lost substantial equity in her home, has damaged or destroyed credit, and at the time Ridgway-Ball entered into the loan her home was worth $825,000.00, now her home is worth approximately $. Ridgway-Ball did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around March 7, 2011. (True and correct copies of the aforementioned documents are attached here to as *Exhibit 5*).

12.    Plaintiffs Fiona Whitmore and Robert Whitmore ("Mr. and Mrs. Whitmore") discussed obtaining a mortgage to purchase their home located at 12437 Sisar, Ojai, CA 93023, A.P.N.:030-0-090-165 with a Loan Consultant ("Loan Consultant"), a representative and authorized agent of Millennium Mortgage Corporation, a correspondent of IndyMac Bank and Defendants herein (the "Defendants") and authorized by Defendants to lend on their behalf, in or around December 2005. In the course of their discussions ranging from December 2005 until February 2006, Defendants and Loan Consultant steered them into an adjustable rate mortgage in the amount of $507,200.00 with an interest rate at 6.75% for a term of 30 years. Little did Mr. and Mrs. Whitmore know, however, payments made during the first 5 years of their loan were Interest-Only. Mr. and Mrs. Whitmore also were not advised that their interest rate was "fixed" for only 5 years, and could adjust every 6 months thereafter. This loan was originated by IndyMac Bank, on the note and deed of trust Millennium Mortgage Corporation is identified as the lender, and OneWest Bank is currently servicing the loan.

Defendants and Loan Consultant represented to Mr. and Mrs. Whitmore that their monthly payment would always be $2,853.00. Although the amount of Mr. and Mrs. Whitmore's monthly payment was $2,853.00, Defendants and Loan Consultant failed to clarify their partially

35

APPENDIX A TO COMPLAINT

true representations and advise Mr. and Mrs. Whitmore that: (1) their monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) their monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of their monthly payment would not remain "fixed" for the entire term of the loan.

Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Whitmore that they could afford their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $3,878.38. Given Mr. and Mrs. Whitmore's true monthly income of $2,000.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 193%- grossly in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Mr. and Mrs. Whitmore that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Whitmore's lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income, and because Mr. and Mrs. Whitmore reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Whitmore should be shouldering was, Mr. and Mrs. Whitmore reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

Although Defendants and Loan Consultant represented to Mr. and Mrs. Whitmore that they were "qualified" for their loan and could afford their loan and its monthly payments, Defendants and Loan Consultant misled Mr. and Mrs. Whitmore into believing that their monthly payments would always only be $2,853.00. Furthermore, at no point did Defendants or Loan Consultant clarify Mr. and Mrs. Whitmore's false belief and advise them that $2,853.00 would not be their permanent payment under the loan, or that every time they made a monthly payment in the amount of $2,853.00, they were not paying down any of their principal balance.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or

36

APPENDIX A TO COMPLAINT

on behalf of Defendants were accurate and made in good faith. On February 9, 2006, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Whitmore's home, which was fraudulently inflated to $634,000.00 - an intentionally overstated value. The current fair market value of Mr. and Mrs. Whitmore's home is approximately $430,837.00. Mr. and Mrs. Whitmore allege that the appraisal was artificially inflated, and that they have suffered damages in the amount of $203,163.00 ($634,000.00-$430,837.00) due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Loan Consultant also represented to Mr. and Mrs. Whitmore that they would be able to refinance their loan at a later time. Mr. and Mrs. Whitmore relied on this assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Whitmore have not been able to refinance their loan because their home values have substantially decreased after they entered into the loan. Nor have Mr. and Mrs. Whitmore been able to modify their loan.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mr. and Mrs. Whitmore could afford the loan; (4) they were "qualified" for their loan; (5) "qualified" meant that they could afford their loan; and (6) they would be able to refinance their loan in the future.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Mr. and Mrs. Whitmore that: (1) Defendants and Loan Consultant knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they were being given; (5) Defendants had abandoned its conventional lending business, prudent

37

APPENDIX A TO COMPLAINT

lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mr. and Mrs. Whitmore's home to require them to borrow more money with the knowledge that the true value of Mr. and Mrs. Whitmore's home was insufficient to justify the amount of Mr. and Mrs. Whitmore's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Whitmore would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Whitmore's loan were concealed from them, and they decided to move forward with their loan. On February 23, 2006, Mr. and Mrs. Whitmore signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mr. and Mrs. Whitmore would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Whitmore have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Whitmore entered into the loan their home was worth $634,000.00, now their home is worth approximately $430,837.00. Mr. and Mrs. Whitmore did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around March 21, 2011.

13.    Plaintiff John Hicks ("Hicks") discussed refinancing an existing mortgage on his property located at 870 Leppert Court, San Diego, CA 92114 and A.P.N.:576-790-38 with a Loan Consultant ("Loan Consultant"), a representative and authorized agent of First Federal Bank of California Bank and Defendants herein (the "Defendants") and authorized by Defendants to lend on their behalf, in or around March 2006. In the course of their discussions ranging from March 26 until May 2006, Defendants and Loan Consultant steered him into an adjustable rate mortgage in the amount of $337,000.00 with an interest rate at 2.45% for a term of 30 years. Little did Hicks know, however, his loan was a negatively amortized PayOption ARM. Hicks was not advised that the interest rate was never "fixed" but applied to only his first

38

EXHIBIT A - PAGE 154

APPENDIX A TO COMPLAINT

monthly payment and could adjust every month thereafter. The amount of Hicks's minimum monthly payment was "fixed" for 12 months and could adjust every 12 months thereafter. When the amount of the minimum monthly payment is insufficient to cover the amount of interest due, then the amount of that deficiency is added onto the unpaid principal balance of his loan. The recast point of this loan is 110% of the original loan amount. This loan has a prepayment penalty of 3 years. This loan was originated by First Federal Bank of California, on the note and deed of trust First Federal Bank of California is identified as the lender, and OneWest Bank is currently servicing the loan.

Defendants and Loan Consultant represented to Hicks that his monthly payment would always be $1,102.08. Although the amount of Hicks' minimum monthly payment was $1,102.08, Defendants and Loan Consultant failed to clarify their partially true representations and advise Hicks: (1) how the interest rate on his loan was calculated; (2) that the minimum monthly payment of $1,102.08 would not always be available; (3) that the minimum monthly payment would not be the permanent payment under the loan despite Defendants' and Loan Consultant's affirmative representations to the contrary; (4) that by paying the initial minimum monthly payment he would be definitively deferring interest on his loan, increasing the principal balance of his loan every time he made the minimum monthly payment; (5) that by paying the minimum monthly payment the principal balance of his loan was certain to increase; or (6) his loan would be recast within a few years and he would be forced to pay considerably higher payments.

The disclosures in Hicks's loan documents discussing negative amortization, only frame negative amortization as a mere possibility rather than a certainty when making the minimum payment. However the reality was that by making the minimum payment, negative amortization was a certainty. Indeed, the payment schedule set forth in the Truth in Lending Disclosure Statement ("TILDS") which set forth what appeared to be the required payment schedule fails to disclose that making payments pursuant to the TILDS payment schedule will result in negative amortization. Hicks was not provided, before entering into the loans, with any other payment schedule or with any informed option to make payments different than those listed in the TILDS payment schedule. Had Defendants disclosed that by making the payment pursuant to the TILDS

39

APPENDIX A TO COMPLAINT

Hicks would be deferring interest, or had they disclosed the payment amounts sufficient to avoid negative amortization from occurring, Hicks would not have entered into the loans. Defendants intentionally omitted a clear disclosure of the nature of Hicks's loans because giving a clear explanation of how the loan worked would have punctured the illusion of a low-payment, low interest rate loan.

Defendants and Loan Consultant also explicitly represented to Hicks that he could afford his loan and further represented that he could shoulder the additional financial burden of repaying his loan in consideration of his other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $2,183.16. Given Hicks's true monthly income of $4,000.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 55%- in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Hicks that he could rely on the assessment that he was "qualified" to mean that he could afford the loan. Because of Hicks's lack of familiarity with how much debt a person can and should reasonably take on compared to his monthly income, and because Hicks reasonably relied on Defendants' and Loan Consultant's expertise that any payment he was "qualified" for would take into account what the maximum debt a person such as Hicks should be shouldering was, Hicks reasonably believed Defendants' and Loan Consultant's representations that he could afford his loan and its payments.

Although Defendants and the Loan Consultant represented to Hicks that he was "qualified" for his loan and could afford his loan and its monthly payments, Defendants and the Loan Consultant misled Hicks into believing that his monthly payments would always only be $1,102.08. Furthermore, at no point did Defendants or Loan Consultant clarify Hicks's false belief and advise him that $1,102.08 would not be his permanent payment under the loan, or that every time he made a monthly payment in the amount of $1,102.08, which is less than interest only, he would be deferring interest on his loan, increasing the principal balance of his loan.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around May 4, 2006, an

40

EXHIBIT A - PAGE 156

APPENDIX A TO COMPLAINT

appraisal company under the direct control and supervision of Defendants conducted an appraisal on Hicks's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Hicks's home was worth $500,000.00 at the time he entered into his loan, and that such a valuation was a true and correct measure of his home's worth. The current fair market value of Hicks's home is approximately $245,884.00. Hicks alleges that the appraisal was artificially inflated, and that he has suffered damages in the amount of $254,116.00 ($500,000.00-$245,884.00) due to a substantial loss of equity in his home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Loan Consultant also represented to Hicks that he would be able to refinance his loan at a later time. Hicks relied on this assurance in deciding to enter into the mortgage contract. However, Hicks has not been able to refinance his loan. Defendants and Loan Consultant also represented that it would modify Hicks's loan, and Hicks relied on this representation in deciding to enter into the loan. In addition, Hicks was advised by a representative and authorized agent of Defendants, to stop making payments in order to be eligible for a modification. Hicks relied on Defendants' and Defendants' Representative's advice and stopped making his monthly payments causing him to fall even further behind. However, Defendants refused to permanently modify his loan.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Hicks could afford the loan; (4) he was "qualified" for his loan; (5) "qualified" meant that he could afford his loan; (6) Defendants would modify his loan in the future; and (7) he would be able to refinance his loan in the future.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Hicks that: (1) Defendants and Loan Consultant knew that he could not and would not be able to afford his loan and that there was a very high probability that he would default and/or be foreclosed upon; (2) Defendants had an incentive to sell his loan, and did sell his loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's

41

EXHIBIT A - PAGE 157

### APPENDIX A TO COMPLAINT

"qualification" process was for Defendants' own protection and not his; (4) that Defendants' and Loan Consultant's representations that he was "qualified" to pay his loan was not intended to communicate that he could actually "afford" the loan which he was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Hicks's home to require him to borrow more money with the knowledge that the true value of Hicks's home was insufficient to justify the amount of Hicks' loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Hicks would lose substantial equity in his home.

Based on these misrepresentations and omissions, the material facts concerning Hicks' loan were concealed from him, and he decided to move forward with his loan. On May, 24, 2006, Hicks signed the loan and Deed of Trust, before a notary. Had he known the truth however, Hicks would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Hicks has lost substantial equity in his home, has damaged or destroyed credit, and at the time Hicks entered into the loan his home was worth $500,000.00, now his home is worth approximately $245,884.00. Hicks did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around April 18, 2011.

14.    Plaintiff Katherine Ward ("Ward") discussed refinancing an existing mortgage on her home located at 2027 E Shamwood Street, West Covina, CA 91791 and A.P.N.:8454-027-016 with a loan consultant (the "Loan Consultant"), and representative and authorized agent of Defendants herein (the "Defendants") in or around October 2005. In the course of their discussions ranging from October 2005 until December 2005, Defendants and Loan Consultant steered her into a loan, of which the Defendants and Loan Consultant concealed and inaccurately, incompletely or otherwise improperly disclosed the material terms and information

42

APPENDIX A TO COMPLAINT

concerning the loan to her. This loan was originated by IndyMac Bank, on the note and deed of trust IndyMac Bank is identified as the lender, and IndyMac Mortgage Services, a division OneWest Bank is currently servicing the loan.

Defendants and Loan Consultant explicitly represented to Ward that she could afford her loan; and further represented that she could shoulder the additional financial burden of repaying her loan in consideration of her other existing debts. Loan Consultant and Defendants further represented to Ward that she could rely on the assessment that she was "qualified" to mean that she could afford the loan. Because of Ward's lack of familiarity with how much debt a person can and should reasonably take on compared to his/her monthly income, and because Ward reasonably relied on Defendants' and Loan Consultant's expertise that any payment she was "qualified" for would take into account what the maximum debt a person such as Ward should be shouldering was, Ward reasonably believed Defendants' and Loan Consultant's representations that she could afford her loan and its payments.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. An appraisal company under the direct control and supervision of Defendants conducted an appraisal on Ward's home, which was fraudulently inflated to an intentionally overstated value. Ward alleges that the appraisal was artificially inflated, and that she has suffered damages due to a substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other acts described herein.

Loan Consultant and Defendants also represented to Ward that she would be able to refinance her loan at a later time. Ward relied on this assurance in deciding to enter into the mortgage contract. However, Ward has not been able to refinance her loan. Loan Consultant and Defendants also represented that it would modify Ward's loan, and Ward relied on this representation in deciding to enter into the loan. In addition, Ward was advised by a representative and authorized agent of Defendants to stop making payments in order to be eligible for a modification. Ward relied on Defendants' and the Defendants representative and authorized agent's advice and stopped making her monthly payments causing her to fall even further behind. However, Ward was unable to modify her loan.

43

EXHIBIT A - PAGE 159

APPENDIX A TO COMPLAINT

Furthermore, Loan Consultant and Defendants represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Ward could afford the loan; (4) She was "qualified" for her loan; (5) "qualified" meant that she could afford her loan; (6) She would be able to modify her loan in the future; and (7) She would be able to refinance her loan in the future.

Moreover, Loan Consultant and Defendants withheld or incompletely, inaccurately or otherwise improperly disclosed to Ward that: (1) Loan Consultant and Defendants knew that she could not and would not be able to afford her loan and that there was a very high probability that she would default and/or be foreclosed upon; (2) Defendants had an incentive to sell her loan, and did sell her loan at fraudulently inflated prices; (3) Loan Consultant's and Defendants' "qualification" process was for Defendants' own protection and not hers; (4) That Loan Consultant's and Defendants' representations that she was "qualified" to pay her loan was not intended to communicate that she could actually "afford" the loan which she was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Ward's home to require her to borrow more money with the knowledge that the true value of Ward's home was insufficient to justify the amount of Ward's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Ward would lose substantial equity in her home.

Based on these misrepresentations and omissions, the material facts concerning Ward loan were concealed from her, and she decided to move forward with her loan. On December 28, 2005, Ward signed the loan and Deed of Trust, before a notary. Had she known the truth however, Ward would not have accepted the loan. As a result of the Defendants' fraudulent acts described throughout this complaint Ward has lost substantial equity in her home, has damaged or destroyed credit, and at the time Ward entered into the loan her home was worth substantially more than its current fair market value. Ward did not discover any of these misrepresentations or

44

EXHIBIT A - PAGE 160

APPENDIX A TO COMPLAINT

omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around April 13, 2011.

15.  Plaintiff Cleadith Brewer and Dwayne Brewer ("Mr. and Mrs. Brewer") discussed refinancing an existing mortgage on their property located at 13503 Reva Place, Cerritos, CA 90703, A.P.N.:7023-003-001 with Loan Consultant ("Loan Consultant"), a representative and authorized agent of Global Mortgage Funding, a correspondent of IndyMac Bank and Defendants herein (the "Defendants") and authorized by Defendants to lend on their behalf, in or around September 2005. In the course of their discussions ranging from September 2005 until November 2005, Defendants and Loan Consultant steered them into a fixed rate mortgage in the amount of $532,000.00 for a term of 30 years. This loan was originated by IndyMac Bank, on the note and deed of trust Global Mortgage Funding is identified as the lender, and OneWest Bank was the servicer of the loan.

Further, Defendants and Loan Consultant advised them that they were eligible for a Low Doc Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low documentation requirement to fraudulently inflate their income; and in doing so, Defendants and Loan Consultant caused them to be placed into a loan whose payments they could not afford given their true, un-inflated monthly income. Defendants and Loan Consultant altered Mr. and Mrs. Brewer's loan application without their knowing consent or authorization as Loan Consultant completed Mr. and Mrs. Brewer's application without giving Mr. and Mrs. Brewer an opportunity to review the loan application.

Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Brewer that they could afford their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts. Defendants and Loan Consultant also represented to them that they could afford a $3,318.99 monthly payment, despite their $6000.00 true monthly income (a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 55%) -

45

## APPENDIX A TO COMPLAINT

grossly in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Mr. and Mrs. Brewer that he could rely on the assessment that he was "qualified" to mean that he could afford the loan. Because of Brewer's lack of familiarity with how much debt a person can and should reasonably take on compared to his monthly income, and because Mr. and Mrs. Brewer reasonably relied on Defendants' and Loan Consultant's expertise that any payment he was "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Brewer should be shouldering was, Mr. and Mrs. Brewer reasonably believed Defendants' and Loan Consultant's representations that he could afford his loan and its payments.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around November 3, 2005, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Brewer's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Mr. and Mrs. Brewer's home was worth $630,000.00 at the time he entered into his loan, and that such a valuation was a true and correct measure of their home's worth. The current fair market value of Mr. and Mrs. Brewer's home is approximately $537,079.00. Mr. and Mrs. Brewer alleges that the appraisal was artificially inflated, and that they have suffered damages in the amount of $92,921.00 ($630,000.00-$537,079.00) due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Loan Consultant also represented to Mr. and Mrs. Brewer that they would be able to refinance their loan in 2 years once the prepayment penalty period ended. Brewer relied on this assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Brewer were unable to refinance the loan. Defendants and Loan Consultant also represented that it would modify Mr. and Mrs. Brewer's loan, and Mr. and Mrs. Brewer relied on this representation in deciding to enter into the loan.

However, Defendants never modified Mr. and Mrs. Brewer's loan. To Defendants, Mr. and Mrs. Brewer's loan modification application was just another application on their desk, but it

46

APPENDIX A TO COMPLAINT

was everything to Mr. and Mrs. Brewer and was the only avenue for Mr. and Mrs. Brewer to save their home. In or around the beginning of 2008, Mr. Brewer was diagnosed with prostate cancer and was recommended by the doctor to have a surgery to cure the cancer. Mr. Brewer underwent a 5-hour operation to remove the cancerous tumor. His body was depleted since he was on the operation table longer than his body could endure. About 2 days after the surgery, Mr. Brewer experienced an un-explainable pain on his neck and shoulder while he could not open his right eye. The RMl test later showed another cancerous tumor, but this time it was in his right eye. The second surgery was then scheduled to remove the tumor in his eye. Being placed on medication made Mr. Brewer drowsy most of the day and prevented him from conducting the business. After months of losing the work hours the business slowed down and finally it was closed down.

The business was gone but the mortgage statements continued to come to Mr. and Mrs. Brewer's mailbox. Around this time Mr. and Mrs. Brewer sought Defendants' assistance in modifying his loan. However, Defendants never had any intent to modify Mr. and Mrs. Brewer's loan, despite his full compliance with all of Defendants' requests during the application process. Moreover, Defendant delayed processing, repeatedly demanded that Mr. and Mrs. Brewer furnish duplicate documentation. After numerous unsuccessful attempts to get his loan modified, Brewer ran out of resources and energy to re-apply for another loan modification. At the age of 73 Brewer could no longer hang on to his home and he lost it to foreclosure in June 2012.

The foreclosure against Mr. and Mrs. Brewer was void because at the time the Notice of Default ("NOD") was recorded on February 17, 2011, the foreclosing party (Deutsch Bank National Company) did not yet have the authority to initiate foreclosure. That was because the foreclosing party did not properly receive any beneficial interest in the property until the Assignment of Deed of Trust ("ADOT") dated May 10, 2011 which was more than 3 months after the NOD was recorded. Under California Law, an NOD initiating foreclosure on behalf of a party who is not a true beneficiary at the time of filing the NOD, as here, is void ab initio, rendering any subsequent foreclosure based on that NOD void as well. Accordingly the foreclosure was void.

47

APPENDIX A TO COMPLAINT

In addition, ADOT noted MERS as the party assigning the beneficiary interest in the property in its individual capacity. However, under California law MERS is only a nominee acting on behalf of the true beneficiary, and cannot initiate foreclosure in its own name. MERS can only act when acting in its nominal capacity. Here, MERS assigned the beneficial interest in the Deed of Trust to Deutsch Bank National Company in its own name, rendering ADOT void. Accordingly, Deutsch Bank National Company was never properly assigned the beneficiary interest as a foreclosing beneficiary of the Deed. Therefore, any subsequent recorded documents based on that assignment in order to move forward with the foreclosure sale would be void as well.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Brewer could afford the loan; (4) he was "qualified" for his loan; (5) "qualified" meant that he could afford his loan; (6) Defendants would modify his loan in the future; and (7) he would be able to refinance his loan in the future.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Brewer that: (1) Defendants and Loan Consultant knew that he could not and would not be able to afford his loan and that there was a very high probability that he would default and/or be foreclosed upon; (2) Defendants had an incentive to sell his loan, and did sell his loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not his; (4) that Defendants' and Loan Consultant's representations that he was "qualified" to pay his loan was not intended to communicate that he could actually "afford" the loan which he was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Brewer's home to require him to borrow more money with the knowledge that the true value of Brewer's home was insufficient to justify the amount of Brewer's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of

48

**APPENDIX A TO COMPLAINT**

California that the real estate market would crash and Brewer would lose substantial equity in his home.

Based on these misrepresentations and omissions, the material facts concerning Brewer's loan were concealed from him, and he decided to move forward with his loan. On November 29, 2005, Brewer signed the loan and Deed of Trust, before a notary. Had he known the truth however, Brewer would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Brewer has lost substantial equity in his home, has damaged or destroyed credit, and at the time Brewer entered into the loan his home was worth $630,000.00, now his home is worth approximately $537,079. Brewer did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around May 24, 2011. (True and correct copies of the aforementioned documents are attached here to as *Exhibit 6*).

16.    Plaintiff Daniel Russell ("Russell") discussed refinancing an existing mortgage on his property located at 2921 C Street Unit 279, San Diego, CA 92102 and A.P.N:539-532-24-04 with a Loan Consultant ("Loan Consultant"), a representative and authorized agent of First Federal Bank and Defendants herein (the "Defendants") in or around November 2004. In the course of their discussions ranging from November 2004 until January 2004, Defendants and Loan Consultant steered him into an adjustable rate mortgage in the amount of $202,000.00 for a term of 30 years. Little did Russell know, however, his loan was a negatively amortized PayOption ARM. Little did Russell know, however, when the amount of the minimum monthly payment is insufficient to cover the amount of interest due, then the amount of that deficiency is added onto the unpaid principal balance of his loan. This loan was originated by First Federal Bank, on the note and deed of trust First Federal Bank is identified as the lender, and OneWest Bank was the servicer of the loan.

Defendants and Loan Consultant failed to clarify their partially true representations and advise Russell: (1) how the interest rate on his loan was calculated; (2) that the minimum

49

EXHIBIT A - PAGE 165

APPENDIX A TO COMPLAINT

monthly payment would not always be available; (3) that the minimum monthly payment would not be the permanent payment under the loan despite Defendants' and Loan Consultant's affirmative representations to the contrary; (4) that by paying the initial minimum monthly payment he would be definitively deferring interest on his loan, increasing the principal balance of his loan every time he made the minimum monthly payment; (5) that by paying the minimum monthly payment the principal balance of his loan was certain to increase; or (6) his loan would be recast within a few years and he would be forced to pay considerably higher payments.

The disclosures in Russell's loan documents discussing negative amortization, only frame negative amortization as a mere possibility rather than a certainty when making the minimum payment. However the reality was that by making the minimum payment, negative amortization was a certainty. Indeed, the payment schedule set forth in the Truth in Lending Disclosure Statement ("TILDS") which set forth what appeared to be the required payment schedule fails to disclose that making payments pursuant to the TILDS payment schedule will result in negative amortization. Russell was not provided, before entering into the loans, with any other payment schedule or with any informed option to make payments different than those listed in the TILDS payment schedule. Had Defendants disclosed that by making the payment pursuant to the TILDS Russell would be deferring interest, or had they disclosed the payment amounts sufficient to avoid negative amortization from occurring, Russell would not have entered into the loans. Defendants intentionally omitted a clear disclosure of the nature of Russell's loans because giving a clear explanation of how the loan worked would have punctured the illusion of a low-payment, low interest rate loan.

Defendants and Loan Consultant also explicitly represented to Russell that he could afford his loan and further represented that he could shoulder the additional financial burden of repaying his loan in consideration of his other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was much higher than the minimum payment. Defendants and Loan Consultant further represented to Russell that he could rely on the assessment that he was "qualified" to mean that he could afford the loan. Because of Russell's lack of familiarity with how much debt a person can and should reasonably take on compared to

50

**APPENDIX A TO COMPLAINT**

his monthly income, and because Russell reasonably relied on Defendants' and Loan Consultant's expertise that any payment he was "qualified" for would take into account what the maximum debt a person such as Russell should be shouldering was, Russell reasonably believed Defendants' and Loan Consultant's representations that he could afford his loan and its payments.

Although Defendants and the Loan Consultant represented to Russell that he was "qualified" for his loan and could afford his loan and its monthly payments, Defendants and the Loan Consultant misled Russell into believing that his monthly payments would always only be the same. Furthermore, at no point did Defendants or Loan Consultant clarify Russell's false belief and advise him that the minimum payment would not be his permanent payment under the loan, or that every time he made the minimum payment, which is less than interest only, he would be deferring interest on his loan, increasing the principal balance of his loan.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around December 22, 2004, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Russell's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Russell's home was worth $205,000.00 at the time he entered into his loan, and that such a valuation was a true and correct measure of his home's worth. The current fair market value of Russell's home is approximately $106,250.00. Russell alleges that the appraisal was artificially inflated, and that he has suffered damages in the amount of $98,750.0 ($205,000.00-$106,250.00) due to a substantial loss of equity in his home as a result of Defendants' fraudulent inflation and other acts described herein.

In or around late 2009 Russell lost his job because he had sustained a broken knee in an accident at work. Russel was an employee at an electric company. Experiencing a substantial drop in his income, Russell really needed help in repaying his loan. In that regard, Russel sought Defendants' assistance for a loan modification; however, Defendants refused to modify his loan. During the loan modification process, Defendants at no point assigned a single point of contact to Russel's file. Although Russel submitted all documents in a timely manner and whenever

51

EXHIBIT A - PAGE 167

**APPENDIX A TO COMPLAINT**

Defendants requested, Defendants still refused to modify Russel's loan. In addition, Defendants' representative verbally advised Russel over the phone to default on his loan by making partial monthly payments of only $700.00. Russel followed Defendants' representative's advice and made the payment of $900.00. Russel made the low monthly payment for as long as it took him to fall behind on his loan. However, Defendants "dual tracked" Russel's loan despite his compliance with Defendants' representative's instructions. Defendants foreclosed on Russel's home on June 8, 2011.

The foreclosure against Russell was wrongful because at the time the Notice of Sale ("NOS") was recorded (May 18, 2011), the foreclosing trustee (Aztec Foreclosure Corporation) did not have the legal authority to initiate the foreclosure because the foreclosing trustee was never properly substituted as trustee. The original trustee under the Deed of Trust (recorded January 21, 2005) was Seaside Financial Corporation.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Russell could afford the loan; (4) he was "qualified" for his loan; (5) "qualified" meant that he could afford his loan.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Russell that: (1) Defendants and Loan Consultant knew that he could not and would not be able to afford his loan and that there was a very high probability that he would default and/or be foreclosed upon; (2) Defendants had an incentive to sell his loan, and did sell his loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not his; (4) that Defendants' and Loan Consultant's representations that he was "qualified" to pay his loan was not intended to communicate that he could actually "afford" the loan which he was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Russell's home to require him to borrow more money with the knowledge that the true value of Russell's

52

APPENDIX A TO COMPLAINT

home was insufficient to justify the amount of Russell's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Russell would lose substantial equity in his home.

Based on these misrepresentations and omissions, the material facts concerning Russell's loan were concealed from him, and he decided to move forward with his loan. On January 14, 2005, Russell signed the loan and Deed of Trust, before a notary. Had he known the truth however, Russell would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Russell has lost substantial equity in his home, has damaged or destroyed credit, and at the time Russell entered into the loan his home was worth $202,000.00, now his home is worth approximately $106,250.00. Russell did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around May 23, 2011. (True and correct copies of the aforementioned documents are attached here to as *Exhibit 7*).

17.     Plaintiff Masatoshi Tauchi ("Tauchi") entered into a mortgage contract to purchase his home located at 16639 Alviso Court, Lake Elsinore, CA 92530 and A.P.N.:379-470-045 American Lending Alliance on June 30, 2006. Tauchi was steered into an adjustable rate mortgage in the amount of $358,085.00 with an interest rate at 6.625% for a term of 30 years. Little did Tauchi know, however, payments made during the first 10 years of his loan were Interest-Only. Tauchi also was not advised that his interest rate was "fixed" for only 5 years, and could adjust every 12 months thereafter. Tauchi was represented that his monthly payment would always be $1,976.93. In addition, Tauchi was steered into a "piggy-back" loan in the amount of $44,760.00 for a term of 20 years. On or around November 19, 2010 OneWest Bank became the servicer of the loan.

Towards the end of 2010 Tauchi was experienced financial hardship. He really needed help. With respect to that, he contacted Defendants for assistance in repaying his loan. However,

53

**APPENDIX A TO COMPLAINT**

Tauchi did not receive any assistance from Defendants about the loan modification. On March 17, 2011 Defendants recorded a Notice of Default ("NOD") on his property. Approximately one month later, Tauchi applied for a loan modification again. Defendants gave Tauchi a false sense of security that he would not be foreclosed pending the loan modification. Although Tauchi submitted all of documents in a timely manner and whenever Defendants requested, Defendants "dual tracked" Tauchi in that Defendants recorded a Notice of Sale ("NOS") on June 15, 2011 and denied Tauchi's loan modification in July 2011. Defendants then foreclosed on his home on July 22, 2011.

The foreclosure against Tauchi was wrongful because at the time the NOS was recorded (June 15, 2011), the foreclosing trustee (Ndex West LLC) did not have the legal authority to initiate the foreclosure because the foreclosing trustee was never properly substituted as trustee. The original trustee under the Deed of Trust (recorded June 30, 2006) was Chicago Title Company.

On June 30, 2006, Tauchi signed the loan and Deed of Trust, before a notary. After Tauchi had entered into the loan, Tauchi lost substantial equity in his home, has damaged or destroyed his credit. At the time Tauchi entered into the loan his home was worth substantially higher than the current market value of $151,300.00. When Defendants became the servicer of Tauchi's loan, Tauchi was tricked into the foreclosure. Tauchi did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around June 1, 2011. (True and correct copies of the aforementioned documents are attached here to as *Exhibit 8*).

18.    Plaintiffs Jose Velasco and Beatrice Velasco ("Mr. and Mrs. Velasco") discussed refinancing an existing mortgage on their property located at 11885 Autumn Pl, Fontana, CA 92337, A.P.N.:0236-481-37 with a Loan Consultant ("Loan Consultant"), a representative and authorized agent of IndyMac Bank and Defendants herein (the "Defendants") in or around July 2006. In the course of their discussions ranging from July 2006 until September 2006,

54

EXHIBIT A - PAGE 170

APPENDIX A TO COMPLAINT

Defendants and Loan Consultant steered them into an adjustable rate mortgage in the amount of $328,000.00 with an interest rate at 6.25% for a term of 30 years. Little did Mr. and Mrs. Velasco know, however, payments made during the first 10 years of their loan were Interest-Only. Mr. and Mrs. Velasco also were not advised that their interest rate was "fixed" for only 5 years, and could adjust every 12 months thereafter. This loan was originated by IndyMac Bank, on the note and deed of trust IndyMac Bank is identified as the lender, and OneWest Bank was the servicer of the loan.

Defendants and Loan Consultant represented to Mr. and Mrs. Velasco that their monthly payment would always be $1,708.33. Although the amount of Mr. and Mrs. Velasco's monthly payment was $1,708.33, Defendants and Loan Consultant failed to clarify their partially true representations and advise Mr. and Mrs. Velasco that: (1) their monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) their monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of their monthly payment would not remain "fixed" for the entire term of the loan.

Further, Defendants and Loan Consultant advised them that they were eligible for a Low Doc Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low documentation requirement to fraudulently inflate their assets by $4,000.00; and in doing so, Defendants and Loan Consultant caused them to be placed into a loan whose payments they could not afford given their monthly income. Defendants and Loan Consultant altered Mr. and Mrs. Velasco's loan application without their knowing consent or authorization as Loan Consultant completed Mr. and Mrs. Velasco's application without giving Mr. and Mrs. Velasco an opportunity to review the loan application.

Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Velasco that they could afford their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $2,019.55. Given Mr. and Mrs. Velasco's true monthly income of $6,480.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 31%-

55

APPENDIX A TO COMPLAINT

grossly in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Mr. and Mrs. Velasco that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Velasco's lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income, and because Mr. and Mrs. Velasco reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Velasco should be shouldering was, Mr. and Mrs. Velasco reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

Although Defendants and Loan Consultant represented to Mr. and Mrs. Velasco that they were "qualified" for their loan and could afford their loan and its monthly payments, Defendants and Loan Consultant misled Mr. and Mrs. Velasco into believing that their monthly payments would always only be $1,708.33. Furthermore, at no point did Defendants or Loan Consultant clarify Mr. and Mrs. Velasco's false belief and advise them that $1,708.33 would not be their permanent payment under the loan, or that every time they made a monthly payment in the amount of $1,708.33, they were not paying down any of their principal balance.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around August 25, 2007, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Velasco's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Mr. and Mrs. Velasco's home was worth $410,000.00 at the time they entered into their loan, and that such a valuation was a true and correct measure of their home's worth. The current fair market value of Mr. and Mrs. Velasco's home is approximately $175,100.00. Mr. and Mrs. Velasco allege that the appraisal was artificially inflated, and that they have suffered damages in the amount of $234,900.00 ($410,000.00-$175,100.00) due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

56

EXHIBIT A - PAGE 172

**APPENDIX A TO COMPLAINT**

Defendants and Loan Consultant also represented to Mr. and Mrs. Velasco that they would be able to refinance their loan at a later time. Mr. and Mrs. Velasco relied on this assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Velasco have not been able to refinance their loan. Defendants and Loan Consultant also represented that it would modify Mr. and Mrs. Velasco's loan, and Mr. and Mrs. Velasco relied on this representation in deciding to enter into the loan.

Towards the end of 2009, Mr. and Mrs. Velasco were experiencing financial difficulty. They really needed help. In that regard, Mr. and Mrs. Velasco contacted Defendants for assistance in a loan modification. Mr. and Mrs. Velasco were advised by Defendants and a representative and authorized agent of Defendants, to stop making payments in order to be eligible for a modification. Mr. and Mrs. Velasco relied on Defendants' and Defendants' representative and authorized agent's advice and stopped making their monthly payments causing them to fall even further behind. However, Defendants refused to permanently modify their loan in March 2009

The foreclosure against said Mr. and Mrs. Velasco is void because at the time the NOD was recorded (on October 2, 2009), the foreclosing party (OneWest Bank) did not yet have the authority to initiate foreclosure. That's because the foreclosing party did not properly receive any beneficial interest in the property until the Assignment of Deed of Trust (ADOT) which was dated January 15, 2010 more than 3 months after the NOD was recorded. Accordingly the foreclosure was void. Under California Law, an NOD initiating foreclosure on behalf of a party who is not a true beneficiary at the time of filing the NOD, as here, is void ab initio, rendering any subsequent foreclosure based on that NOD void as well.

In addition, not only was ADOT backdated, ADOT is void also because it noted MERS as the party assigning the beneficiary interest in the property in its individual capacity. However, under California law MERS is only a nominee acting on behalf of the true beneficiary, and cannot initiate foreclosure in its own name. MERS can only act when acting in its nominal capacity. Here, MERS assigned the interest in the Deed of Trust to OneWest Bank in its own name, rendering ADOT void. Accordingly, OneWest Bank was never properly assigned the

57

**APPENDIX A TO COMPLAINT**

beneficiary interest as a foreclosing beneficiary of the Deed. Therefore, any subsequent recorded documents based on that assignment in order to move forward with the foreclosure sale would be void as well.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mr. and Mrs. Velasco could afford the loan; (4) they were "qualified" for their loan; (5) "qualified" meant that they could afford their loan; (6) Defendants would modify their loan in the future; and (7) they would be able to refinance their loan in the future.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Mr. and Mrs. Velasco that: (1) Defendants and Loan Consultant knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they were being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mr. and Mrs. Velasco's home to require them to borrow more money with the knowledge that the true value of Mr. and Mrs. Velasco's home was insufficient to justify the amount of Mr. and Mrs. Velasco's loan; and (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Velasco would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Velasco's loan were concealed from them, and they decided to move forward with their loan. On September 27, 2007, Mr. and Mrs. Velasco signed the loan and Deed of Trust, before a

58

EXHIBIT A - PAGE 174

## APPENDIX A TO COMPLAINT

notary. Had they known the truth however, Mr. and Mrs. Velasco would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Velasco have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Velasco entered into the loan their home was worth $410,000.00, now their home is worth approximately $175,100.00. Mr. and Mrs. Velasco did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around March 17, 2011. (True and correct copies of the aforementioned documents are attached here to as *Exhibit 9*).

19.    Plaintiffs Manuel Martinez and Lilia Martinez ("Mr. and Mrs. Martinez") discussed refinancing their property located at 5752 Marshall Avenue, Buena Park, CA 90621 and APN: 066-174-02 with a Loan Consultant ("Loan Consultant"), a representative and authorized agent of IndyMac Bank and Defendants herein ("Defendants") in or around August 2005. In the course of their discussions ranging from August 2005 until October 2005, Defendants and Loan Consultant steered them into an adjustable rate mortgage in the amount of $608,000.00 with an interest rate at 1.25% for a term of 30 years. Little did Mr. and Mrs. Martinez know, however, their loan was a negatively amortized PayOption ARM. Mr. and Mrs. Martinez was not advised that the interest rate was never "fixed" but applied to only their first monthly payment and could adjust every month thereafter. The amount of Mr. and Mrs. Martinez's minimum monthly payment was "fixed" for 12 months and could adjust every 12 months thereafter. When the amount of the minimum monthly payment is insufficient to cover the amount of interest due, then the amount of that deficiency is added onto the unpaid principal balance of their loan. The recast point of this loan is 110% of the original loan amount. This loan was originated by IndyMac Bank, on the note and deed of trust IndyMac Bank is identified as the lender, and OneWest Bank was the servicer of the loan.

Defendants and Loan Consultant represented to Mr. and Mrs. Martinez that their monthly payment would always be $2,026.17. Although the amount of Mr. and Mrs. Martinez's minimum

59



APPENDIX A TO COMPLAtNT

monthly payment was $2,026.17, Defendants and Loan Consultant failed to clarify their partially true representations and advise Mr. and Mrs. Martinez: (1) how the interest rate on their loan was calculated; (2) that the minimum monthly payment of $2,026.17 would not always be available; (3) that the minimum monthly payment would not be the permanent payment under the loan despite Defendants' and Loan Consultant's affirmative representations to the contrary; (4) that by paying the minimum monthly payment they would be definitively deferring interest on their loan, increasing the principal balance of their loan every time they made the minimum monthly payment; (5) that by paying the minimum monthly payment the principal balance of their loan was certain to increase; or (6) their loan would be recast within a few years and they would be forced to pay considerably higher payments.

The disclosures in Mr. and Mrs. Martinez's loan documents discussing negative amortization, only frame negative amortization as a mere possibility rather than a certainty when making the minimum payment. However the reality was that by making the minimum payment, negative amortization was a certainty. Indeed, the payment schedule set forth in the Truth in Lending Disclosure Statement ("TILDS") which set forth what appeared to be the required payment schedule fails to disclose that making payments pursuant to the TILDS payment schedule will result in negative amortization. Mr. and Mrs. Martinez were not provided, before entering into the loans, with any other payment schedule or with any informed option to make payments different than those listed in the TILDS payment schedule. Had Defendants disclosed that by making the payment pursuant to the TILDS Mr. and Mrs. Martinez would be deferring interest, or had they disclosed the payment amounts sufficient to avoid negative amortization from occurring, Mr. and Mrs. Martinez would not have entered into the loans. Defendants intentionally omitted a clear disclosure of the nature of Mr. and Mrs. Martinez's loans because giving a clear explanation of how the loan worked would have punctured the illusion of a low-payment, low interest rate loan.

Further, Defendants and Loan Consultant advised them that they were eligible for a Low Doc Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low documentation requirement to fraudulently inflate their income; and in doing so, Defendants and

60

APPENDIX A TO COMPLAINT

Loan Consultant caused them to be placed into a loan whose payments they could not afford given their true, un-inflated monthly income. Defendants and Loan Consultant altered Mr. and Mrs. Martinez's loan application without their knowing consent or authorization as Loan Consultant completed Mr. and Mrs. Martinez's application without giving Mr. and Mrs. Martinez an opportunity to review the loan application.

Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Martinez that they could afford their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $3,770.00. Given Mr. and Mrs. Martinez's true monthly income of $1,600.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 235%- grossly in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Mr. and Mrs. Martinez that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Martinez's lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income, and because Mr. and Mrs. Martinez reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Martinez should be shouldering was, Mr. and Mrs. Martinez reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

Although Defendants and the Loan Consultant represented to Mr. and Mrs. Martinez that they were "qualified" for their loan and could afford their loan and its monthly payments, Defendants and the Loan Consultant misled Mr. and Mrs. Martinez into believing that their monthly payments would always only be $2,026.17. Furthermore, at no point did Defendants or Loan Consultant clarify Mr. and Mrs. Martinez's false belief and advise them that $2,026.17 would not be their permanent payment under the loan, or that every time they made a monthly payment in the amount of $2,026.17, which is less than interest only, they would be deferring

61

EXHIBIT A - PAGE 177

**APPENDIX A TO COMPLAINT**

interest on their loan, increasing the principal balance of their loan.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around October 4, 2005, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Martinez's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Mr. and Mrs. Martinez's home was worth $650,000.00 at the time they entered into their loan, and that such a valuation was a true and correct measure of their home's worth. The current fair market value of Mr. and Mrs. Martinez's home is approximately $413,950.00. Mr. and Mrs. Martinez allege that the appraisal was artificially inflated, and that they have suffered damages in the amount of $236,050.00 ($650,000.00-$413,950.00) due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Loan Consultant also represented to Mr. and Mrs. Martinez that they would be able to refinance their loan at a later time. Mr. and Mrs. Martinez relied on this assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Martinez have not been able to afford to refinance their loan because they have to pay prepayment penalties if they pay off their loan within the first 3 years of the loan. Defendants and Loan Consultant also represented that it would modify Mr. and Mrs. Martinez's loan, and Mr. and Mrs. Martinez relied on this representation in deciding to enter into the loan. However, Defendants have refused to permanently modify their loan on 3 separate occasions. Defendants rejected Mr. and Mrs. Martinez's first loan modification because the NPV ratio was below Defendants' criteria. Then Mr. and Mrs. Martinez were placed in a trial payment plan in which they made 3 trial payments and a balloon payment of $23,000. However, Mr. and Mrs. Martinez have not yet been able to get their loan modified yet.

Towards the end of 2008, Mr. and Mrs. Martinez experienced financial hardship that he could not afford the loan. They really needed help. In that regard, Mr. and Mrs. Martinez contacted Defendants for assistance for a loan modification in. On twelve separate occasions Mr. and Mrs. Martinez applied for a loan modification. All of the times Defendants denied Mr. and

62

**APPENDIX A TO COMPLAINT**

Mrs. Martinez's loan modification. At all relevant times during the loan modification process, Mr. and Mrs. Martinez submitted all documents in a timely fashion and whenever Defendants requested. Defendants, however, repetitively demanded same documentation and intentionally delayed in processing Mr. and Mrs. Martinez's loan modification.

In addition, Defendants forced escrows insurance for his loan and tacked on the insurance premiums to his monthly mortgage payments. The insurance premium was approximately 3 times higher than the existing premium Mr. and Mrs. Martinez were paying at the time. Due to this, the forced escrows created a new hardship, making it difficult for Mr. and Mrs. Martinez to afford the loan.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mr. and Mrs. Martinez could afford the loan; (4) they were "qualified" for their loan; (5) "qualified" meant that they could afford their loan; (6) Defendants would modify their loan in the future; and (7) Defendants would refinance their loan in the future.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Mr. and Mrs. Martinez that: (1) Defendants and Loan Consultant knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they were being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mr. and Mrs. Martinez's home to require them to borrow more money with the knowledge that the true value of Mr. and Mrs. Martinez's home was insufficient to justify the amount of Mr. and Mrs. Martinez's loan; or (7) Defendants knew that due to its

63

**APPENDIX A TO COMPLAINT**

scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Martinez would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Martinez's loan were concealed from them, and they decided to move forward with their loan. On October 25, 2005 Mr. and Mrs. Martinez signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mr. and Mrs. Martinez would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Martinez have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Martinez entered into the loan their home was worth $650,000.00, now their home is worth approximately $413,950.00. Mr. and Mrs. Martinez did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around March 14, 2011.

20. Plaintiffs Daniel Gambler and Alice Gambler ("Mr. and Mrs. Gambler") discussed refinancing an existing mortgage on their property located at 8 South Cambridge Drive, Lodi, CA 95242, A.P.N.:029-122-16 with a Loan Consultant ("Loan Consultant"), a representative and authorized agent of Aegis Wholesale Corporation, a correspondent of IndyMac Bank and Defendants herein (the "Defendants") and authorized by Defendants to lend on their behalf, in or around September 2005. In the course of their discussions ranging from September 2005 until November 2005, Defendants and Loan Consultant steered them into a fixed rate mortgage in the amount of $295,200.00 with an interest rate at 6.25% for a term of 30 years. This loan has a prepayment penalty of 3 years. In addition, Loan Consultant steered them into a "piggy-back" loan in the amount of $33,210.00 with an interest rate for 15 years. Little did Mr. and Mrs. Gambler know, however, although their loan is payable in 15 years, it is amortized over 30 years resulting in a huge balloon payment due at the end of the 15 year loan term These loans were originated by IndyMac Bank, on the note and deed of trust Aegis Wholesale

64

APPENDIX A TO COMPLAINT

Corporation is identified as the lender, and OneWest Bank was the servicer of the loans.

Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Gambler that they could afford their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts. Defendants and Loan Consultant also represented to them that they could afford a $1,817.60 monthly payment on the first loan and a $298.50 for the balloon loan on the 15 year term, resulting a total of $2,116.10, despite their $5,870.00 true monthly income (a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 36%). Defendants and Loan Consultant further represented to Mr. and Mrs. Gambler that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Gambler's lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income, and because Mr. and Mrs. Gambler reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Gambler should be shouldering was, Mr. and Mrs. Gambler reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around November October 27, 2005, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Gambler's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Mr. and Mrs. Gambler's home was worth $384,000.00 at the time they entered into their loan, and that such a valuation was a true and correct measure of their home's worth. The current fair market value of Mr. and Mrs. Gambler's home is approximately $147,900.00. Mr. and Mrs. Gambler allege that the appraisal was artificially inflated, and that they have suffered damages in the amount of $236,100.00 ($384,000.00-$147,900.00) due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

65

APPENDIX A TO COMPLAINT

Defendants and Loan Consultant also represented to Mr. and Mrs. Gambler that they would be able to refinance their loan at a later time. Mr. and Mrs. Gambler relied on this assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Gambler were not able to refinance their loan. Defendants and Loan Consultant also represented that it would modify Mr. and Mrs. Gambler's loan, and Mr. and Mrs. Gambler relied on this representation in deciding to enter into the loan. A few years after Mr. and Mrs. Gambler entered into loan, Mr. Gambler's health was deteriorating that caused Mr. and Mrs. Gambler to exhaust their checking and savings account. Due to this, they were struggling to afford their mortgage payments, so they sought Defendants' assistance in modifying their loan. However, throughout the loan modification process Defendants did not treat Mr. and Mrs. Gambler fairly. Although Mr. and Mrs. Gambler complied with every term during the application process and even were verbally approved for a trial loan modification, Defendants ultimately rejected Mr. and Mrs. Gambler's loan modification.

The foreclosure against Mr. and Mrs. Gambler was void at the time the Notice of Default ("NOD") was recorded (on March 14, 2011), the foreclosing party (Deutsch Bank National Trust Company) did not yet have the authority to initiate foreclosure. That was because the foreclosing party did not properly receive any beneficial interest in the property until the Assignment of Deed of Trust ("ADOT") was executed on April 4, 2011, which was more than a month after the NOD was recorded. Under California Law, an NOD initiating foreclosure on behalf of a party who is not a true beneficiary at the time of filing the NOD, as here, is void ab initio, rendering any subsequent foreclosure based on that NOD void as well. Accordingly the foreclosure was void.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mr. and Mrs. Gambler could afford the loan; (4) they were "qualified" for their loan; (5) "qualified" meant that they could afford their loan; (6) Defendants would modify their loan in the future; and (7) they would be able to refinance their loan in the future.

66

EXHIBIT A - PAGE 182

APPENDIX A TO COMPLAINT

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Mr. and Mrs. Gambler that: (1) Defendants and Loan Consultant knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they were being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mr. and Mrs. Gambler's home to require them to borrow more money with the knowledge that the true value of Mr. and Mrs. Gambler's home was insufficient to justify the amount of Mr. and Mrs. Gambler's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Gambler would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Gambler's loan were concealed from them, and they decided to move forward with their loan. On November 7, 2005, Mr. and Mrs. Gambler signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mr. and Mrs. Gambler would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Gambler have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Gambler entered into the loan their home was worth $384,000.00, now their home is worth approximately $147,900.00. Mr. and Mrs. Gambler did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around July 22, 2011. (True and correct

67

APPENDIX A TO COMPLAINT

copies of the aforementioned documents are attached here to as *Exhibit 10*).

21. Plaintiff Jennifer Carolan ("Carolan") refinanced an existing mortgage on her property located at 3659 Albury Avenue, Long Beach, CA 90808, A.P.N.:7187-015-016 with Mountain West Financial Incorporation on November 9, 2006. Carolan was steered into an adjustable rate mortgage in the amount of $506,000.00 with an interest rate at 6.925% for a term of 30 years. Little did Carolan know, however, payments made during the first 10 years of her loan were Interest-Only. Carolan also was not advised that her interest rate was "fixed" for only 5 years, and could adjust every year thereafter. This loan has a prepayment penalty of 3 years. Her initial interest-only monthly payment was $3,231.67. In addition, Carolan was also steered her into a "piggy-back" loan in the amount of $70,000.00 with an interest rate for a term of 30 years. Prior to August 2009, IndyMac Mortgage Services, a division of OneWest Bank and Defendants herein ("Defendants") became the servicer of Carolan's loan.

In anticipation that the loan would be not be affordable once the mortgage payment increased, Carolan contacted Defendants for assistance in loan modification. Defendants' representative advised her to fall behind on the loan in order to be considered for a loan modification. In response, Carolan followed Defendants' representative's advice and further defaulted on the loan. Although Carolan was approved for a loan modification on March 16, 2012, the default caused Carolan to suffer damages from destroyed credit.

Based on these misrepresentations and omissions, the material facts concerning Carolan's loan were concealed from her, and she decided to move forward with her loan. On November 9, 2006, Carolan signed the loan and Deed of Trust, before a notary. Had she known the truth however, Carolan would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Carolan has lost substantial equity in her home, has damaged or destroyed credit, and at the time Carolan entered into the loan her home was worth $700,000.00, now her home is worth approximately $413,100.00. Carolan did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described

68

APPENDIX A TO COMPLAINT

throughout this complaint, were brought to light on or around July 8, 2011.

22.     Plaintiffs Paul Saunders and Melba Saunders ("Mr. and Mrs. Saunders") discussed refinancing an existing mortgage on their home located at 12317 Crewe Street, Norwalk, CA 90650 and A.P.N.: 8025-016-014 with a loan consultant (the "Loan Consultant"), and representative and authorized agent of Defendants herein (the "Defendants") in or around May 2004. In the course of their discussions ranging from May 2004 until July 2004, Defendants and Loan Consultant steered them into a loan of which the Defendants and Loan Consultant concealed and inaccurately, incompletely or otherwise improperly disclosed the material terms and information concerning the loan. This loan was originated by IndyMac Bank, on the note and deed of trust IndyMac Bank is identified as the lender, and IndyMac Mortgage Services, a division of OneWest Bank was the servicer of the loan.

Defendants and Loan Consultant explicitly represented to Mr. and Mrs. Saunders that they could afford their loan; and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts. Loan Consultant and Defendants further represented to Mr. and Mrs. Saunders that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Saunders's lack of familiarity with how much debt a person can and should reasonably take on compared to his/her monthly income, and because Mr. and Mrs. Saunders reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Saunders should be shouldering was, Mr. and Mrs. Saunders reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. An appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Saunders's home, which was fraudulently inflated to an intentionally overstated value. Mr. and Mrs. Saunders allege that the appraisal was artificially inflated, and that they have suffered damages due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation

69

APPENDIX A TO COMPLAINT

and other acts described herein.

Loan Consultant and Defendants also represented to Mr. and Mrs. Saunders that they would be able to refinance their loan at a later time. Mr. and Mrs. Saunders relied on this assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Saunders have not been able to refinance their loan. Loan Consultant and Defendants also represented that it would modify Mr. and Mrs. Saunders's loan, and Mr. and Mrs. Saunders relied on this representation in deciding to enter into the loan. In addition, Mr. and Mrs. Saunders were advised by a representative and authorized agent of Defendants to stop making payments in order to be eligible for a modification. Mr. and Mrs. Saunders relied on the Defendants' and the Defendants representative and authorized agents' advice and stopped making their monthly payments causing them to fall even further behind. However, Mr. and Mrs. Saunders were unable to modify their loan.

Furthermore, Loan Consultant and Defendants represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mr. and Mrs. Saunders could afford the loan; (4) They were "qualified" for their loan; (5) "qualified" meant that they could afford their loan; (6) They would be able to modify their loan in the future; and (7) They would be able to refinance their loan in the future.

Moreover, Loan Consultant and Defendants withheld or incompletely, inaccurately or otherwise improperly disclosed to Mr. and Mrs. Saunders that: (1) Loan Consultant and Defendants knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Loan Consultant's and Defendants' "qualification" process was for Defendants' own protection and not theirs; (4) That Loan Consultant's and Defendants' representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants

70

APPENDIX A TO COMPLAINT

influenced the appraiser to over-value Mr. and Mrs. Saunders's home to require them to borrow more money with the knowledge that the true value of Mr. and Mrs. Saunders's home was insufficient to justify the amount of Mr. and Mrs. Saunders's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Saunders would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Saunders's loan were concealed from them, and they decided to move forward with their loan. On July 29, 2004, Mr. and Mrs. Saunders signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mr. and Mrs. Saunders would not have accepted the loan. As a result of the Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Saunders have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Saunders entered into the loan their home was worth substantially more than its current fair market value. Mr. and Mrs. Saunders did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around August 17, 2011.

23.     Plaintiff Maria Alcantar ("Alcantar") refinanced an existing mortgage on her property located at 5380 Sebastopol Road, Santa Rosa, CA 95407, A.P.N.: 060-36012 with a Loan Consultant ("Loan Consultant"), a representative and authorized agent of IndyMac Bank and Defendants herein (the "Defendants") in or around July 2006. In the course of their discussions ranging from July 2006 until September 2006, Defendants and Loan Consultant steered her into a fixed rate mortgage in the amount of $650,000.00 with an interest rate at 7.5% for a term of 30 years. Little did Alcantar know, however, payments made during the first few years of her loan were Interest-Only. This loan was originated by IndyMac Bank, on the note and deed of trust IndyMac Bank is identified as the lender, and OneWest Bank was the servicer of the loan.

71

EXHIBIT A - PAGE 187



APPENDIX A TO COMPLAINT

Defendants and Loan Consultant represented to Alcantar that her monthly payment would always be $4,062.50. Although the amount of Alcantar's monthly payment was $4,062.50, Defendants and Loan Consultant failed to clarify their partially true representations and advise Alcantar that: (1) her monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) her monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of her monthly payment would not remain "fixed" for the entire term of the loan.

Further, Defendants and Loan Consultant advised her that she was eligible for a Low Doc Loan. Unbeknownst to her at the time, Defendants and Loan Consultant used this low documentation requirement to fraudulently inflate her income; and in doing so, Defendants and Loan Consultant caused her to be placed into a loan whose payments she could not afford given her true, un-inflated monthly income. Defendants and Loan Consultant altered Alcantar's loan application without her knowing consent or authorization as Loan Consultant completed Alcantar's application without giving Alcantar an opportunity to review the loan application.

Defendants and Loan Consultant also explicitly represented to Alcantar that she could afford her loan and further represented that she could shoulder the additional financial burden of repaying her loan in consideration of her other existing debts; yet the fully amortized monthly payment on the loan was $5,236.36, which is more than $1,000.00 than the interest-only payment. Given Alcantar's true monthly income of $5,000.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 104% - grossly in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Alcantar that she could rely on the assessment that she was "qualified" to mean that she could afford the loan. Because of Alcantar's lack of familiarity with how much debt a person can and should reasonably take on compared to her monthly income, and because Alcantar reasonably relied on Defendants' and Loan Consultant's expertise that any payment she was "qualified" for would take into account what the maximum debt a person such as Alcantar should be shouldering was, Alcantar reasonably believed Defendants' and Loan Consultant's

72

### APPENDIX A TO COMPLAINT

representations that she could afford her loan and its payments.

Although Defendants and Loan Consultant represented to Alcantar that she was "qualified" for her loan and could afford her loan and its monthly payments, Defendants and Loan Consultant misled Alcantar into believing that her monthly payments would always only be $4,062.50. Furthermore, at no point did Defendants or Loan Consultant clarify Alcantar's false belief and advise her that $4,062.50 would not be her permanent payment under the loan, or that every time she made a monthly payment in the amount of $4,062.50, she was not paying down any of her principal balance.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around August 10, 2006, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Alcantar's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Alcantar's home was worth $825,000.00 at the time she entered into her loan, and that such a valuation was a true and correct measure of her home's worth. The current fair market value of Alcantar's home is approximately $328,865.00. Alcantar alleges that the appraisal was artificially inflated, and that she has suffered damages in the amount of $496,135.00 ($825,000.00-$496,135.00) due to a substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Loan Consultant also represented to Alcantar that she would be able to refinance her loan at a later time. Alcantar relied on this assurance in deciding to enter into the mortgage contract. However, Alcantar has not been able to refinance her loan. Defendants and Loan Consultant also represented that it would modify Alcantar's loan, and Alcantar relied on this representation in deciding to enter into the loan. Nor was Alcantar able to modify her loan. As a result Alcantar seriously fell behind on her loan and lost her home to foreclosure.

The foreclosure against Alcantar was void because at the time the NOD was recorded (on February 17, 2011), the foreclosing party (Aztec Foreclosure Corporation) did not yet have the authority to initiate foreclosure. That was because the foreclosing party did not properly receive

73

## APPENDIX A TO COMPLAINT

any beneficial interest in the property until the Assignment of Deed of Trust (ADOT) which was dated April 29, 2011 more than 2 months after the NOD was recorded. Under California Law, an NOD initiating foreclosure on behalf of a party who is not a true beneficiary at the time of filing the NOD, as here, is void ab initio, rendering any subsequent foreclosure based on that NOD void as well. Accordingly the foreclosure was void.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Alcantar could afford the loan; (4) she was "qualified" for her loan; (5) "qualified" meant that she could afford her loan; (6) Defendants would modify her loan in the future; and (7) she would be able to refinance her loan in the future.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Alcantar that: (1) Defendants and Loan Consultant knew that she could not and would not be able to afford her loan and that there was a very high probability that she would default and/or be foreclosed upon; (2) Defendants had an incentive to sell her loan, and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not hers; (4) that Defendants' and Loan Consultant's representations that she was "qualified" to pay her loan was not intended to communicate that she could actually "afford" the loan which she was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Alcantar's home to require her to borrow more money with the knowledge that the true value of Alcantar's home was insufficient to justify the amount of Alcantar's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Alcantar would lose substantial equity in her home.

Based on these misrepresentations and omissions, the material facts concerning Alcantar's loan were concealed from her, and she decided to move forward with her loan. On

74

APPENDIX A TO COMPLAINT

September 6, 2006, Alcantar signed the loan and Deed of Trust, before a notary. Had she known the truth however, Alcantar would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Alcantar has lost substantial equity in her home, has damaged or destroyed credit, and at the time Alcantar entered into the loan her home was worth $825,000.00, now her home is worth approximately $328,865.00. Alcantar did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around August 18, 2011. (True and correct copies of the aforementioned documents are attached here to as *Exhibit 11*).

24.     Plaintiff Miguel Vega and Cynthia Vega ("Mr. and Mrs. Vega") discussed obtaining a mortgage to purchase their home located at 7700 Calmhill Drive, Riverside, CA 92503, A.P.N.:145-310-022 with a Loan Consultant ("Loan Consultant"), a representative and authorized agent of IndyMac Bank and Defendants herein (the "Defendants") in or around January 2006. In the course of their discussions ranging from January 2006 until March 2006, Defendants and Loan Consultant steered them into an adjustable rate mortgage in the amount of $320,000.00 with an interest rate at 6.75% for a term of 30 years. The loan has a prepayment penalty of 3 years. Little did Mr. and Mrs. Vega know, however, payments made during the first 10 years of their loan were Interest-Only. Mr. and Mrs. Vega also was not advised that their interest rate was "fixed" for only 10 years, and could adjust every year thereafter. In addition, Loan Consultant steered them into a "piggy-back" loan in the amount of $80,000.00 for a term of 15 years. This loan was originated by IndyMac Bank, on the note and deed of trust IndyMac Bank is identified as the lender, and OneWest Bank is currently servicing the loan.

Defendants and Loan Consultant recommended the loan, representing that Mr. and Mrs. Vega were given a 30-year fixed. However, Mr. and Mrs. Vegas's loan was an adjustable interest-only loan.

Defendants and Loan Consultant represented to Mr. and Mrs. Vega that their monthly payment would always be $1,800.00. Although the amount of Mr. and Mrs. Vega's monthly

75

**APPENDIX A TO COMPLAINT**

payment was $1,800.00, Defendants and Loan Consultant failed to clarify their partially true representations and advise Mr. and Mrs. Vega that: (1) their monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) their monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of their monthly payment would not remain "fixed" for the entire term of the loan.

Further, Defendants and Loan Consultant advised them that they were eligible for a Low Doc Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low documentation requirement to fraudulently inflate their income by $3,556.00, a factor of 72% ;and in doing so, Defendants and Loan Consultant caused them to be placed into a loan whose payments they could not afford given their true, un-inflated monthly income. Defendants and Loan Consultant altered Mr. and Mrs. Vega's loan application without their knowing consent or authorization as Loan Consultant completed Mr. and Mrs. Vega's application without giving Mr. and Mrs. Vega an opportunity to review the loan application.

Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Vega that they could afford their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $2,063.02. Given Mr. and Mrs. Vega's true monthly income of $4,961.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 42% - in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines. Defendants and Loan Consultant further represented to Mr. and Mrs. Vega that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Vega's lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income, and because Mr. and Mrs. Vega reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Vega should be shouldering was, Mr. and Mrs. Vega reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

76

**APPENDIX A TO COMPLAINT**

Although Defendants and Loan Consultant represented to Mr. and Mrs. Vega that they were "qualified" for their loan and could afford their loan and its monthly payments, Defendants and Loan Consultant misled Mr. and Mrs. Vega into believing that their monthly payments would always only be $1,800.00. Furthermore, at no point did Defendants or Loan Consultant clarify Mr. and Mrs. Vega's false belief and advise them that $1,800.00 would not be their permanent payment under the loan, or that every time they made a monthly payment in the amount of $1,800.00, they were not paying down any of their principal balance.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around March 3, 2006, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Vega's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Mr. and Mrs. Vega's home was worth $400,000.00 at the time they entered into their loan, and that such a valuation was a true and correct measure of their home's worth. The current fair market value of Mr. and Mrs. Vega's home is approximately $158,100.00. Mr. and Mrs. Vega allege that the appraisal was artificially inflated, and that they have suffered damages in the amount of $241,900.00 ($400,000.00-$158,100.00) due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Loan Consultant also represented to Mr. and Mrs. Vega that they would be able to refinance their loan at a later time. Mr. and Mrs. Vega relied on this assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Vega have not been able to refinance their loan. Defendants and Loan Consultant also represented that it would modify Mr. and Mrs. Vega's loan, and Mr. and Mrs. Vega relied on this representation in deciding to enter into the loan.

In or around 2010 Mr. Vega did not get paid for all the hours he worked over a period of 2 years as a correctional officer in a State prison. Without bringing sufficient income home, Mr. and Mrs. Vega were caused to experience financial hardship and sought Defendants' assistance in repaying their loan. When Mr. and Mrs. Vega applied for loan modification, Defendants,

77

APPENDIX A TO COMPLAINT

acting as servicers, never had the intent to modify Mr. and Mrs. Vega's loan. First of all, Defendants advised Mr. and Mrs. Vega to fall behind on their payments in order to be eligible for a loan modification. Mr. and Mrs. Vega relied on Defendants' and Defendants' representative and authorized agent's advice and stopped making their monthly payments causing them to fall even further behind because they were led to believe that being in default was the only way to get their application on Defendants' desk full of applications upon applications.

However, Defendants have rejected Mr. and Mrs. Vega's loan modification on 4 separate occasions. Each time Mr. and Mrs. Vega applied for a loan modification, Defendants plodded Mr. and Mrs. Vega's loan application. Throughout the loan modification process, Defendants repeatedly requested Mr. and Mrs. Vega to submit the same loan documentation. The time in which Mr. and Mrs. Vega were placed in a "trial payment plan," Defendants refused to permanently modify Mr. and Mrs. Vega's loan despite their compliance with every term of the loan modification offer. Mr. and Mrs. Vega had made at least 6 trial payments in a timely fashion. As of now Defendants have not yet modified Mr. and Mrs. Vega's loan.

Defendants also fraudulently placed Mr. and Mrs. Vega in a "trial payment plan" in which Defendants never intended to permanently modify their loan. Defendants ultimately refused to modify their loan despite Mr. and Mrs. Vega made 3 timely trial payments. As of now, Defendants have not yet modified their loan.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mr. and Mrs. Vega could afford the loan; (4) they were "qualified" for their loan; (5) "qualified" meant that they could afford their loan; (6) Defendants would modify their loan in the future; and (7) they would be able to refinance their loan in the future.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Mr. and Mrs. Vega that: (1) Defendants and Loan Consultant knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to

78

EXHIBIT A - PAGE 194

APPENDIX A TO COMPLAINT

sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they were being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mr. and Mrs. Vega's home to require them to borrow more money with the knowledge that the true value of Mr. and Mrs. Vega's home was insufficient to justify the amount of Mr. and Mrs. Vega's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Vega would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Vega's loan were concealed from them, and they decided to move forward with their loan. On March 29, 2006, Mr. and Mrs. Vega signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mr. and Mrs. Vega would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Vega have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Vega entered into the loan their home was worth $400,000.00, now their home is worth approximately $158,100.00 Mr. and Mrs. Vega did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around September 19, 2011.

25. Plaintiffs Raghda Zayer ("Zayer") and Mike Manougian ("Manougian") discussed obtaining a mortgage to purchase their home located at 6287 Eaglemount Drive, Fontana, CA 92336, A.P.N.:1119-291-22 with a Loan Consultant ("Loan Consultant"), a representative and authorized agent of IndyMac Bank and Defendants herein (the "Defendants") in or around

79

## APPENDIX A TO COMPLAINT

December 2007. In the course of their discussions ranging from December 2007 until February 2008, Defendants and Loan Consultant steered them into a fixed rate mortgage in the amount of $417,000.00 with an interest rate at 5.25% for a term of 30 years. This loan was originated by IndyMac Bank, on the note and deed of trust IndyMac Bank is identified as the lender, and OneWest Bank is currently servicing the loan.

Further, Defendants and Loan Consultant advised them that they were eligible for a Low Doc Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low documentation requirement to fraudulently inflate their income; and in doing so, Defendants and Loan Consultant caused them to be placed into a loan whose payments they could not afford given their true, un-inflated monthly income. Defendants and Loan Consultant altered Zayer's and Manougian's loan application without their knowing consent or authorization as Loan Consultant completed Zayer's and Manougian's application without giving Zayer and Manougian an opportunity to review the loan application.

Defendants and Loan Consultant also explicitly represented to Zayer and Manougian that they could afford their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts. Defendants and Loan Consultant also represented to them that they could afford a $2,302.69 monthly payment, despite their $6,549.00 true monthly income (a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 35%). Defendants and Loan Consultant further represented to Zayer and Manougian that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Zayer's and Manougian 's lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income, and because Zayer and Manougian reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Zayer and Manougian should be shouldering was, Zayer and Manougian reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or

80

EXHIBIT A - PAGE 196

APPENDIX A TO COMPLAINT

on behalf of Defendants were accurate and made in good faith. On or around January 15, 2008, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Zayer and Manougian's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Zayer and Manougian 's home was worth $425,000.00 at the time they entered into their loan, and that such a valuation was a true and correct measure of their home's worth. The current fair market value of Zayer and Manougian's home is approximately $259,755.00. Zayer and Manougian allege that the appraisal was artificially inflated, and that they have suffered damages in the amount of $165,245.00 ($425,000.00-$259,755.00) due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

Due to the economic crash caused by Defendants' fraudulent acts described throughout the complaint, Zayer and Manougian suffered from financial hardship that caused them to be unable to afford their loan. In or around November 2010, Raghda Zayer lost her job that caused a huge drop in income in the family. Struggling to afford their loan, Zayer and Manougian sought Defendants' assistance in repaying their loan.

Zayer and Manougian were approved for a forbearance plan. They made the payments to Defendants in a timely fashion for 6 months. The deferred amount during the forbearance plan was tacked on to their loan, increasing their unpaid principal significantly. Then Zayer and Manougian were placed in a "3-Month-Trial Payment Plan" which was extended to 8 months. On April 19, 2012 Zayer's and Manougian's loan was ultimately modified.

Throughout the loan modification process, Defendants delayed processing, always claiming that Zayer and Manougian did not send in all of the requested documents and repeatedly demanded them to submit the same documentation many times. Not only it took Zayer and Manougian a long time to get their loan modified, but also the loan delayed process tremendously destroyed their credit score.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

81

EXHIBIT A - PAGE 197

APPENDIX A TO COMPLAINT

made in good faith; (3) Zayer and Manougian could afford the loan; (4) they were "qualified" for their loan; and (5) "qualified" meant that they could afford their loan.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Zayer and Manougian that: (1) Defendants and Loan Consultant knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they were being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Zayer and Manougian's home to require them to borrow more money with the knowledge that the true value of Zayer and Manougian's home was insufficient to justify the amount of Zayer and Manougian 's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Zayer and Manougian would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Zayer and Manougian's loan were concealed from them, and they decided to move forward with their loan. On February 8, 2008, Zayer and Manougian signed the loan and Deed of Trust, before a notary. Had they known the truth however, Zayer and Manougian would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Zayer and Manougian have lost substantial equity in their home, have damaged or destroyed credit, and at the time Zayer and Manougian entered into the loan their home was worth $425,000.00, now their home is worth approximately $259,755.00. Zayer and Manougian did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a

82

APPENDtX A TO COMPLAtNT

discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around October 3, 2011.

26.    Plaintiffs Sidney Jacobs and Lynn Jacobs ("Mr. and Mrs. Jacobs") discussed refinancing an existing mortgage on their property located at 2009 Chestnut Creek Road, Diamond Bar, CA 91765 and APN: 8297-007-011 with a Loan Consultant ("Loan Consultant"), a representative and authorized agent of First Federal Bank and Defendants herein (the "Defendants") in or around February 2005. In the course of their discussions ranging from February 2005 until April 2005, Defendants and Loan Consultant steered them into an adjustable rate mortgage in the amount of $400,000.00 with an interest rate at 5.696% for a term of 30 years. Little did Mr. and Mrs. Jacobs know, however, their loan was a negatively amortized PayOption ARM. Mr. and Mrs. Jacobs was not advised that the interest rate was never "fixed" but applied to only their first monthly payment and could adjust every month thereafter. The amount of Mr. and Mrs. Jacobs's minimum monthly payment was "fixed" for 12 months and could adjust every 12 months thereafter. When the amount of the minimum monthly payment is insufficient to cover the amount of interest due, then the amount of that deficiency is added onto the unpaid principal balance of their loan. The recast point of this loan is 125% of the original loan amount. This loan was originated by First Federal Bank, on the note and deed of trust First Federal Bank is identified as the lender, and OneWest Bank is currently servicing the loan.

Defendants and Loan Consultant represented to Mr. and Mrs. Jacobs that their monthly payment would always be $1,286.24. Although the amount of Mr. and Mrs. Jacobs's minimum monthly payment was $1,286.24, Defendants and Loan Consultant failed to clarify their partially true representations and advise Mr. and Mrs. Jacobs: (1) how the interest rate on their loan was calculated; (2) that the minimum monthly payment of $1,286.24 would not always be available; (3) that the minimum monthly payment would not be the permanent payment under the loan despite Defendants' and Loan Consultant's affirmative representations to the contrary; (4) that by paying the minimum monthly payment they would be definitively deferring interest on their loan, increasing the principal balance of their loan every time they made the minimum monthly payment; (5) that by paying the minimum monthly payment the principal balance of their loan

83

EXHIBIT A - PAGE 199

APPENDIX A TO COMPLAINT

was certain to increase; or (6) their loan would be recast within a few years and they would be forced to pay considerably higher payments.

The disclosures in Mr. and Mrs. Jacobs' loan documents discussing negative amortization, only frame negative amortization as a mere possibility rather than a certainty when making the minimum payment. However the reality was that by making the minimum payment, negative amortization was a certainty. Indeed, the payment schedule set forth in the Truth in Lending Disclosure Statement ("TILDS") which set forth what appeared to be the required payment schedule fails to disclose that making payments pursuant to the TILDS payment schedule will result in negative amortization. Mr. and Mrs. Jacobs were not provided, before entering into the loans, with any other payment schedule or with any informed option to make payments different than those listed in the TILDS payment schedule. Had Defendants disclosed that by making the payment pursuant to the TILDS Mr. and Mrs. Jacobs would be deferring interest, or had they disclosed the payment amounts sufficient to avoid negative amortization from occurring, Mr. and Mrs. Jacobs would not have entered into the loans. Defendants intentionally omitted a clear disclosure of the nature of Mr. and Mrs. Jacobs's loans because giving a clear explanation of how the loan worked would have punctured the illusion of a low-payment, low interest rate loan.

Further, Defendants and Loan Consultant advised them that they were eligible for a Low Doc Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low documentation requirement to fraudulently inflate their income by $4,630.00, a factor of 97%; and in doing so, Defendants and Loan Consultant caused them to be placed into a loan whose payments they could not afford given their true, un-inflated monthly income. Defendants and Loan Consultant altered Mr. and Mrs. Jacobs's loan application without their knowing consent or authorization as Loan Consultant completed Mr. and Mrs. Jacobs' application without giving Mr. and Mrs. Jacobs an opportunity to review the loan application.

Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Jacobs that they could afford their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts; yet failed to

84

APPENDIX A TO COMPLAINT

disclose that the fully amortized monthly payment on the loan was $2,116.69. Given Mr. and Mrs. Jacobs's true monthly income of $4,750.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 45%- grossly in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Mr. and Mrs. Jacobs that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Jacobs's lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income, and because Mr. and Mrs. Jacobs reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Jacobs should be shouldering was, Mr. and Mrs. Jacobs reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

Although Defendants and the Loan Consultant represented to Mr. and Mrs. Jacobs that they were "qualified" for their loan and could afford their loan and its monthly payments, Defendants and the Loan Consultant misled Mr. and Mrs. Jacobs into believing that their monthly payments would always only be $1,286.24. Furthermore, at no point did Defendants or Loan Consultant clarify Mr. and Mrs. Jacobs's false belief and advise them that $1,286.24 would not be their permanent payment under the loan, or that every time they made a monthly payment in the amount of $1,286.24, which is less than interest only, they would be deferring interest on their loan, increasing the principal balance of their loan.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around April 7, 2005, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Jacobs' home, which was fraudulently inflated to an intentionally overstated value. Mr. and Mrs. Jacobs's loan documentation indicates that their home was worth $500,000.00 at the time they entered into their loan. The current fair market value of Mr. and Mrs. Jacobs's home is approximately $362,015.00. Mr. and Mrs. Jacobs allege that the appraisal

85

EXHIBIT A - PAGE 201

**APPENDIX A TO COMPLAINT**

was artificially inflated, and that they have suffered damages in the amount of $137,900.00 ($500,000.00-$362,015.00) due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Loan Consultant also represented to Mr. and Mrs. Jacobs that they would be able to refinance their loan at a later time. Mr. and Mrs. Jacobs relied on this assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Jacobs have not been able to refinance their loan. Defendants and Loan Consultant also represented that it would modify Mr. and Mrs. Jacobs's loan, and Mr. and Mrs. Jacobs relied on this representation in deciding to enter into the loan.

In or around late 2010, Mr. and Mrs. Jacobs experienced financial hardship. With that regard, Mr. and Mrs. Jacobs contacted Defendants for assistance in a loan modification. Mr. and Mrs. Jacobs have applied for a loan modification on multiple occasions. At all relevant times Mr. and Mrs. Jacobs submitted all documents in a timely fashion and whenever Defendants requested. Throughout the entire loan modification process, Mr. and Mrs. Jacobs were never assigned to a single point of contact. Every time Mr. and Mrs. Jacobs called Defendants for a status update, Mr. and Mrs. Jacobs bounced from one representative to another, which caused to delay their loan modification. Having to go through several loan modifications, Mr. and Mrs. Jacobs's credit scores was ruined. Mr. and Mrs. Jacobs have suffered damages in the loss of their credit scores, which reduced availability and increased cost of goods and services that are tied to credit rating.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mr. and Mrs. Jacobs could afford the loan; (4) they were "qualified" for their loan; (5) "qualified" meant that they could afford their loan; (6) Defendants would modify their loan in the future; and (7) they would be able to refinance their loan in the future.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Mr. and Mrs. Jacobs that: (1) Defendants and Loan Consultant

86

APPENDIX A TO COMPLAINT

knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they were being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mr. and Mrs. Jacobs's home to require them to borrow more money with the knowledge that the true value of Mr. and Mrs. Jacobs's home was insufficient to justify the amount of Mr. and Mrs. Jacobs's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Jacobs would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Jacobs's loan were concealed from them, and they decided to move forward with their loan. On April 7, 2005, Mr. and Mrs. Jacobs signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mr. and Mrs. Jacobs would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Jacobs have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Jacobs entered into the loan their home was worth $500,000.00, now their home is worth approximately $362,015.00. Mr. and Mrs. Jacobs did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around October 17, 2011.

27.     Plaintiff Donna Casty ("Casty") discussed obtaining a mortgage to purchase her home located at 5329 E Flagstone Street, Long Beach, CA 90808, A.P.N.:7189-010-016 with

87

APPENDIX A TO COMPLAINT

Jenny Van Derimissen, a Derimissen ("Derimissen") with IndyMac Bank and Defendants herein ("Defendants") in or around July 2007. In the course of their discussions ranging from July 2007 until September 2007, Defendants and Derimissen steered her into a fixed rate mortgage in the amount of $417,000.00 with an interest rate at 60375% for a term of 30 years. Little did Casty know, however, payments made during the first 10 years of her loan were Interest-Only. This loan was originated by IndyMac Bank, on the note and deed of trust IndyMac Bank is identified as the lender, and IndyMac Mortgage Services, a division of OneWest Bank is currently servicing the loan.

Defendants and Derimissen represented to Casty that her monthly payment would always be $2,215.31. Although the amount of Derimissen's monthly payment was $2,215.31, Defendants and Derimissen failed to clarify their partially true representations and advise Casty that: (1) her monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) her monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of her monthly payment would not remain "fixed" for the entire term of the loan.

Further, Defendants and Derimissen advised her that she was eligible for a Low Doc Loan. Unbeknownst to her at the time, Defendants and Derimissen used this low documentation requirement to fraudulently inflate her income; and in doing so, Defendants and Derimissen caused her to be placed into a loan whose payments she could not afford given her true, un-inflated monthly income. Defendants and Derimissen altered Casty's loan application without her knowing consent or authorization as Derimissen completed Casty's application without giving Casty an opportunity to review the loan application.

Defendants and Derimissen also explicitly represented to Casty that she could afford her loan and further represented that she could shoulder the additional financial burden of repaying her loan in consideration of her other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $2,601.54. Defendants and Derimissen further represented to Casty that she could rely on the assessment that she was "qualified" to mean that she could afford the loan. Because of Casty's lack of familiarity with how much debt a person can and

88

EXHIBIT A - PAGE 204

APPENDIX A TO COMPLAINT

should reasonably take on compared to her monthly income, and because Casty reasonably relied on Defendants' and Derimissen's expertise that any payment she was "qualified" for would take into account what the maximum debt a person such as Casty should be shouldering was, Casty reasonably believed Defendants' and Derimissen's representations that she could afford her loan and its payments.

In addition, Defendants and Derimissen represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around September 3, 2007, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Casty's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Derimissen represented that, per appraisal, Casty's home was worth $650,000.00 at the time she entered into her loan, and that such a valuation was a true and correct measure of her home's worth. The current fair market value of Casty's home is approximately $395,250.00. Casty alleges that the appraisal was artificially inflated, and that she has suffered damages in the amount of $254,750.00 ($650,000.00-$395,250.00) due to a substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Derimissen also represented to Casty that she would be able to refinance her loan at a later time. Casty relied on this assurance in deciding to enter into the mortgage contract. However, Casty has not been able to refinance her loan. Defendants and Derimissen also represented that it would modify Casty's loan, and Casty relied on this representation in deciding to enter into the loan. However, Defendants refused to permanently modify her loan. Casty has applied for a loan modification on 6 separate occasions. At all time during the loan modification process, Casty always submitted all documents in a timely fashion and whenever Defendants requested. However, Defendants never modified Casty's loan modification.

Furthermore, Defendants and Derimissen represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Casty could afford the loan; (4) she was "qualified" for her loan; (5) "qualified" meant that she could afford her loan; (6) Defendants would modify her loan in the future; and (7)

89

EXHIBIT A - PAGE 205

APPENDIX A TO COMPLAINT

Defendants would refinance her loan in the future.

Moreover, Defendants and Derimissen withheld or incompletely, inaccurately or otherwise improperly disclosed to Casty that: (1) Defendants and Derimissen knew that she could not and would not be able to afford her loan and that there was a very high probability that she would default and/or be foreclosed upon; (2) Defendants had an incentive to sell her loan, and did sell her loan at fraudulently inflated prices; (3) Defendants' and Derimissen's "qualification" process was for Defendants' own protection and not hers; (4) that Defendants' and Derimissen's representations that she was "qualified" to pay her loan was not intended to communicate that she could actually "afford" the loan which she was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Casty's home to require her to borrow more money with the knowledge that the true value of Casty's home was insufficient to justify the amount of Casty's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Casty would lose substantial equity in her home.

Based on these misrepresentations and omissions, the material facts concerning Casty's loan were concealed from her, and she decided to move forward with her loan. On September 24, 2007, Casty signed the loan and Deed of Trust, before a notary. Had she known the truth however, Casty would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Casty has lost substantial equity in her home, has damaged or destroyed credit, and at the time Casty entered into the loan her home was worth $650,000.00, now her home is worth approximately $395,250.00. Casty did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around October 21, 2011.

28.    Plaintiffs William Bartel and Winifred Bartel ("Mr. and Mrs. Bartel") discussed

90

APPENDIX A TO COMPLAINT

refinancing an existing mortgage on their property located at 22140 Tanager Street, Grand Terrace, CA 92313, A.P.N.:1167-291-24 with a Loan Consultant ("Loan Consultant"), a representative and authorized agent of California Heritage Financial, a correspondent of IndyMac Bank and Defendants herein (the "Defendants") and authorized by Defendants to lend on their behalf, in or around October 2006. In the course of their discussions ranging from October 2006 until December 2006, Defendants and Loan Consultant steered them into a fixed rate mortgage in the amount of $279,300.00 with an interest rate at 6.5% for a term of 30 years. This loan was originated by IndyMac Bank, on the note and deed of trust California Heritage Financial is identified as the lender, and OneWest Bank is currently servicing the loan.

Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Bartel that they could afford their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts. Defendants and Loan Consultant also represented to them that they could afford a $1,765.37 monthly payment, despite their $5,500.00 true monthly income (a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 32%). Defendants and Loan Consultant further represented to Mr. and Mrs. Bartel that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Bartel's lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income, and because Mr. and Mrs. Bartel reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Bartel should be shouldering was, Mr. and Mrs. Bartel reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around December 2, 2006, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Bartel's home, which was fraudulently inflated an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Mr. and Mrs.

91

APPENDIX A TO COMPLAINT

Bartel's home was worth $230,000.00 at the time they entered into their loan, and that such a valuation was a true and correct measure of their home's worth. The current fair market value of Mr. and Mrs. Bartel's home is approximately $148,665.00. Mr. and Mrs. Bartel allege that the appraisal was artificially inflated, and that they have suffered damages in the amount of $81,335.00 ($230,000.00-$148,665.00) due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Loan Consultant also represented to Mr. and Mrs. Bartel that they would be able to refinance their loan at a later time. Mr. and Mrs. Bartel relied on this assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Bartel have not been able to refinance their loan. Defendants and Loan Consultant also represented that it would modify Mr. and Mrs. Bartel's loan, and Mr. and Mrs. Bartel relied on this representation in deciding to enter into the loan.

However, Mr. and Mrs. Bartel never received any loan modifications when they sought Defendants' assistance in repaying their loan. In or around 2010, Mr. and Mrs. Bartel's heating and air condition business experienced a downturn that caused them to lose a substantial portion of their income to repay their mortgage. In addition, Mr. Bartel was in precarious health condition. His health deteriorated in 2010 and had an open heart surgery shortly thereafter. Due to this, Mr. and Mrs. Bartel seriously suffered financial hardship. In that regard, Mr. and Mrs. Bartel contacted Defendants for assistance in a loan modification. Throughout the loan modification process, Defendants intentionally delayed the modification process by repeatedly requesting Mr. and Mrs. Bartel to furnish them the same documentation, with which Mr. and Mrs. Bartel fully complied. As of now Defendants have not yet modified Mr. and Mrs. Bartel's loan.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mr. and Mrs. Bartel could afford the loan; (4) they were "qualified" for their loan; (5) "qualified" meant that they could afford their loan; (6) Defendants would modify

92

**APPENDIX A TO COMPLAINT**

their loan in the future; and (7) they would be able to refinance their loan in the future.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Mr. and Mrs. Bartel that: (1) Defendants and Loan Consultant knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they were being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mr. and Mrs. Bartel's home to require them to borrow more money with the knowledge that the true value of Mr. and Mrs. Bartel's home was insufficient to justify the amount of Mr. and Mrs. Bartel's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Bartel would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Bartel's loan were concealed from them, and they decided to move forward with their loan. On December 21, 2006, Mr. and Mrs. Bartel signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mr. and Mrs. Bartel would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Bartel have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Bartel entered into the loan their home was worth $230,000.00, now their home is worth approximately $148,665.00. Mr. and Mrs. Bartel did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this

93

EXHIBIT A - PAGE 209

**APPENDIX A TO COMPLAINT**

complaint, were brought to light on or around October 28, 2011.

29.     Plaintiffs Gary Milleman and Rosalinda Milleman ("Mr. and Mrs. Milleman") refinanced an existing mortgage on their property located at 17163 East Tudor Street, Covina, CA 91722 and APN: 8409-009-012 with U.S Financial Funding on April 27, 2007. Mr. and Mrs. Milleman were steered into an adjustable rate mortgage in the amount of $400,000.00 with an interest rate at 6.75% for a term of 30 years. Little did Mr. and Mrs. Milleman know, however, their loan was a negatively amortized PayOption ARM. Mr. and Mrs. Milleman were not advised that the interest rate was "fixed" for 7 years and could adjust every 12 months thereafter. The amount of Mr. and Mrs. Milleman's minimum monthly payment was "fixed" for 7 years and will change once thereafter and will remain the same for another 3 years. When the amount of the minimum monthly payment is insufficient to cover the amount of interest due, then the amount of that deficiency is added onto the unpaid principal balance of their loan. The recast point of this loan is 115% of the original loan amount. On the note and deed of trust U.S Financial Funding Incorporation is identified as the lender. Shortly thereafter the loan was then transferred to IndyMac Bank, a division of OneWest Bank and Defendants herein (the "Defendants"). OneWest Bank is currently servicing the loan.

Mr. and Mrs. Milleman were represented that their monthly payment would always be $1,297.19. Although the amount of Mr. and Mrs. Milleman's minimum monthly payment was $1,297.19, Mr. and Mrs. Milleman was not fully advised that: (1) how the interest rate on their loan was calculated; (2) that the minimum monthly payment of $1,297.19 would not always be available; (3) that the minimum monthly payment would not be the permanent payment under the loan despite Defendants' and Loan Consultant's affirmative representations to the contrary; (4) that by paying the minimum monthly payment they would be definitively deferring interest on their loan, increasing the principal balance of their loan every time they made the minimum monthly payment; (5) that by paying the minimum monthly payment the principal balance of their loan was certain to increase; or (6) their loan would be recast within a few years and they would be forced to pay considerably higher payments.

Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Milleman

94

**APPENDIX A TO COMPLAINT**

that they could afford their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $2,594.39. Given Mr. and Mrs. Milleman's true monthly income of $4,200.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 62% - in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Not to mention Mr. and Mrs. Milleman incurred other Defendants and Loan Consultant further represented to Mr. and Mrs. Milleman that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Milleman's lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income, and because Mr. and Mrs. Milleman reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Milleman should be shouldering was, Mr. and Mrs. Milleman reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

The loan has the minimum payment of $1,297.19. Mr. and Mrs. Milleman had been paying the minimum payment for 4 years before Defendants took away Mr. and Mrs. Milleman's minimum payment option on November 21, 2011 and gave Mr. and Mrs. Milleman an option to make the interest-only payment of $2,585.65.

Acting as servicers of the loan, Defendants unfairly misled Mr. and Mrs. Milleman into believing the interest rate on the loan was 2%. The records show inconsistencies in their mortgage statements with regard to the interest rate, which was bounced back and forth between the interest rate of 6.75% and 2%. For example, the mortgage statement for July 2012 listed the interest rate as 6.75%; however, the mortgage statement for May 2012 showed 2% and June 2012 showed 6.75% again. The inconsistences confused Mr. and Mrs. Milleman about their interest rate on the loan. Because of Mr. and Mrs. Milleman's lack of familiarity with how the interest rate is calculated and what type of loan they had, Mr. and Mrs. Milleman did not find anything unusual about their mortgage statements and continued to faithfully keep making the

95

**APPENDIX A TO COMPLAINT**

payment as they were instructed.

In the beginning of 2009 Mr. Milleman was disable that prevented him from performing at work in full power causing a serious reduction in Mr. and Mrs. Milleman's income. Mr. and Mrs. Milleman fell behind on their loan. Around this time, Mr. and Mrs. Milleman started to apply for a loan modification. However, Defendants in their capacity as servicers were plodding along throughout the loan modification process. Defendants kept misplacing documents and repeatedly demanded Mr. and Mrs. Milleman submit the same documents over and over.

Acting as servicers of the loan, Defendants sent Mr. and Mrs. Milleman the mortgage statement for the month of September 2011 with the outrageous amount of $5,311.06. Mr. and Mrs. Milleman had to spend many hours over the phone with Defendants on getting the errors fixed.

Pending the loan modification, Mr. and Mrs. Milleman were hit by the payment shock. When Mr. and Mrs. Milleman were struggling to make the minimum payment, on November 21, 2011 Defendants took away Mr. and Mrs. Milleman's minimum payment option increasing the monthly payment from $1,297.19 to $2,585.65. At this point, Mr. and Mrs. Milleman hit rock bottom with the mortgage and other existing debts. They continuously received notices from Defendants that they were in serious default on their loan.

After 2 years of repetitively sending the same documents and got misplaced, Mr. and Mrs. Milleman were placed in a 3-month Trial Payment Plan and got his loan modified.

On April 27, 2007, Mr. and Mrs. Milleman signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mr. and Mrs. Milleman would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Milleman have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Milleman entered into the loan their home was worth $500,000.00, now their home is worth approximately $263,245.00. Mr. and Mrs. Milleman did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described

96

**APPENDIX A TO COMPLAINT**

throughout this complaint, were brought to light on or around November 4, 2011. (True and correct copies of the aforementioned documents are attached here to as *Exhibit 12*).

30.     Plaintiff Elgitha Baldonado ("Baldonado") entered into a mortgage contract to purchase her home located at 417 Bristol Way, Corona, CA 92879, A.P.N.: 172-270-019 withIndyMac Bank and Defendants herein (the "Defendants") in July 30, May 2007. In the course of their discussions, Defendants and Loan Consultant steered her into an adjustable rate mortgage in the amount of $444,000.00 with an interest rate at 6% for a term of 30 years. Little did Baldonado know, however, payments made during the first 10 years of her loan were Interest-Only. Baldonado also was not advised that her interest rate was "fixed" for only 5 years, and could adjust every year thereafter. In addition, Defendants and Loan Consultant also steered Baldonado into a piggy-back loan in the amount of $55,500.00 with an interest rate of 8% for a term of 15 years. However, this is a balloon loan in which the loan is amortized over 30 years, but Baldonado has to pay off the loan with a lump sum amount at the 15th year of the loan. These loans were originated by IndyMac Bank, on the note and deed of trust IndyMac Bank is identified as the lender, and Indymac Mortgage Services, a division of OneWest Bank is currently servicing the loans.

Defendants and Loan Consultant represented to Baldonado that her monthly payment would always be $2,220.00. Although the amount of Baldonado's monthly payment was $2,220.00, Defendants and Loan Consultant failed to clarify their partially true representations and advise Baldonado that: (1) her monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) her monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of her monthly payment would not remain "fixed" for the entire term of the loan.

Defendants and Loan Consultant also explicitly represented to Baldonado that she could afford her loan and further represented that she could shoulder the additional financial burden of repaying her loan in consideration of her other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $2,701.67 on the first loan and $407.24 on the balloon loan, resulting a total of $3,108.91. Given Baldonado's true monthly income of

97

EXHIBIT A - PAGE 213

**APPENDIX A TO COMPLAINT**

$4,000.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 77%- in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Baldonado that she could rely on the assessment that she was "qualified" to mean that she could afford the loan. Because of Baldonado's lack of familiarity with how much debt a person can and should reasonably take on compared to her monthly income, and because Baldonado reasonably relied on Defendants' and Loan Consultant's expertise that any payment she was "qualified" for would take into account what the maximum debt a person such as Baldonado should be shouldering was, Baldonado reasonably believed Defendants' and Loan Consultant's representations that she could afford her loan and its payments.

Although Defendants and Loan Consultant represented to Baldonado that she was "qualified" for her loan and could afford her loan and its monthly payments, Defendants and Loan Consultant misled Baldonado into believing that her monthly payments would always only be $2,220.00. Furthermore, at no point did Defendants or Loan Consultant clarify Baldonado's false belief and advise her that $2,220.00 would not be her permanent payment under the loan, or that every time she made a monthly payment in the amount of $2,220.00, she was not paying down any of her principal balance.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around July 5, 2007, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Baldonado's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Baldonado's home was worth $500,000.00 at the time she entered into her loan, and that such a valuation was a true and correct measure of her home's worth. The current fair market value of Baldonado's home is approximately $266,900.00. Baldonado alleges that the appraisal was artificially inflated, and that she has suffered damages in the amount of $233,100.00 ($500,000.00-$266,900.00) due to a substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other

**APPENDIX A TO COMPLAINT**

acts described herein.

Defendants and Loan Consultant also represented to Baldonado that she would be able to refinance her loan at a later time. Baldonado relied on this assurance in deciding to enter into the mortgage contract. However, Baldonado has not been able to refinance her loan. Defendants and Loan Consultant also represented that it would modify Baldonado's loan, and Baldonado relied on this representation in deciding to enter into the loan.

In or around 2009 Baldonado contacted Defendants and began the loan modification review process. During all relevant times, Baldonado provided all loan documents in timely fashion and whenever Defendants requested them. In addition, Defendants assigned different loan modification specialists to Baldonado's file.

When Baldonado contacted Defendants for assistance in repaying the loan in 2009, Baldonado was told that if she continued to make payments, she would not be eligible for a loan modification. Baldonado relied on Defendants' and Defendants' representative and authorized agent's advice and stopped making 3 monthly payments. After Baldonado had been 3 month in arrears, Defendants' representative called Baldonado to "open and activate a loan modification file." In or around late 2009 Baldonado was approved for a permanent loan modification.

Although Baldonado was in a loan modification, in the beginning of 2010 Baldonado lost her job, causing a substantial drop in her income. Due to this, Baldonado re-applied for another loan modification that could better help her dire financial circumstances. Defendants rejected her loan modification. In or around early 2011, Baldonado was also unsuccessful on her third attempt on getting the loan modified under the Making Home Affordable Program ("HAMP") with Defendants.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Baldonado could afford the loan; (4) she was "qualified" for her loan; (5) "qualified" meant that she could afford her loan; (6) Defendants would modify her loan in the future; and (7) she would be able to refinance her loan in the future.

99

EXHIBIT A - PAGE 215

**APPENDIX A TO COMPLAINT**

Based on these misrepresentations and omissions, the material facts concerning Baldonado's loan were concealed from her, and she decided to move forward with her loan. On July 30, 2007, Baldonado signed the loan and Deed of Trust, before a notary. Had she known the truth however, Baldonado would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Baldonado has lost substantial equity in her home, has damaged or destroyed credit, and at the time Baldonado entered into the loan her home was worth $500,000.00, now her home is worth approximately $266,900.00. Baldonado did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around November 23, 2011.

31.     Plaintiffs Khalil Subat and Manija Subat ("Mr. and Mrs. Subat") discussed refinancing an existing mortgage on their home located at 7330 Cerritos Avenue, Stanton, CA 90680 and A.P.N.:079-541-55 with a loan consultant (the "Loan Consultant"), and representative and authorized agent of Defendants herein (the "Defendants") in or around April 2006. In the course of their discussions ranging from April 2006 until June 2006, Defendants and Loan Consultant steered them into a loan of which the Defendants and Loan Consultant concealed and inaccurately, incompletely or otherwise improperly disclosed the material terms and information concerning the loan. This loan was originated by IndyMac Bank, on the note and deed of trust Greenpoint Mortgage Funding Incorporation is identified as the lender, and IndyMac Mortgage Services, a division of OneWest Bank is currently servicing the loan.

Defendants and Loan Consultant explicitly represented to Mr. and Mrs. Subat that they could afford their loan; and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts. Loan Consultant and Defendants further represented to Mr. and Mrs. Subat that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Subat's lack of familiarity with how much debt a person can and should reasonably take on compared to his/her monthly income, and because Mr. and Mrs. Subat reasonably relied on Defendants' and

100

**APPENDIX A TO COMPLAINT**

Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Subat should be shouldering was, Mr. and Mrs. Subat reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. An appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Subat's home, which was fraudulently inflated to an intentionally overstated value. Mr. and Mrs. Subat allege that the appraisal was artificially inflated, and that they have suffered damages due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

Loan Consultant and Defendants also represented to Mr. and Mrs. Subat that they would be able to refinance their loan at a later time. Mr. and Mrs. Subat relied on this assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Subat have not been able to refinance their loan. Loan Consultant and Defendants also represented that it would modify Mr. and Mrs. Subat's loan, and Mr. and Mrs. Subat relied on this representation in deciding to enter into the loan. In addition, Mr. and Mrs. Subat were advised by a representative and authorized agent of Defendants to stop making payments in order to be eligible for a modification. Mr. and Mrs. Subat relied on the Defendants' and the Defendants representative and authorized agents' advice and stopped making their monthly payments causing them to fall even further behind. However, Mr. and Mrs. Subat were unable to modify their loan.

Furthermore, Loan Consultant and Defendants represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mr. and Mrs. Subat could afford the loan; (4) They were "qualified" for their loan; (5) "qualified" meant that they could afford their loan; (6) They would be able to modify their loan in the future; and (7) They would be able to refinance their loan in the future.

Moreover, Loan Consultant and Defendants withheld or incompletely, inaccurately or

101

EXHIBIT A - PAGE 217

**APPENDIX A TO COMPLAINT**

otherwise improperly disclosed to Mr. and Mrs. Subat that: (1) Loan Consultant and Defendants knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Loan Consultant's and Defendants' "qualification" process was for Defendants' own protection and not theirs; (4) That Loan Consultant's and Defendants' representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mr. and Mrs. Subat's home to require them to borrow more money with the knowledge that the true value of Mr. and Mrs. Subat's home was insufficient to justify the amount of Mr. and Mrs. Subat's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Subat would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Subat's loan were concealed from them, and they decided to move forward with their loan. On June 26, 2006, Mr. and Mrs. Subat signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mr. and Mrs. Subat would not have accepted the loan. As a result of the Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Subat have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Subat entered into the loan their home was worth substantially more than its current fair market value. Mr. and Mrs. Subat did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around December 22, 2011.

32.     Plaintiff Rose Chapman ("Chapman") refinanced an existing mortgage on her

EXHIBIT A - PAGE 218

APPENDIX A TO COMPLAINT

property located at 6127 Faust Avenue, Lakewood, CA 90713, A.P.N.:7166-003-010 with AKT American Capital Corporation on July 13, 2007. In the course of their discussions, Chapman was steered into a fixed rate mortgage in the amount of $525,000.00 with an interest rate at 7.5% for a term of 30 years. Little did Chapman know, however, payments made during the first 10 years of her loan were Interest-Only. On the note and deed of trust AKT American Capital Corporation is identified as the lender, and OneWest Bank is currently servicing the loan.

Chapman was represented that her monthly payment would always be $3,281.25. Although the amount of Chapman's monthly payment was $3,281.25, she was not informed that: (1) her monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) her monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of her monthly payment would not remain "fixed" for the entire term of the loan.

Chapman was represented that she could afford her loan and further represented that she could shoulder the additional financial burden of repaying her loan in consideration of her other existing debts. That was not true. Her fully amortized monthly payment on the loan was $4,229.36. Given Chapman's true monthly income of $8,974.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 47%- in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines.

In addition, on or around June 26, 2007, an appraisal company conducted an appraisal on Chapman's home, which was fraudulently inflated to an intentionally overstated value. Chapman was represented that, per appraisal, Chapman's home was worth $750,000.00 at the time she entered into her loan, and that such a valuation was a true and correct measure of her home's worth. The current fair market value of Chapman's home is approximately $386,948.90. Chapman alleges that the appraisal was artificially inflated, and that she has suffered damages in the amount of $363,051.10 ($750,000.00-$386,948.00) due to a substantial loss of equity in her home as a result of entering into the loan.

When Chapman was experiencing financial difficulties, she contacted Defendants in

103

EXHIBIT A - PAGE 219

## APPENDIX A TO COMPLAINT

repaying the loan. When Chapman entered into a discussion with Defendants' representative, Chapman was advised by Defendants and a representative and authorized agent of Defendants, to stop making payments in order to be eligible for a modification. Chapman relied on Defendants' and Defendants' representative and authorized agent's advice and stopped making her monthly payments causing her to fall even further behind. However, Defendants refused to permanently modify her loan.

Based on these misrepresentations and omissions, the material facts concerning Chapman's loan were concealed from her, and she decided to move forward with her loan. On July 15, 2007, Chapman signed the loan and Deed of Trust, before a notary. Had she known the truth however, Chapman would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Chapman has lost substantial equity in her home, has damaged or destroyed credit, and at the time Chapman entered into the loan her home was worth $750,000.00, now her home is worth approximately $386,948.00. Chapman did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around December 29, 2011.

33.     Plaintiff Genaro Larios ("Larios") refinanced an existing mortgage on his property located at 957 West Mission Boulevard Apartment D, Pomona, CA 91766 and APN.:8342-011-014 with Mortgageit Incorporation on October 27, 2006. In the course of their discussions ranging, Larios was steered him into an adjustable rate mortgage in the amount of $484,000.00 with an interest rate at 1.25% for a term of 40 years. Little did Larios know, however, his loan was a negatively amortized PayOption ARM. Larios was not advised that the interest rate was never "fixed" but applied to only his first monthly payment and could adjust every month thereafter. The amount of Larios's minimum monthly payment was "fixed" for 12 months and could adjust every 12 months thereafter. When the amount of the minimum monthly payment is insufficient to cover the amount of interest due, then the amount of that deficiency is added onto the unpaid principal balance of his loan. The recast point of this loan is 115% of the

104

APPENDIX A TO COMPLAINT

original loan amount. This loan has a prepayment penalty of 3 years. In addition, he was steered into a "piggy-back" loan in the amount of $60,500.00 for a term of 15 years. IndyMac Federal Bank was assigned the interest in Larios' deed of trust loan was assigned to IndyMac Federal Bank and Defendants. IndyMac Federal Bank and Defendants herein became the servicer of Larios' loan.

Larios was represented that that his monthly payment would always be $1,281.85. Although the amount of Larios' minimum monthly payment was $1,281.85, Larios was not clearly explained that: (1) how the interest rate on his loan was calculated; (2) that the minimum monthly payment of $1,281.85 would not always be available; (3) that the minimum monthly payment would not be the permanent payment under the loan despite Larios was represented otherwise; (4) that by paying the initial minimum monthly payment he would be definitively deferring interest on his loan, increasing the principal balance of his loan every time he made the minimum monthly payment; (5) that by paying the minimum monthly payment the principal balance of his loan was certain to increase; or (6) his loan would be recast within a few years and he would be forced to pay considerably higher payments.

The disclosures in Larios' loan documents discussing negative amortization, only frame negative amortization as a mere possibility rather than a certainty when making the minimum payment. However the reality was that by making the minimum payment, negative amortization was a certainty. Indeed, the payment schedule set forth in the Truth in Lending Disclosure Statement ("TILDS") which set forth what appeared to be the required payment schedule fails to disclose that making payments pursuant to the TILDS payment schedule will result in negative amortization. Larios was not provided, before entering into the loans, with any other payment schedule or with any informed option to make payments different than those listed in the TILDS payment schedule. Had Defendants disclosed that by making the payment pursuant to the TILDS Larios would be deferring interest, or had they disclosed the payment amounts sufficient to avoid negative amortization from occurring, Larios would not have entered into the loans. Defendants intentionally omitted a clear disclosure of the nature of Larios' loans because giving a clear explanation of how the loan worked would have punctured the illusion of a low-payment, low

105

EXHIBIT A - PAGE 221

**APPENDIX A TO COMPLAINT**

interest rate loan.

Further, Defendants and Loan Consultant advised him that he was eligible for a Low Doc Loan. Unbeknownst to him at the time, Defendants and Loan Consultant used this low documentation requirement to fraudulently inflate his income; and in doing so, Defendants and Loan Consultant caused him to be placed into a loan whose payments he could not afford given his true, un-inflated monthly income. Defendants and Loan Consultant altered Larios' loan application without his knowing consent or authorization as Loan Consultant completed Larios' application without giving Larios an opportunity to review the loan application.

Defendants and Loan Consultant also explicitly represented to Larios that he could afford his loan and further represented that he could shoulder the additional financial burden of repaying his loan in consideration of his other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $3,498.19. Given Larios's true monthly income of $2,083.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 168%- grossly in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Larios that he could rely on the assessment that he was "qualified" to mean that he could afford the loan. Because of Larios's lack of familiarity with how much debt a person can and should reasonably take on compared to his monthly income, and because Larios reasonably relied on Defendants' and Loan Consultant's expertise that any payment he was "qualified" for would take into account what the maximum debt a person such as Larios should be shouldering was, Larios reasonably believed Defendants' and Loan Consultant's representations that he could afford his loan and its payments.

Although Defendants and the Loan Consultant represented to Larios that he was "qualified" for his loan and could afford his loan and its monthly payments, Defendants and the Loan Consultant misled Larios into believing that his monthly payments would always only be $1,281.85. Furthermore, at no point did Defendants or Loan Consultant clarify Larios' false belief and advise him that $1,281.85 would not be his permanent payment under the loan, or that every time he made a monthly payment in the amount of $1,281.85, which is less than interest

106

EXHIBIT A - PAGE 222

APPENDIX A TO COMPLAINT

only, he would be deferring interest on his loan, increasing the principal balance of his loan.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around October 5, 2006, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Larios' home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Larios' home was worth $360,000.00 at the time he entered into his loan, and that such a valuation was a true and correct measure of his home's worth. The current fair market value of Larios' home is approximately $199,920.00. Larios alleges that the appraisal was artificially inflated, and that he has suffered damages in the amount of $160,080.00 ($360,000.00-$199,920.00) due to a substantial loss of equity in his home as a result of Defendants' fraudulent inflation and other acts described herein.

In or around March 2009, Defendants became the servicer of Larios' loan. Around the same time, Larios experienced financial hardship and defaulted on his loan. He really needed help. In that regard, Larios contacted Defendants for assistance in a loan modification. However, Larios was advised by Representative's, a representative and authorized agent of Defendants, to stop making payments in order to be eligible for a modification. Larios relied on Defendants' and Defendants' Representative's advice and stopped making his monthly payments causing him to fall even further behind. However, Defendants refused to permanently modify his loan because the investor who owned Larios' loan did not approve to modify his loan.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Larios could afford the loan; (4) he was "qualified" for his loan; (5) "qualified" meant that he could afford his loan; (6) Defendants would modify his loan in the future; and (7) he would be able to refinance his loan in the future.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Larios that: (1) Defendants and Loan Consultant knew that he could not and would not be able to afford his loan and that there was a very high probability that

107

APPENDIX A TO COMPLAINT

he would default and/or be foreclosed upon; (2) Defendants had an incentive to sell his loan, and did sell his loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not his; (4) that Defendants' and Loan Consultant's representations that he was "qualified" to pay his loan was not intended to communicate that he could actually "afford" the loan which he was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Larios' home to require him to borrow more money with the knowledge that the true value of Larios' home was insufficient to justify the amount of Larios' loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Larios would lose substantial equity in his home.

Based on these misrepresentations and omissions, the material facts concerning Larios' loan were concealed from him, and he decided to move forward with his loan. On October 27, 2006, Larios signed the loan and Deed of Trust, before a notary. Had he known the truth however, Larios would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Larios has lost substantial equity in his home, has damaged or destroyed credit, and at the time Larios entered into the loan his home was worth $360,000.00, now his home is worth approximately $199,920.00. Larios did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around January 10, 2012.

34. Plaintiff Silvia Medina Rivera ("Rivera") refinanced an existing mortgage on her property located at 14633 Demblon Street, Baldwin Park, CA 91706 and APN.: 8415-019-030 with A-Z Financial Services Incorporation in March 21, 2007. In the course of their discussions, Rivera was steered her into an adjustable rate mortgage in the amount of $376,000.00 with an interest rate at 1.2% for a term of 30 years. Little did Rivera know, however, her loan was a

108

EXHIBIT A - PAGE 224

APPENDtX A TO COMPLAtNT

negatively amortized PayOption ARM. Rivera was not advised that the interest rate was never "fixed" but applied to only her first monthly payment and could adjust every month thereafter. The amount of Rivera's minimum monthly payment was "fixed" for 12 months and could adjust every 12 months thereafter. When the amount of the minimum monthly payment is insufficient to cover the amount of interest due, then the amount of that deficiency is added onto the unpaid principal balance of her loan. The recast point of this loan is 110% of the original loan amount. This loan has a prepayment penalty of 3 years. Before Rivera's first mortgage payment was due, IndyMac Bank and Defendants herein became the servicer of Rivera's loan on May 1, 2007. See Attachment Notice of Assignment, Sale or Transfer of Servicing Rights.

Rivera was represented that her monthly payment would always be $1,244.22. Although the amount of Rivera's minimum monthly payment was $1,244.22, Rivera was not clearly failed to clarify their partially true representations and advise Rivera: (1) how the interest rate on her loan was calculated; (2) that the minimum monthly payment of $1,244.22 would not always be available; (3) that the minimum monthly payment would not be the permanent payment under the loan despite Rivera was affirmatively represented to the contrary; (4) that by paying the initial minimum monthly payment she would be definitively deferring interest on her loan, increasing the principal balance of her loan every time she made the minimum monthly payment; (5) that by paying the minimum monthly payment the principal balance of her loan was certain to increase; or (6) her loan would be recast within a few years and she would be forced to pay considerably higher payments.

The disclosures in Rivera's loan documents discussing negative amortization, only frame negative amortization as a mere possibility rather than a certainty when making the minimum payment. However the reality was that by making the minimum payment, negative amortization was a certainty. Indeed, the payment schedule set forth in the Truth in Lending Disclosure Statement ("TILDS") which set forth what appeared to be the required payment schedule fails to disclose that making payments pursuant to the TILDS payment schedule will result in negative amortization. Rivera was not provided, before entering into the loans, with any other payment schedule or with any informed option to make payments different than those listed in the TILDS

109

APPENDIX A TO COMPLAtNT

payment schedule. Had Defendants disclosed that by making the payment pursuant to the TILDS Rivera would be deferring interest, or had they disclosed the payment amounts sufficient to avoid negative amortization from occurring, Rivera would not have entered into the loans. Defendants intentionally omitted a clear disclosure of the nature of Rivera's loans because giving a clear explanation of how the loan worked would have punctured the illusion of a low-payment, low interest rate loan.

Further, Rivera was advised that she was eligible for a Low Doc Loan. Unbeknownst to her at the time, Defendants used this low documentation requirement to fraudulently inflate her income; and in doing so, Defendants caused her to be placed into a loan whose payments she could not afford given her true, un-inflated monthly income. Defendants altered Rivera's loan application without her knowing consent or authorization as Loan Consultant completed Rivera's application without giving Rivera an opportunity to review the loan application.

Rivera was explicitly represented that she could afford her loan and further represented that she could shoulder the additional financial burden of repaying her loan in consideration of her other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $2,860.00. Given Rivera's true monthly income of $2,218.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 129%- grossly in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants further represented to Rivera that she could rely on the assessment that she was "qualified" to mean that she could afford the loan. Because of Rivera's lack of familiarity with how much debt a person can and should reasonably take on compared to her monthly income, and because Rivera reasonably relied on Defendants' and Loan Consultant's expertise that any payment she was "qualified" for would take into account what the maximum debt a person such as Rivera should be shouldering was, Rivera reasonably believed Defendants' and Loan Consultant's representations that she could afford her loan and its payments.

Although Defendants and the Loan Consultant represented to Rivera that she was "qualified" for her loan and could afford her loan and its monthly payments, Defendants and the

110

EXHIBIT A - PAGE 226

## APPENDIX A TO COMPLAINT

Loan Consultant misled Rivera into believing that her monthly payments would always only be $1,244.22. Furthermore, at no point did Defendants or Loan Consultant clarify Rivera's false belief and advise her that $1,244.22 would not be her permanent payment under the loan, or that every time she made a monthly payment in the amount of $1,244.22 which is less than interest only, she would be deferring interest on her loan, increasing the principal balance of her loan.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On January 25, 2007, Team Appraisal, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Rivera's home, which was fraudulently inflated to $470,000 - an intentionally overstated value. The current fair market value of Rivera's home is approximately $226,763.85. Rivera alleges that the appraisal was artificially inflated, and that she has suffered damages in the amount of $243,236.15 ($470,000.00-$226,763.85) due to a substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants became the servicer of Rivera's loan in 2007. In the wake of the real estate market downsizing that has pushed millions of Americans out of workforce, Rivera experienced a cutback in her work hours that significantly reduced her income. On top of insufficient income to make the mortgage payment, Rivera was faced with an unpredictable jump in the mortgage payment due to the adjustable rate feature of the loan. In that regard, Rivera sought Defendants' assistance in repaying a loan modification.

Approximately 2 months prior to Defendants' recording a Notice of Default (October, 9, 2012) on Rivera's property, Rivera applied for a loan modification for the third time. At all relevant times, Rivera faithfully submitted all loan documents in a timely fashion and whenever Defendants requested. However, Defendants continuously and repeatedly demanded Rivera furnish the same documents and kept telling Rivera that they were missing her paperwork. After a 10-month long marathon, Defendants rejected Rivera's loan modification excusing that Rivera did not submit the requested documents. As of now Rivera has not been able to modify her loan.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in

111

EXHIBIT A - PAGE 227

APPENDIX A TO COMPLAINT

lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Rivera could afford the loan; (4) she was "qualified" for her loan; (5) "qualified" meant that she could afford her loan; (6) Defendants would modify her loan in the future; and (7) she would be able to refinance her loan in the future.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Rivera that: (1) Defendants and Loan Consultant knew that she could not and would not be able to afford her loan and that there was a very high probability that she would default and/or be foreclosed upon; (2) Defendants had an incentive to sell her loan, and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not hers; (4) that Defendants' and Loan Consultant's representations that she was "qualified" to pay her loan was not intended to communicate that she could actually "afford" the loan which she was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Rivera's home to require her to borrow more money with the knowledge that the true value of Rivera's home was insufficient to justify the amount of Rivera's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Rivera would lose substantial equity in her home.

Based on these misrepresentations and omissions, the material facts concerning Rivera's loan were concealed from her, and she decided to move forward with her loan. On March 21, 2007, Rivera signed the loan and Deed of Trust, before a notary. Had she known the truth however, Rivera would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Rivera has lost substantial equity in her home, has damaged or destroyed credit, and at the time Rivera entered into the loan her home was worth $470,000.00, now her home is worth approximately $243,236.15. Rivera did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a

112

EXHIBIT A - PAGE 228

**APPENDIX A TO COMPLAINT**

discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around February 1, 2012.

35.    Plaintiffs Alejandro Manzo and Maria Manzo ("Mr. and Mrs. Manzo") discussed refinancing an existing mortgage on their property located at 29972 Pechanga Drive, Temecula, CA 92592, A.P.N.:922-331-003 with a Loan Consultant ("Loan Consultant") with IndyMac Bank and Defendants herein ("Defendants") in or around April 2006. In the course of their discussions ranging from April 2006 until June 2006, Defendants and Loan Consultant steered them into an adjustable rate mortgage in the amount of $299,000.00 with an interest rate at 6.125% for a term of 30 years. Little did Mr. and Mrs. Manzo know, however, payments made during the first 10 years of their loan were Interest-Only. Mr. and Mrs. Manzo also was not advised that their interest rate was "fixed" for only 5 years, and could adjust every 12 months thereafter. This loan was originated by IndyMac Bank, on the note and deed of trust IndyMac is identified as the lender, and IndyMac Mortgage Services, a division of OneWest Bank was the servicer of the loan.

Defendants and Loan Consultant represented to Mr. and Mrs. Manzo that their monthly payment would always be $1,526.14. Although the amount of Mr. and Mrs. Manzo monthly payment was $1,526.14, Defendants and Loan Consultant failed to clarify their partially true representations and advise Mr. and Mrs. Manzo that: (1) their monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) their monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of their monthly payment would not remain "fixed" for the entire term of the loan.

Further, Defendants and Loan Consultant advised them that they were eligible for a Low Doc Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low documentation requirement to fraudulently inflate their income; and in doing so, Defendants and Loan Consultant caused them to be placed into a loan whose payments they could not afford given their true, un-inflated monthly income. Defendants and Loan Consultant altered Mr. and Mrs. Manzo loan application without their knowing consent or authorization as Loan Consultant completed Mr. and Mrs. Manzo application without giving Mr. and Mrs. Manzo an opportunity

113

### APPENDIX A TO COMPLAINT

to review the loan application.

Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Manzo that they could afford their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $2,265.44. Defendants and Loan Consultant further represented to Mr. and Mrs. Manzo that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Manzo lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income, and because Mr. and Mrs. Manzo reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Manzo should be shouldering was, Mr. and Mrs. Manzo reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

Although Defendants and Loan Consultant represented to Mr. and Mrs. Manzo that they were "qualified" for their loan and could afford their loan and its monthly payments, Defendants and Loan Consultant misled Mr. and Mrs. Manzo into believing that their monthly payments would always only be $1,526.14. Furthermore, at no point did Defendants or Loan Consultant clarify Mr. and Mrs. Manzo false belief and advise them that $1,526.14 would not be their permanent payment under the loan, or that every time they made a monthly payment in the amount of $1,526.14, they were not paying down any of their principal balance.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around September 2, 2006, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Manzo's home to an intentionally inflated value. The current fair market value of Mr. and Mrs. Manzo home is approximately $199,750.00. Mr. and Mrs. Manzo allege that the appraisal was artificially inflated, and that they have suffered damages due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

114

EXHIBIT A - PAGE 230

**APPENDIX A TO COMPLAINT**

In or around early 2009, Mr. and Mrs. Manzo were experiencing financial difficulty. They really needed help. In that regard, Mr. and Mrs. Manzo contacted Defendants for assistance in a loan modification. At no point during the loan modification process, Defendants assigned a single point of contact to Mr. and Mrs. Manzo's file. Then Mr. and Mrs. Manzo were approved for a trial loan modification. At all relevant times, Mr. and Mrs. Manzo submitted all documents in a timely fashion and whenever Defendants requested. Despite that Mr. and Mrs. Manzo also made their trial payments on time every month, Defendants without reasons refused to accept some of the trial payments. Defendants ultimately rejected Mr. and Mrs. Manzo's loan modification.

The foreclosure against Mr. and Mrs. Manzo was wrongful because OneWest Bank did not have authority to file a Notice of Default ("NOD") on Mr. and Mrs. Manzo's home. At the time the Notice of Default was executed on October 4, 2011 and was recorded on October 6, 2011, OneWest Bank which was listed as the beneficiary of Mr. and Mrs. Manzo's deed of trust. However, it appeared that the Assignment Deed of Trust ("ADOT") transferring the beneficial interest from IndyMac Bank to OneWest was backdated to September 7, 2011 so that it looks like the assignment was made prior to OneWest Bank's execution of the NOD. Thus, it appears that OneWest was vested with the authority to execute the NOD on October 6, 2011. The ADOT was recorded on October 6, 2011, which is the same day with NOD. A big gap between the ADOT's execution date and recording date is a redflag to ADOT's backdating, rending the subsequent NOD based on the ADOT invalid. Therefore, the foreclosure based on that NOD was wrongful.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mr. and Mrs. Manzo could afford the loan; (4) they were "qualified" for their loan; (5) "qualified" meant that they could afford their loan; (6) they would be able to modify their loan (7) Defendants would refinance their loan in the future.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

115

APPENDIX A TO COMPLAINT

otherwise improperly disclosed to Mr. and Mrs. Manzo that: (1) Defendants and Loan Consultant knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they were being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mr. and Mrs. Manzo's home to require them to borrow more money with the knowledge that the true value of Mr. and Mrs. Manzo's home was insufficient to justify the amount of Mr. and Mrs. Manzo's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Manzo would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Manzo's loan were concealed from them, and they decided to move forward with their loan. On September 25, 2006, Mr. and Mrs. Manzo signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mr. and Mrs. Manzo would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Manzo have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Manzo's home is worth approximately $199,750.00. Mr. and Mrs. Manzo did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around February 8, 2012. (True and correct copies of the aforementioned documents are attached here to as *Exhibit 13*).

36.   Plaintiff William Lowe ("Lowe") refinanced an existing mortgage on his property

116

**APPENDIX A TO COMPLAINT**

located at 334 East Imperial Highway, Los Angeles, CA 90061 and APN.:6083-005-008 with Mortgageit Incorporation on January 10, 2007. In the course of their discussions ranging from November 2006 until January 2007, Lowe was steered into an adjustable rate mortgage in the amount of $310,000.00 with an interest rate at 1.25% for a term of 30 years. Little did Lowe know, however, his loan was a negatively amortized PayOption ARM. Lowe was not advised that the interest rate was never "fixed" but applied to only his first monthly payment and could adjust every month thereafter. The amount of Lowe's minimum monthly payment was "fixed" for 12 months and could adjust every 12 months thereafter. When the amount of the minimum monthly payment is insufficient to cover the amount of interest due, then the amount of that deficiency is added onto the unpaid principal balance of his loan. The recast point of this loan is 115% of the original loan amount. This loan has a prepayment penalty of 3 years. In addition, Lowe was also steered into a "piggy-back" loan in the amount of $77,000.00 a term of 15 years. This loan was originated by Defendants, on the note and deed of trust Mortgageit is identified as the lender.

Lowe was represented that his monthly payment would always be $821.00. Although the amount of Lowe's minimum monthly payment was $821.00, Lowe was fully represented: (1) how the interest rate on his loan was calculated; (2) that the minimum monthly payment of $821.00 would not always be available; (3) that the minimum monthly payment would not be the permanent payment under the loan despite the fact that Lowe was affirmatively represented to the contrary; (4) that by paying the initial minimum monthly payment he would be definitively deferring interest on his loan, increasing the principal balance of his loan every time he made the minimum monthly payment; (5) that by paying the minimum monthly payment the principal balance of his loan was certain to increase; or (6) his loan would be recast within a few years and he would be forced to pay considerably higher payments.

The disclosures in Lowe's loan documents discussing negative amortization, only frame negative amortization as a mere possibility rather than a certainty when making the minimum payment. However the reality was that by making the minimum payment, negative amortization was a certainty. Indeed, the payment schedule set forth in the Truth in Lending Disclosure

117

**APPENDIX A TO COMPLAINT**

Statement ("TILDS") which set forth what appeared to be the required payment schedule fails to disclose that making payments pursuant to the TILDS payment schedule will result in negative amortization. Lowe was not provided, before entering into the loans, with any other payment schedule or with any informed option to make payments different than those listed in the TILDS payment schedule. Had Defendants disclosed that by making the payment pursuant to the TILDS Lowe would be deferring interest, or had they disclosed the payment amounts sufficient to avoid negative amortization from occurring, Lowe would not have entered into the loans. Defendants intentionally omitted a clear disclosure of the nature of Lowe's loans because giving a clear explanation of how the loan worked would have punctured the illusion of a low-payment, low interest rate loan.

Lowe was represented that he could afford his loan and further represented that he could shoulder the additional financial burden of repaying his loan in consideration of his other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $2,401.89. Given Lowe's true monthly income of $4,900.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 49%- in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Lowe was further represented that he could rely on the assessment that he was "qualified" to mean that he could afford the loan. Because of Lowe's lack of familiarity with how much debt a person can and should reasonably take on compared to his monthly income, and because Lowe reasonably relied on Defendants' expertise that any payment he was "qualified" for would take into account what the maximum debt a person such as Lowe should be shouldering was, Lowe reasonably believed Defendants' representations that he could afford his loan and its payments.

Although Defendants represented to Lowe that he was "qualified" for his loan and could afford his loan and its monthly payments, Defendants misled Lowe into believing that his monthly payments would always only be $821.00. Furthermore, at no point did Defendants clarify Lowe's false belief and advise him that $821.00 would not be his permanent payment under the loan, or that every time he made a monthly payment in the amount of $821.00, which

118

**APPENDIX A TO COMPLAINT**

is less than interest only, he would be deferring interest on his loan, increasing the principal balance of his loan.

In addition, Defendants represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around January 10, 2007, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Lowe's home, which was fraudulently inflated to an intentionally overstated value. The current fair market value of Lowe's home is approximately $198,616.00. Lowe alleges that the appraisal was artificially inflated, and that he has suffered damages due to a substantial loss of equity in his home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants also represented to Lowe that he would be able to refinance his loan at a later time. Lowe relied on this assurance in deciding to enter into the mortgage contract. However, Lowe has not been able to refinance his loan. Defendants also represented that it would modify Lowe's loan, and Lowe relied on this representation in deciding to enter into the loan. In addition, Lowe was advised by a representative and authorized agent of Defendants, to stop making payments in order to be eligible for a modification. Before Lowe got his loan modified, he had tried on several occasions to get a loan modification. During the loan modification process, Lowe always made trial payments and submitted loan documents in a timely fashion and whenever Defendants requested.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Lowe could afford the loan; (4) he was "qualified" for his loan; (5) "qualified" meant that he could afford his loan; (6) he would be able to modify his loan; and (7) he would be able to refinance his loan in the future.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Lowe that: (1) Defendants and Loan Consultant knew that he could not and would not be able to afford his loan and that there was a very high probability that he would default and/or be foreclosed upon; (2) Defendants had an incentive to sell his loan, and

119

EXHIBIT A - PAGE 235

**APPENDIX A TO COMPLAINT**

did sell his loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not his; (4) that Defendants' and Loan Consultant's representations that he was "qualified" to pay his loan was not intended to communicate that he could actually "afford" the loan which he was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Lowe's home to require him to borrow more money with the knowledge that the true value of Lowe's home was insufficient to justify the amount of Lowe's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Lowe would lose substantial equity in his home.

Based on these misrepresentations and omissions, the material facts concerning Lowe's loan were concealed from him, and he decided to move forward with his loan. On January 10, 2007, Lowe signed the loan and Deed of Trust, before a notary. Had he known the truth however, Lowe would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Lowe has lost substantial equity in his home, has damaged or destroyed credit, and at the time Lowe entered into the loan his home was worth substantially higher than the current market value of $198,616.00. Lowe did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around February 13, 2012.

37. Plaintiffs Charles Navarrro and Debra Navarro ("Mr. and Mrs. Navarro") discussed refinancing an existing mortgage on their property located at 27581 Vista De Dons, Dana Point, CA 92624 and APN: 691-223-12 with a Loan Consultant ("Loan Consultant") with IndyMac Bank and Defendants herein ("Defendants") in or around March 2007. In the course of their discussions ranging from March 2007 until May 2007, Defendants and Loan Consultant steered them into an adjustable rate mortgage in the amount of $910,000.00 with an interest rate

APPENDIX A TO COMPLAINT

at 6.5% for a term of 30 years. Little did Mr. and Mrs. Navarro know, however, their loan was a negatively amortized PayOption ARM. Mr. and Mrs. Navarro was not advised that the interest rate was never "fixed" but applied to only their first monthly payment and could adjust every 12 months thereafter. The amount of Mr. and Mrs. Navarro's minimum monthly payment was "fixed" for 12 months and could adjust every 12 months thereafter. When the amount of the minimum monthly payment is insufficient to cover the amount of interest due, then the amount of that deficiency is added onto the unpaid principal balance of their loan. The recast point of this loan is 115% of the original loan amount. This loan was originated by IndyMac Bank, on the note and deed of trust IndyMac Bank is identified as the lender, and IndyMac Mortgage Services, OneWest Bank was the servicer of the loan.

Defendants and Loan Consultant represented to Mr. and Mrs. Navarro that their monthly payment would always be $3,163.50. Although the amount of Mr. and Mrs. Navarro's minimum monthly payment was $3,163.50, Defendants and Loan Consultant failed to clarify their partially true representations and advise Mr. and Mrs. Navarro: (1) how the interest rate on their loan was calculated; (2) that the minimum monthly payment of $3,163.50 would not always be available; (3) that the minimum monthly payment would not be the permanent payment under the loan despite Defendants' and Loan Consultant's affirmative representations to the contrary; (4) that by paying the initial minimum monthly payment they would be definitively deferring interest on their loan, increasing the principal balance of their loan every time they made the minimum monthly payment; (5) that by paying the minimum monthly payment the principal balance of their loan was certain to increase; or (6) their loan would be recast within a few years and they would be forced to pay considerably higher payments.

The disclosures in Mr. and Mrs. Navarro's loan documents discussing negative amortization, only frame negative amortization as a mere possibility rather than a certainty when making the minimum payment. However the reality was that by making the minimum payment, negative amortization was a certainty. Indeed, the payment schedule set forth in the Truth in Lending Disclosure Statement ("TILDS") which set forth what appeared to be the required payment schedule fails to disclose that making payments pursuant to the TILDS payment

121

EXHIBIT A - PAGE 237

**APPENDIX A TO COMPLAINT**

schedule will result in negative amortization. Mr. and Mrs. Navarro were not provided, before entering into the loans, with any other payment schedule or with any informed option to make payments different than those listed in the TILDS payment schedule. Had Defendants disclosed that by making the payment pursuant to the TILDS Mr. and Mrs. Navarro would be deferring interest, or had they disclosed the payment amounts sufficient to avoid negative amortization from occurring, Mr. and Mrs. Navarro would not have entered into the loans. Defendants intentionally omitted a clear disclosure of the nature of Mr. and Mrs. Navarro's loans because giving a clear explanation of how the loan worked would have punctured the illusion of a low-payment, low interest rate loan.

Further, Defendants and Loan Consultant advised them that they were eligible for a Low Doc Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low documentation requirement to fraudulently inflate their income ; and in doing so, Defendants and Loan Consultant caused them to be placed into a loan whose payments they could not afford given their true, un-inflated monthly income. Defendants and Loan Consultant altered Mr. and Mrs. Navarro's loan application without their knowing consent or authorization as Loan Consultant completed Mr. and Mrs. Navarro's application without giving Mr. and Mrs. Navarro an opportunity to review the loan application.

Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Navarro that they could afford their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $6,645.57. Given Mr. and Mrs. Navarro's true monthly income of $10,000.006645.57/1000, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 66%- in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Mr. and Mrs. Navarro that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Navarro's lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income,

122

EXHIBIT A - PAGE 238

**APPENDIX A TO COMPLAINT**

and because Mr. and Mrs. Navarro reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Navarro should be shouldering was, Mr. and Mrs. Navarro reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

Although Defendants and the Loan Consultant represented to Mr. and Mrs. Navarro that they were "qualified" for their loan and could afford their loan and its monthly payments, Defendants and the Loan Consultant misled Mr. and Mrs. Navarro into believing that their monthly payments would always only be $3,163.50. Furthermore, at no point did Defendants or Loan Consultant clarify Mr. and Mrs. Navarro's false belief and advise them that $3,163.50 would not be their permanent payment under the loan, or that every time they made a monthly payment in the amount of $3,163.50, which is less than interest only, they would be deferring interest on their loan, increasing the principal balance of their loan.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around May 3, 2007, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Navarro's home, which was fraudulently inflated to an intentionally overstated value. The current fair market value of Mr. and Mrs. Navarro's home is approximately $708,390.00. Mr. and Mrs. Navarro allege that the appraisal was artificially inflated, and that they have suffered damages due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Loan Consultant also represented to Mr. and Mrs. Navarro that they would be able to refinance their loan at a later time. Mr. and Mrs. Navarro relied on this assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Navarro have not been able to refinance their loan. Defendants and Loan Consultant also represented that it would modify Mr. and Mrs. Navarro's loan, and Mr. and Mrs. Navarro relied on this representation in deciding to enter into the loan.

In or around mid-2009, Mr. and Mrs. Navarro were experiencing financial difficulty.

123

**APPENDIX A TO COMPLAINT**

They really needed help. In that regard, Mr. and Mrs. Navarro contacted Defendants for assistance in a loan modification. At no point during the loan modification process, Defendants did assign a single point of contact for Mr. and Mrs. Navarro's file. Mr. and Mrs. Navarro had to speak to multiple representatives and had to re-present the same facts multiple times and submitted the same documents multiple times. However, Defendants ultimately rejected Mr. and Mrs. Navarro's loan modification.

Mr. and Mrs. Navarro were advised by Representative, to stop making payments in order to be eligible for a modification. Mr. and Mrs. Navarro relied on Defendants' and Defendants' Representative's advice and stopped making their monthly payments causing them to fall even further behind. However, Defendants refused to permanently modify their loan.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mr. and Mrs. Navarro could afford the loan; (4) they were "qualified" for their loan; (5) "qualified" meant that they could afford their loan; (6) Defendants would modify their loan in the future; and (7) Defendants would refinance their loan in the future.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Mr. and Mrs. Navarro that: (1) Defendants and Loan Consultant knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they were being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mr. and Mrs. Navarro's home to require them to borrow more money with the knowledge that the true value of Mr. and Mrs. Navarro's home was insufficient to

124

APPENDIX A TO COMPLAINT

justify the amount of Mr. and Mrs. Navarro's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Navarro would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Navarro's loan were concealed from them, and they decided to move forward with their loan. On May 23, 2007, Mr. and Mrs. Navarro signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mr. and Mrs. Navarro would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Navarro have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Navarro entered into the loan their home was worth much higher , now their home is worth approximately $708,390.00. Mr. and Mrs. Navarro did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around October 17, 2012.

38. Plaintiffs Angel Andrade and Felipa Andrade ("Mr. and Mrs. Andrade") discussed refinancing an existing mortgage on their property located at 2304 W 134th Place, Gardena, CA 90249 and A.P.N.:4060-017-016 with a Loan Consultant with IndyMac Bank and Defendants herein (the "Defendants") in or around March 2008. In the course of their discussions ranging from March 2008 until May 2008, Defendants and Loan Consultant steered them into an adjustable rate mortgage in the amount of $346,000.00 with an interest rate at 6.25% for a term of 30 years. Little did Mr. and Mrs. Andrade know, however, payments made during the first 7 year of their loan were Interest-Only. Mr. and Mrs. Andrade also was not advised that their interest rate was "fixed" for only 7 years, and could adjust every year thereafter. This loan was originated by IndyMac Bank, on the note and deed of trust IndyMac Bank is identified as the lender, and IndyMac Bank/ OneWest Bank is currently servicing the loan.

125

**APPENDIX A TO COMPLAINT**

Defendants and Loan Consultant represented to Mr. and Mrs. Andrade that their monthly payment would always be $1,802.08. Although the amount of Mr. and Mrs. Andrade's monthly payment was $1,802.08, Defendants and Loan Consultant failed to clarify their partially true representations and advise Mr. and Mrs. Andrade that: (1) their monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) their monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of their monthly payment would not remain "fixed" for the entire term of the loan.

Further, Defendants and Loan Consultant advised them that they were eligible for a Low Doc Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low documentation requirement to fraudulently inflate their income by $3003.07, a factor of 60%; and in doing so, Defendants and Loan Consultant caused them to be placed into a loan whose payments they could not afford given their true, un-inflated monthly income. Defendants and Loan Consultant altered Mr. and Mrs. Andrade's loan application without their knowing consent or authorization as Loan Consultant completed Mr. and Mrs. Andrade's application without giving Mr. and Mrs. Andrade an opportunity to review the loan application.

Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Andrade that they could afford their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $2,130.00. Given Mr. and Mrs. Andrade's true monthly income of $2,000, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 106%- grossly in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Mr. and Mrs. Andrade that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Andrade's lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income, and because Mr. and Mrs. Andrade reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person

126

EXHIBIT A - PAGE 242

**APPENDIX A TO COMPLAINT**

such as Mr. and Mrs. Andrade should be shouldering was, Mr. and Mrs. Andrade reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

Although Defendants and Loan Consultant represented to Mr. and Mrs. Andrade that they were "qualified" for their loan and could afford their loan and its monthly payments, Defendants and Loan Consultant misled Mr. and Mrs. Andrade into believing that their monthly payments would always only be $1,802.08. Furthermore, at no point did Defendants or Loan Consultant clarify Mr. and Mrs. Andrade's false belief and advise them that $1,802.08 would not be their permanent payment under the loan, or that every time they made a monthly payment in the amount of $1,802.08, they were not paying down any of their principal balance.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around May 3, 2008, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Andrade's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Mr. and Mrs. Andrade's home was worth $346,000.00 at the time they entered into their loan, and that such a valuation was a true and correct measure of their home's worth. The current fair market value of Mr. and Mrs. Andrade's home is approximately $269,450.00. Mr. and Mrs. Andrade allege(s) that the appraisal was artificially inflated, and that they have suffered damages in the amount of $76,550.00 ($346,000.00-$269,450.00) due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Loan Consultant also represented to Mr. and Mrs. Andrade that they would be able to refinance their loan at a later time. Mr. and Mrs. Andrade relied on this assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Andrade have not been able to refinance their loan. Defendants and Loan Consultant also represented that it would modify Mr. and Mrs. Andrade's loan, and Mr. and Mrs. Andrade relied on this representation in deciding to enter into the loan.

In 2009 Mr. and Mrs. Andrade experienced financial hardship. They really needed help.

127

EXHIBIT A - PAGE 243

APPENDIX A TO COMPLAINT

In that regard, Mr. and Mrs. Andrade contacted Defendants for assistance in a loan modification. When they talked to Defendants' Representative regarding the loan modification, they were advised by the representative and the authorized agent of Defendants to stop making payments in order to be eligible for a modification. Mr. and Mrs. Andrade relied on Defendants and Defendants' representative to stop making their monthly payments causing them to fall even further behind. Unbestknown to Mr. and Mrs. Andrade, Defendants reported them as late to the credit bureau, which gravely damaged their credit ratings. This caused difficulties for Mr. and Mrs. Andrade to purchase any products that require credit clearance. On multiple occasions, Defendants demanded the same documents from Mr. and Mrs. Andrade during all relevant times, and Mr. and Mrs. Andrade submitted all of document in a timely fashion and whenever Defendants requested. Before Mr. and Mrs. Andrade's loan was permanently modified, Mr. and Mrs. Andrade had spent several years on getting their loan modified and being distressed over it.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mr. and Mrs. Andrade could afford the loan; (4) they were "qualified" for their loan; (5) "qualified" meant that they could afford their loan; (6) Defendants would modify their loan in the future; and (7) Defendants would refinance their loan in the future.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Mr. and Mrs. Andrade that: (1) Defendants and Loan Consultant knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they were being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the

128

EXHIBIT A - PAGE 244

**APPENDIX A TO COMPLAINT**

appraiser to over-value Mr. and Mrs. Andrade's home to require them to borrow more money with the knowledge that the true value of Mr. and Mrs. Andrade's home was insufficient to justify the amount of Mr. and Mrs. Andrade's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Andrade would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Andrade's loan were concealed from them, and they decided to move forward with their loan. On May 20, 2008, Mr. and Mrs. Andrade signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mr. and Mrs. Andrade would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Andrade have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Andrade entered into the loan their home was worth $346,000.00, now their home is worth approximately $269,450.00. Mr. and Mrs. Andrade did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around February 17, 2012.

39.    Plaintiff Leonida Papa ("Papa") discussed obtaining a mortgage to purchase her home located at 2985 Mumford Court, Riverside, CA 92503 and  A.P.N 136-440-021 with a loan consultant (the "Loan Consultant"), a representative and authorized agent of IndyMac Bank herein ("Defendants"). In the course of their discussions ranging from July 2004 until September 2004, Defendants and Loan Consultant steered her into an adjustable rate mortgage in the amount of $376,986.00 with an interest rate at 6.947% for a term of 30 years. Little did Papa know however, payments made during the first 5 years of her loan were Interest-Only. Papa also was not advised that her interest rate was "fixed" for only 5 years, and could adjust every 12 months thereafter. This loan was originated by IndyMac Bank F.S.B and IndyMac Mortgage Services is currently servicing the loan.

129

EXHIBIT A - PAGE 245

APPENDIX A TO COMPLAINT

Defendants and Loan Consultant recommended the loan, representing that it suited her financial interests since she could pick payments without falling behind on her payments. Defendants and Loan Consultant represented to Papa that her monthly payment would always be $2,182.44. Although the amount of Papa's monthly payment was $2,182.44, Defendants and Loan Consultant failed to clarify their partially true representations and advise Papa that: (1) her monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) her monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of her monthly payment would not remain "fixed" for the entire term of the loan.

Defendants and Loan Consultant also explicitly represented to Papa that she could afford her loan and further represented that she could shoulder the additional financial burden of repaying her loan in consideration of her other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $2,494.69. Defendants and Loan Consultant further represented to Papa that she could rely on the assessment that she was "qualified" to mean that she could afford the loan. Because of Papa's lack of familiarity with how much debt a person can and should reasonably take on compared to her monthly income, and because Papa reasonably relied on Defendants' and Loan Consultant's expertise that any payment she was "qualified" for would take into account what the maximum debt a person such as Papa should be shouldering was, Papa reasonably believed Defendants' and Loan Consultant's representations that she could afford her loan and its payments.

Although Defendants and Loan Consultant represented to Papa that she was "qualified" for her loan and could afford her loan and its monthly payments, Defendants and Loan Consultant misled Papa into believing that her monthly payments would always only be $2,182.44. Furthermore, at no point did Defendants or Loan Consultant clarify Papa's false belief and advise her that $2,182.44 would not be her permanent payment under the loan, or that every time she made a monthly payment in the amount of $2,182.44, she was not paying down any of her principal balance.

Defendants and Loan Consultant also represented to Papa that she would be able to

130

APPENDIX A TO COMPLAINT

refinance her loan at a later time. Papa relied on this assurance in deciding to enter into the mortgage contract. However, Papa has not been able to refinance her loan. Defendants and Loan Consultant also represented that it would modify Papa's loan, and Papa relied on this representation in deciding to enter into the loan

In or around late 2009, Papa experienced financial hardships. She really needed help. In that regard, Papa contacted Defendants for assistant in a loan modification. When Papa talked to Defendants' Representative, Papa was advised by a representative and authorized agent of Defendants to stop making payments in order to be eligible for a modification. Papa relied on Defendants' and Defendants' advice and stopped making her monthly payments causing her to fall even further behind.

After Papa was more than 3 months in arrears with her mortgage payments, Defendants "dual tracked" Papa in that Defendants executed the Notice of Default ("NOD") on February 1, 2010, which is the same day Defendants approved Papa for a trial loan modification. (Trial Loan Modification). The recorded NOD, which resulted from taking Defendants' advice to default on her loan, caused Papa's credit score dropped substantially. In addition, Papa's trial payments were reported to credit bureaus as default of late payments that destroy Papa's credit scores.

At all relevant times, Papa submitted all necessary documents in a timely fashion and whenever Defendants requested. However, Defendants continuously demanded the same documents from Papa. Papa was approved for a trial loan modification, in which the modified payment was $1,697.46. However, Defendants purchased force-place insurance for Papa's loan and tacked on the insurance premiums in the amount of $446.01 to Papa's monthly mortgage Payments. That the forced escrows created a new hardship, making it very difficult for Papa to afford her loan.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Papa could afford the loan; (4) she was "qualified" for her loan; (5) "qualified" meant that she could afford her loan; (6) she would be able to modify her loan; and

131

EXHIBIT A - PAGE 247

**APPENDIX A TO COMPLAINT**

(7) she would be able to refinance her loan.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Papa that: (1) Defendants and Loan Consultant knew that she could not and would not be able to afford her loan and that there was a very high probability that she would default and/or be foreclosed upon; (2) Defendants had an incentive to sell her loan, and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not hers; (4) that Defendants' and Loan Consultant's representations that she was "qualified" to pay her loan was not intended to communicate that she could actually "afford" the loan which she was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Papa's home to require her to borrow more money with the knowledge that the true value of Papa's home was insufficient to justify the amount of Papa's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Papa would lose substantial equity in her home.

Based on these misrepresentations and omissions, the material facts concerning Papa's loan were concealed from her, and she decided to move forward with her loan. On September 1, 2004, Papa signed the loan and Deed of Trust, before a notary. Had she known the truth however, Papa would not have accepted the loan. Papa did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around February 21, 2012. (True and correct copies of the aforementioned documents are attached here to as *Exhibit 14*).

40. Plaintiff Vincent Adamo ("Adamo") discussed refinancing an existing mortgage on his property located at 15471 Green Valley Truck Trail, Ramona, CA 92065, A.P.N.:277-093-41 with a Loan Consultant ("Loan Consultant") with Bondcorp Realty Services

132

EXHIBIT A - PAGE 248

APPENDIX A TO COMPLAINT

Incorporation, a correspondent of IndyMac Bank and Defendants herein (the "Defendants") and authorized by Defendants to lend on their behalf, in or around May 2007. In the course of their discussions ranging from May 2007 until September 2007, Defendants and Loan Consultant steered him into an adjustable rate mortgage in the amount of $750,000.00 with an interest rate at 6.875% for a term of 30 years. Little did Adamo know, however, payments made during the first 10 years of his loan were Interest-Only. Adamo also was not advised that his interest rate was "fixed" for only 5 years, and could adjust every 12 months thereafter. This loan was originated by IndyMac Bank, on the note and deed of trust Bondcorp Realty Services Incorporation is identified as the lender, and IndyMac Mortgage Services, a division of OneWest Bank was the servicer of the loan.

Defendants and Loan Consultant represented to Adamo that his monthly payment would always be $4,296.87. Although the amount of Adamo's monthly payment was $4,296.87, Defendants and Loan Consultant failed to clarify their partially true representations and advise Adamo that: (1) his monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) his monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of his monthly payment would not remain "fixed" for the entire term of the loan.

Further, Defendants and Loan Consultant advised him that he was eligible for a Low Doc Loan. Unbeknownst to him at the time, Defendants and Loan Consultant used this low documentation requirement to fraudulently inflate his income by; and in doing so, Defendants and Loan Consultant caused him to be placed into a loan whose payments he could not afford given his true, un-inflated monthly income. Defendants and Loan Consultant altered Adamo's loan application without his knowing consent or authorization as Loan Consultant completed Adamo's application without giving Adamo an opportunity to review the loan application.

Defendants and Loan Consultant also explicitly represented to Adamo that he could afford his loan and further represented that he could shoulder the additional financial burden of repaying his loan in consideration of his other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $5,575.56. Given Adamo's true monthly income of

133

EXHIBIT A - PAGE 249

APPENDIX A TO COMPLAINT

$2,268.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 245%- grossly in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Adamo that he could rely on the assessment that he was "qualified" to mean that he could afford the loan. Because of Adamo's lack of familiarity with how much debt a person can and should reasonably take on compared to his monthly income, and because Adamo reasonably relied on Defendants' and Loan Consultant's expertise that any payment he was "qualified" for would take into account what the maximum debt a person such as Adamo should be shouldering was, Adamo reasonably believed Defendants' and Loan Consultant's representations that he could afford his loan and its payments.

Although Defendants and Loan Consultant represented to Adamo that he was "qualified" for his loan and could afford his loan and its monthly payments, Defendants and Loan Consultant misled Adamo into believing that his monthly payments would always only be $4,296.87. Furthermore, at no point did Defendants or Loan Consultant clarify Adamo's false belief and advise him that $4,296.87 would not be his permanent payment under the loan, or that every time he made a monthly payment in the amount of $4,296.87, he was not paying down any of his principal balance.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around June 28, 2007, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Adamo's home, which was fraudulently inflated to an intentionally overstated value an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Adamo's home was worth $980,000.00 at the time he entered into his loan, and that such a valuation was a true and correct measure of his home's worth. The current fair market value of Adamo's home is approximately $637,500.00. Adamo alleges that the appraisal was artificially inflated, and that he has suffered damages in the amount of $342,500.00 ($980,000.00- $637,500.00) due to a substantial loss of equity in his home as a result of Defendants' fraudulent inflation and other acts described herein.

134

EXHIBIT A - PAGE 250

**APPENDIX A TO COMPLAINT**

Defendants and Loan Consultant also represented to Adamo that he would be able to refinance his loan at a later time. Adamo relied on this assurance in deciding to enter into the mortgage contract. However, Adamo has not been able to refinance his loan. Defendants and Loan Consultant also represented that it would modify Adamo's loan, and Adamo relied on this representation in deciding to enter into the loan.

In or around 2009, Adamo was experiencing financial difficulty. He really needed help. In that regard, Adamo contacted Defendants for assistance in a loan modification. During all relevant times, Adamo submitted all documents in a timely fashion and whenever Defendants requested. Adamo was advised by Defendants representative and authorized agent of Defendants, to stop making payments in order to be eligible for a modification. Adamo relied on Defendants' and Defendants' representative and authorized agent's advice and stopped making his monthly payments causing him to fall even further behind.

On March 17, 2010, Adamo entered into a Forbearance Plan with Defendants. However, the Forbearance Plan given to Adamo was designed like a Repayment Plan. Under this Forbearance Agreement, Adamo was required to make an initial lump sum payment of $16,722.13. After the balloon payment, Adamo had to make a payment of $6,654.51 per month for 2 months, which is higher than Adamo's original payment of $4,296.87. The lump sum payment and large monthly payments created a new hardship for Adamo, making it very difficult for Adamo to afford his loan. Adamo performed all the terms required to be performed by him according to the terms of the Forbearance Agreement. Adamo tendered all the required payments.

The entire loan modification/forbearance process was an ordeal for Adamo. Defendants repeatedly demanded Adamo fax over-100-page documents over and over. Although the cost of faxing got expensive, Adamo always complied with Defendants' requests

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Adamo could afford the loan; (4) he was "qualified" for his loan; (5)

135

**APPENDIX A TO COMPLAINT**

"qualified" meant that he could afford his loan; (6) Defendants would modify his loan in the future; and (7) Defendants would refinance his loan in the future.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Adamo that: (1) Defendants and Loan Consultant knew that he could not and would not be able to afford his loan and that there was a very high probability that he would default and/or be foreclosed upon; (2) Defendants had an incentive to sell his loan, and did sell his loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not his; (4) that Defendants' and Loan Consultant's representations that he was "qualified" to pay his loan was not intended to communicate that he could actually "afford" the loan which he was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Adamo's home to require him to borrow more money with the knowledge that the true value of Adamo's home was insufficient to justify the amount of Adamo's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Adamo would lose substantial equity in his home.

Based on these misrepresentations and omissions, the material facts concerning Adamo's loan were concealed from him, and he decided to move forward with his loan. On July 19, 2007, Adamo signed the loan and Deed of Trust, before a notary. Had he known the truth however, Adamo would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Adamo has lost substantial equity in his home, has damaged or destroyed credit, and at the time Adamo entered into the loan his home was worth $980,000.00, now his home is worth approximately $637,500.00. Adamo did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around February 27, 2012. (True and correct copies of the

136

EXHIBIT A - PAGE 252

**APPENDIX A TO COMPLAINT**

aforementioned documents are attached here to as *Exhibit 15*).

41.    Plaintiffs David-Cerda Paz and Rosa Chavez-Cerda ("Paz and Cerda") discussed refinancing an existing mortgage on their property located at 852 La Cuesta Court, Salinas, CA 93905, A.P.N.:153-342-015 with a Loan Consultant ("Loan Consultant"), a representative and authorized agent of IndyMac Bank and Defendants herein (the "Defendants") in or around August 2006. In the course of their discussions ranging from August 2006 until October 2006, Defendants and Loan Consultant steered them into an adjustable rate mortgage in the amount of $411,000.00 with an interest rate at 5.75% for a term of 30 years. Little did Paz and Cerda know, however, payments made during the first 10 years of their loan were Interest-Only. Paz and Cerda also were not advised that their interest rate was "fixed" for only 5 years, and could adjust every 12 years thereafter. This loan was originated by IndyMac Bank, on the note and deed of trust IndyMac Bank is identified as the lender, and IndyMac Mortgage Services, a division of OneWest Bank was the servicer of the loan.

Defendants and Loan Consultant represented to Paz and Cerda that their monthly payment would always be $1,969.37. Although the amount of Paz and Cerda's monthly payment was $1,969.37, Defendants and Loan Consultant failed to clarify their partially true representations and advise Paz and Cerda that: (1) their monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) their monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of their monthly payment would not remain "fixed" for the entire term of the loan.

Defendants and Loan Consultant also explicitly represented to Paz and Cerda that they could afford their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $2,872.36. Given Paz and Cerda's true monthly income of $4,000.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 72%- grossly in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Paz and Cerda that they

137

EXHIBIT A - PAGE 253

APPENDIX A TO COMPLAINT

could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Paz and Cerda's lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income, and because Paz and Cerda reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Paz and Cerda should be shouldering was, Paz and Cerda reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

Although Defendants and Loan Consultant represented to Paz and Cerda that they were "qualified" for their loan and could afford their loan and its monthly payments, Defendants and Loan Consultant misled Paz and Cerda into believing that their monthly payments would always only be $1,969.37. Furthermore, at no point did Defendants or Loan Consultant clarify Paz and Cerda's false belief and advise them that $1,969.37 would not be their permanent payment under the loan, or that every time they made a monthly payment in the amount of $1,969.37, they were not paying down any of their principal balance.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around October 2, 2007, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Paz and Cerda's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Paz and Cerda's home was worth $600,000.00 at the time they entered into their loan, and that such a valuation was a true and correct measure of their home's worth. The current fair market value of Paz and Cerda's home is approximately $246,500.00. Paz and Cerda allege that the appraisal was artificially inflated, and that they have suffered damages in the amount of $353,500.00 ($600,000.00-$246,500.00) due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Loan Consultant also represented to Paz and Cerda that they would be able to refinance their loan at a later time. Paz and Cerda relied on this assurance in deciding to enter into the mortgage contract. However, Paz and Cerda have not been able to refinance their

138

EXHIBIT A - PAGE 254

### APPENDIX A TO COMPLAINT

loan. Defendants and Loan Consultant also represented that it would modify Paz and Cerda's loan, and Paz and Cerda relied on this representation in deciding to enter into the loan.

In 2009, Paz and Cerda were experiencing financial difficulty and they really needed help. During all relevant times, Paz and Cerda always submitted documents in a timely fashion and whenever Defendants requested. However, Defendants repeatedly demanded the same documents from Paz and Cerda. When Paz and Cerda talked to Defendants' Representative, Paz and Cerda were advised by Defendants and Representative's advice to stop making payments in order to be eligible for a modification. Paz and Cerda relied on Defendants' and Defendants' representative's advice and stopped making their monthly payments causing them to fall even further behind. Before Paz and Cerda entered into a permanent loan modification, Paz and Cerda had spent over 3 years to get their loan modified.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Paz and Cerda could afford the loan; (4) they were "qualified" for their loan; (5) "qualified" meant that they could afford their loan; (6) Defendants would modify their loan in the future; and (7) Defendants would refinance their loan in the future.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Paz and Cerda that: (1) Defendants and Loan Consultant knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they were being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Paz and Cerda's home to require them to borrow more money with the

139

EXHIBIT A - PAGE 255

APPENDIX A TO COMPLAINT

knowledge that the true value of Paz and Cerda's home was insufficient to justify the amount of Paz and Cerda's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Paz and Cerda would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Paz and Cerda's loan were concealed from them, and they decided to move forward with their loan. On October 25, 2007, Paz and Cerda signed the loan and Deed of Trust, before a notary. Had they known the truth however, Paz and Cerda would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Paz and Cerda have lost substantial equity in their home, have damaged or destroyed credit, and at the time Paz and Cerda entered into the loan their home was worth $600,000.00, now their home is worth approximately $246,000.00. Paz and Cerda did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around March 5, 2012.

42.    Plaintiff Nazario Madrigal ("Madrigal") discussed obtaining a mortgage to purchase his home located at 720-724 I Avenue, National City, CA 91950, A.P.N.:556-414-05 with a Loan Consultant of IndyMac Bank and Defendants herein (the "Defendants") in or around August 9, 2007. In the course of their discussions ranging from June 2007 until August 2009, Defendants and Loan Consultant steered him into an adjustable rate mortgage in the amount of $416,000.00 with an interest rate at 6.875% for a term of 30 years. Little did Madrigal know, however, payments made during the first 10 years of his loan were Interest-Only. Madrigal also was not advised that his interest rate was "fixed" for only 10 years, and could adjust every year thereafter. This loan was originated by IndyMac Bank, on the note and deed of trust IndyMac Bank is identified as the lender, and IndyMac Mortgage Services, a division of OneWest Bank is currently servicing the loan.

Defendants and Loan Consultant represented to Madrigal that his monthly payment

140

APPENDIX A TO COMPLAINT

would always be $2,383.33. Although the amount of Madrigal monthly payment was $2,383.33, Defendants and Loan Consultant failed to clarify their partially true representations and advise Madrigal that: (1) his monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) his monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of his monthly payment would not remain "fixed" for the entire term of the loan.

Further, Defendants and Loan Consultant advised him that he was eligible for a Low Doc Loan. Unbeknownst to him at the time, Defendants and Loan Consultant used this low documentation requirement to fraudulently inflate his income; and in doing so, Defendants and Loan Consultant caused him to be placed into a loan whose payments he could not afford given his true, un-inflated monthly income. In addition, Defendants and Loan Consultant also inflated his assets by $3,000.00 Defendants and Loan Consultant altered Madrigal loan application without his knowing consent or authorization as Loan Consultant completed Madrigal application without giving Madrigal an opportunity to review the loan application.

Defendants and Loan Consultant also explicitly represented to Madrigal that he could afford his loan and further represented that he could shoulder the additional financial burden of repaying his loan in consideration of his other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $3,096.07. Given Madrigal's true monthly income of $2,000.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 154%- grossly in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Madrigal that he could rely on the assessment that he was "qualified" to mean that he could afford the loan. Because of Madrigal lack of familiarity with how much debt a person can and should reasonably take on compared to his monthly income, and because Madrigal reasonably relied on Defendants' and Loan Consultant's expertise that any payment he was "qualified" for would take into account what the maximum debt a person such as Madrigal should be shouldering was, Madrigal reasonably believed Defendants' and Loan Consultant's representations that he could afford his loan and its payments.

141

### APPENDIX A TO COMPLAINT

Although Defendants and Loan Consultant represented to Madrigal that he was "qualified" for his loan and could afford his loan and its monthly payments, Defendants and Loan Consultant misled Madrigal into believing that his monthly payments would always only be $2,383.33. Furthermore, at no point did Defendants or Loan Consultant clarify Madrigal false belief and advise him that $2,383.00 would not be his permanent payment under the loan, or that every time he made a monthly payment in the amount of $2,383.33, he was not paying down any of his principal balance.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around July 15, 2007, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Madrigal's home, which was fraudulently inflated to an intentionally overstated value. The current fair market value of Madrigal's home is approximately $329,848.00. Madrigal alleges that the appraisal was artificially inflated, and that he has suffered damages due to a substantial loss of equity in his home as a result of Defendants' fraudulent inflation and other acts described herein.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Madrigal could afford the loan; (4) he was "qualified" for his loan; (5) "qualified" meant that he could afford his loan; (6) Defendants would modify his loan in the future; and (7) Defendants would refinance his loan in the future.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Madrigal that: (1) Defendants and Loan Consultant knew that he could not and would not be able to afford his loan and that there was a very high probability that he would default and/or be foreclosed upon; (2) Defendants had an incentive to sell his loan, and did sell his loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not his; (4) that Defendants' and Loan Consultant's representations that he was "qualified" to pay his loan was not intended to

142

**APPENDIX A TO COMPLAINT**

communicate that he could actually "afford" the loan which he was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Madrigal home to require him to borrow more money with the knowledge that the true value of Madrigal home was insufficient to justify the amount of Madrigal's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Madrigal would lose substantial equity in his home.

Based on these misrepresentations and omissions, the material facts concerning Madrigal loan were concealed from him, and he decided to move forward with his loan. On August 9, 2007, Madrigal signed the loan and Deed of Trust, before a notary. Had he known the truth however, Madrigal would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Madrigal has lost substantial equity in his home, has damaged or destroyed credit, and at the time Madrigal entered into the loan his home was worth more than the current market, which is 329,848.00. Madrigal did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around March 5, 2012.

43.     Plaintiff Millicent Dickinson ("Dickinson") discussed obtaining a second mortgage on her home located at 21422 Rossford Street, Lakewood, CA 90715 and A.P.N. 7065-019-023 with a loan consultant (the "Loan Consultant"), a representative and authorized agent of IndyMac Mortgage herein ("Defendants"). Loan Consultant steered Dickinson into an adjustable rate loan in the amount of $88,000 with an interest rate at 8.250% for a term of 30 years. This loan was originated by IndyMac Bank, on the note and deed of trust Citi Group Financial is identified as the lender, and IndyMac Mortgage Services is currently servicing the loan.

Defendants and Loan Consultant represented to Dickinson that her monthly payment would always be $150.00. Although the amount of Dickinson's monthly payment was $150.00,

143

**APPENDIX A TO COMPLAINT**

Defendants and Loan Consultant failed to clarify their partially true representations and advise Dickinson that: (1) her monthly payment would drastically increase at the end of the "fixed" interest rate period, (2) her interest rate was not "fixed" for the loan term, or (3) the amount of her monthly payment would not remain "fixed" for the entire term of the loan.

Defendants and Loan Consultant also explicitly represented to Dickinson that she could afford her second loan and further represented that she could shoulder the additional financial burden of repaying her loan in consideration of her first mortgage in the amount of $500,000.00; yet failed to disclose that the fully amortized monthly payment on her second loan was $536.13. Considering Dickinson first loan monthly payment of 2,389.63 and given Dickinson's true monthly income of $2,917.00, Defendants qualified Dickinson for this second mortgage even with a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 81%- grossly in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Dickinson that she could rely on the assessment that she was "qualified" to mean that she could afford the loan. Because of Dickinson's lack of familiarity with how much debt a person can and should reasonably take on compared to her monthly income, and because Dickinson reasonably relied on Defendants' and Loan Consultant's expertise that any payment she was "qualified" for would take into account what the maximum debt a person such as Dickinson should be shouldering was, Dickinson reasonably believed Defendants' and Loan Consultant's representations that she could afford her loan and its payments.

Although Defendants and Loan Consultant represented to Dickinson that she was "qualified" for her loan and could afford her loan and its monthly payments, Defendants and Loan Consultant misled Dickinson into believing that her monthly payments for her second mortgage would always only be $150.00. Furthermore, at no point did Defendants or Loan Consultant clarify Dickinson's false belief and advise her that $150.00 would not be her permanent payment under the loan, or her interest rate would not remain "fixed" for the loan term.

144

APPENDIX A TO COMPLAINT

Defendants and Loan Consultant also represented to Dickinson that she would be able to refinance her loan at a later time. Dickinson relied on this assurance in deciding to enter into the mortgage contract. However, Dickinson has not been able to refinance her loan. Nor has she been able to get her loan modified.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Dickinson could afford the loan ; (4) she was "qualified" for her loan; (5) "qualified" meant that she could afford her loan; (6) she would be able to modify her loan and (7) she would be able to refinance her second loan.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Dickinson that: (1) Defendants and Loan Consultant knew that she could not and would not be able to afford both her first and second loan and that there was a very high probability that she would default and/or be foreclosed upon;  (2) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not hers; (3) that Defendants' and Loan Consultant's representations that she was "qualified" to pay both of her loans was not intended to communicate that she could actually "afford" the loan which she was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Dickinson's home to require her to borrow more money with the knowledge that the true value of Dickinson's home was insufficient to justify the amount of Dickinson's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Dickinson would lose substantial equity in her home.

Based on these misrepresentations and omissions, the material facts concerning Dickinson's second loan were concealed from her, and she decided to move forward with her loan. On September 8, 2006, Dickinson signed the loan and Deed of Trust, before a notary. Had she known the truth however, Dickinson would not have accepted the second loan. As a result of

145

EXHIBIT A - PAGE 261

APPENDtX A TO COMPLAtNT

Defendants' fraudulent acts described throughout this complaint Dickinson has damaged or destroyed credit. Dickinson did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around March 28, 2012.

44.     Plaintiffs Terry Sannita and Raye Sannita ("Mr. and Mrs. Sannita") refinanced existing mortgage on their property located at 7340 Sausalito Avenue, West Hills, CA 91307, A.P.N.:2022-023-025 with Troxler & Association Incorporation in or around June 16, 2005. In the course of their discussions, Defendants and Loan Consultant steered them into an adjustable rate mortgage in the amount of $375,000.00 with an interest rate at 5.875% for a term of 30 years. Little did Mr. and Mrs. Sannita know, however, payments made during the first 10 years of their loan were Interest-Only. Mr. and Mrs. Sannita also were not advised that their interest rate was "fixed" for only 10 years, and could adjust every 6 months thereafter. On the note and deed of trust Troxler & Associates Incorporation is identified as the lender, and IndyMac Mortgage Services, a division of OneWest Bank is currently servicing the loan.

Mr. and Mrs. Sannita's interest-only monthly payment was $1,835.93. Little did Mr. and Mrs. Sannita know, however, that their fully amortized monthly payment on the loan was $2,288.25.

Mr. and Mrs. Sannita's monthly mortgage payment was jumped substantially because Defendants had overcharged Mr. and Mrs. Sannita on the escrow for county taxes. Defendants charged Mr. and Mrs. Sannita approximately double the amount of the original amount. According to the mortgage statement for March 2013, Mr. and Mrs. Sannita was charged $1,163.19 for the impound account, which was almost double the original escrow amount.

At the time Mr. and Mrs. Santana entered into the loan, their home was fraudulently inflated to intentionally overstated value. Mr. and Mrs. Sannita were represented that per appraisal, Mr. and Mrs. Sannita's home was worth $450,000.00 at the time they entered into their loan. The current fair market value of Mr. and Mrs. Sannita's home is approximately

146

**APPENDIX A TO COMPLAINT**

$366,350.00. Due to the fraudulent inflation, Mr. and Mrs. Sannita have suffered damages in the amount of $83,650.00 ($450,000.00-$366,350.00) due to a substantial loss of equity in their home.

On June 16, 2005, Mr. and Mrs. Sannita signed the loan and Deed of Trust, before a notary. After Mr. and Mrs. Sannita entered into the loan, Mr. and Mrs. Sannita have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Sannita entered into the loan their home was worth $450,000.00, now their home is worth approximately $366,350.00. Mr. and Mrs. Sannita did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around March 26, 2012.

45.     Plaintiff Taryn Coss ("Coss") discussed refinancing an existing mortgage on her home located at 46 Shea Ridge, Rancho Santa Margarita, CA 92688 and A.P.N.:780-193-31 with Secured Bankers Mortgage Company on December 16, 2005. In the course of the discussions with her lender, she was steered into a loan, of which her lender concealed and inaccurately, incompletely or otherwise improperly disclosed the material terms and information concerning the loan to her. On the note and deed of trust Secured Bankers Mortgage Company is identified as the lender, and IndyMac Mortgage Services, a division of OneWest Bank is currently servicing the loan.

Defendants and Loan Consultant explicitly represented to Coss that she could afford her loan; and further represented that she could shoulder the additional financial burden of repaying her loan in consideration of her other existing debts.  Loan Consultant and Defendants further represented to Coss that she could rely on the assessment that she was "qualified" to mean that she could afford the loan.  Because of Coss' lack of familiarity with how much debt a person can and should reasonably take on compared to his/her monthly income, and because Coss reasonably relied on Defendants' and Loan Consultant's expertise that any payment she was "qualified" for would take into account what the maximum debt a person such as Coss should be

147

APPENDIX A TO COMPLAINT

shouldering was, Coss reasonably believed Defendants' and Loan Consultant's representations that she could afford her loan and its payments.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. An appraisal company under the direct control and supervision of Defendants conducted an appraisal on Coss' home, which was fraudulently inflated to an intentionally overstated value. Coss alleges that the appraisal was artificially inflated, and that she has suffered damages due to a substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other acts described herein.

Loan Consultant and Defendants also represented to Coss that she would be able to refinance her loan at a later time. Coss relied on this assurance in deciding to enter into the mortgage contract. However, Coss has not been able to refinance her loan. Loan Consultant and Defendants also represented that it would modify Coss' loan, and Coss relied on this representation in deciding to enter into the loan. In addition, Coss was advised by a representative and authorized agent of Defendants to stop making payments in order to be eligible for a modification. Coss relied on Defendants' and the Defendants representative and authorized agent's advice and stopped making her monthly payments causing her to fall even further behind. However, Coss was unable to modify her loan.

Furthermore, Loan Consultant and Defendants represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Coss could afford the loan; (4) She was "qualified" for her loan; (5) "qualified" meant that she could afford her loan; (6) She would be able to modify her loan in the future; and (7) She would be able to refinance her loan in the future.

Moreover, Loan Consultant and Defendants withheld or incompletely, inaccurately or otherwise improperly disclosed to Coss that: (1) Loan Consultant and Defendants knew that she could not and would not be able to afford her loan and that there was a very high probability that she would default and/or be foreclosed upon; (2) Defendants had an incentive to sell her loan, and did sell her loan at fraudulently inflated prices; (3) Loan Consultant's and Defendants'

148

APPENDIX A TO COMPLAINT

"qualification" process was for Defendants' own protection and not hers; (4) That Loan Consultant's and Defendants' representations that she was "qualified" to pay her loan was not intended to communicate that she could actually "afford" the loan which she was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Cosshome to require her to borrow more money with the knowledge that the true value of Coss home was insufficient to justify the amount of Cossloan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Cosswould lose substantial equity in her home.

Based on these misrepresentations and omissions, the material facts concerning Coss' loan were concealed from her, and she decided to move forward with her loan. On June 16, 2005, Coss signed the loan and Deed of Trust, before a notary. Had she known the truth however, Coss would not have accepted the loan. As a result of the Defendants' fraudulent acts described throughout this complaint Coss has lost substantial equity in her home, has damaged or destroyed credit, and at the time Coss entered into the loan her home was worth substantially more than its current fair market value. Coss did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around April 26, 2012.

46.    Plaintiff Scott and Rocio Seelig ("Mr. and Mrs. Seelig") discussed refinancing an existing mortgage on their property located at 25475 Jaclyn Avenue, Moreno Valley, CA 92557 and A.P.N. 474-283-002 with a loan consultant with IndyMac Bank and Defendants herein ("Defendants"), and authorized by Defendants to lend on their behalf, in or around December 2006. In the course of their discussions ranging from December 2006 until February 2007, Defendants and Loan Consultant steered them into an adjustable rate mortgage in the amount of $288,000.00 with an interest rate at 6% for a term of 30 years. Little did Mr. and Mrs. Seelig

149

EXHIBIT A - PAGE 265

**APPENDIX A TO COMPLAINT**

know, however, payments made during the first 10 years of their loan were Interest-Only. Mr. and Mrs. Seelig also were not advised that their interest rate was "fixed" for only 10 years, and could adjust every 12 months thereafter. In addition, Loan Consultant steered them into a "piggy-back" loan in the amount of $50,000.00 with an interest rate at 7.75% for a term of 10 years. These loans were originated by IndyMac Bank, on the note and deed of trust IndyMac Bank is identified as the lender, and IndyMac Mortgage Services is currently servicing the loan.

Defendants and Loan Consultant recommended the loan, representing that it was the best loan available considering their financial situation. Defendants and Loan Consultant represented to Mr. and Mrs. Seelig that their monthly payment would always be $1,440.00. Although the amount of Mr. and Mrs. Seelig's monthly payment was $1,440.00, Defendants and Loan Consultant failed to clarify their partially true representations and advise Mr. and Mrs. Seelig that: (1) their monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) their monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of their monthly payment would not remain "fixed" for the entire term of the loan.

Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Seelig that they could afford their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $2,026.18. Defendants and Loan Consultant further represented to Mr. and Mrs. Seelig that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Seelig's lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income, and because Mr. and Mrs. Seelig reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Seelig should be shouldering was, Mr. and Mrs. Seelig reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

Although Defendants and Loan Consultant represented to Mr. and Mrs. Seelig that they

150

**APPENDIX A TO COMPLAINT**

were "qualified" for their loan and could afford their loan and its monthly payments, Defendants and Loan Consultant misled Mr. and Mrs. Seelig into believing that their monthly payments would always only be $1,440.00. Furthermore, at no point did Defendants or Loan Consultant clarify Mr. and Mrs. Seelig's false belief and advise them that $1,440.00 would not be their permanent payment under the loan, or that every time they made a monthly payment in the amount of $1,440.00, they were not paying down any of their principal balance.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On January 25, 2007, Premier Appraisal, an appraisal company under the direct control and supervision of Defendants, conducted an appraisal on Mr. and Mrs. Seelig's home, which was fraudulently inflated to $480,000.00 - an intentionally overstated value. The current fair market value of Mr. and Mrs. Seelig's home is approximately $192,608.30. Mr. and Mrs. Seelig allege that the appraisal was artificially inflated and that they have suffered damages in the amount of $ due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Loan Consultant also represented to Mr. and Mrs. Seelig that they would be able to refinance their loan at a later time. Mr. and Mrs. Seelig relied on this assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Seelig have not been able to refinance their loan. Defendants and Loan Consultant also represented that it would modify Mr. and Mrs. Seelig's loan, and Mr. and Mrs. Seelig relied on this representation in deciding to enter into the loan. However, Defendants have not yet permanently modify Mr. and Mrs. Seelig's loan.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mr. and Mrs. Seelig could afford the loan; (4) they were "qualified" for their loan; (5) "qualified" meant that they could afford their loan; (6) they would be able to modify their loan and (7) they would be able to refinance their loan.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

**APPENDIX A TO COMPLAINT**

otherwise improperly disclosed to Mr. and Mrs. Seelig that: (1) Defendants and Loan Consultant knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they were being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mr. and Mrs. Seelig's home to require them to borrow more money with the knowledge that the true value of Mr. and Mrs. Seelig's home was insufficient to justify the amount of Mr. and Mrs. Seelig's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Seelig would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Seelig's loan were concealed from them, and they decided to move forward with their loan. On February 8, 2007, Mr. and Mrs. Seelig signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mr. and Mrs. Seelig would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Seelig have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Seelig entered into the loan their home was worth $480,000.00 , now their home is worth approximately $210,503.00. Mr. and Mrs. Seelig did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around April 3, 2012.

47.    Plaintiff Scott and Victoria Jakovich ("Mr. and Mrs. Jakovich") discussed

152

**APPENDIX A TO COMPLAINT**

refinancing an existing mortgage on their property located at 2 Larkfield Lane, Laguna Niguel, CA 92677 and A.P.N.: 673-541-02 with Loan Consultant with IndyMac Bank F.S.B herein ("Defendants"), and authorized by Defendants to lend on their behalf in or around January 2005. In the course of their discussions ranging from January 2005 until March 2005, Defendants and Loan Consultant steered them into an adjustable rate mortgage in the amount of $867,000.00 with an interest rate at 1% for a term of 30 years. Little did Mr. and Mrs. Jakovich know, however, their loan was a negatively amortized PayOption ARM. Mr. and Mrs. Jakovich were not advised that the interest rate was never "fixed" but applied to only their first 12 monthly payment and could adjust every 12 months thereafter. The maximum interest rate is 9.950%. The amount of Mr. and Mrs. Jakovich's minimum monthly payment was "fixed" for 12 months and could adjust every 12 months thereafter. When the amount of the minimum monthly payment is insufficient to cover the amount of interest due, then the amount of that deficiency is added onto the unpaid principal balance of their loan. The recast point of this loan is 115% of the original loan amount. This loan was originated by Defendants, and IndyMac Mortgage Services is currently servicing the loan.

Defendants and Loan Consultant represented to Mr. and Mrs. Jakovich that their monthly payment would always be $2,788.61. Although the amount of Mr. and Mrs. Jakovich's minimum monthly payment was $2,788.61, Defendants and Loan Consultant failed to clarify their partially true representations and advise Mr. and Mrs. Jakovich: (1) how the interest rate on their loan was calculated; (2) that the minimum monthly payment of $2,788.61 would not always be available; (3) that the minimum monthly payment would not be the permanent payment under the loan despite Defendants' and Loan Consultant's affirmative representations to the contrary; (4) that by paying the initial minimum monthly payment they would be definitively deferring interest on their loan, increasing the principal balance of their loan every time they made the minimum monthly payment; (5) that by paying the minimum monthly payment the principal balance of their loan was certain to increase; or (6) their loan would be recast within a few years and they would be forced to pay considerably higher payments.

The disclosures in Mr. and Mrs. Jakovich's loan documents discussing negative

153

APPENDIX A TO COMPLAINT

amortization, only frame negative amortization as a mere possibility rather than a certainty when making the minimum payment. However the reality was that by making the minimum payment, negative amortization was a certainty. Indeed, the payment schedule set forth in the Truth in Lending Disclosure Statement ("TILDS") which set forth what appeared to be the required payment schedule fails to disclose that making payments pursuant to the TILDS payment schedule will result in negative amortization. Mr. and Mrs. Jakovich were not provided, before entering into the loans, with any other payment schedule or with any informed option to make payments different than those listed in the TILDS payment schedule. Had Defendants disclosed that by making the payment pursuant to the TILDS Mr. and Mrs. Jakovich would be deferring interest, or had they disclosed the payment amounts sufficient to avoid negative amortization from occurring, Mr. and Mrs. Jakovich would not have entered into the loans. Defendants intentionally omitted a clear disclosure of the nature of Mr. and Mrs. Jakovich's loans because giving a clear explanation of how the loan worked would have punctured the illusion of a low-payment, low interest rate loan.

Further, Defendants and Loan Consultant advised them that they were eligible for a Low Doc Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low documentation requirement to fraudulently inflate their assets by $460,000.00; and in doing so, Defendants and Loan Consultant caused them to be placed into a loan whose payments they could not afford given their true, un-inflated monthly income. Defendants and Loan Consultant altered Mr. and Mrs. Jakovich's loan application without their knowing consent or authorization as Loan Consultant completed Mr. and Mrs. Jakovich's application without giving Mr. and Mrs. Jakovich an opportunity to review the loan application.

Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Jakovich that they could afford their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $5,016.15. Given Mr. and Mrs. Jakovich's true monthly income of $6,600.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 76%-

154

EXHIBIT A - PAGE 270

**APPENDIX A TO COMPLAINT**

in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Mr. and Mrs. Jakovich that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Jakovich's lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income, and because Mr. and Mrs. Jakovich reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Jakovich should be shouldering was, Mr. and Mrs. Jakovich reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

Although Defendants and the Loan Consultant represented to Mr. and Mrs. Jakovich that they were "qualified" for their loan and could afford their loan and its monthly payments, Defendants and the Loan Consultant misled Mr. and Mrs. Jakovich into believing that their monthly payments would always only be $2,788.61. Furthermore, at no point did Defendants or Loan Consultant clarify Mr. and Mrs. Jakovich's false belief and advise them that $2,788.61 would not be their permanent payment under the loan, or that every time they made a monthly payment in the amount of $2,788.61, which is less than interest only, they would be deferring interest on their loan, increasing the principal balance of their loan.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On February 16, 2005, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Jakovich's home, which was fraudulently inflated to $1,240,000.00 - an intentionally overstated value. The current fair market value of Mr. and Mrs. Jakovich's home is approximately $888,826.95. Mr. and Mrs. Jakovich allege that the appraisal was artificially inflated, and that they have suffered damages in the amount of $351,173.05 ($1,240,000.00-$888,826.95) due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Loan Consultant also represented to Mr. and Mrs. Jakovich that they

155

APPENDIX A TO COMPLAINT

would be able to refinance their loan at a later time. Mr. and Mrs. Jakovich relied on this assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Jakovich have not been able to refinance their loan. Defendants and Loan Consultant also represented that it would modify Mr. and Mrs. Jakovich's loan, and Mr. and Mrs. Jakovich relied on this representation in deciding to enter into the loan. When Mr. and Mrs. Jakovich were experiencing financial hardship, they contacted Defendants for assistance in repaying their loan. During the loan modification process, Defendants never assigned a single point of contact to Mr. and Mrs. Jakovich's file and repeatedly demanded the same documents. Mr. and Mrs. Jakovich always submitted all documents to Defendants in a timely fashion and whenever Defendants requested. As of now, Defendants have not yet modified Mr. and Mrs. Jakovich's loan.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mr. and Mrs. Jakovich could afford the loan ; (4) they were "qualified" for their loan; ( (5) "qualified" meant that they could afford their loan; (6) they would be able to modify their loan; and (7) they would be able to refinance their loan.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Mr. and Mrs. Jakovich that: (1) Defendants and Loan Consultant knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they were being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mr. and Mrs. Jakovich's home to require them to borrow more money with the knowledge that the true value of Mr. and Mrs. Jakovich's home was insufficient to

156

APPENDIX A TO COMPLAINT

justify the amount of Mr. and Mrs. Jakovich's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Jakovich would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Jakovich's loan were concealed from them, and they decided to move forward with their loan. On March 3, 2005, Mr. and Mrs. Jakovich signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mr. and Mrs. Jakovich would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint have damaged or destroyed credit. Mr. and Mrs. Jakovich did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around April 17, 2012.

48.      Plaintiffs Eunice Akpan and Usoro Akpan ("Mr. and Mrs. Akpan") discussed obtaining a mortgage to purchase their home located at 1518 W. 103 Street, Los Angeles, CA 90017 and A.P.N. 6059-021-004 with a loan consultant (the "Loan Consultant"), a representative and authorized agent of IndyMac Bank F.S.B and Defendants herein ("Defendants"). In the course of their discussions ranging from August 2006 to November 2006, Defendants and Loan Consultant steered them into an adjustable rate mortgage in the amount of $412,000.00 with an interest rate at 6.875% for a term of 30 years. Little did Mr. and Mrs. Akpan know, however, payments made during the first 10 years of their loan were Interest-Only. Mr. and Mrs. Akpan also were not advised that their interest rate was "fixed" for only 5 years, and could adjust every 12 months thereafter. This loan has a prepayment penalty of 3 years. In addition, Loan Consultant steered them into a "piggy-back" loan in the amount of $77,250.00 with an interest rate for a term of 30 years. These loans were originated by Defendants, and IndyMac Mortgage Services is currently servicing the loan.

Defendants and Loan Consultant represented to Mr. and Mrs. Akpan that their monthly

157

### APPENDIX A TO COMPLAINT

payment would always be $2,360.42. Although the amount of Mr. and Mrs. Akpan's monthly payment was $2,360.42, Defendants and Loan Consultant failed to clarify their partially true representations and advise Mr. and Mrs. Akpan that: (1) their monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) their monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of their monthly payment would not remain "fixed" for the entire term of the loan.

Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Akpan that they could afford their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $3,021.36. Given Mr. and Mrs. Akpan's true monthly income of $6,000.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 50%- in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Mr. and Mrs. Akpan that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Akpan's lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income, and because Mr. and Mrs. Akpan reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Akpan should be shouldering was, Mr. and Mrs. Akpan reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

Although Defendants and Loan Consultant represented to Mr. and Mrs. Akpan that they were "qualified" for their loan and could afford their loan and its monthly payments, Defendants and Loan Consultant misled Mr. and Mrs. Akpan into believing that their monthly payments would always only be $2,360.42. Furthermore, at no point did Defendants or Loan Consultant clarify Mr. and Mrs. Akpan's false belief and advise them that $2,360.42 would not be their permanent payment under the loan, or that every time they made a monthly payment in the

158

APPENDIX A TO COMPLAINT

amount of $2,360.42, they were not paying down any of their principal balance.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around November 2006, an appraisal company under the direct control and supervision of Defendants, conducted an appraisal on Mr. and Mrs. Akpan's home, which was fraudulently inflated to an intentionally overstates value. Defendants and Loan Consultant represented that, per appraisal, Mr. and Mrs. Akpan's home was worth $459,000.00 at the time they entered into their loan, and that such a valuation was a true and correct measure of their home's worth. The current fair market value of Mr. and Mrs. Akpan's home is approximately $250,847.00. Mr. and Mrs. Akpan allege that the appraisal was artificially inflated and that they have suffered damages in the amount of $208,153.00 ($459,000.00-$250,847.00) due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Loan Consultant also represented to Mr. and Mrs. Akpan that they would be able to refinance their loan at a later time. Mr. and Mrs. Akpan relied on this assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Akpan have not been able to refinance their loan because their home does not contain enough equity. Defendants and Loan Consultant also represented that it would modify Mr. and Mrs. Akpan's loan, and Mr. and Mrs. Akpan relied on this representation in deciding to enter into the loan.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mr. and Mrs. Akpan could afford the loan ; (4) they were "qualified" for their loan; (5) "qualified" meant that they could afford their loan; and (6) they would be able to refinance their loan.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Mr. and Mrs. Akpan that: (1) Defendants and Loan Consultant knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive

159

APPENDIX A TO COMPLAINT

to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they were being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mr. and Mrs. Akpan's home to require them to borrow more money with the knowledge that the true value of Mr. and Mrs. Akpan's home was insufficient to justify the amount of Mr. and Mrs. Akpan's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Akpan would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Akpan's loan were concealed from them, and they decided to move forward with their loan. On November 1, 2006, Mr. and Mrs. Akpan signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mr. and Mrs. Akpan would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Akpan have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Akpan entered into the loan their home was worth $459,000.00, now their home is worth approximately $250,847.00. Mr. and Mrs. Akpan did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around April 23, 2012.

49.    Plaintiffs John and Deanna Vigliotti ("Mr. and Mrs. Vigliotti") discussed obtaining a mortgage to purchase their home located at 41805 Jojoba Hills Circle, Aguanga, CA 92536 and A.P.N. 571-610-003 with Terry Feingold (the "Loan Consultant") a loan consultant of IndyMac Bank F.S.B herein ("Defendants"). In the course of their discussions ranging from

160

EXHIBIT A - PAGE 276

## APPENDIX A TO COMPLAINT

October 2005 until December 2005, Defendants and Loan Consultant steered them into a construction loan that includes a construction/home improvement loan and a permanent mortgage loan. During the "construction period," Mr. and Mrs. Vigliotti are required to pay interest-only at the rate of 7.75%. Once the permanent loan period commences, the interest-only payment starts at the interest rate at 7.75%. Little did Mr. and Mrs. Vigliotti know, however, their interest rate was "fixed" for only 7 years, and could adjust every 12 months thereafter. These loans were originated by Defendants and IndyMac Mortgage Services, a division of OneWest Bank is currently servicing the loan.

Defendants and Loan Consultant represented to Mr. and Mrs. Vigliotti that their monthly payment would always be $4,197.91. Although the amount of Mr. and Mrs. Vigliotti's monthly payment was $4,197.00, Defendants and Loan Consultant failed to clarify their partially true representations and advise Mr. and Mrs. Vigliotti that: (1) their monthly payment would drastically increase at the end of the "fixed" interest rate period, (2) their interest rate was not "fixed" for the loan term, or (3) the amount of their monthly payment would not remain "fixed" for the entire term of the loan.

Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Vigliotti that they could afford their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $4,737.79. Given Mr. and Mrs. Vigliotti's true monthly income of $6,000.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 80%- in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Mr. and Mrs. Vigliotti that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Vigliotti's lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income, and because Mr. and Mrs. Vigliotti reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person

161

EXHIBIT A - PAGE 277

**APPENDIX A TO COMPLAINT**

such as Mr. and Mrs. Vigliotti should be shouldering was, Mr. and Mrs. Vigliotti reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

Although Defendants and Loan Consultant represented to Mr. and Mrs. Vigliotti that they were "qualified" for their loan and could afford their loan and its monthly payments, Defendants and Loan Consultant misled Mr. and Mrs. Vigliotti into believing that their monthly payments would always only be $4,197.91. Furthermore, at no point did Defendants or Loan Consultant clarify Mr. and Mrs. Vigliotti's false belief and advise them that $4,197.91 would not be their permanent payment under the loan, or their interest rate would not remain "fixed" for the loan term.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around December 2005, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Vigliotti's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Mr. and Mrs. Vigliotti's home was worth $950,000.00 at the time they entered into their loan, and that such a valuation was a true and correct measure of their home's worth. The current fair market value of Mr. and Mrs. Vigliotti's home is approximately $375,000.00. Mr. and Mrs. Vigliotti allege that the appraisal was artificially inflated and that they have suffered damages in the amount of $575,000.00 ($950,000-$375,000) due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Loan Consultant also represented to Mr. and Mrs. Vigliotti that they would be able to refinance their loan at a later time. Mr. and Mrs. Vigliotti relied on this assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Vigliotti have not been able to refinance their loan because their home does not contain enough equity. Defendants and Loan Consultant also represented that it would modify Mr. and Mrs. Vigliotti's loan, and Mr. and Mrs. Vigliotti relied on this representation in deciding to enter into the loan. Defendants modified Mr. and Mrs. Vigliotti into a loan that contains two balloon payments due

162

EXHIBIT A - PAGE 278

**APPENDIX A TO COMPLAINT**

at the maturity of their loan; the first being $311,736.11 and a second balloon payment in the amount of $93, 593.29. Mr. and Mrs. Vigliotti allege that this modification has furthered their financial hardship.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mr. and Mrs. Vigliotti could afford the loan; (4) they were "qualified" for their loan; (5) "qualified" meant that they could afford their loan; (6) they would be able to modify their loan; and (7) they would be able to refinance their loan.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Mr. and Mrs. Vigliotti that: (1) Defendants and Loan Consultant knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they were being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mr. and Mrs. Vigliotti's home to require them to borrow more money with the knowledge that the true value of Mr. and Mrs. Vigliotti's home was insufficient to justify the amount of Mr. and Mrs. Vigliotti's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Vigliotti would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Vigliotti's loan were concealed from them, and they decided to move forward with their loan. On December 30, 2005, Mr. and Mrs. Vigliotti signed the loan and Deed of Trust, before a

163

EXHIBIT A - PAGE 279

**APPENDIX A TO COMPLAINT**

notary. Had they known the truth however, Mr. and Mrs. Vigliotti would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Vigliotti have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Vigliotti entered into the loan their home was worth $950,000.00, now their home is worth approximately $375,000.00. Mr. and Mrs. Vigliotti did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around June 16, 2012.

50.   Plaintiffs Jesus Lopez and Haydee Lopez ("Mr. and Mrs. Lopez") discussed obtaining a mortgage to purchase their home located at 15307 Sandhurst Street, Fontana, CA 92336 and A.P.N. 1110-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 with Loan Consultant (the "Loan Consultant") with IndyMac Bank and Defendants herein ("Defendants") in or around February 2007. In the course of their discussions ranging from February 2007 until April 2007, Defendants and Loan Consultant steered them into a fixed rate mortgage in the amount of $400,000.00 with an interest rate at 7.000% for a term of 30 years. Little did Mr. and Mrs. Lopez know, however, payments made during the first 10 years of their loan were Interest-Only. Mr. and Mrs. Lopez also were not advised that their interest rate was "fixed" for only 10 years, and could adjust every year thereafter. This loan was originated by IndyMac Bank, on the note and deed of trust IndyMac Bank F.S.B is identified as the lender, and IndyMac Mortgage Services, a division of OneWest Bank is currently servicing the loan.

Defendants and Loan Consultant represented to Mr. and Mrs. Lopez that their monthly payment would always be $2,333.33. Although the amount of Mr. and Mrs. Lopez's monthly payment was $2,333.33, Defendants and Loan Consultant failed to clarify their partially true representations and advise Mr. and Mrs. Lopez that: (1) their monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) their monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of their monthly payment would not remain "fixed" for the entire term of the loan.

164

**APPENDIX A TO COMPLAINT**

Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Lopez that they could afford their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $3,101.20. Given Mr. and Mrs. Lopez's true monthly income of $7,959.34, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 39%. . Defendants and Loan Consultant further represented to Mr. and Mrs. Lopez that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Lopez's lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income, and because Mr. and Mrs. Lopez reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Lopez should be shouldering was, Mr. and Mrs. Lopez reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

Although Defendants and Loan Consultant represented to Mr. and Mrs. Lopez that they were "qualified" for their loan and could afford their loan and its monthly payments, Defendants and Loan Consultant misled Mr. and Mrs. Lopez into believing that their monthly payments would always only be $2,333.31. Furthermore, at no point did Defendants or Loan Consultant clarify Mr. and Mrs. Lopez's false belief and advise them that $2,333.31 would not be their permanent payment under the loan, or that every time they made a monthly payment in the amount of $2,333.31, they were not paying down any of their principal balance.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around April 2007, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Lopez's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Mr. and Mrs. Lopez's home was worth $500,000.00 at the time they entered into their loan, and that such a valuation was a true and correct measure of their home's worth. The current fair market value of Mr. and

165

EXHIBIT A - PAGE 281

**APPENDIX A TO COMPLAINT**

Mrs. Lopez's home is approximately $282,806.00. Mr. and Mrs. Lopez allege that the appraisal was artificially inflated and that they have suffered damages in the amount of $217,194.00 ($500,000-$217,194) due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Loan Consultant also represented to Mr. and Mrs. Lopez that they would be able to refinance their loan at a later time. Mr. and Mrs. Lopez relied on this assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Lopez have not been able to refinance their loan because their home does not contain enough equity. Defendants and Loan Consultant also represented that it would modify Mr. and Mrs. Lopez's loan, and Mr. and Mrs. Lopez relied on this representation in deciding to enter into the loan. However, Defendants refused to permanently modify their loan.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mr. and Mrs. Lopez could afford the loan ; (4) they were "qualified" for their loan;(5) "qualified" meant that they could afford their loan; (6) they would be able to modify their loan; and (7) they would be able to refinance their loan.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Mr. and Mrs. Lopez that: (1) Defendants and Loan Consultant knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they were being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mr. and Mrs. Lopez's home to require them to borrow more money with

APPENDIX A TO COMPLAINT

the knowledge that the true value of Mr. and Mrs. Lopez's home was insufficient to justify the amount of Mr. and Mrs. Lopez's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Lopez would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Lopez's loan were concealed from them, and they decided to move forward with their loan. On April 6, 2007, Mr. and Mrs. Lopez signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mr. and Mrs. Lopez would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Lopez have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Lopez entered into the loan their home was worth $500,000.00, now their home is worth approximately $282,806.00. Mr. and Mrs. Lopez did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around May 14, 2012.

51. Plaintiff Rolanda White ("White") discussed obtaining a mortgage to purchase herhome located at 19856 Santa Clara Court, Riverside, CA 92508 and A.P.N.:266-522-006 with a Loan Consultant ("Loan Consultant"), a representative and authorized agent of Paramount Residential Mortgage Group, a correspondent of IndyMac Bank and Defendants herein (the "Defendants") and authorized by Defendants to lend on their behalf in or around May 2006. In the course of their discussions ranging from May 2006 until July 2006, Defendants and Loan Consultant steered her into an adjustable rate mortgage in the amount of $536,000.00 with an interest rate at 2.65% for a term of 30 years. Little did White know, however, herloan was a negatively amortized PayOption ARM. White was not advised that the interest rate was never "fixed" but applied to only her first monthly payment and could adjust every month thereafter. The amount of White's minimum monthly payment was "fixed" for 12 months and could adjust

167

**APPENDIX A TO COMPLAINT**

every 12 months thereafter. When the amount of the minimum monthly payment is insufficient to cover the amount of interest due, then the amount of that deficiency is added onto the unpaid principal balance of herloan. The recast point of this loan is 110% of the original loan amount. This loan was originated by IndyMac Bank, on the note and deed of trust Paramount Residential Mortgage Group. In addition, Loan Consultant steered her into a "piggy-back" loan in the amount of $67,000.00 for a term of 15 years. This loan was also originated by IndyMac Bank.

Defendants and Loan Consultant represented to White that her monthly payment would always be $2,159.89. Although the amount of White 's minimum monthly payment was $2,159.89, Defendants and Loan Consultant failed to clarify their partially true representations and advise White : (1) how the interest rate on her loan was calculated; (2) that the minimum monthly payment of $2,159.89 would not always be available; (3) that the minimum monthly payment would not be the permanent payment under the loan despite Defendants' and Loan Consultant's affirmative representations to the contrary; (4) that by paying the initial minimum monthly payment she would be definitively deferring interest on her loan, increasing the principal balance of her loan every time she made the minimum monthly payment; (5) that by paying the minimum monthly payment the principal balance of her loan was certain to increase; or (6) her loan would be recast within a few years and she would be forced to pay considerably higher payments.

The disclosures in White's loan documents discussing negative amortization, only frame negative amortization as a mere possibility rather than a certainty when making the minimum payment. However the reality was that by making the minimum payment, negative amortization was a certainty. Indeed, the payment schedule set forth in the Truth in Lending Disclosure Statement ("TILDS") which set forth what appeared to be the required payment schedule fails to disclose that making payments pursuant to the TILDS payment schedule will result in negative amortization. White was not provided, before entering into the loans, with any other payment schedule or with any informed option to make payments different than those listed in the TILDS payment schedule. Had Defendants disclosed that by making the payment pursuant to the TILDS White would be deferring interest, or had they disclosed the payment amounts sufficient to avoid

168

### APPENDIX A TO COMPLAINT

negative amortization from occurring, White would not have entered into the loans. Defendants intentionally omitted a clear disclosure of the nature of White's loans because giving a clear explanation of how the loan worked would have punctured the illusion of a low-payment, low interest rate loan.

Further, Defendants and Loan Consultant advised her that she was eligible for a Low Doc Loan. Unbeknownst to her at the time, Defendants and Loan Consultant used this low documentation requirement to fraudulently inflate her income; and in doing so, Defendants and Loan Consultant caused her to be placed into a loan whose payments she could not afford given hertrue, un-inflated monthly income. Defendants and Loan Consultant altered White's loan application without her knowing consent or authorization as Loan Consultant completed White's application without giving White an opportunity to review the loan application.

Defendants and Loan Consultant also explicitly represented to White that she could afford her loan and further represented that she could shoulder the additional financial burden of repaying her loan in consideration of her other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $3,7414.19. Defendants and Loan Consultant further represented to White that she could rely on the assessment that she was "qualified" to mean that she could afford the loan. Because of White's lack of familiarity with how much debt a person can and should reasonably take on compared to her monthly income, and because White reasonably relied on Defendants' and Loan Consultant's expertise that any payment she was "qualified" for would take into account what the maximum debt a person such as White should be shouldering was, White reasonably believed Defendants' and Loan Consultant's representations that she could afford her loan and its payments.

Although Defendants and the Loan Consultant represented to White that she was "qualified" for her loan and could afford her loan and its monthly payments, Defendants and the Loan Consultant misled White into believing that her monthly payments would always only be $2,159.89. Furthermore, at no point did Defendants or Loan Consultant clarify White's false belief and advise her that $2,159.89 would not be her permanent payment under the loan, or that every time she made a monthly payment in the amount of $2,159.89, which is less than interest

169

EXHIBIT A - PAGE 285

## APPENDIX A TO COMPLAINT

only, she would be deferring interest on her loan, increasing the principal balance of her loan.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around July 3, 2006, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on White's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, White's home was worth $800,000.00 at the time she entered into her loan, and that such a valuation was a true and correct measure of her home's worth. The current fair market value of White's home is approximately $331,500.00. White alleges that the appraisal was artificially inflated, and that she has suffered damages in the amount of $548,500.00- ($800,000.00-$331,500.00) due to a substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Loan Consultant also represented to White that she would be able to refinance her loan at a later time. White relied on this assurance in deciding to enter into the mortgage contract. However, White has not been able to refinance her loan. Defendants and Loan Consultant also represented that it would modify White's loan, and White relied on this representation in deciding to enter into the loan. In addition, White was advised by a representative and authorized agent of Defendants to stop making payments in order to be eligible for a modification. White relied on Defendants' and Defendants' advice and stopped making her monthly payments causing her to fall even further behind. However, Defendants refused to permanently modify her loan.

In or around early 2008, White was experiencing financial hardship because her income dropped substantially. She really needed help. White fell behind on his loan that caused a Notice of Default ("NOD") to be recorded on her property on November 24, 2008. In regard to this, White twice applied for a loan modification. At no time during the loan modification process, Defendants never assigned a single point of contact to White's file. Defendants twice rejected White's loan modification. Not be able to afford her loan, White further defaulted on her loan and lost her house to foreclosure on June 25, 2012.

170

APPENDIX A TO COMPLAINT

The foreclosure against White's home was wrongful because the Assignment Deed of Trust ("ADOT") recorded on September 16, 2009 transferring the beneficial interest from MERS as a nominee for IndyMac Bank to OneWest Bank was invalid. In that assignment, MERS in its role as a nominee for IndyMac Bank no longer had the authority to assign the beneficial interest in the Deed of Trust to OneWest Bank. This is because MERS acting as a nominee for Paramount Residential had already assigned the beneficial interest to IndyMac Federal Bank. Since MERS had already acted as a nominee for IndyMac Bank, it cannot act again in the same role or at all in assigning the beneficial interest to a different party. Due to this, the ADOT is in valid, any subsequent foreclosure documents based on that ADOT is also invalid.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) White could afford the loan; (4) she was "qualified" for her loan; (5) "qualified" meant that she could afford her loan; (6) Defendants would modify her loan in the future; and (7) Defendants would refinance her loan in the future.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to White that: (1) Defendants and Loan Consultant knew that she could not and would not be able to afford her loan and that there was a very high probability that she would default and/or be foreclosed upon; (2) Defendants had an incentive to sell her loan, and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that Defendants' and Loan Consultant's representations that she was "qualified" to pay her loan was not intended to communicate that she could actually "afford" the loan which she was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value White's home to require her to borrow more money with the knowledge that the true value of White's home was insufficient to justify the amount of White's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the

171

APPENDIX A TO COMPLAINT

State of California that the real estate market would crash and White would lose substantial equity in her home.

Based on these misrepresentations and omissions, the material facts concerning White's loan were concealed from her, and she decided to move forward with her loan. On July 24, 2006 White signed the loan and Deed of Trust, before a notary. Had she known the truth however, White would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint White has lost substantial equity in her home, has damaged or destroyed credit, and at the time White entered into the loan her home was worth $800,000.00, now her home is worth approximately $331,500.00. White did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around July 27, 2012. (True and correct copies of the aforementioned documents are attached here to as *Exhibit 16*).

52.     Plaintiffs Luis and Sara Lopez ("Luis and Sara Lopez") discussed obtaining a mortgage to purchase their home located at 2817 South Bronson Avenue, Los Angeles, CA 90018 and A.P.N. 5051-008-004 with a Loan Consultant with IndyMac Bank and Defendants herein (the "Defendants") in or around December 2007. In the course of their discussions ranging from December 2007 to February 2008, Defendants and Loan Consultant steered them into a fixed rate mortgage in the amount of $384,000.00 with an interest rate at 6.375% for a term of 30 years. This loan was originated by IndyMac Bank, and IndyMac Mortgage Services is currently servicing the loan.

Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Lopez that they could afford their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts. Defendants and Loan Consultant also represented to them that they could afford a $2,395.66 monthly payment. Defendants and Loan Consultant further represented to Mr. and Mrs. Lopez that they could rely on the assessment that they were "qualified" to mean that they could afford the loan.

172

**APPENDIX A TO COMPLAINT**

Because of Mr. and Mrs. Lopez's lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income, and because Mr. and Mrs. Lopez reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Lopez should be shouldering was, Mr. and Mrs. Lopez reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around January 2008, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Lopez's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Luis and Sara Lopez's home was worth $510,000.00 at the time they entered into their loan, and that such a valuation was a true and correct measure of their home's worth. The current fair market value of Mr. and Mrs. Lopez's home is approximately $365,000.00. Mr. and Mrs. Lopez allege that the appraisal was artificially inflated and that they have suffered damages in the amount of $145,000.00 ($510,000-365,000) due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Loan Consultant also represented to Mr. and Mrs. Lopez that they would be able to refinance their loan at a later time. Mr. and Mrs. Lopez relied on this assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Lopez have not been able to refinance their loan because their home does not contain enough equity. Defendants and Loan Consultant also represented that it would modify Mr. and Mrs. Lopez's loan, and Mr. and Mrs. Lopez relied on this representation in deciding to enter into the loan. However, Defendants refused to permanently modify their loan.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; 2) property appraisals done by Defendants were accurate and made in good faith; (3) Luis and Sara Lopez could afford the loan; (4) they were "qualified" for

173

EXHIBIT A - PAGE 289

APPENDIX A TO COMPLAINT

their loan; (5) "qualified" meant that they could afford their loan; (6) they would be able to modify their loan and (7) they would be able to refinance their loan.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Mr. and Mrs. Lopez that: (1) Defendants and Loan Consultant knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they were being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mr. and Mrs. Lopez's home to require them to borrow more money with the knowledge that the true value of Luis and Sara Lopez's home was insufficient to justify the amount of Mr. and Mrs. Lopez's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Lopez would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Lopez's loan were concealed from them, and they decided to move forward with their loan. On February 8, 2008, Mr. and Mrs. Lopez signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mr. and Mrs. Lopez would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Lopez have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Lopez entered into the loan their home was worth $510,000.00, now their home is worth approximately $365,000.00. Mr. and Mrs. Lopez did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion

174

EXHIBIT A - PAGE 290

APPENDIX A TO COMPLAINT

of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around June 15, 2012.

53.     Plaintiffs Oscar and Sonia Sandoval ("Mr. and Mrs. Sandoval") discussed refinancing an existing mortgage on their property located at 1843 Kashlan Road, La Habra Heights, CA 90631 and A.P.N 8267-033-004 with a Loan Consultant (the "Loan Consultant"), a representative and authorized agent of IndyMac Bank and Defendants herein ("Defendants"). In the course of their discussions ranging from June 2005 until August 2005, Defendants and Loan Consultant steered them into an adjustable rate mortgage in the amount of $650,000.00 with an interest rate at 1% for a term of 30 years. Little did Mr. and Mrs. Sandoval know, however, their loan was a negatively amortized PayOption ARM. Mr. and Mrs. Sandoval were not advised that the interest rate was never "fixed" but applied to only their first monthly payment and could adjust every month thereafter. The amount of Mr. and Mrs. Sandoval's minimum monthly payment was "fixed" for 24 months and could adjust every 12 months thereafter. When the amount of the minimum monthly payment is insufficient to cover the amount of interest due, then the amount of that deficiency is added onto the unpaid principal balance of their loan. The recast point of this loan is 110% of the original loan amount. These loans were originated by IndyMac Bank, on the Note and Deed of Trust IndyMac Bank is identified as the lender. IndyMac Mortgage Services, a division of OneWest Bank is currently servicing the loan.

Defendants and Loan Consultant represented to Mr. and Mrs. Sandoval that their monthly payment would always be $2,090.66. Although the amount of Mr. and Mrs. Sandoval's minimum monthly payment was $2,090.66, Defendants and Loan Consultant failed to clarify their partially true representations and advise Mr. and Mrs. Sandoval: (1) how the interest rate on their loan was calculated; (2) that the minimum monthly payment of $2,090.66 would not always be available; (3) that the minimum monthly payment would not be the permanent payment under the loan despite Defendants' and Loan Consultant's affirmative representations to the contrary; (4) that by paying the initial minimum monthly payment they would be definitively deferring interest on their loan, increasing the principal balance of their loan every time they made the minimum monthly payment; (5) that by paying the minimum monthly payment the principal

175

APPENDIX A TO COMPLAINT

balance of their loan was certain to increase; or (6) their loan would be recast within a few years and they would be forced to pay considerably higher payments.

The disclosures in Mr. and Mrs. Sandoval's loan documents discussing negative amortization, only frame negative amortization as a mere possibility rather than a certainty when making the minimum payment. However the reality was that by making the minimum payment, negative amortization was a certainty. Indeed, the payment schedule set forth in the Truth in Lending Disclosure Statement ("TILDS") which set forth what appeared to be the required payment schedule fails to disclose that making payments pursuant to the TILDS payment schedule will result in negative amortization. Mr. and Mrs. Sandoval were not provided, before entering into the loans, with any other payment schedule or with any informed option to make payments different than those listed in the TILDS payment schedule. Had Defendants disclosed that by making the payment pursuant to the TILDS Mr. and Mrs. Sandoval would be deferring interest, or had they disclosed the payment amounts sufficient to avoid negative amortization from occurring, Mr. and Mrs. Sandoval would not have entered into the loans. Defendants intentionally omitted a clear disclosure of the nature of Mr. and Mrs. Sandoval's loans because giving a clear explanation of how the loan worked would have punctured the illusion of a low-payment, low interest rate loan.

Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Sandoval that they could afford their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $3,746.29. Given Mr. and Mrs. Sandoval's true monthly income of $7,500.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 51%- in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Mr. and Mrs. Sandoval that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Sandoval's lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income, and because

176

EXHIBIT A - PAGE 292

## APPENDIX A TO COMPLAINT

Mr. and Mrs. Sandoval reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Sandoval should be shouldering was, Mr. and Mrs. Sandoval reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

Although Defendants and the Loan Consultant represented to Mr. and Mrs. Sandoval that they were "qualified" for their loan and could afford their loan and its monthly payments, Defendants and the Loan Consultant misled Mr. and Mrs. Sandoval into believing that their monthly payments would always only be $2,090.66. Furthermore, at no point did Defendants or Loan Consultant clarify Mr. and Mrs. Sandoval's false belief and advise them that $2,090.66 would not be their permanent payment under the loan, or that every time they made a monthly payment in the amount of $2,090.66, which is less than interest only, they would be deferring interest on their loan, increasing the principal balance of their loan.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around August 2, 2005, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Sandoval's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Mr. and Mrs. Sandoval's home was worth $800,000 at the time they entered into their loan, and that such a valuation was a true and correct measure of their home's worth. The current fair market value of Mr. and Mrs. Sandoval's home is approximately $511,700.00. Mr. and Mrs. Sandoval allege that the appraisal was artificially inflated and that they have suffered damages in the amount of $110,627.00 ($800,000-$511,700.00) due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

On or before early 2009, Mr. and Mrs. Sandoval were experiencing financial hardships because their mortgage payments ballooned to $4,191.68. Their initial payments were only $2,090.66. Mr. and Mrs. Sandoval really needed help. In this regard, Mr. and Mrs. Sandoval contacted Defendants for assistance in repaying the loan by getting their loan modified. At all

177

APPENDIX A TO COMPLAINT

time during the loan modification period, Mr. and Mrs. Sandoval submitted all documents in a timely manner and whenever Defendants requested. Defendants' representative advised Mr. and Mrs. Sandoval to fall behind on the loan for 3 months in order to be eligible for a loan modification. Mr. and Mrs. Sandoval followed Defendants' representative's advice and stopped making payments for 3 months. Mr. and Mrs. Sandoval were approved for 3-month trial loan modification. However, when Mr. and Mrs. Sandoval tendered the first trial payment, Defendants rejected the loan modification stating that Mr. and Mrs. Sandoval's last paystub was not in Defendants' receipt.

Defendants applied the same fraudulent tactics again to Mr. and Mrs. Sandoval when they re-applied for a loan modification for the second time. Although Mr. and Mrs. Sandoval were once again approved and put on a 3-month trial loan modification, Defendants refused to accept the third trial payment and retracted the trial loan modification offer. No reason Defendants provided to Mr. and Mrs. Sandoval as to why Defendants overturned the trial loan modification.

Defendants used the same unfair and fraudulent pattern of inducing and directing Mr. and Mrs. Sandoval to fall behind on their payments with a similar promise to permanently modify their loan. Defendants again approved Mr. and Mrs. Sandoval for a 3-month trial loan modification. Mr. and Mrs. Sandoval fully complied with the agreement's requirement by making 6 trial payments in addition the 3 required trial payments. When attempting to pay the seventh mortgage payment, Defendants, once again, rejected Mr. and Mrs. Sandoval. Defendants also "dual tracked" Mr. and Mrs. Sandoval in that Defendants initiated the foreclosure on Mr. and Mrs. Sandoval's home.

Persistently Mr. and Mrs. Sandoval applied for a loan modification the fourth time. This time Mr. and Mr. Sandoval were on the loan modification for 2 months. However, within 2 months Defendants refused to accept the payment and once again and put their house in foreclosure.

After so many efforts to modify their loan, Mr. and Mrs. Sandoval had no option but to put the house up for a short sale. Because the potential buyer's offer to purchase the house was

178

### APPENDIX A TO COMPLAINT

substantially below the amount owed, Defendants did not approve the short sale request. Mr. and Mrs. Sandoval lost their home to foreclosure in November 2012.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mr. and Mrs. Sandoval could afford the loan; (4) they were "qualified" for their loan; (5) "qualified" meant that they could afford their loan; (6) they would be able to modify their loan; and (7) they would be able to refinance their loan.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Mr. and Mrs. Sandoval that: (1) Defendants and Loan Consultant knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not his/her/theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they were being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mr. and Mrs. Sandoval's home to require them to borrow more money with the knowledge that the true value of Mr. and Mrs. Sandoval's home was insufficient to justify the amount of Mr. and Mrs. Sandoval's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Sandoval would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Sandoval's loan were concealed from them, and they decided to move forward with their loan. On August 22, 2005, Mr. and Mrs. Sandoval signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mr. and Mrs. Sandoval would not have accepted the

179

**APPENDIX A TO COMPLAINT**

loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Sandoval have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Sandoval entered into the loan their home was worth $800,000, now their home is worth approximately $689,373.00. Mr. and Mrs. Sandoval did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around June 21, 2012. (True and correct copies of the aforementioned documents are attached here to as *Exhibit 17*).

54.    Plaintiff Hugo Carcamo ("Carcamo") discussed obtaining a mortgage on his home located at 1936 S Palm Grove Avenue, Los Angeles, CA 90016 and A.P.N.:5061-015-037 with a loan consultant (the "Loan Consultant"), and representative and authorized agent of Defendants herein (the "Defendants") in or around January 2006. In the course of their discussions ranging from January 2006 until March 2006, Defendants and Loan Consultant steered him into a loan, of which the Defendants and Loan Consultant concealed and inaccurately, incompletely or otherwise improperly disclosed the material terms and information concerning the loan to him. This loan was originated by IndyMac Bank, on the note and deed of trust SBMC Mortgage is identified as the lender, and IndyMac Mortgage Services, a division of OneWest Bank was the servicer of the loan.

Defendants and Loan Consultant explicitly represented to Carcamo that he could afford his loan; and further represented that he could shoulder the additional financial burden of repaying his loan in consideration of his other existing debts. Loan Consultant and Defendants further represented to Carcamo that he could rely on the assessment that he was "qualified" to mean that he could afford the loan. Because of Carcamo's lack of familiarity with how much debt a person can and should reasonably take on compared to his/her monthly income, and because Carcamo reasonably relied on Defendants' and Loan Consultant's expertise that any payment he was "qualified" for would take into account what the maximum debt a person such as Carcamo should be shouldering was, Carcamo reasonably believed Defendants' and Loan

180

APPENDIX A TO COMPLAINT

Consultant's representations that he could afford his loan and its payments.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. An appraisal company under the direct control and supervision of Defendants conducted an appraisal on Carcamo's home, which was fraudulently inflated to an intentionally overstated value. Carcamo alleges that the appraisal was artificially inflated, and that he has suffered damages due to a substantial loss of equity in his home as a result of Defendants' fraudulent inflation and other acts described herein.

Loan Consultant and Defendants also represented to Carcamo that he would be able to refinance his loan at a later time. Carcamo relied on this assurance in deciding to enter into the mortgage contract. However, Carcamo has not been able to refinance his loan. Loan Consultant and Defendants also represented that it would modify Carcamo's loan, and Carcamo relied on this representation in deciding to enter into the loan. In addition, Carcamo was advised by a representative and authorized agent of Defendants to stop making payments in order to be eligible for a modification. Carcamo relied on Defendants' and the Defendants representative and authorized agent's advice and stopped making his monthly payments causing him to fall even further behind. However, Carcamo was unable to modify his loan lost his home to foreclosure.

Furthermore, Loan Consultant and Defendants represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Carcamo could afford the loan; (4) He was "qualified" for his loan; (5) "qualified" meant that he could afford his loan; (6) He would be able to modify his loan in the future; and (7) He would be able to refinance his loan in the future.

Moreover, Loan Consultant and Defendants withheld or incompletely, inaccurately or otherwise improperly disclosed to Carcamo that: (1) Loan Consultant and Defendants knew that he could not and would not be able to afford his loan and that there was a very high probability that he would default and/or be foreclosed upon; (2) Defendants had an incentive to sell his loan, and did sell his loan at fraudulently inflated prices; (3) Loan Consultant's and Defendants'

181

APPENDIX A TO COMPLAINT

"qualification" process was for Defendants' own protection and not his; (4) That Loan Consultant's and Defendants' representations that he was "qualified" to pay his loan was not intended to communicate that he could actually "afford" the loan which he was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Carcamo 's home to require him to borrow more money with the knowledge that the true value of Carcamo 's home was insufficient to justify the amount of Carcamo 's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Carcamo would lose substantial equity in his home.

Based on these misrepresentations and omissions, the material facts concerning Carcamo's loan were concealed from him, and he decided to move forward with his loan. On March 13, 2006, Carcamo signed the loan and Deed of Trust, before a notary. Had he known the truth however, Carcamo would not have accepted the loan. As a result of the Defendants' fraudulent acts described throughout this complaint Carcamo has lost substantial equity in his home, has damaged or destroyed credit, and at the time Carcamo entered into the loan his home was worth substantially more than its current fair market value. Carcamo did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around July 6, 0212.

55.    Plaintiffs Elvira and Noel Baluyot ("Mr. and Mrs. Baluyot") refinancing an existing mortgage on their property located at 1758 Vendola Drive, Chula Vista, CA 91913 and A.P.N. 643-550-25-00 with a Loan Consultant with American Internet Mortgage Incorporation, a correspondent of IndyMac Bank and Defendants herein ("Defendants") and authorized by Defendants to lend on their behalf in or around July 2006. In the course of their discussions ranging from July 2006 until September 2006, Defendants and Loan Consultant steered them into a fixed rate mortgage in the amount of $600,000.00 with an interest rate at 6.00% for a term

182

APPENDIX A TO COMPLAINT

of 30 years. Little did Mr. and Mrs. Baluyot know, however, payments made during the first 10 years of their loan were Interest-Only. Mr. and Mrs. Baluyot also were not advised that their interest rate was "fixed" for only 10 years, and could adjust every year thereafter. This loan was originated by Defendants, on the note and deed of trust American Internet Mortgage Inc. is identified as the lender, and IndyMac Mortgage Services is currently servicing the loan.

Defendants and Loan Consultant represented to Mr. and Mrs. Baluyot that their monthly payment would always be $3,000.00. Although the amount of Mr. and Mrs. Baluyot's monthly payment was $3,000.00, Defendants and Loan Consultant failed to clarify their partially true representations and advise Mr. and Mrs. Baluyot that: (1) their monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) their monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of their monthly payment would not remain "fixed" for the entire term of the loan.

Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Baluyot that they could afford their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $4,791.46. Given Mr. and Mrs. Baluyot's true monthly income of $6,679.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 71%- in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines. Defendants and Loan Consultant further represented to Mr. and Mrs. Baluyot that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Baluyot's lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income, and because Mr. and Mrs. Baluyot reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Baluyot should be shouldering was, Mr. and Mrs. Baluyot reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

183

**APPENDIX A TO COMPLAINT**

Although Defendants and Loan Consultant represented to Mr. and Mrs. Baluyot that they were "qualified" for their loan and could afford their loan and its monthly payments, Defendants and Loan Consultant misled Mr. and Mrs. Baluyot into believing that their monthly payments would always only be $3,000.00. Furthermore, at no point did Defendants or Loan Consultant clarify Mr. and Mrs. Baluyot's false belief and advise them that $3,000.00 would not be their permanent payment under the loan, or that every time they made a monthly payment in the amount of $3,000.00, they were not paying down any of their principal balance.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around August 2006, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Baluyot's home, which was fraudulently, inflated an intentionally overstated value. The loan documentation indicated that per appraisal, Mr. and Mrs. Baluyot's home was worth $829,000.00 at the time they entered into their loan, and that such a valuation was a true and correct measure of their home's worth. The current fair market value of Mr. and Mrs. Baluyot's home is approximately $430,658.00. Mr. and Mrs. Baluyot allege that the appraisal was artificially inflated and that they have suffered damages in the amount of $398,342.00 ($829,000-$430,658) due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Loan Consultant also represented to Mr. and Mrs. Baluyot that they would be able to refinance their loan at a later time. Mr. and Mrs. Baluyot relied on this assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Baluyot have not been able to refinance their loan because their home does not contain enough equity. Defendants and Loan Consultant also represented that it would modify Mr. and Mrs. Baluyot's loan, and Mr. and Mrs. Baluyot relied on this representation in deciding to enter into the loan. However, Mr. and Mrs. Baluyot were not able to modify their loan and had no option by to sell their home in late 2012.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in

184

APPENDIX A TO COMPLAINT

lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mr. and Mrs. Baluyot could afford the loan ; (4) they were "qualified" for their loan; (5) "qualified" meant that they could afford their loan; (6) they would be able to modify their loan and (7) they would be able to refinance their loan.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Mr. and Mrs. Baluyot that: (1) Defendants and Loan Consultant knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they were being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mr. and Mrs. Baluyot's home to require them to borrow more money with the knowledge that the true value of Mr. and Mrs. Baluyot's home was insufficient to justify the amount of Mr. and Mrs. Baluyot's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Baluyot would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Baluyot's loan were concealed from them, and they decided to move forward with their loan. On September 29, 2006 Mr. and Mrs. Baluyot signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mr. and Mrs. Baluyot would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Baluyot have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Baluyot entered into the loan their home was worth $829,000.00, now their home is worth approximately $430,658.00. Mr. and Mrs. Baluyot did not discover any of

185

**APPENDIX A TO COMPLAINT**

these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around July 7, 2012.

56.     Plaintiffs Edward and Nelinia Varenas ("Mr. and Mrs. Varenas") discussed obtaining a mortgage to purchase their home located at 1742 Grand Ave #5, Long Beach, CA 90804 and A.P.N 7253-015-068 with Joseph McGreevy (the "Loan Consultant") a loan consultant with BHS Home Loans, LLC and authorized by IndyMac Bank F.S.B to lend on their behalf, in or around August 2006. In the course of their discussions ranging from August 2006 until November 2006, Defendants and Loan Consultant steered them into a fixed rate mortgage in the amount of $506,014.00 with an interest rate at 6.375% for a term of 30 years. Little did Mr. and Mrs. Varenas know, however, payments made during the first 10 years of their loan were Interest-Only. Mr. and Mrs. Varenas also were not advised that their interest rate was "fixed" for only 10 years, and could adjust every year thereafter. In addition, Loan Consultant steered them into a "piggy-back" loan in the amount of $126,503.00 with an interest rate at 9.5% for a term of 15 years ending with a balloon of the unpaid amount. These loans were originated by Defendants, and IndyMac Mortgage Services is currently servicing the loan.

Defendants and Loan Consultant represented to Mr. and Mrs. Varenas that their monthly payment would always be $2,688.20 Although the amount of Mr. and Mrs. Varenas's monthly payment was $2,688.20, Defendants and Loan Consultant failed to clarify their partially true representations and advise Mr. and Mrs. Varenas that: (1) their monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) their monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of their monthly payment would not remain "fixed" for the entire term of the loan.

Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Varenas that they could afford their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $3,727.00. Given Mr. and

186

**APPENDIX A TO COMPLAINT**

Mrs. Varenas's true monthly income of $8,761.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 43%- in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Mr. and Mrs. Varenas that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Varenas's lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income, and because Mr. and Mrs. Varenas reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Varenas should be shouldering was, Mr. and Mrs. Varenas reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

Although Defendants and Loan Consultant represented to Mr. and Mrs. Varenas that they were "qualified" for their loan and could afford their loan and its monthly payments, Defendants and Loan Consultant misled Mr. and Mrs. Varenas into believing that their monthly payments would always only be $2,688.20. Furthermore, at no point did Defendants or Loan Consultant clarify Mr. and Mrs. Varenas's false belief and advise them that $2,688.20 would not be their permanent payment under the loan, or that every time they made a monthly payment in the amount of $2,688.20, they were not paying down any of their principal balance.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around September 2006, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Varenas's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Mr. and Mrs. Varenas's home was worth $632,720.00 at the time they entered into their loan, and that such a valuation was a true and correct measure of their home's worth. The current fair market value of Mr. and Mrs. Varenas's home is approximately $297,632.00. Mr. and Mrs. Varenas allege(s) that the appraisal was artificially inflated and that they have suffered damages in the amount of

187

**APPENDIX A TO COMPLAINT**

$335,088.00 ($632,720-$297,632) due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Loan Consultant also represented to Mr. and Mrs. Varenas that they would be able to refinance their loan at a later time. Mr. and Mrs. Varenas relied on this assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Varenas have not been able to refinance their loan because their home does not contain enough equity.

In or around late 2009 Mr. and Mrs. Varenas were experiencing financial hardship. In this regard, Mr. and Mrs. Varenas contacted Defendants for assistant for a loan modification. At all time during the loan modification, Mr. and Mrs. Varenas submitted all documents in a timely fashion and whenever Defendants requested. However, Defendants have not yet modified Mr. and Mrs. Varenas' loan. On many occasions Defendants repeatedly demanded the same documentation from Mr. and Mrs. Varenas. One of the times Mr. and Mrs. Varenas applied, Defendants rejected their loan modification because Defendants stated that Defendants did not receive all of the documents requested. That was true because Mr. and Mrs. Varenas submitted the same documents over and over to Defendants. As of now, Mr. and Mrs. Varenas have not been able to modify their loan.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mr. and Mrs. Varenas could afford the loan; (4) they were "qualified" for their loan; (5) "qualified" meant that they could afford their loan; (6) they would be able to modify their loan and (7) they would be able to refinance their loan.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Mr. and Mrs. Varenas that: (1) Defendants and Loan Consultant knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not

188

EXHIBIT A - PAGE 304

**APPENDIX A TO COMPLAINT**

theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they were being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mr. and Mrs. Varenas's home to require them to borrow more money with the knowledge that the true value of Mr. and Mrs. Varenas's home was insufficient to justify the amount of Mr. and Mrs. Varenas's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Varenas would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Varenas's loan were concealed from them, and they decided to move forward with their loan. On November 8, 2006, Mr. and Mrs. Varenas signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mr. and Mrs. Varenas would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Varenas have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Varenas entered into the loan their home was worth $632,720.00, now their home is worth approximately $297,632.00. Mr. and Mrs. Varenas did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around July 12, 2012.

57.    Plaintiff Gloria Charles ("Charles") discussed refinancing an existing mortgage on her property located at 4268 S. Hobart Boulevard, Los Angeles, CA 90062 and A.P.N.: 5021-023-025 with a loan consultant (the "Loan Consultant"), a representative and authorized agent of IndyMac Bank and Defendants herein ("Defendants"). In the course of their discussions ranging from August 2007 to October 2007, Defendants and Loan Consultant steered her into an adjustable rate mortgage in the amount of $400,000 with an interest rate at 5.75% for a term of

189

**APPENDIX A TO COMPLAINT**

30 years. Little did Ms. Charles know, however, payments made during the first 10 years of her loan were Interest-Only. Ms. Charles also was not advised that her interest rate was "fixed" for only 5 years, and could adjust every year thereafter. In addition, Loan Consultant steered her into a "piggy-back" loan in the amount of $55,000 for a term of 20 years. These loans were originated by Defendants and IndyMac Mortgage Services is currently servicing the loan.

Defendants and Loan Consultant represented to Charles that her monthly payment would always be $1,916.17. Although the amount of Charles's monthly payment was $1,916.17, Defendants and Loan Consultant failed to clarify their partially true representations and advise Charles that: (1) her monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) her monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of her monthly payment would not remain "fixed" for the entire term of the loan.

Defendants and Loan Consultant also explicitly represented to Charles that she could afford her loan and further represented that she could shoulder the additional financial burden of repaying her loan in consideration of her other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $2,795.49. Defendants and Loan Consultant further represented to Charles that she could rely on the assessment that she was "qualified" to mean that she could afford the loan. Because of Charles' lack of familiarity with how much debt a person can and should reasonably take on compared to her monthly income, and because Charles reasonably relied on Defendants' and Loan Consultant's expertise that any payment she was "qualified" for would take into account what the maximum debt a person such as Charles should be shouldering was, Charles reasonably believed Defendants' and Loan Consultant's representations that she could afford her loan and its payments.

Although Defendants and Loan Consultant represented to Charles that she was "qualified" for her loan and could afford her loan and its monthly payments, Defendants and Loan Consultant misled Charles into believing that her monthly payments would always only be $1,916.17. Furthermore, at no point did Defendants or Loan Consultant clarify Charles' false belief and advise her that $1,916.17 would not be her permanent payment under the loan, or that

190

EXHIBIT A - PAGE 306

APPENDIX A TO COMPLAINT

every time she made a monthly payment in the amount of $1,916.17, she was not paying down any of her principal balance.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around September 2007, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Ms. Charles's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Ms. Charles's home was worth $491,000.00 at the time she entered into her loan, and that such a valuation was a true and correct measure of her home's worth. The current fair market value of Charles' home is approximately $266,590.00. Charles alleges that the appraisal was artificially inflated and that she has suffered damages in the amount of $224,410.00 ($491,000-$266,590) due to a substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Loan Consultant also represented to Charles that she would be able to refinance her loan at a later time. Charles relied on this assurance in deciding to enter into the mortgage contract. However, Charles has not been able to refinance her loan because Defendants and Loan Consultant also represented that it would modify Charles's loan, and Charles relied on this representation in deciding to enter into the loan. However, Defendants refused to permanently modify her loan.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Charles could afford the loan ; (4) she was "qualified" for her loan; (5) "qualified" meant that she could afford her loan; (6) she would be able to modify her loan; and (7) she would be able to refinance her loan.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Ms. Charles that: (1) Defendants and Loan Consultant knew that she could not and would not be able to afford her loan and that there was a very high

191

**APPENDIX A TO COMPLAINT**

probability that she would default and/or be foreclosed upon; (2) Defendants had an incentive to sell her loan, and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not hers; (4) that Defendants' and Loan Consultant's representations that she was "qualified" to pay her loan was not intended to communicate that she could actually "afford" the loan which she was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Ms. Charles's home to require her to borrow more money with the knowledge that the true value of Ms. Charles's home was insufficient to justify the amount of Ms. Charles's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Ms. Charles would lose substantial equity in her home.

Based on these misrepresentations and omissions, the material facts concerning Ms. Charles's loan were concealed from her, and she decided to move forward with her loan. On October 26, 2007, Ms. Charles signed the loan and Deed of Trust, before a notary. Had she known the truth however, Ms. Charles would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Ms. Charles has/have lost substantial equity in her home, has damaged or destroyed credit, and at the time Ms. Charles entered into the loan her home was worth $491,000.00, now her home is worth approximately $266,590.00. Ms. Charles did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around August 6, 2012.

58.    Plaintiff Francisco Romo ("Romo") discussed obtaining a mortgage to purchase his home located at 10143 Capistrano Ave., South Gate, CA 90280 and A.P.N. 6207-012-012 with a loan consultant (the "Loan Consultant"), a representative and authorized agent of IndyMac Bank and Defendants herein ("Defendants"). In the course of their discussions ranging

192

EXHIBIT A - PAGE 308

APPENDIX A TO COMPLAINT

from June 2006 until August 2006, Defendants and Loan Consultant steered him into an adjustable rate mortgage in the amount of $368,000.00 with an interest rate at 6.125% for a term of 30 years. Little did Romo know, however, payments made during the first 10 years of his loan were Interest-Only.

Romo also was not advised that his interest rate was "fixed" for only 5 years, and could adjust every 12 months thereafter. In addition, Loan Consultant steered him into a "piggy-back" loan in the amount of $92,000.00, with a balloon payment of $75,404.23 due in 15 years. These loans were originated by IndyMac Bank, on the note and Deed of Trust IndyMac Bank is identified as the lender. IndyMac Mortgage Services, a division of OneWest Bank is currently servicing the loan.

Defendants and Loan Consultant represented to Romo that his monthly payment would always be $1,878.33. Although the amount of Romo's monthly payment was $1,878.33, Defendants and Loan Consultant failed to clarify their partially true representations and advise Romo that: (1) his monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) his monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of his monthly payment would not remain "fixed" for the entire term of the loan.

Defendants and Loan Consultant also explicitly represented to Romo that he could afford his loan and further represented that he could shoulder the additional financial burden of repaying his loan in consideration of his other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $2,833.78. Defendants and Loan Consultant further represented to Romo that he could rely on the assessment that he was "qualified" to mean that he could afford the loan. Because of Romo's lack of familiarity with how much debt a person can and should reasonably take on compared to his monthly income, and because Romo reasonably relied on Defendants' and Loan Consultant's expertise that any payment he was "qualified" for would take into account what the maximum debt a person such as Romo should be shouldering was, Romo reasonably believed Defendants' and Loan Consultant's representations that he could afford his loan and its payments.

193

APPENDIX A TO COMPLAINT

Although Defendants and Loan Consultant represented to Romo that he was "qualified" for his loan and could afford his loan and its monthly payments, Defendants and Loan Consultant misled Romo into believing that his monthly payments would always only be $1,878.33. Furthermore, at no point did Defendants or Loan Consultant clarify Romo's false belief and advise him that $1,878.33 would not be his permanent payment under the loan, or that every time he made a monthly payment in the amount of $1,878.33, he was not paying down any of his principal balance.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around July 2006, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Romo's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Romo's home was worth $460,000.00 at the time he entered into his loan, and that such a valuation was a true and correct measure of his home's worth. The current fair market value of Romo's home is approximately $236,557.00. Romo alleges that the appraisal was artificially inflated and that he has suffered damages in the amount of $223,443.00 ($460,000-$223,443) due to a substantial loss of equity in his home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Loan Consultant also represented to Romo that he would be able to refinance his loan at a later time. Romo relied on this assurance in deciding to enter into the mortgage contract. However, Romo has not been able to refinance his loan because his home does not have enough equity. Defendants and Loan Consultant also represented that it would modify Romo's loan, and Romo relied on this representation in deciding to enter into the loan. Romo was approved for a loan modification, but it did not help Romo to afford the loan because the payments were still too high compared to the original payments.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Romo could afford the loan; (4) he was "qualified" for his loan; (5)

194

EXHIBIT A - PAGE 310

APPENDIX A TO COMPLAINT

"qualified" meant that he could afford his loan; (6) he would be able to modify his loan (7) he would be able to refinance his loan.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Romo that: (1) Defendants and Loan Consultant knew that he could not and would not be able to afford his loan and that there was a very high probability that he would default and/or be foreclosed upon; (2) Defendants had an incentive to sell his loan, and did sell his loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that Defendants' and Loan Consultant's representations that he was "qualified" to pay his loan was not intended to communicate that he could actually "afford" the loan which he was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Romo's home to require him to borrow more money with the knowledge that the true value of Romo's home was insufficient to justify the amount of Romo's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Romo would lose substantial equity in his home.

Based on these misrepresentations and omissions, the material facts concerning Romo's loan were concealed from him, and he decided to move forward with his loan. On August 18 2006, Romo signed the loan and Deed of Trust, before a notary. Had he known the truth however, Romo would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Romo has lost substantial equity in his home, has damaged or destroyed credit, and at the time Romo entered into the loan his home was worth $460,000.00, now his home is worth approximately $236,557.00. Romo did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around August 14, 2012.

195

EXHIBIT A - PAGE 311

**APPENDIX A TO COMPLAINT**

59. Plaintiffs Felipe Muro and Paola Muro ("Mr. and Mrs. Muro") refinanced an existing mortgage on their property located at 515 E. 7 Street, Corona, CA 92879 and 117-202-008 with Mega Cap Funding Incorporation on March 26, 2007. Mr. and Mrs. Muro were steered into an adjustable rate mortgage in the amount of $312,000.00 with an interest rate at 1% for a term of 30 years. Little did Mr. and Mrs. Muro know, however, their loan was a negatively amortized PayOption ARM. Mr. and Mrs. Muro were not advised that the interest rate was never "fixed" but applied to only their first 2 monthly payment and could adjust every month thereafter. The amount of Mr. and Mrs. Muro's minimum monthly payment was "fixed" for 12 months and could adjust every 12 months thereafter. When the amount of the minimum monthly payment is insufficient to cover the amount of interest due, then the amount of that deficiency is added onto the unpaid principal balance of their loan. The recast point of this loan is 115% of the original loan amount was originated by Mega Cap Funding Incorporation, on the note and deed of trust Mega Capital Funding is identified as the lender, and IndyMac Mortgage Services, a Division of OneWest Bank is currently servicing the loan.

When Mr. and Mrs. Muro entered into a mortgage contract, they were represented that that their monthly payment would always be $1,003.52. However, Mr. and Mrs. Muro were not represented that the minimum monthly payment of $1,003.52 would not always be available and that the minimum payment would not be the permanent payment under the loan. Also Mr. and Mrs. Muro were also represented that by paying the initial minimum monthly payment they would be definitively deferring interest on their loan, increasing the principal balance of their loan every time they made the minimum monthly payment, that by paying the minimum monthly payment the principal balance of their loan was certain to increase; or their loan would be recast within a few years and they would be forced to pay considerably higher payments. Mr. and Mrs. Muro were also not represented that the fully amortized monthly payment on the loan was $2,285.65. However, Mr. and Mrs. Muro's true monthly income at that time was only $1,600.00; this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 143%- grossly in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines).

196

EXHIBIT A - PAGE 312

## APPENDIX A TO COMPLAINT

The disclosures in Mr. and Mrs. Muro's loan documents discussing negative amortization, only frame negative amortization as a mere possibility rather than a certainty when making the minimum payment. However the reality was that by making the minimum payment, negative amortization was a certainty. Indeed, the payment schedule set forth in the Truth in Lending Disclosure Statement ("TILDS") which set forth what appeared to be the required payment schedule fails to disclose that making payments pursuant to the TILDS payment schedule will result in negative amortization. Mr. and Mrs. Muro were not provided, before entering into the loans, with any other payment schedule or with any informed option to make payments different than those listed in the TILDS payment schedule. Had Defendants disclosed that by making the payment pursuant to the TILDS Mr. and Mrs. Muro would be deferring interest, or had they disclosed the payment amounts sufficient to avoid negative amortization from occurring, Mr. and Mrs. Muro would not have entered into the loans. Defendants intentionally omitted a clear disclosure of the nature of Mr. and Mrs. Muro's loans because giving a clear explanation of how the loan worked would have punctured the illusion of a low-payment, low interest rate loan.

Mr. and Mrs. Muro's home was fraudulently inflated to an intentionally inflated value to qualify them for a larger mortgage loan amount. Mr. and Mrs. Muro were issued a loan in the amount of $316,000 when they refinanced their pre-existing mortgage in 2007. However, the current fair market value of Mr. and Mrs. Muro's home is approximately $123,250.00. Mr. and Mrs. Muro allege that the appraisal was artificially inflated and that they have suffered damages due to a substantial loss of equity in their home as a result of their home's being fraudulently inflated.

Mr. and Mrs. Muro have not been able to refinance their loan because their home does not contain enough equity. Defendants and Loan Consultant also represented that it would modify Mr. and Mrs. Muro's loan, and Mr. and Mrs. Muro relied on this representation in deciding to enter into the loan.

In or around September 2010, Mr. and Mrs. Muro defaulted on their loan. They really needed help. Mr. and Mrs. Muro contacted Defendants for assistance for a loan modification.

197

EXHIBIT A - PAGE 313

APPENDIX A TO COMPLAINT

Mr. and Mrs. Muro applied for a loan modification on 3 separate occasions. During all 3 times of the loan modification process, Mr. and Mrs. Muro always submitted all documents in a timely fashion and whenever Defendants requested. However, Defendants always claimed that Mr. and Mrs. Muro failed to submit the requested documents. Defendants refused to permanently modify Mr. and Mrs. Muro's loan. As a result, Mr. and Mrs. Muro lost their home to foreclosure.

The foreclosure against Mr. and Mrs. Muro was wrongful for several reasons. First, the foreclosure is void because at the time the NOD was recorded (on September 22, 2010), the foreclosing party (HSBC Bank USA, National Association as Trustee for BCAP LLC Trust 2008-IND1) did not yet have the authority to initiate foreclosure. That's because the foreclosing party did not properly receive any beneficial interest in the property until the Assignment of Deed of Trust (ADOT) was recorded on March 23, 2011, which is more than 6 months after the NOD was recorded. Accordingly the foreclosure was void. Under California Law, an NOD initiating foreclosure on behalf of a party who is not a true beneficiary at the time of filing the NOD, as here, is void ab initio, rendering any subsequent foreclosure based on that NOD void as well.

Secondly the foreclosure is void because the NOD initiates foreclosure on behalf of HSB Bank USA, National Association as Trustee for BCAP LLC Trust 2008-IND1). However, HSB Bank USA was not the foreclosing party at the time the NOD was recorded. Mega Cap Funding Incorporation was. Under California Law the foreclosing party must be the party listed on the NOD.

On March 26, 2007, Mr. and Mrs. Muro signed the loan and Deed of Trust, before a notary. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Muro have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Muro entered into the loan their home was worth $361,000.00, now their home is worth approximately $149,113.00. Mr. and Mrs. Muro did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this

198

EXHIBIT A - PAGE 314

APPENDIX A TO COMPLAINT

complaint, were brought to light on or around August 10, 2012. (True and correct copies of the aforementioned documents are attached here to as *Exhibit 18*).

60.     Plaintiffs Dennis Michael Chicoat and Carol Ann Chilcoat ("Mr. and Mrs. Chilcoat") discussed refinancing an existing mortgage on their property located at 43285 Deer Canyon Road, Big Bear Lake, CA 92315 with a Loan Consultant ("Loan Consultant") of IndyMac Bank and Defendants herein ("Defendants") in or around April 2007. In the course of their discussions ranging from April 2007 until June 2007, Defendants and Loan Consultant steered them into an adjustable rate mortgage in the amount of $600,000.00 with an interest rate at 8.375% for a term of 30 years. Little did Mr. and Mrs. Chilcoat know, however, payments made during the first 10 year of their loan were Interest-Only. Mr. and Mrs. Chilcoat also was not advised that their interest rate was "fixed" for only 5 years, and could adjust every year thereafter. This loan originated by IndyMac Bank, on the note and deed of trust IndyMac Bank is identified as the lender, and OneWest Bank is currently servicing the loan.

Defendants and Loan Consultant represented to Mr. and Mrs. Chilcoat that their monthly payment would always be $4,187.00. Although the amount of Mr. and Mrs. Chilcoat's monthly payment was $4,187.00, Defendants and Loan Consultant failed to clarify their partially true representations and advise Mr. and Mrs. Chilcoat that: (1) their monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) their monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of their monthly payment would not remain "fixed" for the entire term of the loan.

Further, Defendants and Loan Consultant advised them that they were eligible for a Low Doc Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low documentation requirement to fraudulently inflate their income; and in doing so, Defendants and Loan Consultant caused them to be placed into a loan whose payments they could not afford given their true, un-inflated monthly income. Defendants and Loan Consultant altered Mr. and Mrs. Chilcoat's loan application without their knowing consent or authorization as Loan Consultant completed Mr. and Mrs. Chilcoat's application without giving Mr. and Mrs. Chilcoat an opportunity to review the loan application.

199

## APPENDIX A TO COMPLAINT

Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Chilcoat that they could afford their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $4,560.43. Given Mr. and Mrs. Chilcoat's true monthly income of $8,100.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 56%- grossly in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Mr. and Mrs. Chilcoat that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Chilcoat's lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income, and because Mr. and Mrs. Chilcoat reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Chilcoat should be shouldering was, Mr. and Mrs. Chilcoat reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

Although Defendants and Loan Consultant represented to Mr. and Mrs. Chilcoat that they were "qualified" for their loan and could afford their loan and its monthly payments, Defendants and Loan Consultant misled Mr. and Mrs. Chilcoat into believing that their monthly payments would always only be $4,187.00. Furthermore, at no point did Defendants or Loan Consultant clarify Mr. and Mrs. Chilcoat's false belief and advise them that $4,187.00 would not be their permanent payment under the loan, or that every time they made a monthly payment in the amount of $4,187.00, they were not paying down any of their principal balance.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around May 25, 2007, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Chilcoat's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Mr. and Mrs. Chilcoat's

200

EXHIBIT A - PAGE 316

**APPENDIX A TO COMPLAINT**

home was worth $750,000.00 at the time they entered into their loan, and that such a valuation was a true and correct measure of their home's worth. The current fair market value of Mr. and Mrs. Chilcoat's home is approximately $407,159.00. Mr. and Mrs. Chilcoat allege that the appraisal was artificially inflated, and that they have suffered damages in the amount of $342,841.00 ($750,000.00-$342,841.00) due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

In or around beginning of 2009, Mr. and Mrs. Chilcoat were experiencing diminishing income. They really needed help. In this regard, Mr. and Mrs. Chilcoat contacted Defendants to negotiate a loan modification. However, Mr. and Mrs. Chilcoat did not receive any assistance from Defendants until late 2009. Prior to Defendants' response to Mr. and Mrs. Chilcoat's request for a loan modification, Mr. and Mrs. Chilcoat had defaulted on their loan.

In early 2010, Mr. and Mrs. Chilcoat were approved for a trial loan modification. However, Defendants "dual tracked" Mr. and Mrs. Chilcoat's loan in that Defendant made harassing phone calls to Mr. and Mrs. Chilcoat regarding foreclosure pending loan modification review. Mr. and Mrs. Chilcoat had resumed making mortgage payments upon being placed on a trial loan modification.

Mr. and Mrs. Chilcoat then entered into a permanent loan modification. This loan modification neither considered the substantial devaluation of the property nor did it consider Mr. and Mrs. Chilcoat's diminishing monthly income. The outcome of this modification left Mr. and Mrs. Chilcoat with a monthly payment almost identical to their original payment.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mr. and Mrs. Chilcoat could afford the loan; (4) they were "qualified" for their loan; (5) "qualified" meant that they could afford their loan; (6) Defendants would modify their loan in the future; and (7) Defendants would refinance their loan in the future.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Mr. and Mrs. Chilcoat that: (1) Defendants and Loan

201

APPENDIX A TO COMPLAINT

Consultant knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they were being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mr. and Mrs. Chilcoat's home to require them to borrow more money with the knowledge that the true value of Mr. and Mrs. Chilcoat's home was insufficient to justify the amount of Mr. and Mrs. Chilcoat's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Chilcoat would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Chilcoat's loan were concealed from them, and they decided to move forward with their loan. On June 19, 2007, Mr. and Mrs. Chilcoat signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mr. and Mrs. Chilcoat would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Chilcoat have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Chilcoat entered into the loan their home was worth $750,000.00, now their home is worth approximately $407,159.00. Mr. and Mrs. Chilcoat did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around August 17, 2012.

61.    Plaintiff Pearl/Lillie Bowen ("Bowen") discussed refinancing an existing mortgage on her home located at 11847 Gorham Avenue, Los Angeles, CA 90049 and

202

APPENDIX A TO COMPLAINT

A.P.N.:4265-018-050 with Mortgageit, a correspondence of IndyMac Bank and Defendants herein ("Defendants") in or around June 2006. In the course of their discussions ranging from June 2006 until August 2006, Defendants and Loan Consultant steered her into a loan, of which the Defendants and Loan Consultant concealed and inaccurately, incompletely or otherwise improperly disclosed the material terms and information concerning the loan to her. This loan was originated by IndyMac Bank, on the note and deed of trust Mortgageit is identified as the lender, and Indymac Bank is currently servicing the loan.

Defendants and Loan Consultant explicitly represented to Bowen that she could afford her loan; and further represented that she could shoulder the additional financial burden of repaying her loan in consideration of her other existing debts. Loan Consultant and Defendants further represented to Bowen that she could rely on the assessment that she was "qualified" to mean that she could afford the loan. Because of Bowen's lack of familiarity with how much debt a person can and should reasonably take on compared to his/her monthly income, and because Bowen reasonably relied on Defendants' and Loan Consultant's expertise that any payment she was "qualified" for would take into account what the maximum debt a person such as Bowen should be shouldering was, Bowen reasonably believed Defendants' and Loan Consultant's representations that she could afford her loan and its payments.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. An appraisal company under the direct control and supervision of Defendants conducted an appraisal on Bowen's home, which was fraudulently inflated to an intentionally overstated value. Bowen alleges that the appraisal was artificially inflated, and that she has suffered damages due to a substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other acts described herein.

Loan Consultant and Defendants also represented to Bowen that she would be able to refinance her loan at a later time. Bowen relied on this assurance in deciding to enter into the mortgage contract. However, Bowen has not been able to refinance her loan. Loan Consultant and Defendants also represented that it would modify Bowen's loan, and Bowen relied on this representation in deciding to enter into the loan. In addition, Bowen was advised by a

203

EXHIBIT A - PAGE 319

**APPENDIX A TO COMPLAINT**

representative and authorized agent of Defendants to stop making payments in order to be eligible for a modification. Bowen relied on Defendants' and the Defendants representative and authorized agent's advice and stopped making her monthly payments causing her to fall even further behind. However, Bowen was unable to modify her loan.

Furthermore, Loan Consultant and Defendants represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Bowen could afford the loan; (4) She was "qualified" for her loan; (5) "qualified" meant that she could afford her loan; (6) She would be able to modify her loan in the future; and (7) She would be able to refinance her loan in the future.

Moreover, Loan Consultant and Defendants withheld or incompletely, inaccurately or otherwise improperly disclosed to Bowen that: (1) Loan Consultant and Defendants knew that she could not and would not be able to afford her loan and that there was a very high probability that she would default and/or be foreclosed upon; (2) Defendants had an incentive to sell her loan, and did sell her loan at fraudulently inflated prices; (3) Loan Consultant's and Defendants' "qualification" process was for Defendants' own protection and not hers; (4) That Loan Consultant's and Defendants' representations that she was "qualified" to pay her loan was not intended to communicate that she could actually "afford" the loan which she was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Bowen's home to require her to borrow more money with the knowledge that the true value of Bowen's home was insufficient to justify the amount of Bowen's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Bowen would lose substantial equity in her home.

Based on these misrepresentations and omissions, the material facts concerning Bowen loan were concealed from her, and she decided to move forward with her loan. On August 24, 2006, Bowen signed the loan and Deed of Trust, before a notary. Had she known the truth

204

APPENDIX A TO COMPLAINT

however, Bowen would not have accepted the loan. As a result of the Defendants' fraudulent acts described throughout this complaint Bowen has lost substantial equity in her home, has damaged or destroyed credit, and at the time Bowen entered into the loan her home was worth substantially more than its current fair market value. Bowen did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around August 28, 2012.

62.     Plaintiff Manuel Cavillo ("Cavillo") discussed obtaining a mortgage to purchase his home located at 31150 Avenida Valdez, Cathedral City, CA 92234 and A.P.N 678-251-038 with a loan consultant (the "Loan Consultant"), a representative and authorized agent of IndyMac Bank F.S.B herein ("Defendants"). In the course of their discussions ranging from November 2007 until January 2008, Defendants and Loan Consultant steered him into a fixed rate mortgage in the amount of $304,000.00 with an interest rate at 5.5% for a term of 30 years. This loan was originated by IndyMac Bank, on the Note and Deed of Trust IndyMac Bank is identified as the lender. IndyMac Mortgage Services is currently servicing the loan.

Defendants and Loan Consultant explicitly represented to Cavillo that he could afford his loan and further represented that he could shoulder the additional financial burden of repaying his loan in consideration of his other existing debts. Defendants and Loan Consultant also represented to them that they could afford a $1,726.08 monthly payment, despite his $3,333.33 true monthly income (a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 51%) in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Cavillo that he could rely on the assessment that he was "qualified" to mean that he could afford the loan. Because of Cavillo's lack of familiarity with how much debt a person can and should reasonably take on compared to his monthly income, and because Cavillo reasonably relied on Defendants' and Loan Consultant's expertise that any payment he was "qualified" for would take into account what the maximum debt a person such

205

EXHIBIT A - PAGE 321

APPENDIx A TO COMPLAtNT

as Cavillo should be shouldering was, Cavillo reasonably believed Defendants' and Loan Consultant's representations that he could afford his loan and its payments.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around December 2007, an appraisal company under the direct control and supervision of Defendants, conducted an appraisal on Cavillo's home, which was fraudulently inflated to an intentionally overstated value Defendants and Loan Consultant represented that, per appraisal, Cavillo's home was worth $327,000.00 at the time he entered into his loan, and that such a valuation was a true and correct measure of his home's worth. The current fair market value of Cavillo's home is approximately $158,378.00. Cavillo alleges that the appraisal was artificially inflated and that he has suffered damages in the amount of $168,622.00 ($327,000-$158,378) due to a substantial loss of equity in his home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Loan Consultant also represented to Cavillo that he would be able to refinance his loan at a later time. Cavillo relied on this assurance in deciding to enter into the mortgage contract. However, Cavillo has not been able to refinance his loan because his home does not contain enough equity. Defendants and Loan Consultant also represented that it would modify Cavillo's loan, and Cavillo relied on this representation in deciding to enter into the loan.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber;(2) property appraisals done by Defendants were accurate and made in good faith; (3) Cavillo could afford the loan; (4) he was "qualified" for his loan; (5) "qualified" meant that he could afford his loan; (6) he would be able to modify his loan and (7) he would be able to refinance his loan.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Cavillo that: (1) Defendants and Loan Consultant knew that he could not and would not be able to afford his loan and that there was a very high probability that he would default and/or be foreclosed upon; (2) Defendants had an incentive to sell his loan, and did sell his loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's

206

EXHIBIT A - PAGE 322

**APPENDIX A TO COMPLAINT**

"qualification" process was for Defendants' own protection and not his; (4) that Defendants' and Loan Consultant's representations that he was "qualified" to pay his loan was not intended to communicate that he could actually "afford" the loan which he was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Cavillo's home to require him to borrow more money with the knowledge that the true value of Cavillo's home was insufficient to justify the amount of Cavillo's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Cavillo would lose substantial equity in his home.

Based on these misrepresentations and omissions, the material facts concerning Cavillo's loan were concealed from him, and he decided to move forward with his loan. On January 16, 2008, Cavillo signed the loan and Deed of Trust, before a notary. Had he known the truth however, Cavillo would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Cavillo has lost substantial equity in his home, has damaged or destroyed credit, and at the time Cavillo entered into the loan his home was worth $327,000.00, now his home is worth approximately $158,378.00. Cavillo did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around September 15, 2012.

63.     Plaintiff Heraclio Gonzalez and Marisela Gonzalez ("Mr. and Mrs. Gonzalez") discussed refinancing an existing mortgage on their property located at 825 Ohio Avenue, Placentia, CA 92870, A.P.N.:344-121-08 with a Loan Consultant ("Loan Consultant") with IndyMac Bank and Defendants herein ("Defendants") in or around April 2007. In the course of their discussions ranging from February 2007 until April 2007, Defendants and Loan Consultant steered them into an adjustable rate mortgage in the amount of $496,000.00 with an interest rate at 5.5% for a term of 30 years. Little did Mr. and Mrs. Gonzalez know, however, payments made

207

**APPENDIX A TO COMPLAINT**

during the first # year of their loan were Interest-Only. Mr. and Mrs. Gonzalez also were not advised that their interest rate was "fixed" for only 30 years, and could adjust every year thereafter. This loan was originated by IndyMac Bank, on the note and deed of trust IndyMac Bank is identified as the lender, and IndyMac Mortgage Services, a division of OneWest Bank is currently servicing the loan. In addition, Loan Consultant steered them into a "piggy-back" loan in the amount of $62,000.00 for a term of 15 years.

Defendants and Loan Consultant represented to Mr. and Mrs. Gonzalez that their monthly payment would always be $2,273.00. Although the amount of Mr. and Mrs. Gonzalez's monthly payment was $2,273.00, Defendants and Loan Consultant failed to clarify their partially true representations and advise Mr. and Mrs. Gonzalez that: (1) their monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) their monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of their monthly payment would not remain "fixed" for the entire term of the loan.

Further, Defendants and Loan Consultant advised them that they were eligible for a Low Doc Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low documentation requirement to fraudulently inflate their income; and in doing so, Defendants and Loan Consultant caused them to be placed into a loan whose payments they could not afford given their true, un-inflated monthly income. Defendants and Loan Consultant altered Mr. and Mrs. Gonzalez's loan application without their knowing consent or authorization as Loan Consultant completed Mr. and Mrs. Gonzalez's application without giving Mr. and Mrs. Gonzalez an opportunity to review the loan application.

Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Gonzalez that they could afford their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $3,668.14. Given Mr. and Mrs. Gonzalez's true monthly income of $5,805.00 this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 63%- grossly in excess of industry standard underwriting guidelines, and in excess of Defendants' own

208

**APPENDIX A TO COMPLAINT**

underwriting guidelines). Defendants and Loan Consultant further represented to Mr. and Mrs. Gonzalez that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Gonzalez's lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income, and because Mr. and Mrs. Gonzalez's reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Gonzalez should be shouldering was, Mr. and Mrs. Gonzalez reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

Although Defendants and Loan Consultant represented to Mr. and Mrs. Gonzalez that they were "qualified" for their loan and could afford their loan and its monthly payments, Defendants and Loan Consultant misled Mr. and Mrs. Gonzalez into believing that their monthly payments would always only be $2,273.00. Furthermore, at no point did Defendants or Loan Consultant clarify Mr. and Mrs. Gonzalez's false belief and advise them that $2,273.00 would not be their permanent payment under the loan, or that every time they made a monthly payment in the amount of $2,273.00, they were not paying down any of their principal balance.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around April 2, 2007, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Gonzalez's home, which was fraudulently inflated to intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Mr. and Mrs. Gonzalez's home was worth $560,000.00 at the time they entered into their loan, and that such a valuation was a true and correct measure of their home's worth. The current fair market value of Mr. and Mrs. Gonzalez's home is approximately $413,015.00. Mr. and Mrs. Gonzalez allege that the appraisal was artificially inflated, and that they have suffered damages in the amount of $146,985.00 ($560,000.00-$413,015.00) due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Loan Consultant also represented to Mr. and Mrs. Gonzalez that they

209

EXHIBIT A - PAGE 325

APPENDIX A TO COMPLAINT

would be able to refinance their loan at a later time. Mr. and Mrs. Gonzalez relied on this assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Gonzalez have not been able to refinance their loan. Defendants and Loan Consultant also represented that it would modify Mr. and Mrs. Gonzalez's loan, and Mr. and Mrs. Gonzalez relied on this representation in deciding to enter into the loan.

When Mr. and Mrs. Gonzalez were experiencing financial difficulty they contacted Defendants for assistance in repaying the loan. Mr. and Mrs. Gonzalez really needed help. Mr. and Mrs. Gonzalez have applied for a loan modification on three separate occasions. Throughout all 3 loan modification processes, Defendants always claimed that Mr. and Mrs. Gonzalez failed to submit all documents as requested. However, Mr. and Mrs. Gonzalez always sent in all of the documents in a timely fashion and whenever Defendants requested. However, Defendants rejected all of Mr. and Mrs. Gonzalez's loan modifications. As of now, Mr. and Mrs. Gonzalez have not been able to get their loan modified.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mr. and Mrs. Gonzalez could afford the loan; (4) they were "qualified" for their loan; (5) "qualified" meant that they could afford their loan; (6) Defendants would modify their loan in the future; and (7) Defendants would refinance their loan in the future.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Mr. and Mrs. Gonzalez that: (1) Defendants and Loan Consultant knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not theirs;(4) that Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they were being given; (5) Defendants had abandoned its conventional lending business, prudent

210

EXHIBIT A - PAGE 326

APPENDIX A TO COMPLAINT

lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mr. and Mrs. Gonzalez's home to require them to borrow more money with the knowledge that the true value of Mr. and Mrs. Gonzalez's home was insufficient to justify the amount of Mr. and Mrs. Gonzalez's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Gonzalez would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Gonzalez's loan were concealed from them, and they decided to move forward with their loan. On April 18, 2007, Mr. and Mrs. Gonzalez signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mr. and Mrs. Gonzalez would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Gonzalez have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Gonzalez entered into the loan their home was worth $560,000.00 now their home is worth approximately $413,015.00. Mr. and Mrs. Gonzalez did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around September 17, 2012.

64. Plaintiffs Tommie Mccray and Carletta McGray ("Mr. and Mrs. Mccray") discussed refinancing an existing mortgage on their home located at 11007 Kiowa Road, Apple Valley, CA 92308 and A.P.N.: 0434-351-38 with a loan consultant (the "Loan Consultant"), and representative and authorized agent of Defendants herein (the "Defendants") in or around March 2005. In the course of their discussions ranging from March 2005 until May 2005, Defendants and Loan Consultant steered them into a loan of which the Defendants and Loan Consultant concealed and inaccurately, incompletely or otherwise improperly disclosed the material terms and information concerning the loan. This loan was originated by IndyMac Bank, on the note and deed of trust IndyMac Bank is identified as the lender, and IndyMac Mortgage Services, a

211

EXHIBIT A - PAGE 327

**APPENDIX A TO COMPLAINT**

division of OneWest Bank is currently servicing the loan.

Defendants and Loan Consultant explicitly represented to Mccray that they could afford their loan; and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts. Loan Consultant and Defendants further represented to Mccray that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mccray's lack of familiarity with how much debt a person can and should reasonably take on compared to his/her monthly income, and because Mccray reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mccray should be shouldering was, Mccray reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. An appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mccray's home, which was fraudulently inflated to an intentionally overstated value. Mccray allege that the appraisal was artificially inflated, and that they have suffered damages due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

Loan Consultant and Defendants also represented to Mccray that they would be able to refinance their loan at a later time. Mccray relied on this assurance in deciding to enter into the mortgage contract. However, Mccray have not been able to refinance their loan. Loan Consultant and Defendants also represented that it would modify Mccray's loan, and Mccray relied on this representation in deciding to enter into the loan. In addition, Mccray were advised by a representative and authorized agent of Defendants to stop making payments in order to be eligible for a modification. Mccray relied on the Defendants' and the Defendants representative and authorized agents' advice and stopped making their monthly payments causing them to fall even further behind. However, Mccray were unable to modify their loan.

Furthermore, Loan Consultant and Defendants represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in

212

EXHIBIT A - PAGE 328



**APPENDIX A TO COMPLAINT**

lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mccray could afford the loan; (4) They were "qualified" for their loan; (5) "qualified" meant that they could afford their loan; (6) They would be able to modify their loan in the future; and (7) They would be able to refinance their loan in the future.

Moreover, Loan Consultant and Defendants withheld or incompletely, inaccurately or otherwise improperly disclosed to Mccray that: (1) Loan Consultant and Defendants knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Loan Consultant's and Defendants' "qualification" process was for Defendants' own protection and not theirs; (4) That Loan Consultant's and Defendants' representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mccray's home to require them to borrow more money with the knowledge that the true value of Mccray's home was insufficient to justify the amount of Mccray's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mccray would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mccray's loan were concealed from them, and they decided to move forward with their loan. On May 19, 2005, Mccray signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mccray would not have accepted the loan. As a result of the Defendants' fraudulent acts described throughout this complaint Mccray have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mccray entered into the loan their home was worth substantially more than its current fair market value. Mccray did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion

213

**APPENDIX A TO COMPLAINT**

of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light in or around September 2012.

65.    Plaintiffs Alan Bergum and Rocio Bergum ("Mr. and Mrs. Bergum") refinancing an existing mortgage on their property located at 2662 Snowdrop Street, san Diego, CA 92105 and A.P.N. 476-420-23-00 with a loan consultant (the "Loan Consultant"), a representative and authorized agent of IndyMac Bank F.S.B herein ("Defendants"). In the course of their discussions ranging from July 2006 until September 2006, Defendants and Loan Consultant steered them into an adjustable rate mortgage in the amount of $417,000.00 with an interest rate at 7.75% for a term of 30 years. Little did Mr. and Mrs. Bergum know, however, payments made during the first 10 years of their loan were Interest-Only. Mr. and Mrs. Bergum also were not advised that their interest rate was "fixed" for only 5 years, and could adjust every year thereafter This loan was originated by IndyMac Bank, in the note and Deed of Trust IndyMac Bank is identified as the lender. IndyMac Mortgage Services, a division of OneWest Bank is currently servicing the loan Defendants and OneWest Bank, F.S.B is currently servicing the loan.

Defendants and Loan Consultant represented to Mr. and Mrs. Bergum that their monthly payment would always be $2,693.12. Although the amount of Mr. and Mrs. Bergum's monthly payment was $2,693.12, Defendants and Loan Consultant failed to clarify their partially true representations and advise Mr. and Mrs. Bergum that: (1) their monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) their monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of their monthly payment would not remain "fixed" for the entire term of the loan.

Further, Defendants and Loan Consultant advised them that they were eligible for a Low Doc Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low documentation requirement to fraudulently inflate their income by $4,000, a factor of 50%; and in doing so, Defendants and Loan Consultant caused them to be placed into a loan whose payments they could not afford given their true, un-inflated monthly income. Defendants and Loan Consultant altered Mr. and Mrs. Bergum's loan application without their knowing consent or authorization as Loan Consultant completed Mr. and Mrs. Bergum's application without

214

APPENDIX A TO COMPLAINT

giving Mr. and Mrs. Bergum an opportunity to review the loan application.

Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Bergum that they could afford their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $3,159.20. Given Mr. and Mrs. Bergum's true monthly income of $3,509.92, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 90%- in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Mr. and Mrs. Bergum that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Bergum's lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income, and because Mr. and Mrs. Bergum reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Bergum should be shouldering was, Mr. and Mrs. Bergum reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

Although Defendants and Loan Consultant represented to Mr. and Mrs. Bergum that they were "qualified" for their loan and could afford their loan and its monthly payments, Defendants and Loan Consultant misled Mr. and Mrs. Bergum into believing that their monthly payments would always only be $2,693.12. Furthermore, at no point did Defendants or Loan Consultant clarify Mr. and Mrs. Bergum's false belief and advise them that $2,693.12 would not be their permanent payment under the loan, or that every time they made a monthly payment in the amount of $2,693.12, they were not paying down any of their principal balance.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around August 2006, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Bergum's home, which was fraudulently inflated to an intentionally overstated

215

EXHIBIT A - PAGE 331

## APPENDIX A TO COMPLAINT

value. Defendants and Loan Consultant represented that, per appraisal, Mr. and Mrs. Bergum's home was worth $535,000.00 at the time they entered into their loan, and that such a valuation was a true and correct measure of their home's worth. The current fair market value of Mr. and Mrs. Bergum's home is approximately $284,000.00. Mr. and Mrs. Bergum allege that the appraisal was artificially inflated and that they have suffered damages in the amount of $251,000.00 ($535,000-$284,000) due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Loan Consultant also represented to Mr. and Mrs. Bergum that they would be able to refinance their loan at a later time. Mr. and Mrs. Bergum relied on this assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Bergum have not been able to refinance their loan. Defendants and Loan Consultant also represented that it would modify Mr. and Mrs. Bergum's loan, and Mr. and Mrs. Bergum relied on this representation in deciding to enter into the loan. Yet after multiple attempts to get the loan modified, Defendants repeatedly denied Mr. and Mrs. Bergum's modification.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mr. and Mrs. Bergum could afford the loan ; (4) they were "qualified" for their loan; (5) "qualified" meant that they could afford their loan; (6) they would be able to modify their loan; and (7) they would be able to refinance their loan.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Mr. and Mrs. Bergum that: (1) Defendants and Loan Consultant knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which

216

APPENDIX A TO COMPLAINT

they were being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mr. and Mrs. Bergum's home to require him/her/them to borrow more money with the knowledge that the true value of Mr. and Mrs. Bergum's home was insufficient to justify the amount of Mr. and Mrs. Bergum's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Bergum would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Bergum's loan were concealed from them, and they decided to move forward with their loan. On September 25, 2006, Mr. and Mrs. Bergum signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mr. and Mrs. Bergum would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Bergum have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Bergum entered into the loan their home was worth $535,000.00, now their home is worth approximately $284,000.00. Mr. and Mrs. Bergum did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around September 9, 2012.

66.    Plaintiffs Ivory Rodriguez and Francisca Rodriguez ("Mr. and Mrs. Rodriguez") discussed obtaining a mortgage to purchase their home located at 12601 Van Nuys Boulevard Unit 28, Los Angeles, CA 91331, A.P.N.: 2532-007-117 with a loan consultant ("Loan Consultant") in or around September 2006. In the course of their discussions ranging from September 2006 until November 2006, Defendants and Loan Consultant steered them into an adjustable rate mortgage in the amount of $240,000.00 with an interest rate at 6.25% for a term of 30 years. Little did Mr. and Mrs. Rodriguez know, however, payments made during the first 10 year of their loan were Interest-Only. Mr. and Mrs. Rodriguez also was not advised that their

217

APPENDIX A TO COMPLAINT

interest rate was "fixed" for only 5 years, and could adjust every year thereafter. This loan has a prepayment penalty of 2 years. This loan was originated by IndyMac Bank, on the note and deed of trust IndyMac Bank is identified as the lender, and IndyMac Mortgage Services, a division of OneWest Bank is currently servicing the loan.

Defendants and Loan Consultant represented to Mr. and Mrs. Rodriguez that their monthly payment would always be $1,250.00. Although the amount of Mr. and Mrs. Rodriguez's monthly payment was $1,250.00, Defendants and Loan Consultant failed to clarify their partially true representations and advise Mr. and Mrs. Rodriguez that: (1) their monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) their monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of their monthly payment would not remain "fixed" for the entire term of the loan.

Further, Defendants and Loan Consultant advised them that they were eligible for a Low Doc Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low documentation requirement to fraudulently inflate their income; and in doing so, Defendants and Loan Consultant caused them to be placed into a loan whose payments they could not afford given their true, un-inflated monthly income. Defendants and Loan Consultant altered Mr. and Mrs. Rodriguez's loan application without their knowing consent or authorization as Loan Consultant completed Mr. and Mrs. Rodriguez's application without giving Mr. and Mrs. Rodriguez an opportunity to review the loan application.

Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Rodriguez that they could afford their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $1,769.07. Given Mr. and Mrs. Rodriguez's true monthly income of $2,400.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 74%- grossly in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Mr. and Mrs. Rodriguez that they could rely on the assessment that they were "qualified" to

218

APPENDIX A TO COMPLAINT

mean that they could afford the loan. Because of Mr. and Mrs. Rodriguez's lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income, and because Mr. and Mrs. Rodriguez reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Rodriguez should be shouldering was, Mr. and Mrs. Rodriguez reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

Although Defendants and Loan Consultant represented to Mr. and Mrs. Rodriguez that they were "qualified" for their loan and could afford their loan and its monthly payments, Defendants and Loan Consultant misled Mr. and Mrs. Rodriguez into believing that their monthly payments would always only be $1,269.00. Furthermore, at no point did Defendants or Loan Consultant clarify Mr. and Mrs. Rodriguez's false belief and advise them that $1,269.00 would not be their permanent payment under the loan, or that every time they made a monthly payment in the amount of $1,269.00, they were not paying down any of their principal balance.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around October 12, 2006, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Rodriguez's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Mr. and Mrs. Rodriguez's home was worth $300,000.00 at the time they entered into their loan, and that such a valuation was a true and correct measure of their home's worth. The current fair market value of Mr. and Mrs. Rodriguez's home is approximately $85,000.00. Mr. and Mrs. Rodriguez allege(s) that the appraisal was artificially inflated, and that they have suffered damages in the amount of $215,000.00 ($300,000.00-$85,000.00) due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Loan Consultant also represented to Mr. and Mrs. Rodriguez that they would be able to refinance their loan at a later time. Mr. and Mrs. Rodriguez relied on this assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Rodriguez has

219

EXHIBIT A - PAGE 335

APPENDIX A TO COMPLAINT

not been able to refinance their loan because Defendants and Loan Consultant also represented that it would modify Mr. and Mrs. Rodriguez's loan, and Mr. and Mrs. Rodriguez relied on this representation in deciding to enter into the loan. In addition, Mr. and Mrs. Rodriguez were advised by Defendants and Representative's to stop making payments in order to be eligible for a modification. Mr. and Mrs. Rodriguez relied on Defendants' and Defendants' representative and authorized agent's advice and stopped making their monthly payments causing them to fall even further behind. However, Defendants refused to permanently modify their loan.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mr. and Mrs. Rodriguez could afford the loan; (4) they were "qualified" for their loan; (5) "qualified" meant that they could afford their loan; (6) Defendants would modify their loan in the future; and (7) they would be able to refinance their loan.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Mr. and Mrs. Rodriguez that: (1) Defendants and Loan Consultant knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they were being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mr. and Mrs. Rodriguez's home to require them to borrow more money with the knowledge that the true value of Mr. and Mrs. Rodriguez's home was insufficient to justify the amount of Mr. and Mrs. Rodriguez's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Rodriguez would lose

220

APPENDIX A TO COMPLAINT

substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Rodriguez's loan were concealed from them, and they decided to move forward with their loan. On November 7, 2006, Mr. and Mrs. Rodriguez signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mr. and Mrs. Rodriguez would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Rodriguez have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Rodriguez entered into the loan their home was worth $300,000.00, now their home is worth approximately $85,000.00. Mr. and Mrs. Rodriguez did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around October 2, 2012.

67.     Plaintiff Diana Than ("Than") discussed obtaining a mortgage to purchase her home located at 680 Shady Place, Diamond Bar, CA 91765 and A.P.N 8281-044-088 with a loan consultant (the "Loan Consultant"), a representative and authorized agent of IndyMac Bank F.S.B herein ("Defendants"). In the course of their discussions ranging from October 2007 until December 2007, Defendants and Loan Consultant steered her into an adjustable rate mortgage in the amount of $558,750.00 with an interest rate at 7.625% for a term of 30 years. This loan was originated by IndyMac Bank, on the note and deed of trust IndyMac Bank is identified as the lender, and IndyMac Mortgage Services is currently servicing the loan.

Defendants and Loan Consultant represented to Than that her monthly payment would always be $3,954.80 Although the amount of Than's monthly payment was $3,954.80, Defendants and Loan Consultant failed to clarify their partially true representations and advise Than that: (1) her monthly payment would drastically increase at the end of the "fixed" interest rate period, (2) her interest rate was not "fixed" for the loan term, or (3) the amount of her monthly payment would not remain "fixed" for the entire term of the loan.

Defendants and Loan Consultant also explicitly represented to Than that she could afford

221

EXHIBIT A - PAGE 337

APPENDIX A TO COMPLAINT

her loan and further represented that she could shoulder the additional financial burden of repaying her loan in consideration of her other existing debts. Given Than's true monthly income of $4,700.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 84%- grossly in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Than that she could rely on the assessment that she was/were "qualified" to mean that she could afford the loan. Because of Than's lack of familiarity with how much debt a person can and should reasonably take on compared to her monthly income, and because Than reasonably relied on Defendants' and Loan Consultant's expertise that any payment she was "qualified" for would take into account what the maximum debt a person such as Than should be shouldering was, Than reasonably believed Defendants' and Loan Consultant's representations that she could afford her loan and its payments.

Although Defendants and Loan Consultant represented to Than that she was "qualified" for her loan and could afford her loan and its monthly payments, Defendants and Loan Consultant misled Than into believing that her monthly payments would always only be $3,954.80. Furthermore, at no point did Defendants or Loan Consultant clarify Than's false belief and advise her that $3,954.80 would not be her permanent payment under the loan, or her interest rate would not remain "fixed" for the loan term.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around November 2007, an appraisal company under the direct control and supervision of Defendants, conducted an appraisal on Than's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Than's home was worth $745,000.00 at the time she entered into her loan, and that such a valuation was a true and correct measure of her home's worth. The current fair market value of Than's home is approximately $647,213.00. Than alleges that the appraisal was artificially inflated and that she has suffered damages in the amount of $97,787.00 ($745,000-$647,213) due to a substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other acts described

222

EXHIBIT A - PAGE 338

APPENDtX A TO COMPLAtNT

herein.

Defendants and Loan Consultant also represented to Than that she would be able to refinance her loan at a later time. Than relied on this assurance in deciding to enter into the mortgage contract. However, Than has not been able to refinance her loan because her loan does not contain enough equity. Defendants and Loan Consultant also represented that it would modify Than's loan, and Than relied on this representation in deciding to enter into the loan. However, Defendants refused to permanently modify her loan.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Than could afford the loan; (4) she was "qualified" for her loan; (5) "qualified" meant that she could afford her loan; (6) she would be able to modify her loan; and (7) she would be able to refinance her loan.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Than that: (1) Defendants and Loan Consultant knew that she could not and would not be able to afford her loan and that there was a very high probability that she would default and/or be foreclosed upon;  (2) Defendants had an incentive to sell her loan, and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not her; (4) that Defendants' and Loan Consultant's representations that she was "qualified" to pay her loan was not intended to communicate that she could actually "afford" the loan which she was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Than's home to require her to borrow more money with the knowledge that the true value of Than's home was insufficient to justify the amount of Than's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Than would lose substantial equity in her home.

223

EXHIBIT A - PAGE 339

APPENDIX A TO COMPLAINT

Based on these misrepresentations and omissions, the material facts concerning Than's loan were concealed from her, and she decided to move forward with her loan. On December 26, 2007, Than signed the loan and Deed of Trust, before a notary. Had she known the truth however, Than would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Than has lost substantial equity in her home, has damaged or destroyed credit, and at the time Than entered into the loan her home was worth $745,000, now her home is worth approximately $647,213. Than did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around October 8, 2012.

68.     Plaintiff Enriqueta Polanco ("Polanco") discussed obtaining a mortgage to purchase her home located at 14101Garber Street, Arleta, CA 91331 and A.P.N.:2642-002-014 with a Loan Consultant ("Loan Consultant") with IndyMac Bank and Defendants herein (the "Defendants") in or around August 2007. In the course of their discussions ranging from August 2007 until October 2007, Defendants and Loan Consultant steered her into an adjustable rate mortgage in the amount of $450,000.00 with an interest rate 8.125% for a term of 30 years. Little did Polanco know, however, payments made during the first 10 years of her loan were Interest-Only. Polanco also was not advised that her interest rate was "fixed" for only 7 years, and could adjust every year thereafter. This loan was originated by IndyMac Bank, on the note and deed of trust IndyMac Bank is identified as the lender, and IndyMac Mortgage Services, a division of OneWest Bank is currently servicing the loan.

Defendants and Loan Consultant represented to Polanco that her monthly payment would always be $3,046.90. Although the amount of Polanco's monthly payment was $3,046.90, Defendants and Loan Consultant failed to clarify their partially true representations and advise Polanco that: (1) her monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) her monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of her monthly payment would not remain "fixed" for the

224

APPENDIX A TO COMPLAINT

entire term of the loan.

Further, Defendants and Loan Consultant advised her that she was eligible for a Low Doc Loan. Unbeknownst to her at the time, Defendants and Loan Consultant used this low documentation requirement to fraudulently inflate her income; and in doing so, Defendants and Loan Consultant caused her to be placed into a loan whose payments she could not afford given her true, un-inflated monthly income. Defendants and Loan Consultant altered Polanco's loan application without her knowing consent or authorization as Loan Consultant completed Polanco's application without giving Polanco an opportunity to review the loan application.

Defendants and Loan Consultant also explicitly represented to Polanco that she could afford her loan and further represented that she could shoulder the additional financial burden of repaying her loan in consideration of her other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $3,549.48. Defendants and Loan Consultant further represented to Polanco that she could rely on the assessment that she was "qualified" to mean that she could afford the loan. Because of Polanco's lack of familiarity with how much debt a person can and should reasonably take on compared to her monthly income, and because Polanco reasonably relied on Defendants' and Loan Consultant's expertise that any payment she was "qualified" for would take into account what the maximum debt a person such as Polanco should be shouldering was, Polanco reasonably believed Defendants' and Loan Consultant's representations that she could afford her loan and its payments.

Although Defendants and Loan Consultant represented to Polanco that she was "qualified" for her loan and could afford her loan and its monthly payments, Defendants and Loan Consultant misled Polanco into believing that her monthly payments would always only be $3,046.90. Furthermore, at no point did Defendants or Loan Consultant clarify Polanco's false belief and advise her that $3,046.90 would not be her permanent payment under the loan, or that every time she made a monthly payment in the amount of $3,046.90 she was not paying down any of her principal balance.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around October 26, 2007

225

EXHIBIT A - PAGE 341

APPENDIX A TO COMPLAINT

an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Polanco's home, which was fraudulently inflated to an intentionally overstated value. The current fair market value of Polanco's home is approximately $235,365.00. Polanco alleges that the appraisal was artificially inflated, and that she has suffered damages due to a substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other acts described herein.

At the time of entering into the loan, Defendants and Loan Consultant also represented that it would modify Polanco's loan, and Polanco relied on this representation in deciding to enter into the loan. In addition, Polanco was advised by Defendants and a representative and authorized agent of Defendants, to stop making payments in order to be eligible for a modification. Polanco relied on Defendants' and Defendants' representative and authorized agent's advice and stopped making her monthly payments causing her to fall even further behind. However, Defendants refused to permanently modify her loan.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Polanco could afford the loan; (4) she was "qualified" for her loan; (5) "qualified" meant that she could afford her loan; (6) Defendants would modify her loan in the future; and (7) Defendants would refinance her loan in the future.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Polanco that: (1) Defendants and Loan Consultant knew that she could not and would not be able to afford her loan and that there was a very high probability that she would default and/or be foreclosed upon; (2) Defendants had an incentive to sell her loan, and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not hers; (4) that Defendants' and Loan Consultant's representations that she was "qualified" to pay her loan was not intended to communicate that she could actually "afford" the loan which she was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and

226

EXHIBIT A - PAGE 342

APPENDIX A TO COMPLAINT

industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Polanco's home to require her to borrow more money with the knowledge that the true value of Polanco's home was insufficient to justify the amount of Polanco's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Polanco would lose substantial equity in her home.

Based on these misrepresentations and omissions, the material facts concerning Polanco's loan were concealed from her, and she decided to move forward with her loan. On October 26, 2007 Polanco signed the loan and Deed of Trust, before a notary. Had she known the truth however, Polanco would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Polanco has lost substantial equity in her home, has damaged or destroyed credit. Now her home is worth approximately $235,365.00 Polanco did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around October 13, 2012.

69.     Plaintiff Martin Lozano ("Lozano") discussed obtaining a mortgage to purchase his home located at 2191 W 29th Place, Los Angeles, CA 90018 and A.P.N.:5052-027-014 with Loan Consultant ("Loan Consultant") with Mortgageit Incorporation, a correspondent of IndyMac Bank and Defendants herein ("Defendants") in or around October 2006. In the course of their discussions ranging from October 2006 until December 2006, Defendants and Loan Consultant steered him into an adjustable rate mortgage in the amount of $575,200.00 with an interest rate at 1.25% for a term of 30 years. Little did Lozano know, however, his loan was a negatively amortized PayOption ARM. Lozano was not advised that the interest rate was never "fixed" but applied to only his first monthly payment and could adjust every month thereafter. The amount of Lozano's minimum monthly payment was "fixed" for 12 months and could adjust every 12 months thereafter. When the amount of the minimum monthly payment is insufficient to cover the amount of interest due, then the amount of that deficiency is added onto the unpaid

227

EXHIBIT A - PAGE 343

APPENDIX A TO COMPLAINT

principal balance of his loan. The recast point of this loan is 115% of the original loan amount. On the note and deed of trust Mortgageit Incorporation is identified as the lender, and IndyMac Mortgage Services, a division of OneWest Bank was the servicer of the loan.

Defendants and Loan Consultant explicitly represented to Lozano that he could afford his loan; and further represented that he could shoulder the additional financial burden of repaying his loan in consideration of his other existing debts. Loan Consultant and Defendants further represented to Lozano that he could rely on the assessment that he was "qualified" to mean that he could afford the loan. Because of Lozano's lack of familiarity with how much debt a person can and should reasonably take on compared to his/her monthly income, and because Lozano reasonably relied on Defendants' and Loan Consultant's expertise that any payment he was "qualified" for would take into account what the maximum debt a person such as Lozano should be shouldering was, Lozano reasonably believed Defendants' and Loan Consultant's representations that he could afford his loan and its payments.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. An appraisal company under the direct control and supervision of Defendants conducted an appraisal on Lozano's home, which was fraudulently inflated to an intentionally overstated value. Lozano alleges that the appraisal was artificially inflated, and that he has suffered damages due to a substantial loss of equity in his home as a result of Defendants' fraudulent inflation and other acts described herein.

When Lozano was experiencing financial difficulty, they contacted Defendants for assistance in a loan modification. Lozano had applied for a loan modification on 2 separate occasions. However, Defendants refused to permanently modify his loan.

The foreclosure against Lozano's home was wrongful because Defendants did not yet have the authority to executed the Notice of Default ("NOD") recorded on August 3, 2009. Defendants, OneWest Bank, was not assigned the beneficial interest in the Deed of Trust ("DOT) until August 25, 2009. The original beneficiary of the DOT was Mortgageit Incorporation. Since on August 3, 2009 OneWest was not vested with the authority to initiate the foreclosure, the NOD was invalid. Any subsequent foreclosure documents based on the NOD are also invalid.

228

EXHIBIT A - PAGE 344

APPENDIX A TO COMPLAINT

Therefore, the foreclosure against Lozano's home is void.

Furthermore, Loan Consultant and Defendants represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Lozano could afford the loan; (4) He was "qualified" for his loan; (5) "qualified" meant that he could afford his loan; (6) He would be able to modify his loan in the future; and (7) He would be able to refinance his loan in the future.

Moreover, Loan Consultant and Defendants withheld or incompletely, inaccurately or otherwise improperly disclosed to Lozano that: (1) Loan Consultant and Defendants knew that he could not and would not be able to afford his loan and that there was a very high probability that he would default and/or be foreclosed upon; (2) Defendants had an incentive to sell his loan, and did sell his loan at fraudulently inflated prices; (3) Loan Consultant's and Defendants' "qualification" process was for Defendants' own protection and not his; (4) That Loan Consultant's and Defendants' representations that he was "qualified" to pay his loan was not intended to communicate that he could actually "afford" the loan which he was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Lozano 's home to require him to borrow more money with the knowledge that the true value of Lozano 's home was insufficient to justify the amount of Lozano 's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Lozano would lose substantial equity in his home.

Based on these misrepresentations and omissions, the material facts concerning Lozano's loan were concealed from him, and he decided to move forward with his loan. On December 15, 2006, Lozano signed the loan and Deed of Trust, before a notary. Had he known the truth however, Lozano would not have accepted the loan. As a result of the Defendants' fraudulent acts described throughout this complaint Lozano has lost substantial equity in his home, has damaged or destroyed credit, and at the time Lozano entered into the loan his home was worth

229

EXHIBIT A - PAGE 345

APPENDIX A TO COMPLAINT

substantially more than its current fair market value. Lozano did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around October 25, 2012. (True and correct copies of the aforementioned documents are attached here to as *Exhibit 19*).

70.    Plaintiffs Charles and Debra Navarro ("Mr. and Mrs. Navarro") discussed refinancing an existing mortgage on their property located at 27581 Vista De Dons, Dana Point, CA 92629 and A.P.N. 691-223-12 with a loan consultant (the "Loan Consultant"), a representative and authorized agent of Emerald Pacific Financial, and authorized by IndyMac Bank F.S.B to lend on their behalf, in or around March 2007. In the course of their discussions ranging from March 2007 until May 2007, Defendants and Loan Consultant steered them into an adjustable rate mortgage in the amount of $910,000.00 with an interest rate at 6.5% for a term of 30 years. Little did Mr. and Mrs. Navarro know, however, payments made during the first 7 years of their loan were Interest-Only. Mr. and Mrs. Navarro also were not advised that their interest rate was "fixed" for only 7 years, and could adjust every year thereafter. This loan was originated by Emerald Pacific Financial and IndyMac Mortgage Services is currently servicing the loan.

Defendants and Loan Consultant represented to Mr. and Mrs. Navarro that their monthly payment would always be $4,929.17. Although the amount of Mr. and Mrs. Navarro's monthly payment was $4,929.17, Defendants and Loan Consultant failed to clarify their partially true representations and advise Mr. and Mrs. Navarro that: (1) their monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) their monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of their monthly payment would not remain "fixed" for the entire term of the loan.

Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Navarro that they could afford their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts; yet failed to

230

**APPENDIX A TO COMPLAINT**

disclose that the fully amortized monthly payment on the loan was $6,785.41. Given Mr. and Mrs. Navarro's true monthly income of $8,000.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 84%- in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines. Defendants and Loan Consultant further represented to Mr. and Mrs. Navarro that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Navarro's lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income, and because Mr. and Mrs. Navarro reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Navarro should be shouldering was, Mr. and Mrs. Navarro reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

Although Defendants and Loan Consultant represented to Mr. and Mrs. Navarro that they were "qualified" for their loan and could afford their loan and its monthly payments, Defendants and Loan Consultant misled Mr. and Mrs. Navarro into believing that their monthly payments would always only be $4,929.17. Furthermore, at no point did Defendants or Loan Consultant clarify Mr. and Mrs. Navarro's false belief and advise them that $4,929.17 would not be their permanent payment under the loan, or that every time they made a monthly payment in the amount of $4,929.17, they were not paying down any of their principal balance.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around April 2007, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Navarro's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Mr. and Mrs. Navarro's home was worth $949,000.00 at the time they entered into their loan, and that such a valuation was a true and correct measure of their home's worth. The current fair market value of Mr. and Mrs. Navarro's home is approximately $880,000.00. Mr. and Mrs. Navarro allege that the

231

EXHIBIT A - PAGE 347

**APPENDIX A TO COMPLAINT**

appraisal was artificially inflated, and that they have suffered damages in the amount of $69,000.00 ($949,000-$880,000) due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mr. and Mrs. Navarro could afford the loan ; (4) they were "qualified" for their loan; (5) "qualified" meant that they could afford their loan; (6) they would be able to modify their loan; and (7) they would be able to refinance their loan.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Mr. and Mrs. Navarro that: (1) Defendants and Loan Consultant knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon;  (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they were being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mr. and Mrs. Navarro's home to require them to borrow more money with the knowledge that the true value of Mr. and Mrs. Navarro's home was insufficient to justify the amount of Mr. and Mrs. Navarro's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Navarro would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Navarro's loan were concealed from them, and they decided to move forward with their loan. On May 23, 2007, Mr. and Mrs. Navarro signed the loan and Deed of Trust, before a

232

APPENDtX A TO COMPLAINT

notary. Had they known the truth however, Mr. and Mrs. Navarro would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Navarro have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Navarro entered into the loan their home was worth $949,000.00, now their home is worth approximately $880,000.00. Mr. and Mrs. Navarro did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around October 17, 2012.

71.     Plaintiff Nhu Thuan Thi Nguyen ("Nguyen") discussed refinancing an existing mortgage on her property located at 3521 W Kent Avenue, Santa Ana, CA 92704, A.P.N.:144-352-08 with a Loan Consultant ("Loan Consultant") in or around May 2007. In the course of their discussions ranging from May 2007 until July 2007, Defendants and Loan Consultant steered her into an adjustable rate mortgage in the amount of $640,000.00 with an interest rate at 6.625% for a term of 30 years. Little did Nguyen know, however, payments made during the first 10 years of her loan were Interest-Only. Nguyen also was not advised that her interest rate was "fixed" for only 5 years, and could adjust every 12 months thereafter. This loan was originated by IndyMac Bank, on the note and deed of trust IndyMac Bank is identified as the lender, and IndyMac Mortgage Services is currently servicing the loan.

Defendants and Loan Consultant represented to Nguyen that her monthly payment would always be $4,340.00. Although the amount of Nguyen's monthly payment was $4,340.00, Defendants and Loan Consultant failed to clarify their partially true representations and advise Nguyen that: (1) her monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) her monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of her monthly payment would not remain "fixed" for the entire term of the loan.

Further, Defendants and Loan Consultant advised him that she was eligible for a Low Doc Loan. Unbeknownst to him at the time, Defendants and Loan Consultant used this low

233

APPENDIX A TO COMPLAINT

documentation requirement to fraudulently inflate her income; and in doing so, Defendants and Loan Consultant caused him to be placed into a loan whose payments she could not afford given her true, un-inflated monthly income. Defendants and Loan Consultant altered Nguyen's loan application without her knowing consent or authorization as Loan Consultant completed Nguyen's application without giving Nguyen an opportunity to review the loan application.

Defendants and Loan Consultant also explicitly represented to Nguyen that she could afford her loan and further represented that she could shoulder the additional financial burden of repaying her loan in consideration of her other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $4,757.81. Given Nguyen's true monthly income of $4,700.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 101%- grossly in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Nguyen that she could rely on the assessment that she was "qualified" to mean that she could afford the loan. Because of Nguyen's lack of familiarity with how much debt a person can and should reasonably take on compared to her monthly income, and because Nguyen reasonably relied on Defendants' and Loan Consultant's expertise that any payment she was "qualified" for would take into account what the maximum debt a person such as Nguyen should be shouldering was, Nguyen reasonably believed Defendants' and Loan Consultant's representations that she could afford her loan and its payments.

Although Defendants and Loan Consultant represented to Nguyen that she was "qualified" for her loan and could afford her loan and its monthly payments, Defendants and Loan Consultant misled Nguyen into believing that her monthly payments would always only be $4,340.00. Furthermore, at no point did Defendants or Loan Consultant clarify Nguyen's false belief and advise him that $4,340.00 would not be her permanent payment under the loan, or that every time she made a monthly payment in the amount of $4,340.00, she was not paying down any of her principal balance.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around June 12, 2007, an

234

EXHIBIT A - PAGE 350

#:392

### APPENDIX A TO COMPLAINT

appraisal company under the direct control and supervision of Defendants conducted an appraisal on Nguyen's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Nguyen's home was worth $800,000.00 at the time she entered into her loan, and that such a valuation was a true and correct measure of her home's worth. The current fair market value of Nguyen's home is approximately $334,900.00. Nguyen allege that the appraisal was artificially inflated, and that she have suffered damages in the amount of $465,100.00 ($800,000.00-$334,900.00) due to a substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other acts described herein.

In or around early 2009, Nguyen was experiencing financial difficulty. In that regard, she contacted Defendants for assistance for a loan modification. During the loan modification process, Defendants never assigned Nguyen a single point of contact and repeatedly demanded the same documents from Nguyen. Nguyen applied for a loan modification on 3 separate occasions. As of now Defendants have not yet modified Nguyen's loan.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Nguyen could afford the loan; (4) she was "qualified" for her loan; (5) "qualified" meant that she could afford her loan; (6) Defendants would modify her loan in the future; and (7) Defendants would refinance her loan in the future.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Nguyen that: (1) Defendants and Loan Consultant knew that she could not and would not be able to afford her loan and that there was a very high probability that she would default and/or be foreclosed upon; (2) Defendants had an incentive to sell her loan, and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not hers; (4) that Defendants' and Loan Consultant's representations that she was "qualified" to pay her loan was not intended to communicate that she could actually "afford" the loan which she was being given; (5)

235

**APPENDIX A TO COMPLAINT**

Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Nguyen 's home to require him to borrow more money with the knowledge that the true value of Nguyen 's home was insufficient to justify the amount of Nguyen 's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Nguyen would lose substantial equity in her home.

Based on these misrepresentations and omissions, the material facts concerning Nguyen's loan were concealed from him, and she decided to move forward with her loan. On July 3, 2007, Nguyen signed the loan and Deed of Trust, before a notary. Had she known the truth however, Nguyen would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Nguyen has damaged or destroyed credit. Nguyen did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around October 19, 2012.

72.     Plaintiffs Josefina Martinez and Agustin Martinez ("Mr. and Mrs. Martinez") discussed obtaining refinancing an existing mortgage on their property located at 1558 East 48 Street, Los Angeles, CA 90011, A.P.N.:5106-018-004 with a Loan Consultant ("Loan Consultant") of IndyMac Bank and Defendants herein (the "Defendants") in or around February 2007. In the course of their discussions ranging from February 2007 until April 2007, Defendants and Loan Consultant steered them into an adjustable rate mortgage in the amount of $337,500.00 with an interest rate at 6.897% for a term of 30 years. Little did Mr. and Mrs. Martinez know, however, payments made during the first 10 years of their loan were Interest-Only. Mr. and Mrs. Martinez also were not advised that their interest rate was "fixed" for only 5 years, and could adjust every 12 months thereafter. This loan was originated by IndyMac Bank, on the note and deed of trust IndyMac Bank is identified as the lender, and OneWest Bank is currently servicing the loan.

236

**APPENDIX A TO COMPLAINT**

Defendants and Loan Consultant represented to Mr. and Mrs. Martinez that their monthly payment would always be $1,939.80. Although the amount of Mr. and Mrs. Martinez's monthly payment was $1,939.80, Defendants and Loan Consultant failed to clarify their partially true representations and advise Mr. and Mrs. Martinez that: (1) their monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) their monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of their monthly payment would not remain "fixed" for the entire term of the loan.

Defendants and Loan Consultant altered Mr. and Mrs. Martinez's loan application without their knowing consent or authorization as Loan Consultant completed Mr. and Mrs. Martinez's application without giving Mr. and Mrs. Martinez an opportunity to review the loan application. Unbeknownst to them at the time, Defendants and Loan Consultant used this low documentation requirement to fraudulently inflate their income; and in doing so, Defendants and Loan Consultant caused them to be placed into a loan whose payments they could not afford given their true, un-inflated monthly income.

Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Martinez that they could afford their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $2,222.10. Given Mr. and Mrs. Martinez's true monthly income of $4,000.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 55%- in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Mr. and Mrs. Martinez that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Martinez's lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income, and because Mr. and Mrs. Martinez reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Martinez should be shouldering was, Mr. and Mrs. Martinez reasonably

237

EXHIBIT A - PAGE 353

**APPENDIX A TO COMPLAINT**

believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

Although Defendants and Loan Consultant represented to Mr. and Mrs. Martinez that they were "qualified" for their loan and could afford their loan and its monthly payments, Defendants and Loan Consultant misled Mr. and Mrs. Martinez into believing that their monthly payments would always only be $1,939.80. Furthermore, at no point did Defendants or Loan Consultant clarify Mr. and Mrs. Martinez's false belief and advise them that $1,939.80 would not be their permanent payment under the loan, or that every time they made a monthly payment in the amount of $1,939.80, they were not paying down any of their principal balance.

Defendants and Loan Consultant also represented that it would modify Mr. and Mrs. Martinez's loan, and Mr. and Mrs. Martinez relied on this representation in deciding to enter into the loan. In addition, Mr. and Mrs. Martinez were advised by Defendants and a representative and authorized agent of Defendants, to stop making payments in order to be eligible for a modification. Mr. and Mrs. Martinez relied on Defendants' and Defendants' representative and authorized agent's advice and stopped making their monthly payments causing them to fall even further behind. However, Defendants refused to permanently modify their loan.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around April 26, 2007, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Martinez's home, which was fraudulently inflated to an intentionally overstated value. The current fair market value of Mr. and Mrs. Martinez's home is approximately $194,721.00. Mr. and Mrs. Martinez allege that the appraisal was artificially inflated, and that they have suffered damages due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mr. and Mrs. Martinez could afford the loan; (4) they were "qualified"

238

APPENDIX A TO COMPLAINT

for their loan; (5) "qualified" meant that they could afford their loan; (6) Defendants would modify their loan in the future; and (7) they would be able to refinance their loan in the future.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Mr. and Mrs. Martinez that: (1) Defendants and Loan Consultant knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they were being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mr. and Mrs. Martinez's home to require them to borrow more money with the knowledge that the true value of Mr. and Mrs. Martinez's home was insufficient to justify the amount of Mr. and Mrs. Martinez's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Martinez would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Martinez's loan were concealed from them, and they decided to move forward with their loan. On April 26, 2007, Mr. and Mrs. Martinez signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mr. and Mrs. Martinez would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Martinez have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Martinez entered into the loan their home was worth substantially higher than the current market value of $194,721.00. Mr. and Mrs. Martinez did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation,

239

APPENDIX A TO COMPLAINT

and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around November 10, 2012.

73. Plaintiff GilbertoMurillo ("Murillo") discussed refinancing an existing mortgage on his property located at 9873 Primrose Drive, Riverside, CA 92503, A.P.N.:234-080-042 with a Loan Consultant ("Loan Consultant") with IndyMac Bank and Defendants herein ("Defendants") in or around June 2005. In the course of their discussions ranging from June 2005 until August 2005, Defendants and Loan Consultant steered him into a fixed rate mortgage in the amount of $434,000.00 with an interest rate at7.75% for a term of 30 years. Murillo's monthly payment is $3,109.23. This loan has a prepayment penalty of 3 years. This loan was originated by IndyMac Bank, on the note and deed of trust IndyMac Bank is identified as the lender, and OneWest Bank is currently servicing the loan.

Shortly after Murillo entered into the loan, Murillo was experiencing financial difficulty. In that regard, Murillo contacted Defendants for assistance in a loan modification and applied for a loan modification. At no point during the loan modification process, Defendants never assigned Murillo a single point of contact. Murillo had to speak to multiple people. Murillo's loan modification added all of the late payments, late fees surcharges, attorney fees, and other unexplainable fees.

On August 15, 2007, Murillo signed the loan and Deed of Trust, before a notary. After Murillo entered into this loan, Murillo has lost substantial equity in his home As a result of the loan that Murillo was issued, Murillo has lost substantial equity in his home, has damaged or destroyed credit, and now his home is worth approximately $320,147.00. Murillo did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around January 15, 2013.

74. Plaintiff Jannet Torres ("Torres") discussed obtaining a mortgage to purchase her home located at 27901 Rockwood Avenue, Moreno Valley, CA 92555, A.P.N.:304-483-014with a Loan Consultant ("Loan Consultant") with IndyMac Bank and Defendants herein

240

## APPENDIX A TO COMPLAINT

("Defendants") in or around January 2008. In the course of their discussions ranging from January 2008 until March 2008, Defendants and Loan Consultant steered her into a fixed rate mortgage in the amount of $294,500.00 with an interest rate at 6.5% for a term of 30 years. This loan was originated by IndyMac Bank, on the note and deed of trust IndyMac Bank is identified as the lender, and IndyMac Mortgage Services, a division of OneWest Bank is currently servicing the loan.

Further, Defendants and Loan Consultant advised her that she was eligible for a Low Doc Loan. Unbeknownst to her at the time, Defendants and Loan Consultant used this low documentation requirement to fraudulently inflate her income; and in doing so, Defendants and Loan Consultant caused her to be placed into a loan whose payments she could not afford given her true, un-inflated monthly income. Defendants and Loan Consultant altered Torres's loan application without her knowing consent or authorization as Loan Consultant completed Torres's application without giving Torres an opportunity to review the loan application.

Defendants and Loan Consultant also explicitly represented to Torres that she could afford her loan and further represented that she could shoulder the additional financial burden of repaying her loan in consideration of her other existing debts. Defendants and Loan Consultant also represented to them that they could afford a $1,861.44 monthly payment, despite their $4,885.00 true monthly income (a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 38%) - in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Torres that she could rely on the assessment that she was "qualified" to mean that she could afford the loan. Because of Torres's lack of familiarity with how much debt a person can and should reasonably take on compared to her monthly income, and because Torres reasonably relied on Defendants' and Loan Consultant's expertise that any payment she was "qualified" for would take into account what the maximum debt a person such as Torres should be shouldering was, Torres reasonably believed Defendants' and Loan Consultant's representations that she could afford her loan and its payments.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or

EXHIBIT A - PAGE 357

APPENDIX A TO COMPLAINT

on behalf of Defendants were accurate and made in good faith. On or around February 18, 2008, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Torres's home, which was fraudulently inflated to intentionally overstated value. The current fair market value of Torres's home is approximately $222,666.00. Torres allege that the appraisal was artificially inflated, and that she has suffered due to a substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other acts described herein.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Torres could afford the loan; (4) she was "qualified" for her loan;(5) "qualified" meant that she could afford her loan; (6) Defendants would modify her loan in the future; and (7) Defendants would refinance her loan in the future.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Torres that: (1) Defendants and Loan Consultant knew that she could not and would not be able to afford her loan and that there was a very high probability that she would default and/or be foreclosed upon; (2) Defendants had an incentive to sell her loan, and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not hers; (4) that Defendants' and Loan Consultant's representations that she was "qualified" to pay her loan was not intended to communicate that she could actually "afford" the loan which she was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Torres's home to require her to borrow more money with the knowledge that the true value of Torres's home was insufficient to justify the amount of Torres's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Torres would lose substantial equity in her home.

Based on these misrepresentations and omissions, the material facts concerning Torres's

242

## APPENDIX A TO COMPLAINT

loan were concealed from her, and she decided to move forward with her loan. On March 10, 2008, Torres signed the loan and Deed of Trust, before a notary. Had she known the truth however, Torres would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Torres has lost substantial equity in her home, has damaged or destroyed credit, and at the time Torres entered into the loan her home was worth substantially higher than the current market value, which is approximately $222,666.00. Torres did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around

75.     Plaintiff Ivan Salazar ("Salazar") discussed obtaining a mortgage to purchase his home located at 13007 Garber Street, Pacoima, CA 91331, A.P.N.:2623-001-023 with a Loan Consultant ("Loan Consultant") with Camino Real Mortgage Bankers on April 13, 2006. In the course of their discussions with the lender, Salazar was steered him into a fixed rate mortgage in the amount of $391,920.00 with an interest rate at 6.9% for a term of 30 years. Salazar was represented that he could afford a $2,581.19 monthly payment. In addition, Loan Consultant steered him into a "piggy-back" loan in the amount of $97,980.00. This loan was originated by IndyMac Bank, on the note and deed of trust IndyMac Bank is identified as the lender, and IndyMac Mortgage Services is currently servicing the loan.

In or around early 2009, Salazar was experiencing financial difficulty. He really needed help. In that regard, Salazar applied for a loan modification with Defendants. During the loan modification, at no point Defendants assigned a single point of contact. Salazar had to speak to different people and had to present his facts multiple times to multiple representatives.

On April 13, 2006, Salazar signed the loan and Deed of Trust, before a notary. Had he known the truth however, Salazar would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Salazar has lost substantial equity in his home, has damaged or destroyed credit, and now his home is worth approximately $218,450.00. Salazar did not discover any of these misrepresentations or omissions until after a consultation

243

EXHIBIT A - PAGE 359

**APPENDIX A TO COMPLAINT**

with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around March 8, 2013.

76.      Plaintiff Porfirio Camacho ("Camacho") discussed obtaining a mortgage to purchase his home located at 12655 Verano Street, Victorville, CA 92392, A.P.N.:3136-421-02 with a Loan Consultant ("Loan Consultant") with IndyMac Bank and Defendants herein ("Defendants") in or around August 2007. In the course of their discussions ranging from August 2007 until October 2007, Defendants and Loan Consultant steered him into a fixed rate mortgage in the amount of $254,990.00 with an interest rate at 6.5% for a term of 30 years. This loan was originated by IndyMac Bank, on the note and deed of trust IndyMac Bank is identified as the lender, and IndyMac Mortgage Services was the servicer of Camacho's loan.

Further, Defendants and Loan Consultant advised him that he was eligible for a Low Doc Loan. Unbeknownst to him at the time, Defendants and Loan Consultant used this low documentation requirement to fraudulently inflate his income; and in doing so, Defendants and Loan Consultant caused him to be placed into a loan whose payments he could not afford given his true, un-inflated monthly income. Defendants and Loan Consultant altered Camacho's loan application without his knowing consent or authorization as Loan Consultant completed Camacho's application without giving Camacho an opportunity to review the loan application.

Defendants and Loan Consultant also explicitly represented to Camacho that he could afford his loan and further represented that he could shoulder the additional financial burden of repaying his loan in consideration of his other existing debts. Defendants and Loan Consultant also represented to them that they could afford a $1,611.71 monthly payment, despite their $3,000.00 true monthly income (a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 54%). Defendants and Loan Consultant further represented to Camacho that he could rely on the assessment that he was "qualified" to mean that he could afford the loan. Because of Camacho's lack of familiarity with how much debt a person can and should reasonably take on compared to his monthly income, and because

244

APPENDIX A TO COMPLAINT

Camacho reasonably relied on Defendants' and Loan Consultant's expertise that any payment he was "qualified" for would take into account what the maximum debt a person such as Camacho should be shouldering was, Camacho reasonably believed Defendants' and Loan Consultant's representations that he could afford his loan and its payments.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around October 2, 2007, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Camacho's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Camacho's home was worth $346,000.00 at the time he entered into his loan, and that such a valuation was a true and correct measure of his home's worth. The current fair market value of Camacho's home is approximately $170,425.00. Camacho alleges that the appraisal was artificially inflated, and that he has suffered damages in the amount of $175,575.00 ($346,000.00-$170,425.00) due to a substantial loss of equity in his home as a result of Defendants' fraudulent inflation and other acts described herein.

In or around early 2012, Camacho was experiencing financial difficulty. He really needed help. In that regard, Camacho contacted Defendants for assistance in a loan modification. When Camacho applied for a loan modification, Camacho was advised by Defendants and Representative to stop making payments in order to be eligible for a modification. Camacho relied on Defendants' and Defendants' representative's advice and stopped making his monthly payments causing him to fall even further behind. However, Defendants refused to permanently modify his loan.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Camacho could afford the loan; (4) he was "qualified" for his loan; (5) "qualified" meant that he could afford his loan; (6) Defendants would modify his loan in the future; and (7) he would be able to refinance his loan in the future.

245

EXHIBIT A - PAGE 361

**APPENDIX A TO COMPLAINT**

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Camacho that: (1) Defendants and Loan Consultant knew that he could not and would not be able to afford his loan and that there was a very high probability that he would default and/or be foreclosed upon; (2) Defendants had an incentive to sell his loan, and did sell his loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not his; (4) that Defendants' and Loan Consultant's representations that he was "qualified" to pay his loan was not intended to communicate that he could actually "afford" the loan which he was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Camacho's home to require him to borrow more money with the knowledge that the true value of Camacho's home was insufficient to justify the amount of Camacho's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Camacho would lose substantial equity in his home.

Based on these misrepresentations and omissions, the material facts concerning Camacho's loan were concealed from him, and he decided to move forward with his loan. On October 19, 2007 Camacho signed the loan and Deed of Trust, before a notary. Had he known the truth however, Camacho would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Camacho has lost substantial equity in his home, has damaged or destroyed credit, and at the time Camacho entered into the loan his home was worth $346,000.00, now his home is worth approximately $170,425.00. Camacho did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around September 28, 2011.

77.     Plaintiffs Nelson and Malieta Miguel ("Mr. and Mrs. Miguel") discussed refinancing an existing mortgage on their property located at 21012 Millpoint Avenue, Carson,

246

EXHIBIT A - PAGE 362

**APPENDIX A TO COMPLAINT**

CA 90745, A.P.N.: 7326-003-007 with a Loan Consultant ("Loan Consultant"), a representative and authorized agent of Integrity Bancorp, a correspondent of IndyMac Bank and Defendants herein ("Defendants') and authorized by Defendants to lend on their behalf, in or around April 2007. In the course of their discussions ranging from April 2007 until June 2007, Defendants and Loan Consultant steered them into an adjustable rate mortgage in the amount of $480,000.00 with an interest rate at 6.25% for a term of 30 years. Little did Mr. and Mrs. Miguel know, however, payments made during the first 10 years of their loan were Interest-Only. Mr. and Mrs. Miguel also was not advised that their interest rate was "fixed" for only 5 years, and could adjust every year thereafter. This loan was originated by IndyMac Bank, on the note and deed of trust Integrity Bancorp is identified as the lender, and OneWest Bank is currently servicing the loan.

Defendants and Loan Consultant represented to Mr. and Mrs. Miguel that their monthly payment would always be $2,480.00. Although the amount of Mr. and Mrs. Miguel's monthly payment was $2,480.00, Defendants and Loan Consultant failed to clarify their partially true representations and advise Mr. and Mrs. Miguel that: (1) their monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) their monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of their monthly payment would not remain "fixed" for the entire term of the loan.

Further, Defendants and Loan Consultant advised them that they were eligible for a Low Doc Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low documentation requirement to fraudulently inflate their income; and in doing so, Defendants and Loan Consultant caused them to be placed into a loan whose payments they could not afford given their true, un-inflated monthly income. Defendants and Loan Consultant altered Mr. and Mrs. Miguel's loan application without their knowing consent or authorization as Loan Consultant completed Mr. and Mrs. Miguel's application without giving Mr. and Mrs. Miguel an opportunity to review the loan application.

Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Miguel that they could afford their loan and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts; yet failed to

**APPENDIX A TO COMPLAINT**

disclose that the fully amortized monthly payment on the loan was $2,480.00. Given Mr. and Mrs. Miguel's true monthly income of $3,500.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 71%- grossly in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Mr. and Mrs. Miguel that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Miguel's lack of familiarity with how much debt a person can and should reasonably take on compared to their monthly income, and because Mr. and Mrs. Miguel reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Miguel should be shouldering was, Mr. and Mrs. Miguel reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

Although Defendants and Loan Consultant represented to Mr. and Mrs. Miguel that they were "qualified" for their loan and could afford their loan and its monthly payments, Defendants and Loan Consultant misled Mr. and Mrs. Miguel into believing that their monthly payments would always only be $2,480.00. Furthermore, at no point did Defendants or Loan Consultant clarify Mr. and Mrs. Miguel's false belief and advise them that $2,480.00 would not be their permanent payment under the loan, or that every time they made a monthly payment in the amount of $2,480.00, they were not paying down any of their principal balance.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around May 12, 2007, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Miguel's home, which was fraudulently inflated to an intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal, Mr. and Mrs. Miguel's home was worth $380,000.00 at the time they entered into their loan, and that such a valuation was a true and correct measure of their home's worth. The current fair market value of Mr. and Mrs. Miguel's home is approximately $306,000.00. Mr. and Mrs. Miguel allege that the

248

APPENDlX A TO COMPLAINT

appraisal was artificially inflated, and that they have suffered damages in the amount of $74,000.00 ($380,000.00-$306,000.00) due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Loan Consultant also represented to Mr. and Mrs. Miguel that they would be able to refinance their loan at a later time. Mr. and Mrs. Miguel relied on this assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Miguel have not been able to refinance their loan. Defendants and Loan Consultant also represented that it would modify Mr. and Mrs. Miguel's loan, and Mr. and Mrs. Miguel relied on this representation in deciding to enter into the loan. In addition, Mr. and Mrs. Miguel were advised by Defendants and Representative to stop making payments in order to be eligible for a modification. Mr. and Mrs. Miguel relied on Defendants' and Defendants' representative and authorized agent's advice and stopped making their monthly payments causing them to fall even further behind. Mr. and Mrs. Miguel were approved for a trial loan modification and ultimately received a permanent loan modification. However, payments made during trial loan modification period were placed into suspense accounts with unwarranted late charges and other fees in connection with defaults accruing. As a result, Mr. and Mrs. Miguel were still struggling in repaying their mortgage.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mr. and Mrs. Miguel could afford the loan; (4) they were "qualified" for their loan; (5) "qualified" meant that they could afford their loan; (6) Defendants would modify their loan in the future; and  (7) Defendants would refinance their loan in the future.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Mr. and Mrs. Miguel that: (1) Defendants and Loan Consultant knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not

249

APPENDIX A TO COMPLAINT

theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they were being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mr. and Mrs. Miguel's home to require them to borrow more money with the knowledge that the true value of Mr. and Mrs. Miguel's home was insufficient to justify the amount of Mr. and Mrs. Miguel's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Miguel would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Miguel's loan were concealed from them, and they decided to move forward with their loan. On June 7, 2007, Mr. and Mrs. Miguel signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mr. and Mrs. Miguel would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Miguel have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Miguel entered into the loan their home was worth $380,000.00, now their home is worth approximately $306,000.00. Mr. and Mrs. Miguel did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around May 23, 2013.

78.     Plaintiffs Teodoro B. Abuyo and Natividad D. Abuyo ("Mr. and Mrs. Abuyo") discussed refinancing an existing mortgage on their property located at 6762 Anton Lane, San Diego CA 92114 and A.P.N.: 582-341-46 with Valley Vista Mortgage on May 3, 2006. Mr. and Mrs. Abuyo were steered into an adjustable rate mortgage in the amount of $417,000.00 with an interest rate at 6.75% for a term of 30 years. Little did Mr. and Mrs. Abuyo know, however, payments made during the first 10 years of their loan were Interest-Only. Mr. and Mrs. Abuyo

250

**APPENDIX A TO COMPLAINT**

also were not advised that their interest rate was "fixed" for only 10 years, and could adjust every 12 months thereafter. On the note and deed of trust Valley Vista Mortgage is identified as the lender. The loan was assigned to OneWest Bank and Defendants herein ("Defendants") in April 2009. OneWest Bank is also currently servicing the loan.

Mr. and Mrs. Abuyo were represented at the time they entered into the loan that their monthly payment would always be $2,345.62. That was false. Mr. and Mrs. Abuyo were never informed that: (1) their monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) their monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of their monthly payment would not remain "fixed" for the entire term of the loan.

Mr. and Mrs. Abuyo were further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $3,056.89. Given Mr. and Mrs. Abuyo's true monthly income of $4,166.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 73%- grossly in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines.

In addition, on or around April 12, 2006 Mr. and Mrs. Abuyo's home were appraised and it was fraudulently inflated to an intentionally overstated value. Mr. and Mrs. Abuyo were represented that, per appraisal, Mr. and Mrs. Abuyo's home was worth $550,000.00 at the time they entered into their loan, and that such a valuation was a true and correct measure of their home's worth. The current fair market value of Mr. and Mrs. Abuyo's home is approximately $216,750.00. Mr. and Mrs. Abuyo allege that the appraisal was artificially inflated, and that they have suffered damages in the amount of $333,250.00 ($550,000.00-$216,750.0) due to a substantial loss of equity in their home as a result of the predatory loan Mr. and Mrs. Abuyo were given.

Mr. and Mrs. Abuyo entered into the mortgage contract in 2006 because they were led to believe that they could refinance or modify their loan in the future. When Mr. and Mrs. Abuyo

251

EXHIBIT A - PAGE 367

**APPENDIX A TO COMPLAINT**

were experiencing financial hardship, they contacted OneWest Bank, Defendants, for assistance in repaying their loan. However, Defendants' representative advised Mr. and Mrs. Abuyo to stop making payments in order to be eligible for a modification. Mr. and Mrs. Abuyo relied on Defendants' and Defendants' representative and authorized agent's advice and stopped making their monthly payments causing them to fall even further behind. Mr. and Mrs. Abuyo applied for a loan modification on 2 separate occasions. Although Mr. and Mrs. Abuyo were approved for a loan modification, their modified payments were nearly as much as the original payments. Since Mr. and Mrs. Abuyo were still struggling to make their monthly mortgage payments, they had to file for bankruptcy, which consequentially destroyed their credits and took away Mr. and Mrs. Abuyo's ability to purchase goods that are tied to credit rating.

On May 16, 2006, Mr. and Mrs. Abuyo signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mr. and Mrs. Abuyo would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Abuyo have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Abuyo entered into the loan their home was worth $550,000.00, now their home is worth approximately $216,750.00. Mr. and Mrs. Abuyo did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around June 6, 2013.

79. Plaintiffs Felipe Tlatenchi and Juana Tlatenchi ("Mr. and Mrs. Tlatenchi") discussed refinancing an existing mortgage on their home located at 985 Jeanette Lane, Nipomo, CA 93444 and A.P.N.:092-183-016 with a loan consultant (the "Loan Consultant"), and representative and authorized agent of Defendants herein (the "Defendants") in or around July 2006. In the course of their discussions ranging from July 2006 until September 2006, Defendants and Loan Consultant steered them into a loan of which the Defendants and Loan Consultant concealed and inaccurately, incompletely or otherwise improperly disclosed the material terms and information concerning the loan. This loan was originated by IndyMac Bank,

252

EXHIBIT A - PAGE 368

### APPENDIX A TO COMPLAINT

on the note and deed of trust Loan Correspondents Incorporation is identified as the lender, and IndyMac Mortgage Services, a division of OneWest Bank is currently servicing the loan.

Defendants and Loan Consultant explicitly represented to Mr. and Mrs. Tlatenchi that they could afford their loan; and further represented that they could shoulder the additional financial burden of repaying their loan in consideration of their other existing debts. Loan Consultant and Defendants further represented to Mr. and Mrs. Tlatenchi that they could rely on the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Tlatenchi's lack of familiarity with how much debt a person can and should reasonably take on compared to his/her monthly income, and because Mr. and Mrs. Tlatenchi reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs. Tlatenchi should be shouldering was, Mr. and Mrs. Tlatenchi reasonably believed Defendants' and Loan Consultant's representations that they could afford their loan and its payments.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. An appraisal company under the direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Tlatenchi home, which was fraudulently inflated to an intentionally overstated value. Mr. and Mrs. Tlatenchi allege that the appraisal was artificially inflated, and that they have suffered damages due to a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other acts described herein.

Loan Consultant and Defendants also represented to Mr. and Mrs. Tlatenchi that they would be able to refinance their loan at a later time. Mr. and Mrs. Tlatenchi relied on this assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Tlatenchi have not been able to refinance their loan. Loan Consultant and Defendants also represented that it would modify Mr. and Mrs. Tlatenchi's loan, and Mr. and Mrs. Tlatenchi relied on this representation in deciding to enter into the loan. In addition, Mr. and Mrs. Tlatenchi were advised by a representative and authorized agent of Defendants to stop making payments in order to be eligible for a modification. Mr. and Mrs. Tlatenchi relied on the Defendants' and the

253

**APPENDIX A TO COMPLAINT**

Defendants representative and authorized agents' advice and stopped making their monthly payments causing them to fall even further behind. However, Mr. and Mrs. Tlatenchi were unable to modify their loan.

Furthermore, Loan Consultant and Defendants represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mr. and Mrs. Tlatenchi could afford the loan; (4) They were "qualified" for their loan; (5) "qualified" meant that they could afford their loan; (6) They would be able to modify their loan in the future; and (7) They would be able to refinance their loan in the future.

Moreover, Loan Consultant and Defendants withheld or incompletely, inaccurately or otherwise improperly disclosed to Mr. and Mrs. Tlatenchi that: (1) Loan Consultant and Defendants knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Loan Consultant's and Defendants' "qualification" process was for Defendants' own protection and not theirs; (4) That Loan Consultant's and Defendants' representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mr. and Mrs. Tlatenchi's home to require them to borrow more money with the knowledge that the true value of Mr. and Mrs. Tlatenchi's home was insufficient to justify the amount of Mr. and Mrs. Tlatenchi's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Tlatenchi would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Tlatenchi's loan were concealed from them, and they decided to move forward with their loan. On September 25, 2006, Mr. and Mrs. Tlatenchi signed the loan and Deed of Trust, before

254

EXHIBIT A - PAGE 370

APPENDIX A TO COMPLAINT

a notary. Had they known the truth however, Mr. and Mrs. Tlatenchi would not have accepted the loan. As a result of the Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Tlatenchi have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs. Tlatenchi entered into the loan their home was worth substantially more than its current fair market value. Mr. and Mrs. Tlatenchi did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around June 20, 2013.

80.  Plaintiff Q.C Kelker ("Kelker") discussed refinancing an existing mortgage on her property located at 3104 S Budlong Avenue, Los Angeles, CA 90007 and APN 5040-024-009 with a Loan Consultant ("Loan Consultant"), a representative and authorized agent of Mortgageit, Inc., a correspondent of IndyMac and Defendants herein ("Defendants") and authorized by Defendants to lend on their behalf, in or around June 2006. In the course of their discussions ranging from June 2006 until August 2006, Defendants and Loan Consultant steered her into an adjustable rate mortgage in the amount of $400,000.00 with an interest rate at 1.25% for a term of 30 years. Little did Kelker know, however, her loan was a negatively amortized PayOption ARM. Kelker was not advised that the interest rate was never "fixed" but applied to only her first monthly payment and could adjust every month thereafter. The amount of Kelker's minimum monthly payment was "fixed" for 12 months and could adjust every 12 months thereafter. When the amount of the minimum monthly payment is insufficient to cover the amount of interest due, then the amount of that deficiency is added onto the unpaid principal balance of her loan. The recast point of this loan is 115% of the original loan amount. This loan has a prepayment penalty of 3 years. This loan was originated by IndyMac, on the note and deed of trust Mortgageit, Inc. is identified as the lender, and OneWest Bank is currently servicing the loan.

Defendants and Loan Consultant represented to Kelker that her monthly payment would always be $1,059.38. Although the amount of Kelker's minimum monthly payment was

255

EXHIBIT A - PAGE 371

## APPENDIX A TO COMPLAINT

$1,059.38, Defendants and Loan Consultant failed to clarify their partially true representations and advise Kelker: (1) how the interest rate on her loan was calculated; (2) that the minimum monthly payment of $1,059.38 would not always be available; (3) that the minimum monthly payment would not be the permanent payment under the loan despite Defendants' and Loan Consultant's affirmative representations to the contrary; (4) that by paying the initial minimum monthly payment she would be definitively deferring interest on her loan, increasing the principal balance of her loan every time she made the minimum monthly payment; (5) that by paying the minimum monthly payment the principal balance of her loan was certain to increase; or (6) her loan would be recast within a few years and she would be forced to pay considerably higher payments.

The disclosures in Kelker's loan documents discussing negative amortization, only frame negative amortization as a mere possibility rather than a certainty when making the minimum payment. However the reality was that by making the minimum payment, negative amortization was a certainty. Indeed, the payment schedule set forth in the Truth in Lending Disclosure Statement ("TILDS") which set forth what appeared to be the required payment schedule fails to disclose that making payments pursuant to the TILDS payment schedule will result in negative amortization. Kelker was not provided, before entering into the loans, with any other payment schedule or with any informed option to make payments different than those listed in the TILDS payment schedule. Had Defendants disclosed that by making the payment pursuant to the TILDS Kelker would be deferring interest, or had they disclosed the payment amounts sufficient to avoid negative amortization from occurring, Kelker would not have entered into the loans. Defendants intentionally omitted a clear disclosure of the nature of Kelker's loans because giving a clear explanation of how the loan worked would have punctured the illusion of a low-payment, low interest rate loan.

Further, Defendants and Loan Consultant advised her that she was eligible for a Low Doc Loan. Unbeknownst to her at the time, Defendants and Loan Consultant used this low documentation requirement to fraudulently inflate her income ; and in doing so, Defendants and Loan Consultant caused her to be placed into a loan whose payments she could not afford given

256

EXHIBIT A - PAGE 372

### APPENDIX A TO COMPLAINT

her true, un-inflated monthly income. Defendants and Loan Consultant altered Kelker's loan application without her knowing consent or authorization as Loan Consultant completed Kelker's application without giving Kelker an opportunity to review the loan application.

Defendants and Loan Consultant also explicitly represented to Kelker that she could afford her loan and further represented that she could shoulder the additional financial burden of repaying her loan in consideration of her other existing debts; yet failed to disclose that the fully amortized monthly payment on the loan was $2,909.22. Given Kelker's true monthly income of $1,895.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 153%- grossly in excess of industry standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan Consultant further represented to Kelker that she could rely on the assessment that she was "qualified" to mean that she could afford the loan. Because of Kelker's lack of familiarity with how much debt a person can and should reasonably take on compared to her monthly income, and because Kelker reasonably relied on Defendants' and Loan Consultant's expertise that any payment she was "qualified" for would take into account what the maximum debt a person such as Kelker should be shouldering was, Kelker reasonably believed Defendants' and Loan Consultant's representations that she could afford her loan and its payments.

Although Defendants and the Loan Consultant represented to Kelker that she was "qualified" for her loan and could afford her loan and its monthly payments, Defendants and the Loan Consultant misled Kelker into believing that her monthly payments would always only be $1,059.38. Furthermore, at no point did Defendants or Loan Consultant clarify Kelker's false belief and advise her that $1,059.38 would not be her permanent payment under the loan, or that every time she made a monthly payment in the amount of $1,059.38, which is less than interest only, she would be deferring interest on her loan, increasing the principal balance of her loan.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. On or around August 2, 2006, an appraisal company under the direct control and supervision of Defendants conducted an appraisal on Kelker's home, which was fraudulently inflated to an intentionally overstated value.

257

EXHIBIT A - PAGE 373

## APPENDIX A TO COMPLAINT

Defendants and Loan Consultant represented that, per appraisal, Kelker's home was worth $ at the time she entered into her loan, and that such a valuation was a true and correct measure of her home's worth. The current fair market value of Kelker's home is approximately $267,750.00. Kelker alleges that the appraisal was artificially inflated, and that she has suffered due to a substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other acts described herein.

Defendants and Loan Consultant also represented to Kelker that she would be able to refinance her loan at a later time. Kelker relied on this assurance in deciding to enter into the mortgage contract. However, Kelker has not been able to refinance her loan. Defendants and Loan Consultant also represented that it would modify Kelker's loan, and Kelker relied on this representation in deciding to enter into the loan. However, Defendants refused to permanently modify her loan.

Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Kelker could afford the loan; (4) she was "qualified" for her loan; (5) "qualified" meant that she could afford her loan; (6) Defendants would modify her loan in the future; and (7) she would be able to refinance her loan.

Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or otherwise improperly disclosed to Kelker that: (1) Defendants and Loan Consultant knew that she could not and would not be able to afford her loan and that there was a very high probability that she would default and/or be foreclosed upon; (2) Defendants had an incentive to sell her loan, and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection and not hers; (4) that Defendants' and Loan Consultant's representations that she was "qualified" to pay her loan was not intended to communicate that she could actually "afford" the loan which she was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value

258

EXHIBIT A - PAGE 374

APPENDIX A TO COMPLAINT

Kelker's home to require her to borrow more money with the knowledge that the true value of Kelker's home was insufficient to justify the amount of Kelker's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Kelker would lose substantial equity in her home.

Based on these misrepresentations and omissions, the material facts concerning Kelker's loan were concealed from her, and she decided to move forward with her loan. On August 21, 2006, Kelker signed the loan and Deed of Trust, before a notary. Had she known the truth however, Kelker would not have accepted the loan. As a result of Defendants' fraudulent acts described throughout this complaint Kelker has lost substantial equity in her home, has damaged or destroyed credit, and at the time Kelker entered into the loan her home was worth substantially higher than the current market value, and now her home is worth approximately $267,750.00. Kelker did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around August 14, 2013.

81.    Plaintiff Facundo Rosas ("Rosas") discussed obtaining a mortgage on his home located at 12242 Buaro Street, Garden Grove, CA 92840 and A.P.N.: 231-464-19 with a loan consultant (the "Loan Consultant"), and representative and authorized agent of Defendants herein (the "Defendants") in or around August 2006. In the course of their discussions ranging from August 2006 until October 2006, Defendants and Loan Consultant steered him into a loan, of which the Defendants and Loan Consultant concealed and inaccurately, incompletely or otherwise improperly disclosed the material terms and information concerning the loan to him. This loan was originated by IndyMac Bank, on the note and deed of trust Mortgageit, Inc. is identified as the lender, and IndyMac Mortgage Services was the servicer of the loan.

Defendants and Loan Consultant explicitly represented to Rosas that he could afford his loan; and further represented that he could shoulder the additional financial burden of repaying

259

EXHIBIT A - PAGE 375

APPENDIX A TO COMPLAINT

his loan in consideration of his other existing debts. Loan Consultant and Defendants further represented to Rosas that he could rely on the assessment that he was "qualified" to mean that he could afford the loan. Because of Rosas's lack of familiarity with how much debt a person can and should reasonably take on compared to his/her monthly income, and because Rosas reasonably relied on Defendants' and Loan Consultant's expertise that any payment he was "qualified" for would take into account what the maximum debt a person such as Rosas should be shouldering was, Rosas reasonably believed Defendants' and Loan Consultant's representations that he could afford his loan and its payments.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. An appraisal company under the direct control and supervision of Defendants conducted an appraisal on Rosas's home, which was fraudulently inflated to an intentionally overstated value. Rosas alleges that the appraisal was artificially inflated, and that he has suffered damages due to a substantial loss of equity in his home as a result of Defendants' fraudulent inflation and other acts described herein.

Loan Consultant and Defendants also represented to Rosas that he would be able to refinance his loan at a later time. Rosas relied on this assurance in deciding to enter into the mortgage contract. However, Rosas has not been able to refinance his loan. Loan Consultant and Defendants also represented that it would modify Rosas's loan, and Rosas relied on this representation in deciding to enter into the loan. In addition, Rosas was advised by a representative and authorized agent of Defendants to stop making payments in order to be eligible for a modification. Rosas relied on Defendants' and the Defendants representative and authorized agent's advice and stopped making his monthly payments causing him to fall even further behind. However, Rosas was unable to modify his loan.

Furthermore, Loan Consultant and Defendants represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Rosas could afford the loan; (4) He was "qualified" for his loan; (5) "qualified" meant that he could afford his loan; (6) He would be able to modify his loan in the

260

APPENDIX A TO COMPLAINT

future; and (7) He would be able to refinance his loan in the future.

Moreover, Loan Consultant and Defendants withheld or incompletely, inaccurately or otherwise improperly disclosed to Rosas that: (1) Loan Consultant and Defendants knew that he could not and would not be able to afford his loan and that there was a very high probability that he would default and/or be foreclosed upon; (2) Defendants had an incentive to sell his loan, and did sell his loan at fraudulently inflated prices; (3) Loan Consultant's and Defendants' "qualification" process was for Defendants' own protection and not his; (4) That Loan Consultant's and Defendants' representations that he was "qualified" to pay his loan was not intended to communicate that he could actually "afford" the loan which he was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Rosas 's home to require him to borrow more money with the knowledge that the true value of Rosas 's home was insufficient to justify the amount of Rosas 's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Rosas would lose substantial equity in his home.

Based on these misrepresentations and omissions, the material facts concerning Rosas 's loan were concealed from him, and he decided to move forward with his loan. On October 26, 2006, Rosas signed the loan and Deed of Trust, before a notary. Had he known the truth however, Rosas would not have accepted the loan. As a result of the Defendants' fraudulent acts described throughout this complaint Rosas has lost substantial equity in his home, has damaged or destroyed credit, and at the time Rosas entered into the loan his home was worth substantially more than its current fair market value. Rosas did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around August 5, 2013.

82.    Plaintiff Christina Resina ("Resina") discussed refinancing an existing mortgage

261

EXHIBIT A - PAGE 377

APPENDIX A TO COMPLAINT

on her home located at 688 Indian Oak Lane, Oak Park, CA 91377 and A.P.N.: 801-0-230-715 with a loan consultant (the "Loan Consultant"), and representative and authorized agent of Defendants herein (the "Defendants") in or around September 2005. In the course of their discussions ranging from September 2005 until November 2005, Defendants and Loan Consultant steered her into a loan, of which the Defendants and Loan Consultant concealed and inaccurately, incompletely or otherwise improperly disclosed the material terms and information concerning the loan to her. This loan was originated by IndyMac Bank, on the note and deed of trust Mortgageit, Inc. is identified as the lender, and IndyMac Mortgage Services is currently servicing the loan.

Defendants and Loan Consultant explicitly represented to Resina that she could afford her loan; and further represented that she could shoulder the additional financial burden of repaying her loan in consideration of her other existing debts. Loan Consultant and Defendants further represented to Resina that she could rely on the assessment that she was "qualified" to mean that she could afford the loan. Because of Resina's lack of familiarity with how much debt a person can and should reasonably take on compared to his/her monthly income, and because Resina reasonably relied on Defendants' and Loan Consultant's expertise that any payment she was "qualified" for would take into account what the maximum debt a person such as Resina should be shouldering was, Resina reasonably believed Defendants' and Loan Consultant's representations that she could afford her loan and its payments.

In addition, Defendants and Loan Consultant represented that appraisals conducted by or on behalf of Defendants were accurate and made in good faith. An appraisal company under the direct control and supervision of Defendants conducted an appraisal on Resina's home, which was fraudulently inflated to an intentionally overstated value. Resina alleges that the appraisal was artificially inflated, and that she has suffered damages due to a substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other acts described herein.

Loan Consultant and Defendants also represented to Resina that she would be able to refinance her loan at a later time. Resina relied on this assurance in deciding to enter into the mortgage contract. However, Resina has not been able to refinance her loan. Loan Consultant

262

EXHIBIT A - PAGE 378

APPENDIX A TO COMPLAINT

and Defendants also represented that it would modify Resina's loan, and Resina relied on this representation in deciding to enter into the loan. In addition, Resina was advised by a representative and authorized agent of Defendants to stop making payments in order to be eligible for a modification. Resina relied on Defendants' and the Defendants representative and authorized agent's advice and stopped making her monthly payments causing her to fall even further behind. However, Resina was unable to modify her loan.

Furthermore, Loan Consultant and Defendants represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Resina could afford the loan; (4) She was "qualified" for her loan; (5) "qualified" meant that she could afford her loan; (6) She would be able to modify her loan in the future; and (7) She would be able to refinance her loan in the future.

Moreover, Loan Consultant and Defendants withheld or incompletely, inaccurately or otherwise improperly disclosed to Resina that: (1) Loan Consultant and Defendants knew that she could not and would not be able to afford her loan and that there was a very high probability that she would default and/or be foreclosed upon; (2) Defendants had an incentive to sell her loan, and did sell her loan at fraudulently inflated prices; (3) Loan Consultant's and Defendants' "qualification" process was for Defendants' own protection and not hers; (4) That Loan Consultant's and Defendants' representations that she was "qualified" to pay her loan was not intended to communicate that she could actually "afford" the loan which she was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Resina's home to require her to borrow more money with the knowledge that the true value of Resina's home was insufficient to justify the amount of Resina's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Resina would lose substantial equity in her home.

Based on these misrepresentations and omissions, the material facts concerning Resina

263

EXHIBIT A - PAGE 379

**APPENDIX A TO COMPLAINT**

loan were concealed from her, and she decided to move forward with her loan. On November 7, 2005, Resina signed the loan and Deed of Trust, before a notary. Had she known the truth however, Resina would not have accepted the loan. As a result of the Defendants' fraudulent acts described throughout this complaint Resina has lost substantial equity in her home, has damaged or destroyed credit, and at the time Resina entered into the loan her home was worth substantially more than its current fair market value. Resina did not discover any of these misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law, and through a complete and thorough investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint, were brought to light on or around July 24, 2013.

EXHIBIT A - PAGE 380

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____Otis D. Wright II_____ and the assigned Magistrate Judge is _____Charles F. Eick_____ .

The case number on all documents filed with the Court should read as follows:

## 2:14-cv-01340-ODW(Ex)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

_____February 21, 2014_____
Date

By ⸱APEDRO_____
Deputy Clerk

---

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

**Subsequent documents must be filed at the following location:**

[x] Western Division
312 N. Spring Street, G-8
Los Angeles, CA 90012

[ ] Southern Division
411 West Fourth St., Ste 1053
Santa Ana, CA 92701

[ ] Eastern Division
3470 Twelfth Street, Room 134
Riverside, CA 92501

**Failure to file at the proper location will result in your documents being returned to you.**

---

CV-18 (08/13)                NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )
SEE EXHIBIT A

**DEFENDANTS** ( Check box if you are representing yourself ☐ )
SEE EXHIBIT B

**(b)** County of Residence of First Listed Plaintiff Ventura
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant Los Angeles
*(IN U.S. PLAINTIFF CASES ONLY)*

**(c)** Attorneys (*Firm Name, Address and Telephone Number*) If you are representing yourself, provide the same information.
Vito Torchia
BROOKSTONE LAW, PC
18831 Von Karman Ave., Suite 400
Irvine, CA 92612
Tel: (800) 946-8655     Fax: (866) 257-6172

Attorneys (*Firm Name, Address and Telephone Number*) If you are representing yourself, provide the same information.
Brian J. Recor / Andrea N. Winternitz
BRYAN CAVE LLP
120 Broadway, Suite 300, Santa Monica, CA 90401-2386
Tel: (310) 576-2100     Fax: (310) 576-2200

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES-**For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☐ 1. Original Proceeding

☒ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No     ☒ **MONEY DEMANDED IN COMPLAINT:** $ 13,409,752.00

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
15 U.S.C. § 1639e; 12 CFR § 323.5; and 15 U.S.C. § 1; Class Action Fairness Act ("CAFA") 28 U.S.C. Section 1332(d)

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☒ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | **Other:** | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 540 Mandamus/Other | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 550 Civil Rights | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 555 Prison Condition | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 560 Civil Detainee Conditions of Confinement | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE/PENALTY** | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | |
| ☐ 895 Freedom of Info. Act | ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | ☐ 690 Other | |
| ☐ 896 Arbitration | ☐ 196 Franchise | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | **LABOR** | |
| | **REAL PROPERTY** | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accomodations | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | | ☐ 445 American with Disabilities-Employment | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 446 American with Disabilities-Other | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 448 Education | ☐ 790 Other Labor Litigation | |
| | | | | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:** Case Number: CV14-01340

CV-71 (11/13)                    CIVIL COVER SHEET                    Page 1 of 3

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A: Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☒ Yes ☐ No | ☒ Los Angeles | Western |
| If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| Question B: Is the United States, or one of its agencies or employees, a party to this action? | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | **A PLAINTIFF?** Then check the box below for the county in which the majority of DEFENDANTS reside. | **A DEFENDANT?** Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| ☒ Yes ☐ No | ☐ Los Angeles | ☒ Los Angeles | Western |
| If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Ventura, Santa Barbara, or San Luis Obispo | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | ☐ Riverside or San Bernardino | Eastern |
| | ☐ Other | ☐ Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? (Make only one selection per row) | A. Los Angeles County | B. Ventura, Santa Barbara, or San Luis Obispo Counties | C. Orange County | D. Riverside or San Bernardino Counties | E. Outside the Central District of California | F. Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of defendants reside: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of claims arose: | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

**C.1. Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column C

☐ only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the
SOUTHERN DIVISION.
Enter "Southern" in response to Question D, below.

If none applies, answer question C2 to the right. ➡

**C.2. Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column D

☐ only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the
EASTERN DIVISION.
Enter "Eastern" in response to Question D, below.

If none applies, go to the box below. ⬇

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | Western Division |

American LegalNet, Inc.
www.FormsWorkFlow.com

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**IX(a). IDENTICAL CASES**: Has this action been previously filed **in this court** and dismissed, remanded or closed?    ☒ NO    ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES**: Have any cases been previously filed **in this court** that are related to the present case?    ☒ NO    ☐ YES

If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)    ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY
(OR SELF-REPRESENTED LITIGANT):** _____    DATE: February 21, 2014

Brian J. Recor

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

American LegalNet, Inc.
www.FormsWorkFlow.com

# EXHIBIT A

## EXHIBIT A

### Plaintiffs

1.    Lilian Yesenia Padron

2.    Richard West

3.    Nancy Armstrong West

4.    Ladislao Kalmar

5.    Izaskun Galarraga

6.    Jorge Espinoza

7.    Albina Espinoza

8.    Luis Perez

9.    Rogelio Hernandez

10.   Teresa Hernandez

11.   Audrey Vinitsky

12.   Edward Vinitsky

13.   Lonnie Wall

14.   Margaret Lanam

15.   Steven Anderson

16.   Lorrie Anderson

17.   Jill Ridgway-Ball

18.   Robert Whitmore

19.   Fiona Whitmore

20.   John Hicks

21.   Katherine Ward

1018555.1

22.    Dwayne Brewer

23.    Cleadith Brewer

24.    David Cerda Paz

25.    Rosa Cerda

26.    Daniel Russell

27.    Masatoshi Tauchi

28.    Manuel Martinez

29.    Lilia Martinez

30.    Daniel Gambler

31.    Alice Gambler

32.    Jennifer Carolan

33.    Jose Velasco

34.    Beatrice Velasco

35.    Melba Saunders

36.    Paul Saunders

37.    Maria Alcantar

38.    Miguel Vega

39.    Cynthia Vega

40.    Raghda Zayer

41.    Mike Manougian

42.    Sidney P. Jacobs

43.    Lynn B. Jacobs

44.    Donna Casty

1018555.1

45.     William Bartel

46.     Winifred Bartel

47.     Gary Milleman

48.     Rosalinda Milleman

49.     Elgitha Baldonado

50.     Zabi Subat

51.     Rosenda Chapman

52.     Genaro Larios

53.     Silvia Medina Rivera

54.     Alejandro Manzo

55.     Maria Manzo

56.     William Lowe

57.     Angel Andrade

58.     Felipa Andrade

59.     Leonida Papa

60.     Vincent Adamo

61.     Nazario Madrigal

62.     Millicent Dickinson

63.     Terry Sannita

64.     Raye Sannita

65.     Taryn Coss

66.     Scott Seelig

67.     Rocio Seelig

1018555.1

68.    Scott Jakovich

69.    Victoria Jakovich

70.    Eunice Akpan

71.    John Vigliotti

72.    Deanna Vigliotti

73.    Haydee Lopez

74.    Jesus Lopez

75.    Rolanda White

76.    Luis Lopez

77.    Oscar Sandoval

78.    Sonia Sandoval

79.    Hugo Carcamo

80.    Claudia Carcamo

81.    Elvira Baluyot

82.    Noel Baluot

83.    Edward Varenas

84.    Nelinia Varenas

85.    Gloria Charles

86.    Francisco Romo

87.    Felipe Muro

88.    Paola Muro

89.    Dennis Michael Chilcoat

90.    Carol Ann Chilcoat

1018555.1

91. Pearl Bowen

92. Manuel Calvillo

93. Heraclio Gonzalez

94. Maricela Gonzalez

95. Carletta McCray

96. Tommie McCray

97. Alan Bergum

98. Rocio Bergum

99. Ivory Rodriguez

100. Francisca Rodriguez

101. Diana Than

102. Enriqueta Polanco

103. Martin Lozano

104. Charles Navarro

105. Debra Navarro

106. Nhu Thuan Thi Nguyen

107. Josefina Martinez

108. Gilberto Murillo

109. Jannet Torres

110. Ivan Salazar

111. Porfirio Camacho

112. Donida Garzaro

113. Nelson Miguel

1018555.1

114. Malieta Miguel

115. Teodoro Abuyo

116. Natividad Abuyo

117. Juana Tlatenchi

118. Felipe Tlatenchi

119. Q.C Kelker

120. Facundo Rosas

121. Christina Resina

1018555.1

# EXHIBIT B

## EXHIBIT B

### Defendants

1.    OneWest Bank, FSB

2.    OneWest Bank Group LLC

3.    IMB HoldCo LLC

4.    IndyMac Bank

5.    IndyMac Bancorp. Inc.

6.    NDEX West, LLC

7.    Meridian Foreclosure Service f/k/a MTDS, Inc., dba Meridian Trust Deed Service

8.    Federal Deposit Insurance Corporation

9.    LandAmerica, Inc.

1018554.1